**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATIVELY** | § § § § | |
| *Plaintiff,* | § § | **Adv. Proc. No. 21-03067-sgj** |
| **v.** | § § | **Civil Action No. 22-020802-S** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY,** | § § § § § § | |
| *Defendants.* | § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF OBJECTION TO BANKRUPTCY
COURT'S REPORT AND RECOMMENDATION TO THE DISTRICT COURT
ON "RENEWED" MOTION" TO WITHDRAW THE REFERENCE
[BANKR. DOC. NO. 128]**

| Exhibit | Document | App. Pages |
|---------|----------|------------|
| A | Declaration of Mazin A. Sbaiti in Support of the Objection | APP_001 - 002 |
| 1 | Original Complaint<br><br>Case No. 21-00842-B [Dkt. No. 1] | APP_003 - 029 |
| 2 | Defendant Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference and Defendant Highland Capital Management, L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference<br><br>Case No. 21-00842-B [Dkt. Nos. 22 and 23] | APP_030 - 034<br><br>APP_035 - 071 |

1

| Exhibit | Document | App. Pages |
|---|---|---|
| 3 | Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint and Memorandum of Law in Support of Motion to Dismiss Complaint<br><br>Case No. 21-00842-B [Dkt. Nos. 26 and 27] | APP_072 - 111 |
| 4 | Plaintiffs' Response to Defendant Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference<br><br>Case No. 21-00842-B [Dkt. No. 36] | APP_112 - 138 |
| 5 | Debtor's Reply in Support of Debtor's Motion to Enforce the Order of Reference<br><br>Case No. 21-00842-B [Dkt. No. 42] | APP_139 - 151 |
| 6 | Order of Reference<br><br>Adv. Proc. No. 21-03067 [Dkt. No. 64] | APP_152 - 153 |
| 7 | Transcript Regarding Hearing Held November 23, 2021<br><br>Adv. Proc. No. 21-03067 [Dkt. No.146-1] | APP_154 - 258 |
| 8 | Memorandum Opinion and Order Granting Motion to Dismiss the Adversary Proceeding<br><br>Adv. Proc. No. 21-03067 [Dkt. No. 100] | APP_259 - 285 |
| 9 | Memorandum Opinion and Order<br><br>Case No. 22−cv−00695 [Dkt. No. 11] | APP_286 - 294 |
| 10 | Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint and Memorandum of Law in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint<br><br>Adv. Proc. No. 21-03067 [Dkt. Nos. 122 and 123] | APP_295 – 302<br><br>APP_303 - 333 |

| Exhibit | Document | App. Pages |
|---|---|---|
| 11 | Renewed Motion to Withdraw the Reference<br><br>Adv. Proc. No. 21-03067 [Dkt. No. 128] | APP_334 - 344 |
| 12 | Highland Capital Management, L.P.'s Response To "Renewed" Motion To Withdraw The Reference and Brief in Support of Highland Capital Management, L.P.'s Response to "Renewed" Motion to Withdraw the Reference<br><br>Adv. Proc. No. 21-03067 [Dkt. Nos. 138 and 139] | APP_345 - 348<br><br>APP_349 - 373 |
| 13 | Report and Recommendation to the District Court on "Renewed Motion to Withdraw the Reference" [Bankr. Doc. No. 128]<br><br>Adv. Proc. No. 21-03067 [Dkt. No. 158] | APP_374 - 391 |
| 14 | Transcript Regarding Hearing Held January 25, 2023<br><br>Adv. Proc. No. 21-03067 [Dkt. No. 155] | APP_392 - 504 |

**SBAITI & COMPANY PLLC**

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti
Texas Bar No. 24058096
Jonathan Bridges
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
    jeb@sbaitilaw.com

*Counsel for Plaintiffs*

and

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**

Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

***Special Purpose for Plaintiffs for Withdrawal of Reference Motion***

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATIVELY** | § § § § | |
| *Plaintiffs,* | § § | |
| **v.** | § § | **Adv. Proc. No. 21-03067-sgj** **Civil Action No. 22-020802-S** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY,** | § § § § § | |
| *Defendants.* | § | |

## DECLARATION OF MAZIN A. SBAITI

1.      My name is Mazin A. Sbaiti. I am over twenty-one years old and fully competent in all respects to make this Declaration.

2.      I am a partner at Sbaiti & Company PLLC, and am admitted in good standing in this Court. I represent Plaintiffs Charitable DAF Fund, L.P. and CLO Holdco, Ltd. in this matter. The facts stated in this Declaration are based on my personal knowledge and made under penalty of perjury.

3.      Exhibit 1 is a true and correct copy of the Original Complaint filed in Case No. 21-00842-B [Dkt.1], United States District Court for the Northern District of Texas, Dallas Division.

4.      Exhibit 2 is a true and correct copy of Defendant Highland Capital Management, L.P.s Motion for an Order to Enforce the Order of Reference and Defendant Highland Capital Management, L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference filed in Case No. 21-00842-B [Dkt. Nos. 22 and 23].

5.      Exhibit 3 is a true and correct copy of Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint and Memorandum of Law in Support of Motion to Dismiss Complaint filed in Case No. 21-00842-B [Dkt. Nos. 26 and 27].

6.      Exhibit 4 is a true and correct copy of Plaintiffs' Response to Defendant Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference filed in Case No. 21-00842-B [Dkt. No. 36].

1

**EXHIBIT**

**A**

exhibitsticker.com

7.     Exhibit 5 is a true and correct copy of Debtor's Reply in Support of Debtor's Motion to Enforce the Order of Reference filed in Case No. 21-00842-B [Dkt. No. 42].

8.     Exhibit 6 is a true and correct copy of the Order of reference filed in Adversary Proceeding No. 21-03067 [Dkt. No. 64], United States Bankruptcy Court for the Northern District of Texas.

9     Exhibit 7 is a true and correct copy of the transcript of motions hearing [Dkt. No. 78] held on November 23, 2021, filed in Adversary Proceeding No. 21-03067.

10.     Exhibit 8 is a true and correct copy of the Memorandum Opinion and Order Granting Motion to Dismiss the Adversary Proceeding [Dkt. No. 100] filed in Adversary Proceeding No. 21-03067.

11.     Exhibit 9 is a true and correct copy of memorandum Opinion and Order [Dkt. No. 11] filed in Case No. 22-cv-00695, United States District Court for the Northern District of Texas.

12.     Exhibit 10 is a true and correct copy of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint and Memorandum of Law in Support of Defendant highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint [Dkt. Nos. 122 and 123] filed in Adversary Proceeding No. 21-03067.

13.     Exhibit 11 is a true and correct copy of Renewed Motion to Withdraw the Reference [Dkt. No. 128] filed in Adversary Proceeding No. 21-03067.

14.     Exhibit 12 is a true and correct copy of Highland Capital Management, L.P.'s Response to "Renewed" Motion to Withdraw the Reference [Dkt. No. 138] filed in Adversary Proceeding No. 21-03067.

15.     Exhibit 13 is a true and correct copy of Report and Recommendation to the District Court on "Renewed Motion to Withdraw the Reference" [Bankr. Doc. No. 128] filed in Adversary Proceeding No. 21-03067 [Dkt. No. 158].

16.     Exhibit 14 is a true and correct copy of the transcript of motions hearing [Dkt. No. 155] held on January 25, 2023, filed in Adversary Proceeding No. 21-03067.

Executed on February 21, 2023.

/s/ Mazin A. Sbaiti
Mazin A. Sbaiti

2

**Exhibit 1**

Original Complaint

Case No. 21-00842-B [Dkt. No. 1]

APP_003

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P. | § | |
| and CLO HOLDCO, LTD., | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Cause No. _____ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P. , HIGHLAND HCF ADVISOR, LTD., | § | |
| and HIGHLAND CLO FUNDING, LTD., | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

## I.

## <u>INTRODUCTION</u>

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("<u>HCM</u>"), which is the general manager of Highland HCF Advisor, Ltd. ("<u>HCFA</u>"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "<u>Advisers Act</u>"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("<u>HCLOF</u>") (HCM and HCFA each a "<u>Defendant</u>," or together, "<u>Defendants</u>"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty,  a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126



1934054210506000000000000010

APP_004

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

APP_005

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

**1.** Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

**2.** Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

**3.** Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

**4.** Defendant Highland HCF Advisor, Ltd. is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

**5.** Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**6.** Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

APP_006

## III.

## JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

---

Original Complaint

Page 4

**APP_007**

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

**The Harbourvest Settlement with
Highland Capital Management in Bankruptcy**

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

APP_008

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054,  Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

APP_009

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

---

APP_010

**32.** An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

**33.** As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

**34.** HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

**35.** Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

**36.** At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

**37.** It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

**38.** On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

**39.** The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

APP_011

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.    Typically, the value of the securities reflected by a market price quote.

41.    However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.    There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.    Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.    Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.    It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.    For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

APP_012

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth— Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

APP_013

53. Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54. HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55. Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56. HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57. The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

APP_014

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

APP_015

65. This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66. The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67. The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68. HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69. This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70. It also violated HCM's own internal policies and procedures.

APP_016

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

APP_017

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

APP_018

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

APP_019

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.    Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.    What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.    Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.    For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.    HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.    Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

APP_020

## SECOND CAUSE OF ACTION
### *Breach of HCLOF Company Agreement*
### (By Holdco against HCLOF, HCM and HCFA)

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

APP_021

**100.** Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**101.** No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**102.** Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

**103.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**104.** Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**105.** Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**106.** Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**107.** It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

APP_022

**108.**     It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.**     It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.**     Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.**     Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.**     Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

**113.**     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.**     Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.**     HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

APP_023

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116. The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117. Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118. HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119. In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120. On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

APP_025

126.     In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.     Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.     In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.     Seery was at all relevant times operating as an agent of HCM.

130.     This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.     The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

APP_026

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.     Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.     Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
***Tortious Interference***
**(CLO Holdco against HCM)**

134.     Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.     At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.     At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.     Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.     HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

APP_027

139.    HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.    But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.    Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

142.    Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

143.    Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

a.   Actual damages;

b.   Disgorgement;

c.   Treble damages;

d.   Exemplary and punitive damages;

e.   Attorneys' fees and costs as allowed by common law, statute or contract;

f.   A constructive trust to avoid dissipation of assets;

g.   All such other relief to which Plaintiff is justly entitled.

APP_028

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Plaintiffs**

APP_029

**Exhibit 2**

Defendant Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference and Defendant Highland Capital Management, L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference

Case No. 21-00842-B [Dkt. Nos. 22 and 23]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD. | § § § |
| Plaintiff, | § § § Case No. 3:21-cv-00842-B § |
| vs. | § § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | § § § § |
| Defendants. | § § |

## DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR
## AN ORDER TO ENFORCE THE ORDER OF REFERENCE

Highland Capital Management, L.P., a defendant in the above-captioned case (the "Debtor"

or "Highland"), by and through its undersigned counsel, files this motion (the "Motion") seeking

entry of an order enforcing the *Order of Reference of Bankruptcy Cases and Proceedings Nunc*

DOCS_NY:43164.2 36027/002

APP_031

*Pro Tunc* (the "Order of Reference") and referring this case to the United States Bankruptcy Court

for the Northern District of Texas (the "Bankruptcy Court"). In support of its Motion, the Debtor

states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to section 1334(a) and (b) of

title 11 of the United States Code (the "Bankruptcy Code").

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3.      The predicates for the relief requested in the Motion are 28 U.S.C. § 157(a) and

Rule 9019 of the Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules).

## RELIEF REQUESTED

4.      The Debtor requests that this Court issue the proposed form of order attached as

**Exhibit A** (the "Proposed Order") pursuant to 28 U.S.C. § 157(a).

5.      For the reasons set forth more fully in *Defendant Highland Capital Management,*

*L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference*

(the "Memorandum of Law"), filed contemporaneously with this Motion, the Debtor requests that

the Court: (a) enforce the Order of Reference and refer this case to the Bankruptcy Court, and (b)

grant the Debtor such other and further relief as the Court deems just and proper under the

circumstances.

6.      In accordance with Rule 7.1 of the *Local Civil Rules of the United States District*

*Court for the Northern District of Texas* (the "Local Rules"), contemporaneously herewith and in

support of this Motion, the Debtor is filing: (a) its Memorandum of Law, and (b) the *Declaration*

*of Gregory V. Demo Submitted in Support of the Debtor's Motion for an Order to Enforce the*

*Order of Reference* (the "Demo Declaration") together with the exhibits annexed thereto.

7.    Based on the exhibits annexed to the Demo Declaration and the arguments contained in the Memorandum of Law, the Debtor is entitled to the relief requested herein as set forth in the Proposed Order.

8.    Notice of this Motion has been provided to all parties.  The Debtor submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Proposed Order substantially in the formed annexed hereto as **Exhibit A** granting the relief requested herein, and (ii) grant the Debtor such other and further relief as the Court may deem proper.

[*Remainder of Page Intentionally Blank*]

DOCS_NY:43164.2 36027/002

APP_033

Dated:  May 19, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          rfeinstein@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          jelkin@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

4

APP_034

Docket #0023  Date Filed: 5/19/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD. | § § § | |
| Plaintiff, | § § | Case No. 3:21-cv-00842-B |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | § § § § | |
| Defendants. | § § | |

**DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
<u>AN ORDER TO ENFORCE THE ORDER OF REFERENCE</u>**



1934054210519000000000015 APP_055

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ...............................................................................4

    A.    Plaintiffs' Ownership and Control ........................................................4
    B.    HarbourVest's Investment and Claims against the Debtor ..................5
    C.    The HarbourVest Settlement and Objections .....................................6
    D.    Plaintiffs Knew of the Transfer, and Plaintiff CLOH Objected to the
              Settlement ............................................................................................7
    E.    The Dondero Parties Exercised their Right to Take Discovery ..............8
    F.    The Bankruptcy Court Approves the Settlement ................................9
    G.    The DAF and CLOH Sue the Debtor and Others in This Court ............11
    H.    Counsel for the DAF and CLOH Willfully Ignore the Gatekeeper Orders ..........12

ARGUMENT ..................................................................................................15

    A.    Plaintiffs Violated Local Rule 3.3(a) By Failing to Disclose the
              Bankruptcy Case ...............................................................................15
    B.    The Complaint Should Be Automatically Referred to the Bankruptcy
              Court ..................................................................................................16
              i.    The Complaint Should Be Heard in the Bankruptcy Court. ....................16
              ii.    The Order of Reference is Mandatory. ...................................................17
              iii.    Any Disputes Over the Settlement or the Transfer Arise Under,
                       Arise In, and Relate to Title 11 and are Core Proceedings. ...................18
              iv.    Any Disputes Over the Gatekeeper Orders Arise Under, Arise In,
                       and Relate to Title 11 and Are Core Proceedings. .................................19
              v.    The Complaint Impacts Creditor Recoveries. .........................................20
              vi.    Mr. Seery Will Have Indemnification Claims Against the Estate. ............20
    C.    There is No Basis for a Mandatory Withdrawal of the Reference ........21
    D.    The Complaint Is Barred by the Doctrine of *Res Judicata* .................23
    E.    This Court Should Consider Mr. Dondero's Litigious Nature ...............24

CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

Angel v. Tauch
   (In re Chiron Equities, LLC),
   552 B.R. 674 (Bankr. S.D. Tex. 2016).................................................................................. 19

Beta Operating Co., LLC v. Aera Energy, LLC
   (In re Memorial Prod. Partners),
   2018 U.S. Dist. LEXIS 161159, at *9 (S.D. Tex. Sept. 20, 2018).......................................... 22

Burch v. Freedom Mortgage Corp.
   (In re Burch),
   385 Fed. Appx. 741 (5th Cir. 2021) ........................................................................ 17, 18, 25

Celotex Corp. v. Edwards,
   514 U.S. 300 (1995) ........................................................................................................ 17

Centrix Fin. Liq. Trust v. Sutton,
   2019 U.S. Dist. LEXIS 154083 (D. Colo. Sept. 10, 2019) ................................................. 20

Collins v. Sidharthan
   (In re KSRP, Ltd.),
   809 F.3d 263 (5th Cir. 2015)............................................................................................ 21

Comer v. Murphy Oil USA,
   718 F.3d 460 (5th Cir. 2013)............................................................................................ 23

Feld v. Zale Corp.
   (In re Zale Corp.),
   62 F.3d 746 (5th Cir. 1995).............................................................................................. 20

Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.,
   510 F. 2d 272 (5th Cir. 1975)........................................................................................... 23

Houston Baseball Partners, LLC v. Comcast Corp.
   (In re Houston Reg'l Sports Network),
   2014 Bankr. LEXIS 2274, at *15-25 (Bankr. S.D. Tex. May 22, 2013) ................................ 21

In re Galaz,
   841 F.3d 316 (5th Cir. 2016)............................................................................................ 19

In re G-I Holdings, Inc.,
   295 B.R. 211 (D. N.J. 2003) ............................................................................................ 22

DOCS_NY:43079.11 36027/002

APP_037

*In re Idearc, Inc.*,
   423 B.R. 138 (Bankr. N.D. Tex. 2009) ................................................................. 18

*In re Margaux City Lights Partners, Ltd.*,
   2014 Bankr. LEXIS 4841 at *6 (Bankr. N.D. Tex. Nov. 24, 2014) ....................... 18

*In re Margulies*,
   476 B.R. 393 (Bankr. S.D.N.Y. 2012) .................................................................. 24

*In re National Gypsum*,
   14 B.R. 188 (N.D. Tex. 1991) .............................................................................. 22

*In re Republic Supply Co. v. Shoaf*,
   815 F.2d 1046 (5th Cir. 1987) ............................................................................. 24

*Manila Indus., Inc. v. Ondova Ltd.*
   *(In re Ondova Ltd.)*,
   2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009) .......................... 22

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co.*
   *(In re Wolverine Radio Co.)*,
   930 F.2d 1132, 1143 (6th Cir. 1991) .................................................................. 24

*Miller v. Meinhard-Commercial Corp.*,
   462 F.2d 358 (5th Cir. 1972) ............................................................................... 24

*Refinery Holdings Co., L.P. v. TRMI Holdings, Inc.*
   *(In re El Paso Refinery, L.P.)*,
   302 F.3d 343 (5th Cir. 2002) ............................................................................... 21

*Rodriguez v. EMC Mortgage Corp.*
   *(In re Rodriguez)*,
   2001 U.S. App. LEXIS 30564, at *5 (5th Cir. Mar. 15, 2001) ............................. 19

*See Kuzmin v. Thermaflo, Inc.*,
   2:07-CV-00554-TJW, 2009 U.S. Dist. LEXIS 42810,
   at *4-7 (E.D. Tex. May 20, 2009) ........................................................................ 16

*Southern Pac. Transp. v. Voluntary Purchasing Groups*,
   252 B.R. 373 (E.D. Tex. 2000) ............................................................................ 22

*UPH Holdings, Inc. v. Sprint Nextel Corp.*,
   2013 U.S. Dist. LEXIS 189349, at *4 (W.D. Tex. Dec. 10, 2013) ....................... 22

*Uralkali Trading, S.A. v. Sylvite Southeast, LLC*,
   2012 U.S. Dist. LEXIS 40455, at *3 (M.D. Fla. Mar. 26, 2012) .......................... 17

DOCS_NY:43079.11 36027/002

APP_038

*Villegas v. Schmidt*,
   788 F.3d 156, 159 (5th Cir. 2015) ........................................................... 18

*Welch v. Regions Bank*,
   2014 U.S. Dist. LEXIS 96175, at *5 (M.D. Fla. July 15, 2014) ............................ 17

*Wood v. Wood*
   *(In re Wood)*,
   825 F.2d 90 (5th Cir. 1987) ................................................................ 17, 18

**Statutes**

11 U.S.C. § 1334 ................................................................................ 16

28 U.S.C. § 157 ............................................................................ passim

28 U.S.C. § 1927 ................................................................................ 25

**Rules**

Bankr. N.D.Tex. R. 3.3 ...................................................................... 15, 16

Bankr. N.D.Tex. R. 9014 ......................................................................... 8

DOCS_NY:43079.11 36027/002

APP_039

Highland Capital Management, L.P., a defendant in the above-captioned case (the "<u>Debtor</u>" or "<u>Highland</u>"), submits this memorandum of law (the "<u>Memorandum</u>") in support of the *Debtor's Motion for an Order to Enforce the Order of Reference* (the "<u>Motion</u>"). In support of its Motion, the Debtor states as follows:

<b><u>PRELIMINARY STATEMENT</u></b>[1]

1.      Highland is the debtor and debtor-in-possession in a bankruptcy case currently pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Bankruptcy Court</u>"), Case No. 19-34054-sgj11 (the "<u>Bankruptcy Case</u>"). The Bankruptcy Case has been pending since October 16, 2019, having been filed at the direction of James Dondero, who, on information and belief, is the person controlling and directing the actions of both The Charitable DAF Fund, L.P. (the "<u>DAF</u>") and CLO Holdco, Ltd. ("<u>CLOH</u>" and together with the DAF, "<u>Plaintiffs</u>") today. Both the DAF and CLOH have appeared and objected multiple times in the Bankruptcy Case.

2.      In one of those matters, the Bankruptcy Court approved a settlement between the Debtor and HarbourVest[2] (the "<u>Settlement</u>") pursuant to 11 U.S.C. §§ 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") over the objections of CLOH, a Plaintiff in this action, as well as other entities owned and/or controlled by Mr. Dondero. The Settlement is on appeal.[3]

---

[1] Concurrently herewith, the Debtor is filing the *Appendix in Support of the Debtor's Motion to Enforce the Reference* (the "<u>Appendix</u>"). Citations to the Appendix are notated as follows: Appx. #. The Complaint is Appx. 1.

[2] "<u>HarbourVest</u>" collectively refers to the following entities: HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

[3] The Settlement is being appealed by Mr. Dondero's two purported family investment trusts: The Dugaboy Investment Trust ("<u>Dugaboy</u>") and The Get Good Trust ("<u>Get Good</u>" and together with Dugaboy, the "<u>Trusts</u>"). The Trusts, like Plaintiffs, are controlled by Mr. Dondero. The appeal and this litigation are just one battle in Mr. Dondero's multifaceted litigation assault on the bankruptcy process.

DOCS_NY:43079.11 36027/002

3.       Plaintiffs filed their *Original Complaint* (the "Complaint")[4] in this Court seeking to have this Court undertake a *de facto* appeal or reconsideration of the Settlement and to assert monetary claims for actions undertaken in the Bankruptcy Case. However, the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (the "Order of Reference") (Appx. 2) in force in the Northern District of Texas required that this action be filed with the Bankruptcy Court presiding over the Bankruptcy Case. The Order of Reference was entered in 1984 and directs courts in this District to refer all proceedings arising under Title 11 and/or arising in or related to a case under Title 11 to the bankruptcy courts. A mandatory application of the Order of Reference prevents a race to the courthouse and inconsistent rulings by providing one forum to adjudicate *all* aspects of a bankruptcy case. Otherwise, debtors and creditors could blatantly forum shop and choose whether to file cases or claims in the bankruptcy court or the district court to evade what may be perceived as an unwelcoming court – which is precisely what has occurred in this case.[5] Here, the case for enforcing the Order of Reference is compelling. The Complaint addresses issues that not only arise in, arise under, and relate to Title 11 but which have already been adjudicated by the Bankruptcy Court. By this Motion, the Debtor requests that this Court enforce the Order of Reference and refer the Complaint to the Bankruptcy Court for adjudication

4.       The reason Plaintiffs filed the Complaint in this Court – rather than in the Bankruptcy Court – is obvious. Plaintiffs, under the direction of the Debtor's ousted founder, Mr.

---

[4] The Complaint contains a number of errors and material omissions, misstatements, misrepresentations, and mischaracterizations. The Debtor believes the Complaint is frivolous and should be dismissed on numerous grounds. The Debtor reserves all rights to contest the substance of the Complaint and intends to promptly inform Plaintiffs' counsel that the Debtor will seek sanctions if the Complaint is not withdrawn.

[5] Plaintiffs justify their conduct by contending that under the 1984 Amendments to the Bankruptcy Code, the Bankruptcy Court is a "unit" of this Court. Hence, in Plaintiffs' minds, the courts are indistinguishable and interchangeable and Plaintiffs can pick and choose where to file. That is not the law and would render the Order of Reference a nullity.

DOCS_NY:43079.11 36027/002

Dondero, have found little traction in the Bankruptcy Court for the serial, frivolous, and vexatious litigation positions they have taken in more than a dozen pending matters in the Bankruptcy Case and their attempts to interfere with the Debtor's business operations – actions that have cost the Debtor millions. Plaintiffs therefore determined their best course of action was to engage in blatant forum shopping with the goal of re-opening settled litigation and closed factual records in a court Plaintiffs hope will be more hospitable.[6] The Debtor will vigorously defend this action as (a) a flagrant attack on the Bankruptcy Court; (b) a frivolous attempt to avoid settled principals of bankruptcy jurisdiction through (less than) clever pleading; and (c) barred by *res judicata*. The Debtor have also sought to hold Plaintiffs and their counsel, among others, in civil contempt for attempting to add Mr. James P. Seery, Jr., the Debtor's independent, Bankruptcy Court-appointed CEO and CRO, as a defendant in this Case in clear violation of two final Bankruptcy Court orders.[7]

5.      The fact that the Complaint was not automatically referred to the Bankruptcy Court is attributable to a blatant omission by Plaintiffs in Section VIII of their Civil Cover Sheet (Appx. 3). Because this action is undoubtedly "related to" the Bankruptcy Case and the pending appeal of the Settlement, Plaintiffs' attorneys were required to disclose that a "related case" to the Complaint existed – as that term is used in the Local Civil Rules, effective September 1, 2020, of the Northern District of Texas (the "Local Rules"). Plaintiffs' failure to make such disclosure could not have

---

[6] The Complaint is not the first time that Plaintiffs have attempted to disenfranchise the Bankruptcy Court. On March 18, 2021, Mr. Dondero, Plaintiffs, and other entities owned and/or controlled by Mr. Dondero filed *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* [Docket No. 2060] (the "Recusal Motion") pursuant to which they sought to recuse the Honorable Stacey Jernigan from the Bankruptcy Case. The Recusal Motion was denied by the Bankruptcy Court and has been appealed [Docket No. 2149].

[7] On April 19, 2021, filed *Plaintiff's Motion for Leave to File First Amended Complaint in the District Court* (the "Seery Motion") in this Court seeking leave to add Mr. Seery as a defendant, and, in response, on April 23, 2021, the Debtor filed *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2247] (the "Contempt Motion"). The Bankruptcy Court ordered Plaintiffs, among others, to appear at an in person hearing on June 8, 2021, to show cause why they should not be held in contempt [Docket No. 2255] (the "Show Cause Order").

APP_042

been inadvertent. And Plaintiffs have also not been candid with the Bankruptcy Court. On May 14, 2021, Plaintiffs filed a response to the Show Cause Order inaccurately claiming they had made full disclosure to this Court.[8]

6.      The Bankruptcy Court is the appropriate tribunal to address the Complaint as it clearly "arises under, arises in or relates to the Debtor's Chapter 11 case and the Settlement. The Court should send Plaintiffs a strong message that (a) such gamesmanship is not acceptable; (b) the Order of Reference will be enforced; and (c) the Complaint will be immediately sent to the Bankruptcy Court where it belongs.

## FACTUAL BACKGROUND

### A.    Plaintiffs' Ownership and Control

7.      Plaintiffs are controlled and/or directed by Mr. Dondero, the Debtor's ousted founder.[9] CLOH is an entity wholly owned and controlled by the DAF. Until at least mid-January 2021, Grant Scott, Mr. Dondero's life-long friend and college roommate, was the sole director of the DAF and of CLOH (neither of which otherwise had any officers or employees).[10] As found by the Bankruptcy Court, Mr. Dondero has engaged in a coordinated litigation campaign against the Debtor both directly and through his related entities, including Plaintiffs, with the goal of

---

[8] *See Response of the Charitable DAF Fund, L.P., CLO Holdco, Ltd., and Sbaiti & Company PLLC to Show Cause Order* [Docket No. 2313], pg. 3 (the "Bankruptcy Response") (Appx. 28). In the Bankruptcy Response, Plaintiffs prognosticate about how this Court would rule: "… [the Debtor] seem[s] to have assumed that the Motion for Leave would be granted, and that the proposed amended complaint naming Seery would be referred to [the Bankruptcy] Court for a report and recommendation." Appx. 28 at p. 12. If that were the case, Plaintiffs should have just filed in the Bankruptcy Court or, at the very least, disclosed the Bankruptcy Case in the Civil Cover Sheet.

[9] Mr. Dondero also controls, and has appeared in the Bankruptcy Case, through, among others, his two family investment trusts: Dugaboy and Get Good.

[10] Mr. Scott previously testified during a sworn deposition in the Bankruptcy Case that he had little knowledge of the investment and other activities of the DAF and CLOH and was effectively taking direction from Mr. Dondero with respect to their activities. Appx. 27, 11:10-25; 12:1-25; 13:1-25; 14:1-25; 15:1-25; 16:1-17.

"burn[ing] down the [Debtor]."[11] A list of the litigation caused by Mr. Dondero in the Bankruptcy Case since September 2020 is Appx. 4.

**B.**   **HarbourVest's Investment and Claims against the Debtor**

8.     Prior to the commencement of the Bankruptcy Case, HarbourVest invested approximately $80 million (the "Investment") in HCLOF, a Guernsey-based limited company formed and managed by the Debtor and – prior to his ouster – Mr. Dondero. Immediately following the Investment, CLOH held 49.02% of HCLOF's interests, HarbourVest held 49.98%, and the remaining 1% was held by the Debtor and certain current and former Debtor employees. After the Settlement, in which HarbourVest transferred its interests to a wholly-owned subsidiary of the Debtor, the Debtor's interest in HCLOF was 50.18% and CLOH's interest remained 49.02%.

9.     HarbourVest filed Claims[12] in the Bankruptcy Case in excess of $300 million. The Claims alleged HarbourVest was fraudulently induced into the Investment based on the material factual misrepresentations and omissions of Mr. Dondero and certain of his employees, including that the Debtor: (a) did not disclose it never intended to pay an arbitration award obtained by a former portfolio manager, Joshua Terry,[13] (b) did not disclose that Mr. Dondero and the Debtor

---

[11] The Bankruptcy Court made substantial findings of facts regarding Mr. Dondero and his related entities' (including Plaintiffs') history of serial litigation in the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order"). The Confirmation Order is Appx. 5. *See* Appx. 5, ¶¶ 17-19, 77-78. The Confirmation Order approved the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as amended, the "Plan"), which included certain amendments. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Docket No. 1875]. The Plan is attached to the Confirmation Order.

[12] "Claims" collectively refers: HarbourVest 2017 Global Fund L.P. (Claim No. 143), HarbourVest 2017 Global AIF L.P. (Claim No. 147), HarbourVest Dover Street IX Investment L.P. (Claim No. 150), HV International VIII Secondary L.P. (Claim No. 153), HarbourVest Skew Base AIF L.P. (Claim No. 154), and HarbourVest Partners L.P. (Claim No, 149). The Claims are Appx. 6.

[13] This award was entered in favor of Mr. Terry against a Debtor subsidiary, Acis Capital Management, L.P. ("Acis"). Instead of satisfying the award, the Dondero-controlled Debtor caused Acis to transfer its assets in an effort to become judgment proof. Mr. Terry filed an involuntary bankruptcy petition against Acis and, after intense litigation and the appointment of a chapter 11 trustee, confirmed a chapter 11 plan, which transferred Acis to Mr. Terry. These actions resulted in Acis filing a claim of not less than $75 million (Claim No. 23) against the estate.

engaged in a series of fraudulent transfers for the purpose of preventing Mr. Terry from collecting on his arbitration award, (c) misrepresented why the investment manager for HCLOF was changed immediately prior to the Investment, (d) indicated the dispute with Mr. Terry would not impact investment activities, and (e) expressed confidence in HCLOF's ability to reset or redeem certain collateralized loan obligations ("CLOs"). The Claim also asserted causes of action under Racketeering Influenced Corrupt Organizations Act ("RICO") and breaches of fiduciary duty under Guernsey common law.

C.     **The HarbourVest Settlement and Objections**

10.     On December 23, 2020, the Debtor filed its *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625][14] (the "Settlement Motion"), pursuant to which the Debtor sought Bankruptcy Court approval of the Settlement with HarbourVest pursuant to 11 U.S.C. §§ 105(a) and 363 and Bankruptcy Rule 9019. Appx. 7. The Debtor concurrently filed the proposed *Settlement Agreement* and *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* (the "Transfer Agreement") [Docket No. 1631-1]. Appx. 8. The Settlement Agreement expressly provided that it was subject to Bankruptcy Court approval. Appx. 7, ¶ 3.

11.     Among the material terms of the Settlement was that HarbourVest would transfer its interest in Highland CLO Funding, Ltd. ("HCLOF") to the Debtor or its nominee (the "Transfer"). The Transfer was a necessary component of the Settlement. HarbourVest believed the misrepresentations entitled it to a rescission of its Investment, and HarbourVest wanted to extract itself from the Highland platform. The Settlement also provided HarbourVest with (a) an allowed, general unsecured claim in the amount of $45 million, (b) a subordinated, allowed, general

---

[14] Unless otherwise noted, all docket references refer to the docket maintained by the Bankruptcy Court.

unsecured claim in the amount of $35 million, and (c) other consideration more fully described in the Settlement Agreement. *See* Appx. 7, ¶ 32.

12.     The Settlement Motion fully disclosed all aspects of the Transfer, including (a) what HarbourVest was transferring; (b) the valuation (and method of valuation) of the asset being transferred to the Debtor; and (c) the method of the Transfer. (Appx. 7, ¶¶ 1(b) 32, 32 n.5; Appx. 8). Three objections were lodged against the proposed Settlement, all of which were filed by Mr. Dondero or entities controlled by him, including Plaintiff CLOH and Dondero's Trusts. Each of those objections was coordinated by Mr. Dondero.[15]

## D.     Plaintiffs Knew of the Transfer, and Plaintiff CLOH Objected to the Settlement

13.     On January 6, 2021, Mr. Dondero filed his *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (Appx. 9) contending, among other things, that the Settlement: (a) was not "reasonable or in the best interests of the estate" because the Debtor was ***grossly overpaying*** and (b) amounted to "a blatant attempt to purchase votes in support of the Debtor's plan." *Id.*, ¶ 1. Mr. Dondero did not directly challenge the Transfer but made clear that he knew exactly what was being transferred and the valuation being placed on it: "As part of the settlement, HarbourVest will [] transfer its entire interest in [HCLOF] to an entity to be designated by the Debtor. The Debtor states that the value of this interest is approximately $22 million as of December 1, 2020." *Id.*, ¶ 1, n.3.

14.     On January 8, 2021, Dondero's Trusts filed their *Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith.* [Docket No. 1706]. (Appx. 10) Like Mr. Dondero, the Trusts made clear that they knew of the proposed Transfer and its valuation. But,

---

[15] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Proc. 21-03190-sgj, Docket No. 46], Exhibit Q.

APP_046

unlike Mr. Dondero, the Trusts directly questioned (a) whether HarbourVest had the right to effectuate the Transfer, and (b) the valuation of the HCLOF interests – matters which are directly at issue in the Complaint.

15. Finally, and notably, on January 8, 2021, Plaintiff CLOH – presumably at the direction of its parent, the DAF – filed its *Objection to HarbourVest Settlement* [Docket No. 1707]. (Appx. 11) In its objection, CLOH challenged (as it does again in the Complaint) HarbourVest's right to implement the Transfer contending, among other things, that: (a) CLOH and the other members of HCLOF had a "Right of First Refusal" under the Members Agreement (*Id.*, ¶ 3) and (b) "HarbourVest has no authority to transfer its interest in HCLOF without first complying with the Right of First Refusal" (*Id.*, ¶ 6). In support of these contentions, CLOH offered a lengthy analysis of the Members Agreement, including CLOH's purported "Right of First Refusal" under Section 6.2 thereof. *Id.*, ¶¶ 9-22.

**E.** **The Dondero Parties Exercised their Right to Take Discovery**

16. By objecting to the Settlement Motion, Mr. Dondero, the Trusts, and CLOH (collectively, the "Dondero Objectors") initiated a "contested matter" under Bankruptcy Rule 9014[16] and, accordingly, had the unfettered right to conduct discovery under Bankruptcy Rule 9014(c).[17] Thus, for example, the Dondero Objectors had the right to request documents from, and take the depositions of, the Debtor, HarbourVest, HCLOF, and/or Highland HCF Fund Advisor,

---

[16] *See also* Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas 9014-1(a) ("a response is required with respect to a contested matter").

[17] The Debtor filed the Settlement Motion on December 23, 2020, and set the hearing on the motion for January 14, 2021 [Docket No. 1626]. The DAF and CLOH allege that the Debtor "set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal." Appx. 1, ¶ 30. This is a bald lie (one of many) and absurd. The undisputed facts are that (a) the Settlement Motion was filed on regular notice; (b) no one requested or moved for an extension of the hearing date; and (c) no one contended they had insufficient time to "scrutinize the underpinnings of the deal" (at least until the filing of the Complaint).

APP_047

Ltd. ("HCFA")[18] concerning the Settlement Motion, their objections thereto, and the Debtor's valuation of HarbourVest's interest in HCLOF and the method of valuation.

17. The Dondero Objectors – all sophisticated parties represented by sophisticated counsel – exercised their discovery rights.[19] In particular, Mr. Dondero and CLOH conducted a three and a half hour deposition of Michael Pugatch, a representative of the HarbourVest claimants [Docket No. 1705]. (Appx. 12) However, none of the Dondero Objectors, including Plaintiffs, exercised their right to take discovery from the Debtor, HCLOF, or HCFA in connection with the Settlement Motion, except for informal requests for documents which were provided.

18. Notably, despite the issue of the Transfer being "front and center," none of the Dondero Objectors, including Plaintiffs, ever asserted (as Plaintiffs do now) that: (a) the Debtor had a fiduciary duty to offer the HCLOF interests to CLOH, or (b) the Investment Advisers Act of 1940 (the "Advisers Act") was implicated in any way by the proposed Settlement, including the proposed Transfer. Further, although CLOH argued that the Members Agreement gave CLOH a right of first refusal, CLOH, in connection with the Settlement, never offered to buy the HCLOF interests or stated that it wanted to purchase those interests.

**F.    The Bankruptcy Court Approves the Settlement**

19. On January 13, 2021, the Debtor filed its *Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Omnibus

---

[18] HCLOF, HCFA (in its capacity as the portfolio manager of HCLOF), the Debtor's designee, HCMLP Investments, LLC (as transferee), and HarbourVest (as transferors) were parties to the proposed Transfer Agreement pursuant to which the Transfer would be effectuated. Appx. 7, Ex. A; Appx. 8.

[19] Plaintiffs not only failed to disclose that the Dondero Objectors took discovery, they allege the opposite ("No discovery had taken place between the parties, and plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (*or even during its pendency*) in order to investigate its rights."). Appx. 1, ¶ 29 (emphasis added).

9

Reply"). Appx. 13. The Omnibus Reply set forth an extensive rebuttal to CLOH's flawed argument that the Transfer could not be completed without HCLOF's other members being offered HarbourVest's interest in HCLOF, as allegedly required by the "Right of First Refusal" under Section 6.2. *Id.*, ¶¶ 26-39. Both HCLOF – which was independently represented – and HarbourVest agreed with the Debtor's conclusions that the Members Agreement did not require HarbourVest to offer its interests to CLOH or any other member of HCLOF. *Id.*, ¶ 37. At the January 14, 2021, hearing, CLOH ***voluntarily withdrew*** its objection after reading the Debtor's analysis of the Members Agreement:

> CLO Holdco has had an opportunity to review the reply briefing, and . . . [b]ased on our analysis of Guernsey law and some of the arguments of counsel on those pleadings and our review of the appropriate documents, I obtained authority from my client, Grant Scott, as trustee for CLO Holdco, ***to withdraw the CLO Holdco objection based on the interpretation of the member agreement***.

Appx. 14 at 7:20-8:6 (emphasis added). Following CLOH's withdrawal of its objection, the Trusts also abandoned their challenge to the Transfer. *Id.* at 22:5-20.

20.     The Debtor called two witnesses in support of the Settlement Motion, Mr. Seery and Mr. Pugatch. Counsel for Mr. Dondero and the Trusts cross-examined the Debtor's witnesses but did not inquire about the value of the HCLOF interests, the Debtor's fiduciary obligations, or the Transfer (except for a line of questioning concerning which entity would hold the HCLOF interests on behalf of the Debtor). *Id.*, at 87:18-89:21. At the conclusion of the hearing, the Court entered an order overruling the remaining objections and approving the Settlement [Docket No. 1788] (the "Settlement Order"). Appx. 15.

21.     The Settlement Order ***expressly*** authorized the transfer of HarbourVest's interest in HCLOF providing, in relevant part, that "[p]ursuant to the express terms of the [Members Agreement] . . . HarbourVest is authorized to transfer its interest in HCLOF . . . ***without the need to obtain the consent of any party or to offer such interests first to any other investor in***

DOCS_NY:43079.11 36027/002

APP_049

*HCLOF*." *Id.*, ¶ 6 (emphasis added). The Bankruptcy Court specifically included this language in the Settlement Order because of concerns that Mr. Dondero and his entities would "go to a different court somehow to challenge the transfer." Appx. 14 at 156:19-20.[20] The Settlement Order also clearly provided that "[t]he [Bankruptcy] Court shall retain *exclusive jurisdiction* to hear and determine all matters arising from the implementation of this Order." *Id.,* ¶ 7 (emphasis added).

22.     Only the Trusts appealed the Settlement Order [Docket Nos. 1870, 1889]. Appx. 16. Plaintiffs elected not to appeal. However, both the Trust and Plaintiffs are controlled by Mr. Dondero, and Mr. Dondero is thus both appealing the Settlement Order and seeking reconsideration of the Settlement Order in this Court.

**G.     The DAF and CLOH Sue the Debtor and Others in This Court**

23.     On April 12, 2021, after obtaining new counsel,[21] the DAF and CLOH filed the Complaint against the Debtor, HCFA, and HCLOF in this Court. The Complaint seeks to challenge the Transfer and Settlement approved by the Bankruptcy Court over Mr. Dondero's and Plaintiffs' objections and to re-open the Bankruptcy Court's factual record. To justify this blatant attempt to re-litigate the matter, the DAF and CLOH allege they recently learned that (a) the HCLOF interests were substantially more valuable than Mr. Seery testified, and (b) the Debtor had fiduciary and

---

[20] Appx. 14 at 156:10-25; 157:1-5 (emphasis added):

MR. MORRIS: . . . With respect to the order, I just want to make it clear that we are going to include a provision that specifically authorizes the Debtor to engage in -- to receive from HarbourVest the asset, you know, the HCLOF interest, and that that's consistent with its obligations under the agreement.

***The objection has been withdrawn, I think the evidence is what it is, and we want to make sure that nobody thinks that they're going to go to a different court somehow to challenge the transfer.*** So I just want to put the Court on notice and everybody on notice that we are going to put in a specific finding as to that.

THE COURT: All right. Fair . . . Fair enough. I do specifically approve that mechanism and find it is appropriate and supported by the underlying agreements.

And just so you know, I spent some time noodling this yesterday before I knew it was going to be settled, so I'm not just casually doing that. I think it's fine.

[21] Upon information and belief, Mr. Dondero effectively fired Mr. Scott and his counsel, John Kane of Kane Russell, after Mr. Scott withdrew CLOH's objection to the HarbourVest Settlement.

other duties requiring it to provide Plaintiffs with the opportunity to acquire HarbourVest's interest in HCLOF. *See, e.g.,* Appx. 1, ¶¶ 36, 49. Plaintiffs also assert claims for breach of fiduciary duty, breach of contract, negligence, violation of RICO, and tortious interference.

24.     In the Complaint, Plaintiffs recite certain facts relating to HarbourVest's Claims and the process by which the Debtor obtained Bankruptcy Court approval (*Id.*, ¶¶ 16-31) but disclose none of the undisputed facts set forth above. Plaintiffs also do not disclose that they – through their relationship to Mr. Dondero – had the same information concerning the value of the HarbourVest interests that Mr. Seery allegedly had. Finally, they do not even attempt to justify why they are seeking, in this Court, to re-litigate a Bankruptcy Court order.

**H.     Counsel for the DAF and CLOH Willfully Ignore the Gatekeeper Orders**

25.     Throughout the Complaint, Plaintiffs threatened to name Mr. Seery as a defendant,[22] and indeed, on April 19, 2021, just four days after filing the Complaint, Sbaiti & Co. ("Sbaiti"), the newly-retained counsel for the DAF and CLOH, advised the Debtor's counsel that they "intend to move for leave today in the district court seeking permission to amend our complaint to add claims against Mr. Seery. They are the same causes of action. We believe we are entitled to amend as a matter of course." Counsel asked whether they could "put your client down as unopposed?" Appx. 17. In response, the Debtor informed Sbaiti of the two "Gatekeeper Orders" (defined below), which prohibited this action, provided copies, and told them, among other things, that "[i]f you proceed to amend the complaint as you suggest [] without first obtaining Bankruptcy Court approval we reserve all rights to take appropriate action and seek appropriate relief from the

---

[22] By way of example only, Plaintiffs refer to Mr. Seery as a "potential party" and suggest that he had access to and wrongfully utilized "superior non-public information" and lied under oath about the value of the asset subject to the Transfer in his testimony to the Bankruptcy Court. Appx. 1, at Introduction, ¶¶ 6, 43-44.

APP_051

Bankruptcy Court." *Id.* Later that evening, Sbaiti confirmed their intention to seek leave from this Court to sue Mr. Seery and, on April 19, 2021, filed the Seery Motion. Appx. 18.

26.　　Both Gatekeeper Orders are plain, unambiguous, and final. On January 9, 2020, the Bankruptcy Court, **with Mr. Dondero's consent and agreement**, entered the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339] pursuant to 11 U.S.C. §§ 105 and 363 and Rule 9019 (the "January Order"). Appx. 19. Pursuant to the January Order, Mr. Dondero surrendered control of the Debtor and the Independent Board was appointed. To protect the Independent Board and its agents from frivolous litigation (primarily from Mr. Dondero and his related entities), the Debtor asked for, and the Bankruptcy Court included in the January Order (without objection), a "gatekeeper" provision stating in pertinent part:

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

*Id.*, ¶ 10. Mr. Seery is protected under the January Order as a member of the Independent Board and as the Debtor's CEO and CRO – an agent of the Independent Board. The January Order provided that the Bankruptcy Court "shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order. . . ."). *Id.,* ¶ 13.

27.　　Seven months later, the Debtor sought Bankruptcy Court approval to appoint Mr. Seery as the Debtor's CEO and CRO. After an evidentiary hearing, the Bankruptcy Court granted the motion (without objection) and entered its *Order Approving Debtor's Motion Under*

DOCS_NY:43079.11 36027/002

*Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* [Docket No. 854] pursuant to 11 U.S.C. §§ 105(a) and 363(b) (the "July Order" and with the January Order, the "Gatekeeper Orders"). Appx. 20. Like the January Order, the July Order included a "gatekeeper" provision:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

*Id.*, ¶ 5. The Bankruptcy Court "retain[ed] jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of [the July] Order." *Id.,* ¶ 8.

28. The Gatekeeper Orders are final orders, *res judicata*, and law of the case. *See* Appx. 5, ¶ 73 (finding that the Gatekeeper Orders "constitute[] law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987)").

29. The Gatekeeper Orders also featured heavily at the Plan confirmation hearing. CLOH initially objected to the Plan, which Mr. Dondero and his proxies, including CLOH, contested.[23] In the Confirmation Order, the Bankruptcy Court provided the rationale for, and purpose of, the "gatekeeper" provisions in the Gatekeeper Orders (Appx. 5, ¶¶ 12-14) and expressly found that a "gatekeeper" provision was needed in the Plan because "Mr. Dondero and his related entities will likely commence ligation . . . after the Effective Date and do so in jurisdictions other than the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more hospitable to his claims" (Appx. 5, ¶ 78). Despite this clear finding and

---

[23] Mr. Dondero and a number of his related entities are currently appealing the Confirmation Order.

order, Plaintiffs filed the Seery Motion to add Mr. Seery as a defendant and asked this Court to disregard the Gatekeeper Orders. Although this Court denied the Seery Motion, it stated "Plaintiffs may renew their motion after Defendants are served and have appeared" leaving open the possibility that Plaintiffs may still attempt to add Mr. Seery.[24] Appx. 21.

30.     In response, on April 23, 2021, the Debtor filed the Contempt Motion in the Bankruptcy Court for an order to show cause as to why Plaintiffs should not be held in contempt. Appx. 24. Plaintiffs then filed a motion in the Bankruptcy Court purporting to seek reconsideration of the July Order [Docket No. 2248] (the "Motion for Reconsideration").[25] Appx. 25. The Bankruptcy Court ordered Plaintiffs, among others, to appear at an in person hearing on June 8, 2021,[26] to show cause why they should not be held in contempt. Appx. 26.

31.     Finally, on May 14, 2021, Plaintiffs filed the Bankruptcy Response in which they argue that they followed the Gatekeeper Orders by filing the Complaint in this Court rather than the Bankruptcy Court because seeking to amend the Complaint to add Mr. Seery as a defendant was not "pursuing" a claim (as used in the Gatekeeper Orders). Appx. 28 at 13.

## ARGUMENT

### A.      Plaintiffs Violated Local Rule 3.3(a) By Failing to Disclose the Bankruptcy Case

32.     When Plaintiffs filed the Complaint, thereby initiating the action, their counsel was required to complete a Civil Cover Sheet, Section VIII of which required them to disclose whether there were any "related cases." Local Rule 3.3(a) requires that "[w]hen a plaintiff files a complaint and there is a related case . . . the complaint must be accompanied by a notice of related case." A

---

[24] If Mr. Seery incurs any costs defending or preparing to defend against Plaintiffs' action, Mr. Seery will be entitled to indemnification directly from the Debtor under the Debtor's limited partnership agreement (Appx. 22, § 4.1(h)) and indirectly through the Strand's indemnification obligations and the Debtor's guarantee of such obligations (Appx. 23).

[25] The Contempt Motion and the Motion for Reconsideration were re-docketed on April 27, 2021, without any changes.

[26] The hearing on the Show Cause Order will be the first in person hearing since March 2020.

DOCS_NY:43079.11 36027/002

"related case" is defined in pertinent part as a proceeding that "arises from a common nucleus of operative fact with the case being filed or removed, regardless whether the related case is a pending case. . . ." Local Rule 3.3(b)(3). As discussed above, although the Complaint asserts claims based on the same facts as the HarbourVest Settlement approved over Plaintiffs' objection by the Bankruptcy Court, the Civil Cover Sheet makes no mention of the Bankruptcy Case as a "related case." It merely describes the nature of the Complaint as one arising under RICO. Yet the Bankruptcy Case is indisputably related to this one.[27] Plaintiffs' failure to disclose the existence of a related case violates the Local Rules. *See Kuzmin v. Thermaflo, Inc.*, 2:07-CV-00554-TJW, 2009 U.S. Dist. LEXIS 42810, at \*4-7 (E.D. Tex. May 20, 2009) (finding party violated court's local rules where they failed to indicate on civil cover sheet that case was "related to" other cases).

**B.**     **The Complaint Should Be Automatically Referred to the Bankruptcy Court**

    **i.**     **The Complaint Should Be Heard in the Bankruptcy Court.**

33.     Jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11" is conferred on district courts. 11 U.S.C. §§ 1334(a), (b). District courts, in turn, may refer proceedings to the bankruptcy courts. 28 U.S.C. § 157(a) ("Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."). On August 3, 1984, this Court entered the Order of Reference, which provides, in pertinent part: "*any or all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11 . . . be and they hereby are referred to the*

---

[27] Under 28 U.S.C. § 1334(a), this Court has original and exclusive jurisdiction over the Bankruptcy Case. Pursuant to 28 U.S.C. § 157 and the Order of Reference, this Court has referred matters in the Bankruptcy Case to the Bankruptcy Court. It is thus clear that the Bankruptcy case is pending in this District pursuant to this Court's jurisdiction, and as noted above the matters alleged in the Complaint related directly to litigated proceedings involving Plaintiffs and the Debtor in the Bankruptcy Case. These facts require appropriate disclosure in the Civil Cover Sheet.

*Bankruptcy Judges of this district for consideration and resolution consistent with law*." Appx. 2 (emphasis added). The Order of Reference therefore refers the following proceedings:

- **Proceedings "arising under Title 11":** A proceeding "arises under" Title 11 if it is a "cause of action created or determined by a statutory provision of title 11." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987).

- **Proceedings "arising in. . . a case under Title 11":** A proceeding "arises in" Title 11 if it deals with "administrative matters that arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 96 (emphasis in original).[28]

- **Proceedings "related to a case under Title 11":** A proceeding "relates to" a case under Title 11 if "the outcome of [the non-bankruptcy] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 Fed. Appx. 741, 748 (5th Cir. 2021) (internal citations omitted); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) ("Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal. . . with all matters connected with the bankruptcy estate"). A proceeding "relates to" a proceeding under Title 11 even if it arises from postpetition conduct if "it affects the estate, not just the debtor." *Wood*, 825 F.2d at 94.

### ii. The Order of Reference is Mandatory.

34.     Under the plain language of the Order of Reference, "all proceedings under Title 11 or arising or related to a case under Title 11" are ***automatically*** referred to the bankruptcy courts, and the Debtor respectfully submits that the Order of Reference is mandatory. *See Uralkali Trading, S.A. v. Sylvite Southeast, LLC*, 2012 U.S. Dist. LEXIS 40455, at *3 (M.D. Fla. Mar. 26, 2012) (finding that a substantially similar order of reference in the Middle District of Florida "mandate[d]" referral to the appropriate bankruptcy court); *Welch v. Regions Bank*, 2014 U.S. Dist. LEXIS 96175, at *5 (M.D. Fla. July 15, 2014) ("[T]his Court has declared the enforcement of the Standing Order of Reference mandatory"). The fact that 11 U.S.C. §§ 1334 confers original jurisdiction on the district court does not change this requirement as district courts and bankruptcy

---

[28] Proceedings arising under and arising in Title 11 are "core proceedings" under 28 U.S.C. § 157(b). *Wood*, 825 F.2d at 96 ("[T]he phrases 'arising under' and 'arising in' are helpful indicators of the meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding. . . If the proceeding is one that would arise only in bankruptcy. It is also a core proceeding. . . .").

courts are distinct. *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) ("Additionally, every other circuit to address the issue has maintained the distinction between the bankruptcy court and the district court, holding that 'a debtor must obtain leave of the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity'") (citations omitted).

### iii. Any Disputes Over the Settlement or the Transfer Arise Under, Arise In, and Relate to Title 11 and are Core Proceedings.

35.     It is black letter law that the determination of whether to approve a settlement of a claim is a "core proceeding" and arises in and under Title 11. The statutory predicates for relief are 11 U.S.C. §§ 105 and 363 and under Rule 9019, which are "created by the federal bankruptcy law" and "arise only in bankruptcy." *Wood*, 825 F.2d at 96; *see also, e.g., In re Idearc, Inc.,* 423 B.R. 138, 177 (Bankr. N.D. Tex. 2009) (finding approval of a settlement under Bankruptcy Rule 9019 was a "core proceeding" under 28 U.S.C. § 157(b)); *In re Margaux City Lights Partners, Ltd.*, 2014 Bankr. LEXIS 4841 at *6 (Bankr. N.D. Tex. Nov. 24, 2014) (same); Settlement Order, ¶ 2 (same). The HarbourVest Settlement also involved the allowance of HarbourVest's Claims – a black letter core proceeding under 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include, but are not limited to – (B) allowance of disallowance of claims against the estate. . . .").

36.     Since the Complaint seeks to re-litigate the HarbourVest Settlement and to re-open the Bankruptcy Court's factual record, it is seeking a ruling from this Court as to the merits of the HarbourVest Settlement and/or to litigate matters that arose from the same operative facts as the HarbourVest Settlement – in each case, a core proceeding arising in and under Title 11. If the Settlement Order or the Transfer is to be re-assessed it must be by the Bankruptcy Court under the Bankruptcy Code and Bankruptcy Rules. This Court should enforce the Order of Reference and refer the Complaint to the Bankruptcy Court. *See Burch*, 835 Fed. Appx. at 748 ("Each of Burch's

APP_057

state-court claims is premised on his interpretation of a Chapter 11 bankruptcy order, and so each arises from or is related to his Title 11 bankruptcy proceedings.").

37.     Further, the Bankruptcy Court specifically retained jurisdiction in the Settlement Order to adjudicate all disputes arising from the implementation of the Settlement Order, including the Transfer of the HCLOF interests, and therefore retained jurisdiction to hear the Complaint. *Id.* ¶7. Even if jurisdiction had not been explicitly retained, the Bankruptcy Court, like all federal courts, has jurisdiction to interpret and enforce its own orders. *Rodriguez v. EMC Mortgage Corp. (In re Rodriguez)*, 2001 U.S. App. LEXIS 30564, at *5 (5th Cir. Mar. 15, 2001); *In re Galaz*, 841 F.3d 316, 322 (5th Cir. 2016); *Angel v. Tauch (In re Chiron Equities, LLC)*, 552 B.R. 674, 684 (Bankr. S.D. Tex. 2016). The Complaint, which seeks to challenge the Transfer and re-litigate the Settlement Order, is therefore itself a core proceeding arising in and under Title 11 and should be heard in the Bankruptcy Court.

### iv.     Any Disputes Over the Gatekeeper Orders Arise Under, Arise In, and Relate to Title 11 and Are Core Proceedings.

38.     The Seery Motion was denied, and Mr. Seery has not been added as a defendant in this Case. Plaintiffs have also filed the Motion for Reconsideration in the Bankruptcy Court. However, to the extent Plaintiffs seek to add Mr. Seery as a defendant in this Case, any such proceedings must be referred to the Bankruptcy Court for the reasons forth in Section B(iii) *supra*. Like the Settlement Order, the January Order is the result of a settlement with the Committee approved under 11 U.S.C. §§ 105 and 363 and Bankruptcy Rule 9019. The "gatekeeper" provision in the January Order was also a required component of that settlement and the settlement would not have been approved without it. *See* Appx. 5, ¶ 12-14. Similarly, the July Order was the result of a motion seeking authority to appoint Mr. Seery as CEO and CRO under 11 U.S.C. §§ 105(a) and 363(b), an administrative action that only exists in Title 11 and thus "arises in" and "arises

APP_058

under" Title 11. Like the January Order, the "gatekeeper" provision in the July Order was a required component of Mr. Seery's appointment. *Id.* Any attempt to add Mr. Seery as a defendant would be re-litigating a core proceeding arising under, arising in, and related to Title 11.

### v. The Complaint Impacts Creditor Recoveries.

39. The Debtor's Plan provides for the orderly monetization of the Debtor's assets and the distribution of the proceeds to creditors. Because the Plan is an asset monetization plan, distributions depend on two things: (a) the total amount of allowed claims against the estate and (b) the cash available to pay those claims. Consequently, the Complaint will have a material and immediate impact on the Debtor's estate. *First*, any judgment secured by Plaintiffs against the Debtor will decrease the cash available to pay the Debtor's prepetition creditors (which cash is property of the estate under 11 U.S.C. § 541). *Second*, any delay in determining the amount owed to HarbourVest or the amount owed by the Debtor to Plaintiffs will delay payments to creditors under the Plan as the Debtor will need to reserve against such claims. This impact on creditors and the Debtor's ability to satisfy its obligations under the Plan clearly impacts the Debtor's estate and should be adjudicated by the Bankruptcy Court. *Zale*, 62 F.3d at 753 ("Those cases in which courts have upheld 'related to' jurisdiction over third-party actions do so because the subject of the third party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate."); *see generally Centrix Fin. Liq. Trust v. Sutton*, 2019 U.S. Dist. LEXIS 154083 (D. Colo. Sept. 10, 2019) (finding that in a liquidating plan, the bankruptcy court has "related to" jurisdiction over all matters that impact distributions from the liquidating trust).

### vi. Mr. Seery Will Have Indemnification Claims Against the Estate.

40. This Court denied the Seery Motion without prejudice, but if Mr. Seery is ever added as a defendant or is compelled to retain personal counsel because of the completely unfounded and false allegations in the Complaint, Mr. Seery will have the right to indemnification

20

APP_059

from the estate. *See* ¶ n.24 *supra*. The cost of this indemnification will immediately decrease the amount available to creditors and will delay distributions. Again, this clearly "relates to" to the Debtor's bankruptcy. *See, e.g., Collins v. Sidharthan (In re KSRP, Ltd.)*, 809 F.3d 263, 266-67 (5th Cir. 2015) (finding that bankruptcy court had jurisdiction because of potential indemnification claims even though bankruptcy court ultimately determined the indemnification claims were invalid); *Refinery Holdings Co., L.P. v. TRMI Holdings, Inc. (In re El Paso Refinery, L.P.)*, 302 F.3d 343, 349 (5th Cir. 2002) (finding "related to" jurisdiction when "RHC's claim against Texaco could conceivably have an effect on the Estate in light of the chain of indemnification provisions beginning with Texaco and leading directly to the Debtor."); *Houston Baseball Partners, LLC v. Comcast Corp. (In re Houston Reg'l Sports Network)*, 2014 Bankr. LEXIS 2274, at *15-25 (Bankr. S.D. Tex. May 22, 2013).

## C.     There is No Basis for a Mandatory Withdrawal of the Reference

41.     In the Seery Motion, Plaintiffs cite 28 U.S.C. § 157(d) for the proposition that bankruptcy courts are "prohibit[ed] . . . absent the parties consent, from presiding over cases or proceedings that require consideration of both Title 11 and other federal law regulation organizations or activities affecting interstate commerce." Appx. 18, at 7. Plaintiffs argue that, because they pled causes of action arising under the Advisers Act and RICO, this Court will have to withdraw the reference. Plaintiffs make the same argument in the Bankruptcy Response: "Respondents expected that the motion for leave [to amend] would likely be referred to [the Bankruptcy] Court for a report and recommendation. And Respondents planned, if necessary, to move to withdraw the reference. . . ." Appx. 28 at 12.

42.     Even assuming Plaintiffs' federal law claims are not frivolous (and they are), Plaintiffs misinterpret 28 U.S.C. § 157(d)' s applicability to this case. 28 U.S.C. § 157(d) provides for mandatory withdrawal of the reference in certain instances: "The district court shall, on timely

motion of a party, so withdraw the proceeding if . . . resolution of the proceeding *requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce*." 28 U.S.C. § 157(d) (emphasis added). However, in interpreting Section 157(d), courts in this Circuit apply the majority view and require withdrawal of the reference only:

> [W]hen "substantial and material consideration" of a federal statute other than the Bankruptcy Code is necessary to the resolution of a case or proceeding. Withdrawal is not mandatory in cases that require only the "straightforward application of a federal statute to a particular set of facts." Rather, withdrawal is in order only when litigants raise "issues requiring significant interpretation of federal laws that Congress would have intended to [be] decided by a district judge rather than a bankruptcy judge."

*Southern Pac. Transp. v. Voluntary Purchasing Groups*, 252 B.R. 373, 382 (E.D. Tex. 2000) (quoting *In re National Gypsum*, 14 B.R. 188, 192-93 (N.D. Tex. 1991). As such, even the presence of a substantial federal question is not a basis for mandatory withdrawal; mandatory withdrawal is only proper when a bankruptcy court would have to interpret and apply federal law on a novel and unsettled question. *See Beta Operating Co., LLC v. Aera Energy, LLC (In re Memorial Prod. Partners)*, 2018 U.S. Dist. LEXIS 161159, at *9 (S.D. Tex. Sept. 20, 2018); *UPH Holdings, Inc. v. Sprint Nextel Corp.*, 2013 U.S. Dist. LEXIS 189349, at *4 (W.D. Tex. Dec. 10, 2013) (holding no mandatory withdrawal when, among other reasons, "the Bankruptcy Court will be tasked with 'no more than application of federal communications law to a given set of facts.") (citations omitted). Finally, "mandatory withdrawal is to be applied narrowly to ensure bankruptcy cases are litigated in the bankruptcy courts and to prevent 157(d) from becoming an 'escape hatch' from litigating cases under the Bankruptcy Code." *See, e.g., Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009) (quoting *In re G-I Holdings, Inc.*, 295 B.R. 211, 221 (D. N.J. 2003)).

43.     None of the putative federal causes of action raised by Plaintiffs require "substantial and material consideration" of a federal statute or more than the cursory application of settled federal law. In fact, most can be summarily dismissed as they either grossly misinterpret settled law, based on materially misstated facts, or assert causes of action that belong to other parties.

## D.     The Complaint Is Barred by the Doctrine of *Res Judicata*

44.     The doctrine of *res judicata* protects the finality of judgements by preventing litigants from re-litigating the same issues over and over again. "[R]es judicata has four elements: (1) the parties are identical or in privity; (2) the judgment. . . was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Comer v. Murphy Oil USA*, 718 F.3d 460, 467 (5th Cir. 2013). Each of those elements is satisfied here, and the Complaint is barred by *res judicata*. Plaintiffs had their opportunity to challenge these orders; they do not get a second bite at the apple or to re-litigate these issues in a different forum.

45.     As set forth above, the parties are identical. Plaintiffs had the right to object to the HarbourVest Settlement and the Transfer of the HarbourVest interests, and Plaintiffs (a) actually objected to the Settlement Motion arguing that they had a "Right of First Refusal" under the Members Agreement; (b) had the right to take discovery on all issues, including the value of the HarbourVest interests; (c) could have objected based on the Advisers Act or RICO; (d) deposed HarbourVest's 30(b)(6) witness; and (e) **withdrew their objection once they realized that they did not have a "Right of First Refusal."** The Bankruptcy Court also indisputably had jurisdiction over the matter. Although the Settlement Order is being appealed by the Trusts, it is a final judgment for purposes of *res judicata*. *See Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.*, 510 F. 2d 272, 273 (5th Cir. 1975) ("A case pending appeal is res judicata and entitled to full faith and credit unless and until reversed on appeal."). Finally, as set forth above, the same claims or causes

23

APP_062

of action are involved. The Complaint is a blatant collateral attack on the Settlement Order. *See Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) (finding that regardless of relief sought, it is a collateral attack if it must in some fashion overrule a previous judgment).

46. Similarly, the January Order was entered in January 2020 with Mr. Dondero's consent and with the knowledge of Plaintiffs.[29] It was never appealed and is final. The July Order was entered in July 2020 without objection and with the knowledge of Plaintiffs. It was (a) never appealed; (b) is final;[30] and (c) the Bankruptcy Court was a court of competent jurisdiction.[31] *See In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1052-53 (5th Cir. 1987) (finding a court has jurisdiction for purposes of res judicata when no party contests subject matter jurisdiction in the original proceeding). Consequently, any attempt to add Mr. Seery to the Complaint and subsequent challenges to the Gatekeeper Orders would involve the same issues addressed by the Bankruptcy Court and must be dismissed on the basis of *res judicata*.

**E.    This Court Should Consider Mr. Dondero's Litigious Nature**

47. This Court should also consider the history of this case when determining whether to enforce the reference, including Mr. Dondero's history of vexatious litigation (brought directly and indirectly) and the Bankruptcy Court's familiarity with the Bankruptcy Case and the interrelatedness of Mr. Dondero's byzantine web of related companies. Appx. 5, ¶ 77-78. In fact, the Fifth Circuit recently addressed a similar issue in *Burch v. Freedom Mortgage. Corp. (In re*

---

[29] On December 4, 2019, CLOH filed a *Notice of Appearance and Request for Copies* [Docket No. 152] in the Bankruptcy Case by and through its counsel Kane Russell Coleman Logan PC. Since then, CLOH has received notice as required by the Bankruptcy Code of all pleadings filed in the Bankruptcy Case.

[30] The Bankruptcy Court specifically found that the Gatekeeper Orders were *res judicata* in the Confirmation Order. *See* Appx. 5, ¶ 73; ¶ 28 *supra*.

[31] [31] Plaintiffs have questioned whether the Bankruptcy Court exceeded its jurisdiction to enter the July Order in the Motion for Reconsideration. Any attempt to litigate that issue in this Court may impact the Motion for Reconsideration and must be referred to the Bankruptcy Court under the Order of Reference. *See In re Margulies*, 476 B.R. 393 (Bankr. S.D.N.Y. 2012) (citing *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.*), 930 F.2d 1132, 1143 (6th Cir. 1991)) ("If the action between third parties will have a collateral estoppel effect on the debtor, the third party action is 'related to' the bankruptcy case for jurisdictional purposes.").

*Burch).* In *Burch*, the movant sought to avoid bankruptcy court jurisdiction over claims regarding the interpretation and enforceability of prior bankruptcy court orders. *Burch*, 385 Fed. Appx. at 747. Mr. Burch, like Mr. Dondero, had also been found to be an abusive litigant. The Fifth Circuit denied Mr. Burch's attempts to avoid bankruptcy court jurisdiction through clever pleading, calling them "frivolous," and "warn[ed] Burch that any further frivolous or abusive filings in this court, the district court, or the bankruptcy court will invite the imposition of sanctions, including dismissal, monetary sanctions, and/or restrictions on his ability to file pleadings in this court and any court subject to this court's jurisdiction." *Id.*, at 749; *see also* 28 U.S.C. § 1927 ("Any attorney or other person . . . who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct."). Mr. Dondero, directly and through his proxies, is a frivolous and abusive litigant – hence the need for the "gatekeeper" provisions. This Court should not provide him a forum to further abuse the judicial process.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court grant its Motion and enter an order in the form annexed to the Motion as **Exhibit A**, and grant any further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated: May 19, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        jelkin@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

26

APP_065

*Pro Tunc* (the "Order of Reference") and referring this case to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). In support of its Motion, the Debtor states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to section 1334(a) and (b) of title 11 of the United States Code (the "Bankruptcy Code").

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3.      The predicates for the relief requested in the Motion are 28 U.S.C. § 157(a) and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules).

## RELIEF REQUESTED

4.      The Debtor requests that this Court issue the proposed form of order attached as **Exhibit A** (the "Proposed Order") pursuant to 28 U.S.C. § 157(a).

5.      For the reasons set forth more fully in *Defendant Highland Capital Management, L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference* (the "Memorandum of Law"), filed contemporaneously with this Motion, the Debtor requests that the Court: (a) enforce the Order of Reference and refer this case to the Bankruptcy Court, and (b) grant the Debtor such other and further relief as the Court deems just and proper under the circumstances.

6.      In accordance with Rule 7.1 of the *Local Civil Rules of the United States District Court for the Northern District of Texas* (the "Local Rules"), contemporaneously herewith and in support of this Motion, the Debtor is filing: (a) its Memorandum of Law, and (b) the *Declaration of Gregory V. Demo Submitted in Support of the Debtor's Motion for an Order to Enforce the Order of Reference* (the "Demo Declaration") together with the exhibits annexed thereto.

7.     Based on the exhibits annexed to the Demo Declaration and the arguments contained in the Memorandum of Law, the Debtor is entitled to the relief requested herein as set forth in the Proposed Order.

8.     Notice of this Motion has been provided to all parties.  The Debtor submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Proposed Order substantially in the formed annexed hereto as **Exhibit A** granting the relief requested herein, and (ii) grant the Debtor such other and further relief as the Court may deem proper.

*[Remainder of Page Intentionally Blank]*

APP_067

Dated:  May 19, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
           rfeinstein@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           jelkin@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

4

APP_068

# EXHIBIT A

APP_069

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

---

CHARITABLE DAF FUND, L.P., AND CLO
HOLDCO LTD.

Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
HIGHLAND HCF ADVISOR, LTD., AND
HIGHLAND CLO FUNDING, LTD.

Defendants.

§
§
§
§
§
§
§
§
§
§
§
§

Case No. 3:21-cv-00842-B

---

# ORDER GRANTING MOTION FOR
## AN ORDER TO ENFORCE THE ORDER OF REFERENCE

Before the Court is *Defendant Highland Capital Management L.P.'s Motion for an Order to Enforce the Order of Reference* [Docket No. __] (the "Motion").[1]  Having considered: (a) the Motion; (b) *Defendant Highland Capital Management, L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference* (the "Memorandum of Law"); and (c) the *Declaration of Gregory V. Demo Submitted in Support of the Debtor's Motion for an Order to Enforce the Order of Reference* [Docket No. __] (the "Demo Declaration") and the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that: (a) this case arises under title 11 of the United States Code; (b) this case is a core proceeding under 28 U.S.C. § 157(b); (c) reference to the Bankruptcy Court of the Complaint is mandatory under the plain

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Memorandum of Law.

DOCS_NY:43196.2 36027/002

APP_070

language of the Order of Reference; (d) the Bankruptcy Court retains jurisdiction over all disputes relating to this Complaint; (e) the Bankruptcy Court retains jurisdiction to interpret and enforce its own orders; (f) there is no basis for a mandatory withdrawal of reference of this Complaint; and (g) the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.       The Motion is **GRANTED** as set forth herein.

2.       This proceeding is hereby referred to the Bankruptcy Court.

**It is so ordered** this _____ day of _____, 2021.

_____
The Honorable Jane J. Boyle
United States District Judge

2

APP_071

**Exhibit 3**

Defendant Highland Capital Management, L.P.'s Motion to Dismiss Complaint and
Memorandum of Law in Support of Motion to Dismiss Complaint


Case No. 21-00842-B [Dkt. Nos. 26 and 27]

Docket #0026 Date Filed: 5/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

_____

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | § § § | |
| Plaintiffs, | § § § | Case No. 3:21-cv-00842-B |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD., | § § § § | |
| Defendants. | § § | |

_____

**DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S
<u>MOTION TO DISMISS COMPLAINT</u>**

Highland Capital Management, L.P., the plaintiff in the above-captioned case (the

"<u>Debtor</u>" or "<u>Highland</u>"), by and through its undersigned counsel, files this motion (the "<u>Motion</u>")

1



1934054210527000000000025

APP_073

seeking entry of an order dismissing the *Original Complaint* [Docket No. 1] (the "<u>Complaint</u>") filed by Plaintiffs Charitable DAF Fund, L.P. (the "<u>DAF</u>") and CLO Holdco, Ltd. ("<u>CLOH</u>") (together, "<u>Plaintiffs</u>").  In support of its Motion, the Debtor states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to section 1331 and 1367 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3.      The predicates for the relief requested in the Motion are 28 U.S.C. § 1391.

## RELIEF REQUESTED

4.      The Debtor requests that this Court issue the proposed form of order attached as **Exhibit A** (the "<u>Proposed Order</u>") pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.

5.      For the reasons set forth more fully in Defendant Highland Capital Management, L.P.'s *Memorandum of Law in Support of Motion to Dismiss Complaint* (the "<u>Memorandum of Law</u>"), filed contemporaneously with this Motion, the Debtor requests that the Court: (a) dismiss the Complaint in its entirety and (b) grant the Debtor such other and further relief as the Court deems just and proper under the circumstances.

6.      In accordance with Rule 7.1 of the *Local Civil Rules of the United States District Court for the Northern District of Texas* (the "<u>Local Rules</u>"), contemporaneously herewith and in support of this Motion, the Debtor is filing: (a) its Memorandum of Law, and (b) the *Appendix in Support of Defendant Highland Capital Management L.P.'s Motion to Dismiss the Complaint* (the "<u>Appendix</u>") together with the exhibits annexed thereto.

APP_074

7.     Based on the exhibits annexed to the Appendix, and the arguments contained in the Memorandum of Law, the Debtor is entitled to the relief requested herein as set forth in the Proposed Order.

8.     Notice of this Motion has been provided to all parties.  The Debtor submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Proposed Order substantially in the formed annexed hereto as **Exhibit A** granting the relief requested herein, and (ii) grant the Debtor such other and further relief as the Court may deem proper.

APP_075

Dated:  May 27, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
            rfeinstein@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            jelkin@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

APP_076

# EXHIBIT A

APP_077

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

---------------------------------------------------------------------

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | § § § | |
| Plaintiffs, | § § | Case No. 3:21-cv-00842-B |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD., | § § § § | |
| Defendants. | § § | |

---------------------------------------------------------------------

## ORDER GRANTING MOTION TO DISMISS COMPLAINT

Before the Court is *Defendant Highland Capital Management L.P.'s Motion to Dismiss the Complaint* [Docket No. __] (the "Motion").[1]  Having considered: (a) the Motion; (b) Defendant Highland Capital Management, L.P.'s *Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference* [Docket No. __] (the "Memorandum of Law"); and (c) the *Appendix in Support of Highland Capital Management's Motion to Dismiss the Complaint* [Docket No. __] (the "Appendix") and the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1331; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1391; and this Court having found that the Complaint should be dismissed in its entirety because: (a) the Claims asserted therein are barred by the doctrine of *res judicata*; (b) the Claims are barred by the doctrine of judicial estoppel; and (c) the Complaint fails to allege any Claim for relief that is plausible for relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure; and this Court having found that the Debtor's

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Memorandum of Law.

1

notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

    1.    The Motion is **GRANTED** as set forth herein.

    2.    This Complaint is dismissed in its entirety.

**It is so ordered** this _____ day of _____, 2021.

_____
The Honorable Jane J. Boyle
United States District Judge

APP_079

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | § § § | |
| Plaintiff, | § § § | Case No. 3:21-cv-00842-B |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | § § § § | |
| Defendants. | § § | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COMPLAINT



1934054210527000000000026   APP_080

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................ 2

III.   ARGUMENT .................................................................................................... 7

   A.   Legal Standard ........................................................................................... 7

   B.   Plaintiffs' Claims are Barred by the Doctrine of *Res Judicata* ............... 8

   C.   Plaintiffs' Claims are Barred by Judicial Estoppel .................................. 11

   D.   Plaintiffs Fail to State Claims Upon Which Relief Can be Granted .......... 13

       1.   Plaintiffs Fail to State a Claim Under RICO ................................... 13

       2.   Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty ......... 19

       3.   Plaintiffs Fail to State a Claim for Breach of Members Agreement .... 23

       4.   Plaintiffs Fail to State a Claim for Negligence ............................... 24

       5.   Plaintiffs Fail to State a Claim for Tortious Interference with Contract .......... 24

IV.   CONCLUSION ................................................................................................ 25

DOCS_NY:43286.6 36027/002

APP_081

# TABLE OF AUTHORITIES

Page No.

**CASES**

*Alabama Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*,
606 F.2d 602 (5th Cir. 1979) ........................................................................ 19

*Allstate Ins. Co. v. Donovan*,
No. CIV.A. H-12-0432, 2012 WL 2577546 (S.D. Tex. July 3, 2012) .......... 17

*Allstate Insurance Company v. Benhamou*,
190 F. Supp. 3d 631 (S.D. Tex. 2016) ................................................... 17, 18

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) .................................................................................... 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................. 7, 18

*Brandon v. Interfirst Corp.*,
858 F.2d 266 (5th Cir.1988) ....................................................................... 11

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) .................................................................................... 18

*C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*,
61 F.3d 288 (5th Cir. 1995) .......................................................................... 8

*Cade v. Henderson*,
No. CIV A 01-943, 2001 WL 1012251 F.Supp.2d (E.D.La. Aug. 31, 2001) ............................ 8

*Calcasieu Marine Nat'l Bank v. Grant*,
943 F.2d 1453 (5th Cir.1991) ................................................................ 15, 16

*Carnegie-Mellon Univ. v. Cohill*,
484 U.S. 343 (1988) .................................................................................... 25

*Comer v. Murphy Oil USA*, Inc.,
718 F.3d 460 (5th Cir. 2013) ........................................................................ 9

*Corwin v. Marney, Orton Invs.*,
788 F.2d 1063 (5th Cir. 1986) .................................................................... 22

*Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.*,
510 F. 2d 272 (5th Cir. 1975) ....................................................................... 9

*Goldstein v. SEC*,
451 F.3d 873 (D.C. Cir. 2006) .................................................................... 22

*Grigsby v. CMI Corp.*,
765 F.2d 1369 (9th Cir.1985) ...................................................................... 20

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989) ............................................................................... 13, 15

*Hall v. GE Plastic Pac. PTE Ltd.*,
327 F.3d 391 (5th Cir. 2003) ....................................................................... 12

*Hall v. Hodgkins*,
305 F. Appx. 224 (5th Cir. 2008) .................................................................. 8

ii

*Howe v. Vaughan (Matter of Howe)*,
913 F.2d 1138 (5th Cir. 1990) ......................................................................... 9
*In re Burzynski*,
989 F.2d 733 (5th Cir. 1993) ..................................................................... 16, 17
*In re Coastal Plains Inc.*,
179 F.3d 197 (5th Cir. 1999) ......................................................................... 12
*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ............................................................ 20
*In re Intelogic Trace, Inc.*,
200 F.3d 382 (5th Cir. 2000) ......................................................................... 11
*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
802 F. Supp. 2d 725 (E.D. La. 2011) .............................................................. 18
*In re Paige*,
610 F.3d 865 (5th Cir. 2010) ......................................................................... 11
*In re Soporex, Inc.*,
463 B.R. 344 (Bankr. N.D. Tex. 2011) ............................................................ 21
*Matter of ATP Oil & Gas Corp.*,
711 F. App'x 216 (5th Cir. 2017) .................................................................... 21
*Matter of Life Partners Holdings, Inc.*,
926 F.3d 103 (5th Cir. 2019) ......................................................................... 21
Medina v. I.N.S.,
993 F.2d 499 (5th Cir.1993) ............................................................................ 8
*Merrill Lynch, Pierce, Fenner, & Sminth, Inc. v. Young*,
No. 91 Civ. 2923, 1994 WL 88129 (S.D.N.Y. Mar, 14, 1994) .......................... 15
*Mitchell v. Ocwen Loan Servicing, LLC*,
No. 4:18-cv-00820-P, 2019 WL 5647599 (N.D. Tex. 2019) ............................... 8
*Montesano v. Seafirst Commercial Corp.*,
818 F.2d 423 (5th Cir.1987) ...................................................................... 13, 17
*Ocean Energy II*,
868 F.2d 740 (5th Cir.1989) ........................................................................... 16
*Oreck Direct, LLC v. Dyson, Inc.*,
560 F.3d 398 (5th Cir. 2009) ............................................................................ 8
*Parker & Parsley Petroleum Co. v. Dresser Indus.*,
972 F.2d 580 (5th Cir.1992) ........................................................................... 25
*Ranieri v. AdvoCare International, L.P.*,
336 F.Supp.3d 701 (N.D. Tex. 2018) .............................................................. 13
*Ries v. Paige (In re Paige)*,
610 F.3d 865 (5th Cir. 2010) ........................................................................... 9
*Robinson v. Standard Mortg. Corp.*,
191 F. Supp. 3d 630 (E.D. La. 2016) ................................................ 13, 14, 15, 18
*Rodgers v. City of Lancaster Police*,
No. 3:13-CV-2031-M-BH, 2017 WL 457084 (N.D. Tex. Jan. 6, 2017) ............... 24
*Santa Fe Industries, Inc. v. Green*,
430 U.S. 462 (1977) ...................................................................................... 19

DOCS_NY:43286.6 36027/002

APP_083

*Sivertson v. Citibank, N.A. as Tr. for Registered Holders of WAMU Asset-Back Certificates WAMU Series No. 2007-HE2 Tr.*,
    390 F. Supp. 3d 769 (E.D. Tex. 2019) ................................................................................ 24

*Snowden v. Wells Fargo Bank, N.A.*,
    No. 3:18-CV-1797-K-BN, 2019 WL 587304 (N.D. Tex. Jan. 18, 2019) ............................... 24

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ............................................................................................... 20

*Specialties of Mexico Inc. v. Masterfoods USA*,
    No. CIV.A. L-09-88, 2010 WL 2488031 (S.D. Tex. June 14, 2010) ..................................... 25

*St. Paul Mercury Ins. Co. v. Williamson*,
    224 F.3d 425 (5th Cir.2000) ................................................................................................ 14

*T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins.*,
    No. 4:07–cv–0419, 2008 WL 7627807 (S.D.Tex. 2008) ........................................................ 8

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*,
    975 F.2d 1134 (5th Cir. 1992) ....................................................................................... 13, 15

*Test Masters Educ. Services, Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ................................................................................................. 9

*Thomas v. City of Houston*,
    619 F. App'x 291 (5th Cir. 2015) ........................................................................................ 11

*Thomas v. Houston Org. of Pub. Emps.*,
    No. CIV.A. H-14-0485, 2014 WL 4629235 (S.D. Tex. Sept. 15, 2014) ............................... 11

*Tigue Inv. Co. v. Chase Bank of Texas, N.A.*,
    No. CIV.A.3:03 CV 2490 N, 2004 WL 3170789 (N.D. Tex. Nov. 15, 2004) ....................... 19

*Town N. Bank, N.A.*,
    2014 WL 4851558 ......................................................................................................... 20, 22

*Tuchman v. DSC Communications*,
    14 F.3d 1061 (5th Cir.1994) .......................................................................................... 19, 20

*United States v. Gray*,
    96 F.3d 769 (5th Cir. 1996) ................................................................................................. 14

*United States v. McCaskey*,
    9 F.3d 368 (5th Cir.1993) .................................................................................................... 12

*United States v. Shanbaum*,
    10 F.3d 305 (5th Cir. 1994) ................................................................................................... 8

*Wade v. Household Fin. Corp. III*,
    No. 1:18-CV-570-RP, 2019 WL 433741 (W.D. Tex. Feb. 1, 2019) ....................................... 9

*Wong v. Stripling*,
    881 F.2d 200 (5th Cir. 1989) ............................................................................................... 25

**STATUTES**

18 U.S.C. § 1964(c) ..................................................................................................................... 18

**OTHER AUTHORITIES**

Rule 10b-5 of the Securities and Exchange Act ......................................................................... 19
Section 10(b) of the Securities and Exchange Act ..................................................................... 19
Section 47(b) of the Advisers Act .............................................................................................. 22

**RULES**

Fed. R. Bankr. P. 9014(c) ............................................................................................................. 4

iv

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 2, 7, 8

Fed. R. Civ. P. 9(b) ................................................................................................. 13, 20

DOCS_NY:43286.6 36027/002

APP_085

Highland Capital Management, L.P., a defendant in the above-captioned case (the "Debtor" or "Highland"), submits this memorandum of law (the "Memorandum") in support of the *Debtor's Motion to Dismiss the Original Complaint* (the "Motion").

## I.     INTRODUCTION[1]

1.      In January 2021, the Debtor filed a motion in the Bankruptcy Court for an order approving its Settlement with HarbourVest, pursuant to which, *inter alia*, HarbourVest would settle its pre-petition claims against the Debtor and transfer its interest in defendant Highland CLO Funding, Ltd. ("HCLOF"), an entity in which the Debtor already owned interests, to a subsidiary of the Debtor (the "Prior Proceeding"). CLO Holdco, Ltd. ("CLOH") objected to the proposed Settlement, presumably at the direction of its parent, the Charitable DAF Fund, L.P. (the "DAF").[2]

2.      As set forth in the Motion to Enforce, CLOH challenged the Settlement on the grounds that: (i) CLOH had a "Right of First Refusal" to acquire HarbourVest's interest in HCLOF pursuant to the Members Agreement and (ii) HarbourVest had no right to transfer its interest without complying with the purported Right of First Refusal. Two other objections were lodged against the proposed Settlement, one by James Dondero, the Debtor's founder and former CEO ("Mr. Dondero"), and the other by his Trusts.[3] These objectors contended that HarbourVest did not have the right to effectuate the Transfer under the Members Agreement. Each of the objecting parties exercised their right to take discovery concerning the Settlement

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[2] Plaintiffs are controlled and/or directed by Mr. Dondero, the Debtor's ousted founder. The DAF is Mr. Dondero's donor advised fund, and CLOH is an entity wholly owned and controlled by the DAF. Until at least mid-January 2021, Grant Scott, Mr. Dondero's life-long friend and college roommate, was the sole director of the DAF and of CLOH (neither of which otherwise had any officers or employees).

[3] The Settlement is being appealed by Mr. Dondero's two purported family investment trusts: The Dugaboy Investment Trust ("Dugaboy") and The Get Good Trust ("Get Good" and together with Dugaboy, the "Trusts"). The Trusts, like Plaintiffs, are controlled by Mr. Dondero. The appeal and this litigation are just one battle in Mr. Dondero's multifaceted litigation assault on the bankruptcy process.

APP_086

and the Transfer.  The Bankruptcy Court held an evidentiary hearing on the proposed Settlement and heard argument in support of parties' objections and defenses.  During the hearing, CLOH voluntarily withdrew its objection premised on the "Right of First Refusal," after which the Court overruled the remaining objections and approved the Settlement.

3.      Mr. Dondero appealed the Settlement, claiming the Debtor overpaid.  Three months later, Plaintiffs filed their *Original Complaint* (the "Complaint"), raising substantially similar core claims and issues that were litigated in the Prior Proceeding, such as the value of the HCLOF interests and whether the Plaintiffs had some superior right to acquire HarbourVest's interest in HCLOF.  Plaintiffs bring claims for: (i) breach of fiduciary duty; (ii) breach of the Members Agreement; (iii) RICO violations; (iv) negligence; and (v) tortious interference with contract.  Plaintiffs principally allege that: (i) Plaintiffs had a "Right to First Refusal" to purchase the HCLOF interests under the Members Agreement; (ii) the Debtor breached the Members Agreement by diverting this investment opportunity from Plaintiffs; and (iii) the Debtor failed to disclose the "true value" of HarbourVest's interest in HCLOF.

4.      All of Plaintiffs' claims are barred by the doctrines of *res judicata* because they are identical to those previously litigated, and fully decided, in the Prior Proceeding.  Certain claims are subject to judicial estoppel because they seek to assume positions that are inconsistent with those previously asserted, namely, that the Right of First Refusal applied to HarbourVest's interest in HCLOF.  This contradicts Plaintiffs' voluntarily withdrawal of this same contention in the Prior Proceeding.  Plaintiffs also fail to state any claims for relief that are plausible on their face under Rule 12(b)(6).

## II.      FACTUAL BACKGROUND

5.      Prior to the commencement of the Bankruptcy Case, HarbourVest invested approximately $80 million (the "Investment") in HCLOF.  Following the Investment, CLOH

APP_087

held 49.02% of HCLOF's interests, HarbourVest held 49.98%, and the remaining 1% was held by the Debtor and certain Debtor employees. After the Debtor filed for bankruptcy protection, HarbourVest filed claims against the Debtor in excess of $300 million in Bankruptcy Court, alleging that HarbourVest was fraudulently induced into the Investment based on factual misrepresentations and omissions made by Mr. Dondero and certain of his employees. **Appx. 1**.[4]

6. On December 23, 2020, the Debtor filed its *Motion for Entry of an Order Approving Settlement With HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Settlement Motion"), pursuant to which the Debtor sought Bankruptcy Court approval of a settlement the Debtor reached with HarbourVest in December 2020 (the "Settlement"). **Appx. 2**. The Debtor also filed the proposed *Settlement Agreement and Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* (the "Transfer Agreement"). **Appx. 3**. Pursuant to the Settlement, HarbourVest was to transfer its interest in HCLOF to the Debtor or its nominee (the "Transfer") in exchange for (a) an allowed, general unsecured claim in the amount of $45 million, (b) a subordinated, allowed, general unsecured claim in the amount of $35 million, and (c) other consideration more fully described in the Settlement Agreement. **Appx 2 ¶32**. The Transfer was a necessary component of the Settlement. The Settlement Motion disclosed all aspects of the Transfer, including (a) what HarbourVest was transferring; (b) the valuation (and method of valuation) of the asset being transferred to the Debtor; and (c) the method of the Transfer. ***Id.* ¶¶1(b) 32, 32 n.5; Apx. 3**. Mr. Dondero, CLOH, and Mr. Dondero's Trusts objected to the proposed Settlement.

---

[4] Refers to the Appendix in Support of the Debtor's Motion to Dismiss the Complaint (the "Appendix"), filed concurrently herewith.

APP_088

7. On January 6, 2021, Mr. Dondero filed his *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] **Appx. 4** ("<u>Dondero's Objection</u>"), contending that the Settlement: (a) was not "reasonable or in the best interests of the estate" because the Debtor was ***grossly overpaying*** and (b) amounted to "a blatant attempt to purchase votes in support of the Debtor's plan." *Id.* **¶1**. On January 8, 2021, Dondero's Trusts filed their Objection to the Debtor's *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith.* [Docket No. 1706]. **Appx. 5** (the "<u>Trusts' Objection</u>"). The Trusts questioned (a) whether HarbourVest had the right to effectuate the Transfer, and (b) the valuation of the HCLOF interests – matters which are directly at issue in the Complaint.

8. On January 8, 2021, Plaintiff CLOH filed its *Objection to HarbourVest Settlement* [Docket No. 1707]. **Appx. 6** ("<u>CLOH's Objection</u>"). CLOH challenged HarbourVest's right to effectuate the Transfer contending that: (a) CLOH and the other members of HCLOF had a "Right of First Refusal" under the Members Agreement, *id.* **¶3,** and (b) "HarbourVest has no authority to transfer its interest in HCLOF without first complying with the Right of First Refusal." *Id.* **¶6**. CLOH offered a lengthy but faulty analysis of the Members Agreement, including CLOH's purported "Right of First Refusal" under section 6.2 thereof. *Id.* **¶¶9-22**.

9. By filing their objections, Mr. Dondero, the Trusts, and CLOH (collectively, the "<u>Objectors</u>") obtained the right to conduct discovery under Bankruptcy Rule 9014(c).[5] Mr. Dondero and CLOH deposed Michael Pugatch, a representative of HarbourVest [Docket No. 1705], **Ex. 7**, but the Objectors sought no formal discovery from the Debtor, HCLOF, or Highland HCF Advisors, Ltd. ("<u>HHCFA</u>"). CLOH never contended that: (a) the Debtor had a

---

[5] Pursuant to Bankruptcy Rule 9014(c), parties to contested matters (such as the Objectors) have the full panoply of discovery rights provided under the Federal Rules of Civil Procedure, including the rights to take depositions, serve interrogatories and requests for admission, and seek the production of documents.

4

APP_089

fiduciary duty to offer the HCLOF interests to CLOH, or (b) the Investment Advisers Act of 1940 (the "Advisers Act") was implicated by the Settlement.

10.     On January 13, 2021, the Debtor filed *its Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement With HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Omnibus Reply"). **Ex. 8**. The Omnibus Reply rebutted CLOH's argument that the Transfer could not be completed without HCLOF's other members being offered HarbourVest's interest in HCLOF, as allegedly required by the "Right of First Refusal" under section 6.2. *Id.* **¶¶26-39**. At the January 14, 2021, hearing, CLOH *voluntarily withdrew* its objection after considering the Debtor's analysis of the Members Agreement by stating on the record:

> CLO Holdco has had an opportunity to review the reply briefing, and . . . [b]ased on our analysis of Guernsey law and some of the arguments of counsel on those pleadings and our review of the appropriate documents, I obtained authority from my client, Grant Scott, as trustee for CLO Holdco, *to withdraw the CLO Holdco objection based on the interpretation of the member agreement*.

**Appx. 9 at 7:20-8:6** (emphasis added). The Debtor called two witnesses in support of the Settlement Motion, its court-appointed Chief Executive Officer, James P. Seery, Jr., and Mr. Pugatch. Counsel for Mr. Dondero and the Trusts cross-examined the Debtor's witnesses but did not inquire about the value of the HCLOF interests, the Debtor's fiduciary obligations, or the Transfer. *Id.* **at 87:18-89:21**. At the conclusion of the hearing, the Court entered an order overruling the remaining objections and approving the Settlement [Docket No. 1788] (the "Settlement Order"). **Appx. 10**. The Settlement Order *expressly* authorized the transfer of HarbourVest's interest in HCLOF providing, in relevant part, that "[p]ursuant to the express terms of the [Members Agreement]. . . HarbourVest is authorized to transfer its interest in HCLOF. . . *without the need to obtain the consent of any party or to offer such interests first to*

APP_090

*any other investor in HCLOF*." *Id.* **¶6 (emphasis added)**.[6]   The Bankruptcy Court specifically included this language because of concerns that Mr. Dondero and his entities would "go to a different court somehow to challenge the transfer." **Appx. 9 at 156:19-20**.

11.     Nevertheless, on April 12, 2021, Plaintiffs filed their Complaint in this Court against the Debtor, HCLOF, and HHCFA challenging the Settlement and Transfer. **Appx. 11**.[7]   The Complaint raises claims for: (i) breach of fiduciary duty; (ii) breach of the Members Agreement; (iii) RICO violations; (iv) negligence; (v) tortious interference (each, a "Claim" and collectively, the "Claims").   In its Claim for breach of fiduciary duty, Plaintiffs allege that the Debtor violated its "broad" duties to Plaintiffs under the Advisers Act and the Debtor's "internal policies and procedures" by: (i) engaging in "insider trading with HarbourVest"; (ii) "concealing" the value of the HarbourVest interest;[8] and (iii) "diverting" the investment opportunity in the HarbourVest entities to the Debtor without offering it to Plaintiffs.   (*Id.* ¶¶67-74).   In their RICO Claim, Plaintiffs allege that Defendant Highland and two affiliated entities were an "association-in-fact" engaged in a pattern of racketeering activity for this same underlying conduct; namely, failing to disclose the valuation of HCLOF's interest and ultimately effectuating the HarbourVest Settlement.   (*Id.* ¶¶113-133).

12.     Plaintiffs' state-law claims rest on the same underlying allegations.   In support of its claim for breach of the Members Agreement, Plaintiffs allege that the Debtor breached the Agreement's "Right of First Refusal" provision by diverting the investment opportunity away from CLOH to the Debtor. **Appx. 11 ¶¶92-102**.   In its negligence claim, Plaintiffs assert that the

---

[6] *See also* Ex. 9 at 156:10-25; 157:1-5.

[7] Accordingly, the Debtor was forced to file two related motions. First, pending before this Court is the Debtor's *Motion for an Order to Enforce the Order of Reference* [Docket No. 23] (the "Motion to Enforce").   After Plaintiffs sought to add Mr. Seery as a defendant in violation of two Bankruptcy Court orders, the Debtor also filed its motion to hold Plaintiffs and their counsel in contempt. [*See* Docket No. 2247].

[8] Notably, while Mr. Dondero objected to the Settlement in the Prior Proceeding on the ground that the Debtor was overpaying, Plaintiffs contend in the instant proceeding that the Debtor underpaid.

DOCS_NY:43286.6 36027/002

Debtor's actions violated the Members Agreement and the Debtor's internal policies by failing to accurately calculate the HCLOF interests and failing to give Plaintiffs the Right of First Refusal to purchase the interests. (*Id.* ¶¶ 103-112). Plaintiffs' tortious interference claim is premised on the Debtor's alleged interference with Plaintiff's "Right of First Refusal" under the Members Agreement. (*Id.* ¶¶ 134-141).

### III.   ARGUMENT

13.   The Complaint should be dismissed on the following independent grounds: (i) the Claims are barred by *res judicata*, (ii) the Claims are barred by collateral estoppel, (iii) the Claims are barred by judicial estoppel, and (iv) Plaintiff fails to state claims for relief under Rule 12(b)(6).

### A.   Legal Standard

14.   To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Dismissal is proper under Rule 12(b)(6) when, taking the facts alleged in the complaint as true, it appears that the plaintiff "cannot prove any set of facts that would entitle it to the relief it seeks." *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*, 61 F.3d 288,

APP_092

289 (5th Cir. 1995).  The Court may take judicial notice of matters of public record when considering a motion to dismiss for failure to state a claim.[9]

**B.**   **Plaintiffs' Claims are Barred by the Doctrine of _Res Judicata_**

15.     Plaintiffs' Claims are barred by the doctrine of _res judicata_.  "Claim preclusion, or 'pure' _res judicata_, is the 'venerable legal canon' that insures the finality of judgments and thereby conserves judicial resources and protects litigants from multiple lawsuits."  _United States v. Shanbaum_, 10 F.3d 305, 310 (5th Cir. 1994) (quoting _Medina v. I.N.S.,_ 993 F.2d 499, 503 (5th Cir.1993)).  "Under _res judicata_, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  _Oreck Direct, LLC v. Dyson, Inc._, 560 F.3d 398, 401 (5th Cir. 2009).  Dismissal under Rule 12(b)(6) is proper if the elements of _res judicata_ are apparent based on the facts pleaded and judicially noticed.  _See Hall v. Hodgkins_, 305 F. Appx. 224, 227–28 (5th Cir. 2008); _Mitchell v. Ocwen Loan Servicing, LLC_, No. 4:18-cv-00820-P, 2019 WL 5647599, at *3 (N.D. Tex. 2019).

16.     Here, the Debtor requests the Court to take judicial notice of the record created in connection with the Settlement Motion.[10]  It is clear from record that _res judicata_ bars Plaintiffs' claims against the Debtor.  "True _res judicata_ has four element_s:_ '(1) the parties are identical or least in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both suits.'"  _Comer v. Murphy Oil USA_, Inc., 718

---

[9] _See T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins._, No. 4:07–cv–0419, 2008 WL 7627807, at *2 (S.D.Tex. 2008); _Cade v. Henderson_, No. CIV A 01-943, 2001 WL 1012251, at *2 F.Supp.2d (E.D.La. Aug. 31, 2001).

[10] The Record includes (a) the Settlement Motion, and the exhibits admitted into evidence in support, (b) The Transfer Agreement; (c) Dondero's Objection; (d) the Trusts' Objection, (e) CLOH's Objection, (f) the discovery taken by the Objectors; (g) the Omnibus Reply; (h) the January 13, 201 Hearing Transcript; and (i) the Settlement Order.

APP_093

F.3d 460, 466 (5th Cir. 2013) (quoting *Test Masters Educ. Services, Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005)).

17.    Plaintiffs were parties, or in privity with parties, to the Prior Proceeding. As noted *supra*, Plaintiff CLOH objected to the HarbourVest Settlement.  Although Plaintiff DAF did not file an objection, it is the parent of CLOH, is in privity with CLOH, and was controlled by the same person, Mr. Dondero's friend, Grant Scott.[11]  The second and third elements are also met.  The Bankruptcy Court presiding over the Settlement in the Prior Proceeding is a court of competent jurisdiction, and it entered a final order on the merits of the Settlement.  *See Wade v. Household Fin. Corp. III*, No. 1:18-CV-570-RP, 2019 WL 433741, at *1 (W.D. Tex. Feb. 1, 2019), report and recommendation adopted, 2019 WL 2565252 (W.D. Tex. Mar. 11, 2019)*; Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.*, 510 F. 2d 272, 273 (5th Cir. 1975) ("A case pending appeal is res judicata and entitled to full faith and credit unless and until reversed on appeal.").

18.    The claims and causes of actions in the Complaint were raised, or could have been raised, in the Prior Proceeding.  A claim is the same if it relates to the same "transaction, or series of transactions, out of which the [original] action arose."  *Ries v. Paige (In re Paige)*, 610 F.3d 865, 872 (5th Cir. 2010).  "When applying this test, the primary question is whether the lawsuits were based on 'the same nucleus of operative fact,' regardless of the relief requested, or the claims brought.  *Wade*, 2019 WL 433741, at *3. "The rule is that res judicata bars all claims that were or *could have been* advanced in support of the cause of action on the occasion of its former adjudication, . . . not merely those that were adjudicated."  *Howe v. Vaughan (Matter of Howe)*, 913 F.2d 1138, 1144 (5th Cir. 1990) (emphasis in original) (internal quotations omitted).

---

[11] **Ex. 12** at 11:10-25; 12:1-25; 13:1-25; 14:1-25; 15:1-25; 16:1-17.

19.     Plaintiffs' Claims are the "same or substantially similar" as those raised in the Prior Proceeding.   All of Plaintiffs' Claims rest on allegations that the Debtor: (i) did not accurately value the HCLOF interests; (ii) concealed the value of those interests from Plaintiffs; (iii) violated the Member Agreement by failing to offer such interests to Plaintiffs pursuant to a "Right of First Refusal" provision; and (iv) diverted the investment opportunity to the Debtor without offering it to Plaintiffs. (*See* Complaint).   Each of these Claims arise from the same "common nucleus of operative facts" as those raised in the Prior Proceeding.   In the Prior Proceeding, Plaintiff CLOH claimed that: (i) it had a "Right of First Refusal" under the Members Agreement to purchase the HarbourVest interests and (ii) "HarbourVest ha[d] no authority to transfer its interests" in the Debtor without first "complying with the Right of First Refusal." These issues were fully brief, litigated, and decided. ***See, e.g.*, Appx. 6 ¶¶3, 6, 9-22; Ex. 7 at 140:7-25** (deposition testimony concerning Right of First Refusal); **Appx. 8 ¶ 36**.

20.     Plaintiffs' Claims concerning the valuation of HarbourVest's interests in the HCLOF were also central to the issues raised in the Prior Proceeding.   The Settlement Agreement fully disclosed, *inter alia*, (i) the valuation and (ii) the method of valuation. ***See Appx. 2, 3 ¶¶1(b)***.   In his Objection, Mr. Dondero asserted that the Debtor was "grossly overpaying" for HarbourVest's interests. ***See Appx. 4 ¶1***.   The Trusts' Objection similarly addressed the value of HarbourVest's interests. ***See Appx. 5***.   Discovery was taken on this very issue. ***See* Appx. 7 at 28:2-25; 30:1-25; 51:1-25; 59:1-18; 91:1-25** (extensive deposition testimony of HarbourVest relating to valuation).

21.     Indeed, if Plaintiffs believed the Debtor was creating liability for the estate by entering into the Settlement Agreement, they were obligated to raise such concerns during the Prior Proceeding.   This is nothing more than a *de facto* appeal or reconsideration of the

10

APP_095

Settlement under the guise of asserting in this Court that Highland should be held liable for damages for actions it undertook pursuant to the Bankruptcy Court's order authorizing and approving the Settlement. Plaintiffs had a full and fair opportunity to litigate all factual and legal issues presented by the HarbourVest Settlement and the Transfer in the Bankruptcy Court.

22. Plaintiffs contend that "[i]t has recently come to light that … the HarbourVest interests, as of December 31, 2020, were worth in excess of $41,750,000," **Appx. 11 ¶ 37**. This allegation is insufficient to overcome *res judicata* because the Prior Proceeding squarely addressed the overall fairness of the Settlement, including the value of the consideration being exchanged and whether the transaction was in the best interests of the Debtor's estate. Moreover, CLOH had the unfettered right to conduct discovery on all of these issues, including the Debtor's alleged duties to CLOH. *See In re Paige*, 610 F.3d 865, 874 (5th Cir. 2010) (affirming bankruptcy court's finding that res judicata barred claims where previously unlitigated claim against debtor could or should have been asserted in earlier proceeding, where at time of earlier proceeding, party was aware of the "core" facts underlying later claim); *In re Intelogic Trace, Inc.*, 200 F.3d 382, 388 (5th Cir. 2000). Accordingly, the claims in the Prior Proceeding and the Complaint arise from the same operative facts and are barred by *res judicata*. *See Thomas v. Houston Org. of Pub. Emps.*, No. CIV.A. H-14-0485, 2014 WL 4629235, at *4 (S.D. Tex. Sept. 15, 2014), aff'd sub nom. *Thomas v. City of Houston*, 619 F. App'x 291 (5th Cir. 2015).

**C.** **Plaintiffs' Claims are Barred by Judicial Estoppel**

23. Judicial estoppel is "a common law doctrine by which a party who has assumed one position in [their] pleadings may be estopped from assuming an inconsistent position." *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir.1988). The purpose of the doctrine is "to protect the integrity of the judicial process" by "prevent[ing] parties from playing fast and loose

11

APP_096

with the courts to suit the exigencies of self interest". *Id.* (internal quotations omitted); *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993).

24.     The doctrine applies: (1) "where the position of the party to be estopped is clearly inconsistent with its previous one; and (2) that party must have convinced the court to accept that previous position." *In re Coastal Plains Inc.*, 179 F.3d 197, 206 (5th Cir. 1999). Both prongs are easily satisfied here. Plaintiffs' contentions in the Complaint are directly at odds with those taken in the Prior Proceeding. Plaintiff CLOH withdrew its objection to the Settlement Motion premised on its alleged "Right of First Refusal" under the Members Agreement. ***See*** **Appx. 9 at 7:20-8:6**. Plaintiffs' current Claims contradict this withdrawal because they are premised on the Debtor's "breach," or violations of, the Plaintiffs' "Right of First Refusal" under the Members Agreement. (*See generally* Complaint). The first element of judicial estoppel is met. *See Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 398 (5th Cir. 2003) (first prong met where statement made in a previous suit by party's attorney was imputed to that party was clearly inconsistent with party's current position on that same issue).

25.     The Bankruptcy Court, in ruling on the Settlement Motion, necessarily accepted and relied on CLOH's prior position that it was withdrawing any objection premised on the Members Agreement. ***See*** **Appx. 9 at 8:1-10** (Bankruptcy Court accepting CHLOH's withdrawal of objection, noting that withdrawal "eliminates one of the major arguments"); ***see also*** **156:10-25; 157:1-5**; *Hall*, 327 F.3d at 398 (previous court "necessarily accepted, and relied on" party's previous statements in resolving the conflict, noting that the "'judicial acceptance' requirement does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits.'").

**D.    Plaintiffs Fail to State Claims Upon Which Relief Can be Granted**

**1.    Plaintiffs Fail to State a Claim Under RICO**

26.    To state a RICO claim, a plaintiff must allege: "1) the conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity." *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 424 (5th Cir.1987). To defeat a motion to dismiss, "a RICO plaintiff must allege facts sufficient to establish each of the essential elements of his or her RICO Claim." *Robinson v. Standard Mortg. Corp.*, 191 F. Supp. 3d 630, 638 (E.D. La. 2016). The Complaint must be "plead with sufficient particularity" under Rule 9(b). *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992); *see also Ranieri v. AdvoCare International, L.P.*, 336 F.Supp.3d 701, 715-16 (N.D. Tex. 2018). "Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [they] obtained thereby." *Tel-Phonic Servs*, 975 F.2d at 1134. "[T]o establish a RICO claim based on a pattern of mail or wire fraud, the plaintiff must plead that the defendant 'act[ed] knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to [themselves]." *Ranieri,* 336 F.Supp.3d at 715. The plaintiff must plead that RICO violation was the "but-for and proximate cause" of their injury. *Id.*

**i.    Plaintiffs Fail to Allege a Pattern of Racketeering Activity**

27.    "To allege a 'pattern of racketeering activity,' a plaintiff must show that the defendant committed two or more predicate offenses that are (1) related and (2) amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Plaintiffs baldly allege three predicate offenses: (i) wire fraud, (ii) mail fraud, and (iii) violation of the Advisers' Act antifraud provisions. *See* **Appx. 11 ¶¶ 130-132**. Plaintiffs fail to sufficiently plead any of these predicate acts.

13

APP_098

28.    To state a claim for mail fraud, a plaintiff must allege: "(1) a scheme to defraud, (2) which involves the use of the mails, (3) for the purpose of executing the scheme." *United States v. Gray*, 96 F.3d 769, 773 (5th Cir. 1996).  The elements of wire fraud are the same but apply to "wire communications in furtherance of the scheme." *Id.*  "[B]oth RICO mail and wire fraud require evidence of intent to defraud, i.e., evidence of a scheme to defraud by false or fraudulent representations." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir.2000).  "[A] scheme to defraud must involve fraudulent misrepresentations or omissions 'reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *Robinson*, 191 F. Supp. 3d at 639–40.

29.    The Complaint fails to satisfy the heightened pleading standards for asserting a RICO claim.  The thrust of Plaintiffs' claim is that the Debtor operated in such a way as to "violate insider trading rules and regulations when it traded with HarbourVest" by concealing "non-public information that it had not supplied" to Plaintiffs. **Appx. 1 ¶118**.  Plaintiffs' RICO claim is nothing more than a series of conclusory allegations predicated on activities of mail, wire, and bankruptcy fraud. *Id.* ¶¶113-133 (alleging, for instance, that Mr. Seery (i) "utilized wires and/or mails to obtain or arrive at valuations of the HCLOF interests, *id.* ¶120; (ii) "transmitted or caused to be transmitted through the interstate wires information to HCLOF investors from HCM…", *id.* ¶121, and (iii) "operated [the Debtor] in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations…"*id.* ¶122.

30.    The Complaint "does not identify specific acts of communication by mail or by interstate wires" undertaken by the Debtor "in furtherance of a fraudulent scheme." *Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Young*, No. 91 Civ. 2923, 1994 WL 88129, at

14

APP_099

*11 (S.D.N.Y. Mar, 14, 1994). Nor do Plaintiffs plead with particularity details about the contents of the communications, or when the Debtor made such communications, to whom, or where such communications were directed. Plaintiffs generally allege that Mr. Seery testified about the valuation of the HCLOF interests, **Appx. 11 ¶ 125**, but provide no details about mail or wire fraud. These allegations are insufficient to state a plausible claim for relief under RICO. *See Robinson*, 191 F. Supp. 3d at 640 (dismissing RICO claims where "vague" and "general" conclusory allegations "provides no details about the contents of any of these documents. Nor does she specify when defendants made these communications or to whom, specifically, they were directed.").

31.     Plaintiffs' allegations also fail to sufficiently plead a "pattern of racketeering activity." "Continuity" refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Tel-Phonic Servs.,* 975 F.2d at 1139-40. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J., Inc.*, 492 U.S. at 241. A RICO "pattern" is only established "if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *Id.; see also Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1464 (5th Cir.1991) ("Short-term criminal conduct is not the concern of RICO.").

32.     Here, there is no such "continuity" alleged. There is no specific "threat of repetition" or distinct threat of long-term criminal conduct. Nor are the allegations sufficient to suggest that the Debtor "operates as part of a long-term associates that exists for criminal purposes." *H.J., Inc.*, 492 U.S. at 241. Plaintiffs' RICO allegations concern conduct allegedly occurring in the limited period from September 2020 to January 2021, all surrounding the

15

APP_100

alleged predicate acts leading up to the HarbourVest Settlement. *See, e.g.,* **Appx. 11 ¶¶119-128** (alleging that, (i) "[o]n or about September 30, 2020, Seery transmitted … through the interstate wires information to HCLOF investors," (ii) in November 2020, "HCM and HarbourVest entered into discussions about settlement the HarbourVest Claims, and (iii) in January 2021, "Seery testified that he "had valued the HarbourVest Assets at their current valuation and at fair market value"). Such allegations concern short-term, discrete transactions, and do not show a "pattern of activity," or threat of "continuing racketeering activity." *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993); *Calcasieu*, 943 F.2d at 1464.

### ii. Plaintiffs Fails to Allege a RICO Association-in-Fact Enterprise

33. A RICO "enterprise" can be either a legal entity or an "association in fact" enterprise. *Burzynski*, 989 F.2d at 743 (citing 18 U.S.C. 1961(4)). "A RICO association in fact enterprise must be shown to have continuity." *Calcasieu Marine Nat. Bank v. Grant*, 943 F.2d 1453, 1461 (5th Cir. 1991). "Continuity or the ongoing nature of an association in fact is the linchpin of enterprise status." *Ocean Energy II*, 868 F.2d 740, 749 (5th Cir.1989). "The enterprise must have continuity of its structure and personnel, which links the defendants, and a common or shared purpose. . . An association in fact enterprise (1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." *Calcasieu*, 943 F.2d at 1461 (internal quotations omitted). In other words, an "association in fact enterprise must have an existence separate and apart from the pattern of racketeering." *Id.*

34. Plaintiffs argue that the Defendants, together, constitute an "association-in fact" enterprise because "the purpose of the association-in-fact was the perpetuation of Seery's

16

APP_101

position at HCM and using the Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including [Plaintiffs]." Appx. ¶115.  However, these allegations fail to show that Defendants functioned as a continuing unit, separate and apart from the alleged RICO violation, and fail to allege that Defendants are an "enterprise" within the purview of RICO.  *See Montesano*, 818 F.2d at 427 (allegations failed to allege association-in-fact enterprise under RICO where plaintiffs only alleged that defendants "conspired in this one instance," the "enterprise was the accomplishment of this discrete event.  That is not enough."); *Burzynski*, 989 F.2d at 743 (allegations of "association-in-fact" enterprise lack "continuity" where activity of enterprise related to the predicate acts forming basis of RICO allegations).

35.     Plaintiffs also fail to identify the roles of the two affiliates of the Debtor, HHCFA, and HCLOF, and how these two entities, with the Debtor, participated in the alleged criminal enterprise.  *See Allstate Insurance Company v. Benhamou*, 190 F. Supp. 3d 631, 656 (S.D. Tex. 2016) (complaint failed to sufficiently allege how party "participated in the operation or management of the enterprise or association-in-fact enterprise as required by the statute," and "from these sparse allegations it appears [party] had limited involvement in the entity's affairs."); *Allstate Ins. Co. v. Donovan*, No. CIV.A. H-12-0432, 2012 WL 2577546, at *14 (S.D. Tex. July 3, 2012) (plaintiffs failed to plead association-in-fact enterprise under RICO where the complaint "lacks factual allegations capable of establishing how the alleged scheme was formed, who—if anyone—was in charge, how each of the defendants participated in the alleged scheme other than providing independent services, or whether there were communications, agreements, or an understanding between the alleged parties that advanced the fraud").  Plaintiffs fail to allege the existence of an association-in-fact enterprise and fail to state a claim under RICO.

17

### iii. <u>Plaintiffs Fail to Allege Causation</u>

36.     Plaintiffs also fail to plausibly allege causation.  RICO provides civil remedies to "[a]ny person injured in [their] business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). "An injured party must show that the violation was the but-for and proximate cause of the injury." *Allstate*, 802 F.3d at 676 (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").  In general, "a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Bridge*, 553 U.S. at 659.

37.     Here, Plaintiffs fail to allege that the Debtor's actions induced them to act or that any alleged injuries were the proximate cause thereof.  Plaintiffs generally allege that "had Plaintiff been offered those [HCLOF] interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement." **Appx. 11 ¶**50.  Such conclusory and speculative allegations are insufficient to show proximate and but-for causation.[12]  *See Robinson*, 191 F. Supp. 3d at 645 (allegations failed to state causation required for alleged RICO violation where her "after-the-fact" and "bare assertion that she would have acted differently" had she known of certain facts is insufficient, and "absent additional factual allegations to support or explain this assertion," plaintiff's pleadings fail to 'nudge[] [her] claims across the line from conceivable to plausible.'") (quoting *Twombly*, 550 U.S. at 547); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 802 F. Supp. 2d 725, 729 (E.D. La. 2011) (plaintiffs fail to allege

---

[12] Although Plaintiff CLOH alleged in their objection to the Settlement that Defendants breached the "Right of First Refusal" under the Members Agreement, Plaintiff CLOH never stated it was interested in or willing to purchase the HarbourVest interests. *See* Ex. 8.

APP_103

proximate causation for RICO claim where economic harms suffered by plaintiffs are "too remote" and where theory of causation "depends on a series of speculative assumptions to link the alleged fraud" with the harm).

### 2.      Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty

38.      Plaintiffs fail to state a claim for breach of fiduciary duty.  Plaintiffs' fiduciary claim is premised on the Debtor's alleged: (i) insider trading; (ii) concealment of the value of the HarbourVest assets; and (iii) diversion of the investment opportunity from Plaintiffs to the Debtor, in violation of Section 10(b) of the Securities and Exchange Act of 1934 and Advisers Act. *See* **Appx. 11 ¶67-80**.  Where a plaintiff's breach of fiduciary duty claim is premised on theories of securities fraud, Rule 9(b)'s heightened pleadings standards apply.  *See Tigue Inv. Co. v. Chase Bank of Texas, N.A.*, No. CIV.A.3:03 CV 2490 N, 2004 WL 3170789, at *2 (N.D. Tex. Nov. 15, 2004).  This heightened pleading standard "protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Tuchman v. DSC Communications*, 14 F.3d 1061, 1067 (5th Cir.1994).

39.      "Section 10(b) of the Securities and Exchange Act of 1934 makes unlawful the use of 'any manipulative or deceptive device or contrivance' in contravention of SEC rules." *Alabama Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 608 (5th Cir. 1979).  Rule 10b-5 prohibits the use of any "artifice to defraud" or any act "which operates or would operate as a fraud or deceit."  *See id.*  "A cause of action lies under Rule 10b-5 'only if the conduct alleged can be fairly viewed as manipulative or deceptive' within the meaning of the statute." *Id.* (quoting *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473 (1977)).

40.      To state a securities-fraud claim under section 10(b), and Rule 10b–5, plaintiffs must plead: "(1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on

19

APP_104

which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368 (5th Cir. 2004). "A fact is material if there is 'a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.'" *Id.* (quoting *Grigsby v. CMI Corp.*, 765 F.2d 1369, 1373 (9th Cir.1985)). "[S]cienter is a crucial element of the securities fraud claims." *Tuchman*, 14 F.3d at 1067.

41.     Plaintiffs' allegations underlying its breach of fiduciary duty claim are premised largely the same conclusory allegations as those underlying its fraud-based RICO claim. ***See Appx. 1 ¶¶67-91***. Because Plaintiffs fail to plead securities fraud, any fiduciary claim premised on such allegations necessary fails as well. *See Town N. Bank, N.A.*, 2014 WL 4851558, at *27 (plaintiffs' "breach of fiduciary duty claim is based on the same allegations as its fraud claim. Rule 9(b) therefore applies.").

42.     Plaintiffs fail to plead with particularity that any alleged omissions by the Debtor assumed any real significance for the Plaintiffs. ***See, e.g.,* Appx. 11 ¶82-89** (speculating about Plaintiffs "lost opportunity cost," and vaguely asserting that "Defendants' malfeasance" has "exposed HCLOF to a massive liability from HarbourVest."). These allegations also fail to give rise to a "strong interference of scienter" sufficient to state a claim under Rule 10(b). *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 635 (S.D. Tex. 2003). Plaintiffs' allegations also fail to detail any deceptive motive on the part of the Debtor. The allegations are insufficient to lead to any inference of scienter. *See Southland*, 365 F.3d at 368 (plaintiff must plead "more than allegations of motive and opportunity to withstand dismissal" for claim of securities fraud). Plaintiffs' allegations regarding proximate cause are equally

APP_105

deficient. *See* **Appx. 11 ¶¶88-89** (generally alleging that because of Defendants' actions, "Plaintiffs have lost over $25 million").

43. Plaintiffs also fail to allege any breach of fiduciary claims premised on state law. Texas law[13] provides "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Matter of ATP Oil & Gas Corp.*, 711 F. App'x 216, 221 (5th Cir. 2017) (internal quotations omitted). "The plaintiff must plead some facts as to the nature of the relationship to state a plausible claim that that a fiduciary duty has been breached." *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 125 (5th Cir. 2019).

44. The Complaint fails to sufficiently allege facts regarding the nature of the relationship between Plaintiffs and the Debtor. *See* **Appx. 11** (generally alleging that (i) the Debtor "owed a fiduciary duty to [Plaintiffs]" pursuant to which the Debtor "agreed to provide sound investment advice, and (ii) this fiduciary relationship is "broad and applies to the entire advisors-client relationship"). The Complaint also fails to adequately allege that any state law or Guernsey fiduciary duty existed, let alone was breached. *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 125 (5th Cir. 2019) (complaint failed to allege "the nature of the fiduciary duty owed" to plaintiff). The allegations premised on the Debtor's breach of its "internal policies and procedures" or the diversion of "corporate opportunities" are otherwise conclusory. **Appx. 11 ¶¶72-89**. *See In re Soporex, Inc.*, 463 B.R. 344, 417 (Bankr. N.D. Tex. 2011) (allegations fail to state claim for breach of fiduciary duty were conclusory and "lack of factual content" relating to corporate mismanagement and corporate waste).

---

[13] Plaintiffs allege breach of fiduciary duty under state law; however, HCLOF is a Guernsey entity and the Members Agreement is governed by Guernsey law. *See* Ex. 13 at 14.

21

45.     To the extent that Plaintiffs rely on the Advisers Act in support of their Claims for breach of fiduciary duty, they still fail.[14]  Plaintiffs' Claim is purportedly premised on the Advisors Act because (i) Defendant Debtor was Plaintiff DAF's investment adviser under an advisory agreement and (ii) Defendant HHCFA is HCLOF's investment adviser under a separate advisory agreement.  However, the Adviser Act does not contain a private right of action to sue for damages arising from breach of fiduciary duty. *Corwin v. Marney, Orton Invs.*, 788 F.2d 1063, 1066 (5th Cir. 1986)); *Transamerica Mtg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) (holding there is no private right of action under Section 206 of the Advisors Act); *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 34 (S.D.N.Y. 2008) ("The only remedy available under the Advisers Act is rescission of the investment advisory contract and restitution of consideration paid for investment advisory services.").

46.     There is also no fiduciary duty owed to Plaintiff CLOH as an investor in HCLOF.  CLOH does not have any investment advisory relationship with Defendant Debtor (or HHCFA).  Plaintiff CLOH is merely an investor in HCLOF and not an advisory client of Defendant Highland or HHCFA.  It is well established that there is no fiduciary relationship between an investment adviser to HCLOF and investors in HCLOF. *See Goldstein v. SEC*, 451 F.3d 873, 879 (D.C. Cir. 2006) (no fiduciary relationship between an investment adviser to a pooled fund and an investor in the pooled fund).  The claim fails as a matter of law.  *See Town N. Bank*, 2014 WL 4851558, at *27 (fiduciary claim fails as a matter of law where no duty owed to plaintiff).

---

[14] Plaintiffs cite to Section 47(b) of the Advisers Act for the proposition that the Transfer of HCLOF's interests is unenforceable.  However, there is no Section 47(b) of the Advisers Act.

APP_107

### 3. Plaintiffs Fail to State a Claim for Breach of Members Agreement

47. Plaintiffs fail to plead sufficient facts to state a breach of contract claim premised on breach of the Members Agreement. Plaintiffs conceded there was no breach of the Members Agreement in open court. *See* **Appx. 9 at 7:20-8:6**. Plaintiffs' admission was driven by their recognition that their claim for breach is contradicted by the plain terms of the Member Agreement. Section 6.1 of the Members Agreement provides, in pertinent part, "[n]o Member shall sell … or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a '**Transfer**'), *other than to an Affiliate of an initial Member party hereto*, without the prior written consent of [HHCFA]." **Appx. 13 at** § 6.1 (emphasis added). Under the Members Agreement, "Affiliate" is defined as, "with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person. . ." (*Id*. § 1.1). A "Member" is a "holder of shares in the Company." The "initial Member[s]" are the initial Members of HCLOF listed on the first page of the Members Agreement and include the Debtor, HarbourVest, and CLO Holdco. Under the plain language of Section 6.1, HarbourVest is entitled – without the consent of any party – to "Transfer" its interests in HCLOF to an "Affiliate" of any of the Debtor, HarbourVest, or CLOH. Section 6.2 provides two exceptions to the "Right of First Refusal": (1) Transfers to "affiliates of an initial Member" from Members *other than* CLO Holdco and the "Highland Principals" and (2) Transfers from CLO Holdco or a Highland Principal to the Debtor, the Debtor's "Affiliates," or another Highland Principal. Since HarbourVest transferred its interests to the Debtor or its designee, an Affiliate of an initial Member, the plain language of section 6.2 exempts HarbourVest from having to comply with the "Right of First Refusal." *See* **Appx. 13; Appx. 8** **¶¶ 28-35.** Plaintiffs' breach of contract claim fails as a matter of law.

48.     Plaintiffs also fail to plead actual damages resulting from the alleged breach of the Members Agreement, other than contending, as it does throughout its Complaint, that "had plaintiff been allowed to do so, it would have obtained the interests" in HCLOF. (*Id.* ¶100). Such conclusory allegations are insufficient. *See Snowden v. Wells Fargo Bank, N.A.*, No. 3:18-CV-1797-K-BN, 2019 WL 587304, at *6 (N.D. Tex. Jan. 18, 2019), report and recommendation adopted, No. 3:18-CV-1797-K, 2019 WL 586005 (N.D. Tex. Feb. 12, 2019) (plaintiffs failed to plead breach of contract where they failed adequately plead "actual damages").

### 4.     Plaintiffs Fail to State a Claim for Negligence

49.     Plaintiffs fail to state a claim for negligence.  "The elements of a negligence claim under Texas law are: '(1) a legal duty on the part of the defendant; (2) breach of that duty; and (3) damages proximately resulting from that breach.'"  *Sivertson v. Citibank, N.A. as Tr. for Registered Holders of WAMU Asset-Back Certificates WAMU Series No. 2007-HE2 Tr.*, 390 F. Supp. 3d 769, 789 (E.D. Tex. 2019).  Plaintiffs' allegations underlying their negligence claim are premised on the same conclusory allegations forming the basis of their breach of contract and fiduciary duty claims. *See* **Appx. 1 ¶¶103-112**.  The same pleading deficiencies discussed above are present here regarding "duty" and "proximate case." *Id.* ¶¶106-107.  *See Rodgers v. City of Lancaster Police*, No. 3:13-CV-2031-M-BH, 2017 WL 457084, at *17 (N.D. Tex. Jan. 6, 2017) (plaintiff fails to allege how the alleged "negligence was the proximate cause of any damages to her" and fails to "allege facts related to the defendants' duty to her.").

### 5.     Plaintiffs Fail to State a Claim for Tortious Interference with Contract

50.     Plaintiffs' tortious interference claim is premised on the Debtor's alleged violation of the Member Agreement and concealment of the value of HCLOF. **Appx. 1 ¶¶134-141**.  To state a claim for tortious interference with contract, a plaintiff must show: "(1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that

24

proximately causes damage, and (4) actual damage or loss." *Specialties of Mexico Inc. v. Masterfoods USA*, No. CIV.A. L-09-88, 2010 WL 2488031, at *9 (S.D. Tex. June 14, 2010). Plaintiffs' claim fails to sufficiently allege how the Debtor intentionally interfered with the Members Agreement and, in fact, have admitted that the transfer of the HCLOF interests did not violate the Members Agreement. Plaintiffs also fail to allege proximate causation or any actual damages sustained as a result of the alleged interference. Accordingly, this claim should be dismissed.

### IV. <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that the Court grant its Motion and enter an order in the form annexed to the Motion as **<u>Exhibit A</u>**, and grant any further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:43286.6 36027/002

APP_110

Dated: May 27, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

26

APP_111

**Exhibit 4**

Plaintiffs' Response to Defendant Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference

Case No. 21-00842-B [Dkt. No. 36]

Docket #0036  Date Filed: 6/29/2021

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P. and
CLO Holdco, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** <br> **and CLO HOLDCO, LTD.,** <br> *directly and derivatively,* | § <br> § <br> § <br> § | |
| *Plaintiffs,* | § <br> § | |
| v. | § <br> § | **CAUSE NO. 3:21-cv-00842-B** |
| **HIGHLAND CAPITAL MANAGEMENT,** <br> **L.P., HIGHLAND HCF ADVISOR, LTD.,** <br> **and HIGHLAND CLO FUNDING, LTD.,** <br> *nominally,* | § <br> § <br> § <br> § <br> § | |
| *Defendants.* | § <br> § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR AN ORDER TO ENFORCE THE ORDER OF REFERENCE

1934054210630000000000000014   APP_113

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

I. PRELIMINARY STATEMENT ....................................................................1

II. BACKGROUND ............................................................................................2

III. ARGUMENT & AUTHORITY ......................................................................3

    A. The Motion Should Be Denied Because Withdrawal of the Reference is Mandatory .....................................................................3

    B. Automatic Referral is Unnecessary and Would Be Inefficient............................9

        1. The causes of action asserted by the Plaintiffs do not "arise under," or "arise in" Title 11 are not "core" proceedings ......................................................................10

        2. The Bankruptcy Court has limited post-confirmation "related to" jurisdiction..................................................12

    C. The *Res Judicata* Argument is Not Relevant to the Relief Sought in This Motion ...........................................................15

    D. The Local Rule 3.3 Argument is Unavailing ....................................16

    E. The Litigious-Nature Argument is Likewise Unavailing ................................17

    F. Plaintiffs' Cross-Motion Should be Granted ....................................18

VI. CONCLUSION.............................................................................................19

APP_114

# TABLE OF AUTHORITIES

**Cases**

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.),*
   203 F.3d 914 (5th Cir. 2000) ............................................................... 15

*Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),*
   266 F.3d 388 (5th Cir.2001) ................................................................ 18

*Beitel v. OCA, Inc. (In re OCA, Inc.),*
   551 F.3d 359 (5th Cir. 2008) ............................................................... 13

*Belmont v. MB Inv. Partners, Inc.,*
   708 F.3d 470 (3d Cir. 2013) .................................................................. 6

*Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners, L.P.),*
   No. H-18-411, 2018 U.S. Dist. LEXIS 161159 (S.D. Tex. 2018) ........................... 7

*Burch v. Freedom Mortg. Corp. (In re Burch),*
   835 F. App'x 741 (5th Cir. 2021) ......................................................... 18

*Celotex Corp. v. Edwards,*
   514 U.S. 300 (1995) ....................................................................... 15

*Chalmers v. Gavin,*
   No. 3:01-CV-528-H, 2002 U.S. Dist. LEXIS 5636 (N.D. Tex., Apr. 2, 2002) ............... 15

*Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.),*
   309 B.R. 217 (Bankr. N.D. Tex. 2004) .................................................... 14

*Davis v. Dall. Area Rapid Transit,*
   383 F.3d 309 (5th Cir. 2004) ............................................................. 15

*Davis v. Life Inv'rs Ins. Co. of Am.,*
   282 B.R. 186 (S.D. Miss.2002) ........................................................... 10

*Faulkner v. Eagle View Capital Mmgt. (In re The Heritage Org., L.L.C.),,*
   454 B.R. 353 (Bankr. N.D. Tex. 2011) .................................................... 13

*Faulkner v. Kornman,*
   No. 10-301, 2015 Bankr. LEXIS 700 (Bankr. S.D. Tex. 2015) ............................. 14

*Feld v. Zale Corp. (In re Zale Corp.),*
   62 F.3d 746 (5th Cir.1995) ............................................................... 12

APP_115

*Gupta v. Quincy Med. Ctr.*,
   858 F.3d 657 (1st Cir. 2017) ........................................................................... 11-124

*In re Cont'l Airlines Corp.*,
   50 B.R. 342 (S.D. Tex. 1985), *aff'd*, 790 F.2d 5th Cir. 1986) .................................. 4

*In re Exide Tech*s.,
   544 F.3d 196 (3d Cir. 2008) ......................................................................... 10

*In re Harrah's Entm't*,
   No. 95-3925, 1996 U.S. Dist. LEXIS 18097 (E.D. La. 1996) .................................. 1, 5, 9, 19

*In re IQ Telecomms., Inc.*,
   70 B.R. 742 (N.D. Ill. 1987) .......................................................................... 6

*In re Nat'l Gypsum Co.*,
   134 B.R. 188 (N.D. Tex. 1991) ...................................................................... 8

*In re Pegasus Gold Corp.*,
   394 F.3d 1189 (9th Cir. 2005) ...................................................................... 14

*Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   454 B.R. 307 (S.D.N.Y. 2011) ...................................................................... 3-4

*Kuzmin v. Thermaflo, Inc.*,
   No. 2:07-cv-00554-TJW, 2009 U.S. Dist. LEXIS 42810
   (E.D. Tex. May 20, 2009) ........................................................................... 16-17

*Legal Xtranet, Inc. v. AT&T Mgmt. Servx., l.P. (In re Legal Xtranet, Inc.)*,
   453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011) ................................................ 10, 11

*LightSquared Inc. v. Deere & Co.*,
   2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014) ................................................ 3-4

*Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc).*,
   783 F.2d 1283 (5th Cir. 1986) ...................................................................... 15

*Montana v. Goldin (In re Pegasus Gold Corp.)*,
   394 F.3d 1189 (9th Cir. 2005) ..................................................................... 14

*Price v. Rochford*,
   947 F.2d 829 (7th Cir. 1991) ....................................................................... 14

*Rannd Res. v. Von Harten (In re Rannd Res.)*,
   175 B.R. 393 (D. Nev. 1994) ....................................................................... 5-6

APP_116

*Reynolds v. Tombone*,
  Civil No. 3:96-CV-3330-BC, 1999 U.S. Dist. LEXIS 9995
  (N.D. Tex., June 24, 1999)......................................................................15

*Risby v. United States*,
  No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS 8798 (N.D. Tex. 2006) ................................15

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180, 84 S. Ct. 275 (1963)......................................................................6

*S. Pac. Transp. Co. v. Voluntary Purchasing Grps.*
  252 B.R. 373 (E.D. Tex. 2000) ........................................................................8

*Stern v. Marshall*,
  564 U.S. 462 (2011)..............................................................................10, 13

*Stoe v. Flaherty*,
  436 F.3d 209 (3d Cir. 2006)........................................................................11

*TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*,
  764 F.3d 512 (5th Cir. 2014) ....................................................................3, 18

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009)................................................................................15

*Travelers Ins. Co. v. St. Jude Hosp.*,
  37 F.3d 193 (5th Cir. 1994) ......................................................................15

*Triad Guar. Ins. v. Am. Home Mortg. Inv. Corp. (In re Am. Home Mortg. Holding)*,
  477 B.R. 517 (Bankr. D. Del. 2012) ..............................................................14

*TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC*,
  622 B.R. 680 (Bankr. N.D. Tex. 2020)..............................................................10

*UPH Holdings, Inc. v. sprint Nextel Corp.*,
  No. A-13-CA-748-SS, 2013 U.S. Dist. LEXIS 189349
  (W.D. Tex. 2013) ..............................................................................7-8

*United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.)*,
  301 F.3d 296 (5th Cir. 2002) ....................................................................10

*Valley Historic Ltd. P'ship v. Bank of N.Y.*,
  486 F.3d 831 (4th Cir. 2007) ....................................................................15

*Wood v. Wood (In re Wood)*,
  825 F.2d 90 (5th Cir.1987) ......................................................................11

APP_117

*Zerand-Bernal Grp. v. Cox,*
  23 F.3d 159 (7th Cir. 1994)-----------------------------------------------------------------------15

## Rules & Statutes

Fed. R. Civ. P. 12(b)(6)..................................................................................................18

LRCi 3.3...........................................................................................................................16, 17

LRCi 7(a) ................................................................................................................................17

LRCi 7(h) ................................................................................................................................17

LRCi 7(i) .................................................................................................................................17

LRCi 7.1(i) ..............................................................................................................................17

17 C.F.R. 275.206(4)-7 .........................................................................................................7

27 C.F.R. part 275 ..................................................................................................................7

15 U.S.C. § 80b-1 ..................................................................................................................8

28 U.S.C. § 157(d) ..........................................................................................................6,18, 19

28 U.S.C. § 1927 ....................................................................................................................18

## Other

Collier on Bankruptcy ¶ 3.02[2] (16th ed. 2010)...........................................................13

Investment Advisers Act of 1940 .......................................................................... *passim*

Investment Advisers Act Release No. 2106 (Jan. 31, 2003) ........................................7

Investment Advisers Act Release No. 3060 (July 28, 2010) ........................................7

Investment Advisers Act Release No. 4197 (Sept. 17, 2015)......................................7

Racketeer Influenced and Corrupt Organizations Act (RICO)........................... *passim*

Securities Act of 1933, § 12(2) ...........................................................................................6

Securities Exchange Act of 1934, § 10 ..............................................................................6

Securities Exchange Act, Rule 10b-5 ................................................................................6

APP_118

**PLAINTIFFS' RESPONSE TO DEFENDANT HIGHLAND CAPITAL
MANAGEMENT, L.P.'S MOTION FOR AN ORDER TO ENFORCE
THE ORDER OF REFERENCE AND CROSS MOTION**

## I.

## PRELIMINARY STATEMENT

Plaintiffs The Charitable DAF Fund, L.P. and CLO Holdco Ltd. oppose Defendant Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference.

This action primarily involves fiduciary duties imposed upon Registered Investment Advisers by the Investment Advisers Act of 1940 ("Advisers Act") and corresponding state law claims for breach of those duties. It also involves causes of action under the civil RICO statute, for which breaches of Advisers Act fiduciary duties serve as the predicate act. As a result, presiding over this action will require extensive consideration of federal laws regulating interstate commerce, which renders withdrawal of the reference to bankruptcy court mandatory under 28 U.S.C. § 157(d) ("The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.").

No authority requires this Court to refer this action to the bankruptcy court, only to have it return on a motion for withdrawal of the reference. The opposite is true. *In re Harrah's Entm't*, No. 95-3925, 1996 U.S. Dist. LEXIS 18097, at *11 (E.D. La. 1996) (Clement, J.) ("Although 'related to' bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal

---

APP_119

of the reference. Rather than *waste judicial resources* on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit." (emphasis added)). Defendant's arguments to the contrary are unsupported by law.

Defendant's attempts to smear Plaintiffs with 12 pages of irrelevant facts and a 926-page appendix provide no additional support for the Motion. This action involves matters well outside the experience of bankruptcy courts and requires adjudication in an Article III court.

Because the reasons for denying Defendant's Motion are also reasons that this Court should withdraw the reference under 28 U.S.C. § 157(d), and because deciding the same issue twice would be inefficient and unnecessary, Plaintiffs cross-move for withdrawal of the reference.

## II.

## BACKGROUND

Defendant's factual assertions include considerable bluster and vitriol, unsupported by the lengthy materials in its appendix. Importantly, the opening sentence under the heading "Factual Background" is unsupported and false. Memorandum of Law [Doc. 23] ¶ 7. Plaintiffs are not controlled or directed by James Dondero; Plaintiffs are both controlled and directed by Mark Patrick. APP_16-17, 22; *see also* APP_10-14; *see generally* APP_1-22. And Patrick's testimony to this extent went unchallenged in a hearing before the bankruptcy court earlier this month. *Id.*

Of equal importance is Defendant's assertion that all aspects of the Harbourvest settlement, including the valuation of the assets involved, were fully disclosed. Memorandum of Law [Doc. 23] ¶ 12. This statement is unsupported by the appendix cite accompanying it, which at most constitutes a self-serving denial. And it is a hotly contested issue between the parties. The impetus to this action, in fact, was Plaintiffs having learned that the value of the assets transferred in the Harbourvest settlement was *not* as represented. Original Complaint ("Complaint" [Doc. 1]), ¶¶ 36-

APP_120

48. Plaintiffs disagree with much of the remainder of what Defendant presents as "fact" in its Memorandum of Law. But Plaintiffs respectfully submit that none of it is relevant to resolution of the present Motion. And so, for brevity's sake, Plaintiffs have not elected to engage in a blow-by-blow effort to litigate those issues.

Instead, Plaintiffs' brief will focus on the nature of their causes of action as that pertains to which court—district or bankruptcy—should preside over them.

### III.

### ARGUMENT & AUTHORITY

Plaintiffs respectfully submit that Defendant's Motion should be denied and Plaintiffs' cross-motion granted for the reasons provided below:

**A. The Motion Should Be Denied Because Withdrawal of the Reference Is Mandatory**

Because the Complaint relies extensively on and largely is predicated on the Investment Advisers Act of 1940, withdrawal of the reference to the bankruptcy court is mandatory here under 28 U.S.C. § 157(d). That statute requires withdrawal of the reference when a proceeding "requires consideration" of non-bankruptcy federal laws regulating interstate commerce:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d); *cf. TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *LightSquared Inc. v. Deere & Co.*, 2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014) (quoting *Investor Prot. Corp. v. Bernard*

APP_121

*L. Madoff Inv. Sec. LLC*, 454 B.R. 307, 312 (S.D.N.Y. 2011), for the proposition that, "[i]n determining whether withdrawal is mandatory, the Court 'need not evaluate the merits of the parties' claims; rather, it is sufficient for the Court to determine that the proceeding will involve consideration of federal non-bankruptcy law'"); *In re Cont'l Airlines Corp.*, 50 B.R. 342, 360 (S.D. Tex. 1985), *aff'd*, 790 F.2d 5th Cir. 1986) ("While that second clause [of § 157(d)] might not apply when some 'other law' *only tangentially affects the proceeding*, it surely does apply when federal labor legislation *will likely be material* to the proceeding's resolution.") (emphasis added).

Plainly here, the claims in the Complaint at least involve federal laws "regulating organizations or activities affecting interstate commerce." The Advisers Act and the RICO statute are such laws, and at least the first and fourth counts of the Complaint sound under them. *See, e.g.*, Complaint ¶¶ 57 & n.5, 66, 69, 74 & n.6, 89 (explicitly invoking various provisions of the Advisers Act and accompanying regulations), 114, 117, 131, 132 (invoking the RICO statute). Defendant's entire argument against withdrawal of the reference thus turns on whether these laws "must be considered."

It is remarkable that Defendant suggests these statutes need not be considered. The briefing already puts at issue significant, hotly contested issues regarding the interplay of bankruptcy law and the Advisers Act, including

1. Whether Defendant owed fiduciary duties under the Advisers Act that are unwaivable;

2. To whom such duties are owed and whether they were violated;

3. Whether such Advisers Act fiduciary duties can be terminated by a blanket release in a bankruptcy settlement;

4. Whether *res judicata* applies to bar claims for breach of Advisers Act duties that had not yet accrued at the time of the action alleged to have barred them;

---

5. Whether a contractual jury waiver is enforceable as to claims for breach of unwaivable Advisers Act fiduciary duties;

6. Whether such waivers can be enforced as to non-parties to the waiver;

7. Whether breach of Advisers Act fiduciary duties can serve as a predicate for civil RICO liability under the RICO statute, among other significant legal issues.

Presiding over this action most certainly will require consideration of all these issues.

Before joining the Fifth Circuit, Judge Clement addressed a motion similar to Defendant's during her time in the Eastern District of Louisiana. There, in *In re Harrah's Entm't*, 1996 U.S. Dist. LEXIS 18097, at *7-8 (E.D. La. 1996), she denied a motion to refer a federal securities action to bankruptcy court, despite finding that the bankruptcy court had related-to jurisdiction. Judge Clement wrote,

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference. Rather than waste judicial resources on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit.

*Id.* at *11.

Judge Clement rejected the argument Defendant parrots here that the case would "only involve the simple application of established federal securities laws." *Id.* at *7. Instead, she relied on alleged "violations of several federal securities laws" and the plaintiff's attempt "to hold defendants directly liable and secondarily liable based on a 'controlling person' theory for certain acts and omissions." *Id.* Without any need to analyze how "established" the applicable law might be, Judge Clement concluded, [t]his federal securities litigation involves more than simple application of federal securities laws and will be complicated enough to warrant mandatory withdrawal under § 157(d)." *Id.* (citing *Rannd Res. v. Von Harten (In re Rannd Res.)*, 175 B.R.

393, 396 (D. Nev. 1994), for the proposition that withdrawal of the reference is mandatory where resolution requires more than simple application of federal securities laws, even though that court's determination was based solely on a review of the complaint's alleged violations of § 12(2) of the Securities Act of 1933, § 10 of the Securities Exchange Act of 1934, and Rule 10b-5).

This authority applies here. In the Complaint, Plaintiffs allege violations of federal securities law (the Advisers Act), as well as the RICO statute. Deciding even the pending motion to dismiss will require far more than simple application of these laws. Nothing more is necessary to satisfy § 157(d). *Cf. In re IQ Telecomms., Inc.*, 70 B.R. 742, 745 (N.D. Ill. 1987) ("Nevertheless, Central's second amended complaint easily meets [the § 157(d)] standard. Count 2 of the complaint consists of 76 pages and alleges that 29 individuals and entities violated RICO by engaging in a pattern of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and 139 specific instances of bankruptcy fraud, 18 U.S.C. § 152.").

Although it is unnecessary here to demonstrate that Plaintiffs' Advisers Act allegations will require application of *underdeveloped* law, that is certainly the case. As the Third Circuit pointed out in 2013, there is considerable "confusion" in the case law stemming from the fact that federal law (the Advisers Act) provides "the duty and the standard to which investment advisers are to be held," but "the cause of action is presented as springing from state law." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502 (3d Cir. 2013). The *Belmont* court further suggests the "confusion [that this situation] engenders may explain why there has been *little development in either state or federal law* on the applicable standards." *Id.* (emphasis added). "Half a century later," the *Belmont* court tells us, "courts still look primarily to *Capital Gains Research* [*,Inc.*, 375 U.S. 180, 192 (1963),] for a description of an investment adviser's fiduciary duties." *Id.* at 503;

---

APP_124

*see also* Plaintiffs' Response to Motion to Dismiss (addressing Defendant's erroneous argument that the Advisers Act creates no private right of action).

This observation is bolstered by the necessity of relying extensively on SEC regulations and rulings in the Complaint. *See* Complaint ¶ 57 & n.5 (invoking Investment Advisers Act Release Nos. 3060 (July 28, 2010), and 2106 (Jan. 31, 2003), 66 (17 C.F.R. 275.206(4)-7), 69 (27 C.F.R. part 275 and Rule 10b5-1), 74 & n.6 (Advisers Act Release No. 4197 (Sept. 17, 2015)).

None of the cases Defendant cites even remotely suggests that this type of complicated litigation involving underdeveloped securities laws does not require "consideration" of federal laws. In its lead case, *Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners, L.P.)*, No. H-18-411, 2018 U.S. Dist. LEXIS 161159 (S.D. Tex. 2018), the court only held that a state-law contract claim did not require substantial reliance on federal law merely because it involved a trust created under federal law (the OCSLA). *Id.* at *16-17. Moreover, the court's determination appears to have relied primarily, if not solely, on the fact that the bankruptcy court had already submitted a memorandum opinion on the defendant's summary judgment motion, disposing of the case without the need to rely on non-bankruptcy federal law. *Id.* at *14-15, 17.

Next, Defendant cites *UPH Holdings, Inc. v. Sprint Nextel Corp.*, No. A-13-CA-748-SS, 2013 U.S. Dist. LEXIS 189349 (W.D. Tex. 2013), which is, at most, only slightly on point. There, the court declined to withdraw the reference with regard to a turnover action under the Bankruptcy Code, with little analysis other than having repeated the parties' arguments. Thus, it is difficult to draw any significance from the decision. But the court seems to rely on the fact that "the primary dispute center[ed] around the existence of a 'regulatory black hole,' a span of time during which the rules concerning how to set [a telecom] intercarrier compensation rate were left undetermined." *Id.* at *6. And for that reason, the court seemed to believe there was little non-bankruptcy federal

law to consider. *Id.* at 7. Here, in contrast, the causes of action do not arise under the Bankruptcy Code, and there is an extensive regulatory scheme that, plainly, must be considered.

The other cases Defendant cites add little to the analysis, except that *S. Pac. Transp. Co. v. Voluntary Purchasing Gps*, 252 B.R. 373, 382 (E.D. Tex. 2000), holds against Defendant's position, having determined that even the court's "limited" role in approving a CERCLA settlement "necessarily involves the substantial and material consideration of CERCLA and not merely its straightforward application to the facts of this case." *Id.* at 384. The court's reason for this conclusion: its decision "will require the court to examine the unique facts of the case in light of those CERCLA provisions which create the causes of action at issue." *Id.* Of course, the same examination will be necessary here.

Notably, in *S. Pac. Transp.*, the court also stated, "[i]t is well settled that CERCLA is a statute "'rooted in the commerce clause' and is precisely 'the type of law . . . Congress had in mind when it enacted the statutory withdrawal provision [in § 157(d)].'" *Id.* at 382 (quoting *In re Nat'l Gypsum Co.*, 134 B.R. 188, 191 (N.D. Tex. 1991), (alterations in original)). The court could just as easily have been talking about the Advisers Act. *See* 15 U.S.C. § 80b-1 ("Upon the basis of facts disclosed by the record and report of the Securities and Exchange Commission made pursuant to section 30 of the Public Utility Holding Company Act of 1935, and facts otherwise disclosed and ascertained, it is hereby found that investment advisers are of national concern, in that, among other things—(1) their advice, counsel, publications, writings, analyses, and reports are furnished and distributed, and their contracts, subscription agreements, and other arrangements with clients are negotiated and performed, by the use of the mails and means and instrumentalities of interstate commerce; (2) their advice, counsel, publications, writings, analyses, and reports customarily relate to the purchase and sale of securities traded on national securities exchanges and in interstate

APP_126

over-the-counter markets, securities issued by companies engaged in business in interstate commerce, and securities issued by national banks and member banks of the Federal Reserve System; and (3) the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy.").

In sum, the Complaint alleges violations of non-bankruptcy federal law. In presiding over the case—indeed, in addressing the currently pending Motion to Dismiss—this Court will have to substantially and materially consider those laws and their interplay with bankruptcy law. Under § 157(d), this requires withdrawal of the reference, and Defendant's motion should be denied.

**B. Automatic Referral Is Unnecessary and Would Be Inefficient**

As noted previously, Judge Clement's ruling in *In re Harrah's Entm't*, 1996 U.S. Dist. LEXIS 18097 (E.D. La. 1996), establishes that reference to the bankruptcy court—only to have the reference withdrawn—is unnecessary:

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference. *Rather than waste judicial resources on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit.*

*Id.* at *11 (emphasis added).

Defendant nonetheless argues this Court must do precisely that. Plaintiffs submit this is both wrong and tenuous, because at this stage of the bankruptcy proceedings—post confirmation—it is unclear that the bankruptcy court has jurisdiction at all.

---

APP_127

1.  **The causes of action asserted by the Plaintiffs do not "arise under," or "arise in" Title 11 and are not "core" proceedings.**

In the Complaint, Plaintiffs do not seek relief that would undo or reverse any settlement approved by the bankruptcy court. Neither do they attempt an end run around the provisions of any approval, Defendant's protestations notwithstanding. A proper jurisdictional analysis demonstrates Plaintiffs' causes of action asserted here are not core proceedings within the bankruptcy court's jurisdiction, for the reasons addressed below.

First of all, "the 'core proceeding' analysis is properly applied not to the case as a whole, but as to each cause of action within a case." *Legal Xtranet, Inc. v. AT&T Mgmt. Servs., L.P. (In re Legal Xtranet, Inc.*), 453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011*); Davis v. Life Inv'rs Ins. Co. of Am.*, 282 B.R. 186, 193 n. 4 (S.D. Miss.2002); *see also In re Exide Tech*s., 544 F.3d 196, 206 (3d Cir. 2008) ("A single cause of action may include both core and non-core claims. The mere fact that a non-core claim is filed with a core claim will not mean the second claim becomes 'core.'").

Second, the Fifth Circuit has explained that "§ 157 equates core proceedings with the categories of 'arising under' and 'arising in' proceedings; therefore, a proceeding is core under section 157 if it invokes a substantive right provided by title 11[, it 'arises under' the Bankruptcy Code,] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case[, it 'arises in' a bankruptcy case]." *United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 692–93 (Bankr. N.D. Tex. 2020); *Stern v. Marshall*, 564 U.S. 462, 476 (2011).

---

APP_128

Third, none of the Plaintiffs' five causes of action—breach of fiduciary duty under the Advisers Act, breach of contract related to the HCLOF Company Agreement, negligence, RICO, and tortious interference—arise under title 11. That is, none of the substantive rights of recovery are created by federal bankruptcy law. And plainly so. Because "[a]rising under' jurisdiction [only] involve[s] cause[s] of action created or determined by a statutory provision of title 11," this is indisputably the case. *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir.1987) (noting that a proceeding does not "arise under" Title 11 if it does not invoke a substantive right, created by federal bankruptcy law, that could not exist outside of bankruptcy).

Fourth and finally, for similar reasons, none of Plaintiffs' causes of action "arise in" a bankruptcy case. "Claims that 'arise in' a bankruptcy case are claims that by their nature, *not their particular factual circumstance*, could *only* arise in the context of a bankruptcy case." *Legal Xtranet, Inc*., 453 B.R. at 708–09 (emphasis added) (citing *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006). Defendants contend that, because the factual circumstances giving rise to the causes of action included the HarbourVest Settlement, which was approved by the bankruptcy court, this somehow transforms these causes of action into core claims. *See* Memorandum of Law ¶ 36. But it is the nature of the causes of action that determines whether they are core, not their "particular factual circumstance."

To illustrate the point, in *Gupta v. Quincy Med. Ctr.,* 858 F.3d 657, 660 (1st Cir. 2017), the bankruptcy court issued a sale order which approved an asset purchase agreement whereby the purchaser became obligated to make certain payments to employees. The purchaser failed to make these payments so the employees sued the purchaser in bankruptcy court, and the bankruptcy rendered a judgment in favor of the employees. On appeal, the district court concluded that the bankruptcy court lacked subject matter jurisdiction over the claims—claims plainly related to and

existing only because of the approved sale order that gave rise to them. The First Circuit affirmed, explaining as follows:

> [T]he fact that a matter would not have arisen had there not been a bankruptcy case does not ipso facto mean that the proceeding qualifies as an 'arising in' proceeding. Instead, the fundamental question is whether the proceeding by its nature, *not its particular factual circumstance*, could arise only in the context of a bankruptcy case. In other words, it is not enough that Appellants' claims arose in the context of a bankruptcy case or even that those claims exist only because Debtors (Appellants' former employer) declared bankruptcy; rather, "arising in" jurisdiction exists only if Appellants' claims are the type of claims that can only exist in a bankruptcy case.

*Id*. at 664–65 (emphasis added).

Like the claims in *Gupta*, the Plaintiffs' causes of action here arose in the context of a transaction approved in a bankruptcy case. But obviously, the causes of action are not "the type of claims that can only exist in a bankruptcy case." And that ends the analysis. Because Plaintiffs' causes of action do arise under the Bankruptcy Code, and because they are not claims that could only arise in the context of bankruptcy, this action is not a core proceeding.

## 2. The Bankruptcy Court has limited post-confirmation "related to" jurisdiction.

Plaintiffs do not contest that this action is related to the bankruptcy case in some fashion. That is why they amended the Civil Cover Sheet to note the bankruptcy matter. But "related to" jurisdiction is a term of art with differing requirements depending on the status of the bankruptcy case. In its current, post-confirmation status, Plaintiffs submit that the bankruptcy court lacks even "related to" jurisdiction over this action.

"Related to" jurisdiction is meant to avoid piecemeal adjudication and promote judicial economy by aiding in the efficient and expeditious resolution of all matters connected to the debtor's estate. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 (5th Cir.1995). Importantly, proceedings merely "related to" a case under title 11 are considered "non-core"

APP_130

proceedings. *Stern*, 564 U.S. at 477; Collier on Bankruptcy ¶ 3.02[2], p. 3–26, n.5 (16th ed. 2010) ("The terms 'non-core' and 'related' are synonymous."). The jurisdictional standard for related to jurisdiction varies depending on whether the proceeding at issue was commenced pre or post confirmation. *See Beitel v. OCA, Inc. (In re OCA, Inc.),* 551 F.3d 359, 367 at n.10 (5th Cir. 2008). And "after confirmation of a reorganization plan, a stricter post-confirmation standard applies." *See Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390–91 (5th Cir.2001) (explaining this distinction).

Essentially, "after a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Id.* 266 F.3d at 390; *Faulkner v. Eagle View Capital Mmgt. (In re The Heritage Org., L.L.C.),* 454 B.R. 353, 358 (Bankr. N.D. Tex. 2011).

Here, on February 22, 2021, the Bankruptcy Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* [Bankruptcy Court Dkt. No. 1943]. The Complaint was filed on April 12, 2021. Thus, the proceeding was commenced post confirmation.

Defendant does not argue that this action involves "matters pertaining to the implementation or execution of the plan," as required under *Craig's Stores*. It does not even cite to that authority. Certainly Plaintiffs can think of no way that their action affects plan implementation or execution. Thus, it seems, Defendant's argument for bankruptcy court jurisdiction fails entirely.

While Defendant does argue that the bankruptcy court has "related to" jurisdiction as a result of a judgment potentially reducing available cash to pay creditors under the Confirmed Plan, Memorandum of Law ¶ 39, this is precisely the argument that the Fifth Circuit rejected in *Craig's*

---

*Stores*. *See Coho Oil & Gas, Inc. v. Finley Res., Inc.* (*In re Coho Energy, Inc.*), 309 B.R. 217, 220 (Bankr. N.D. Tex. 2004) (recognizing the rejection of this argument). As the Fifth Circuit explained: "while Craig's insists that the status of its contract with the Bank will affect its distribution to creditors under the plan, the same could be said of any other post-confirmation contractual relations in which Craig's is engaged." 266 F.3d at 391. And that type of effect does not meet the threshold for post-confirmation related-to jurisdiction.

Defendant also contends that there is post-confirmation "related to" jurisdiction because the lawsuit will delay payments to creditors under the Confirmed Plan. *Id*. But this is just a re-packaged reduction-in-assets argument. The same would be true of any post-confirmation lawsuit against Defendant and does not meet the "more exacting theory of post-confirmation bankruptcy jurisdiction" required by *Craig's Stores*.

Defendant may argue that the bankruptcy court's confirmation order has not yet gone effective due to having been appealed. But even if this distinction matters, at minimum, there ought to be a sliding scale toward narrower application of "related to" jurisdiction once the bankruptcy court has issued a final confirmation order. *See Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005) (stating "post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation jurisdiction, and … the *Pacor* formulation [used to analyze related-to jurisdiction] may be somewhat overbroad in the post-confirmation context"); *Faulkner v. Kornman*, No. 10-301, 2015 Bankr. LEXIS 700 (Bankr. S.D. Tex. 2015) (stating "[t]he general rule is that post-confirmation subject matter jurisdiction is limited"); *Triad Guar. Ins. v. Am. Home Mortg. Inv. Corp (In re Am. Home Mortg. Holding)*, 477 B.R. 517, 529-30 (Bankr. D. Del. 2012) (stating "[a]fter confirmation… the test for 'related to 'jurisdiction becomes more

---

APP_132

stringent if the plaintiff *files* its action after the confirmation date") (emphasis in original); *cf. rabbd*

v. *Rochford*, 947 F.2d 829, 832 n.1 (7th Cir. 1991) (noting that "after a bankruptcy is over, it may well be more appropriate to bring suit in district court").

Finally, the retention of jurisdiction in the confirmed plan does nothing to alter the forgoing analysis. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). A bankruptcy court may not "retain" jurisdiction it does not have. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). "[N]either the parties nor the bankruptcy court can create § 1334 jurisdiction by simply inserting a retention of jurisdiction provision in a plan of reorganization if jurisdiction otherwise is lacking." *Valley Historic Ltd. P'ship. v. Bank of N.Y.*, 486 F.3d 831, 837 (4th Cir. 2007); *see also Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) ("[O]rders approving [a] bankruptcy sale [or] . . . plan of reorganization . . . [cannot] confer jurisdiction. A court cannot write its own jurisdictional ticket.").

## C. The Res Judicata Argument Is Not Relevant to the Relief Sought in This Motion

Defendant's *res-judicata* argument does not belong in this Motion. It has no bearing on the issue presented here. This is because, to begin with, *res judicata* is always addressed by the second court in the second action. *See, e.g., Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc).*, 783 F.2d 1283 (5th Cir. 1986); *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309 (5th Cir. 2004); *Travelers Ins. Co. v. St. Jude Hosp.*, 37 F.3d 193 (5th Cir. 1994); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914 (5th Cir. 2000); *Risby v. United States*, No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS 8798 (N.D. Tex. 2006); *Chalmers v. Gavin*, 2002 U.S. Dist. LEXIS 5636, 2002 WL 511512 (N.D. Tex. Apr. 2, 2002); *Reynolds v. Tombone*, Civil No. 3:96-CV-3330-BC, 1999 U.S. Dist. LEXIS

APP_133

9995 (N.D. Tex. June 24, 1999). Moreover, *res judicata* is not a basis for referring a matter to the bankruptcy court, and Defendant offers no authority for the notion that it is.

Instead of arguing that its *res judicata* affirmative defense should result in referral to the bankruptcy court, Defendant argues that "the Complaint . . . must be dismissed on the basis of *res judicata*. Memorandum of Law at 24; *see also id.* at 23 (subheading: "The Complaint Is Barred by the Doctrine of Res Judicata"). But dismissal is the relief sought in Defendant's pending Motion to Dismiss, which raises the same *res judicata* arguments asserted here. Plaintiffs therefore will address *res judicata* in their concurrently filed response to the Motion to Dismiss.

## D. The Local Rule 3.3 Argument Is Unavailing

Defendant argues that Plaintiffs failed to disclose the related bankruptcy case by omitting it on the Civil Cover Sheet accompanying the Complaint, although Defendant does not request that the Court take any action as a result of the omission.

Plaintiffs submit that the omission was inadvertent, harmless, and has been corrected. The omission was inadvertent in that Plaintiffs intended to identify the Highland bankruptcy on the Civil Cover Sheet but inadvertently failed to do so and have since submitted an amended Civil Cover Sheet correcting the error. [Doc. 33]. The omission was harmless because the Complaint discloses both the bankruptcy and its relationship to the present action, a disclosure that was supplemented by Plaintiffs' Motion for Leave to Amend, which provides additional detail regarding the related bankruptcy case and attaches two orders issued in that case. Complaint ¶¶ 15-36; Motion for Leave and Exhibits [Docs. 6, 6-1, 6-2].

Defendant refers the Court to *Kuzmin v. Thermaflo.*, No. 2:07-cv-00554-TJW, 2009 U.S. Dist. LEXIS 42810, at *4-7 (E.D. Tex. May 20, 2009), for the proposition that failing to disclose a related case is a violation of the Local Rules. In *Kuzmin*, however, the plaintiff was faulted for

numerous failings, including (1) the failure to submit a Civil Cover Sheet at all, (2) the failure, upon receiving notice of the deficiency, to provide sufficient information for the clerk to identify the related action, and (3) filing a third action without any information indicating it was related to the previous two. *Id*. at *5. The court continued, finding that plaintiff's counsel in that case had also committed violations of the mandate for professionalism in the Texas Lawyer's Creed by failing to communicate about the filings with known counsel for the opposition. *Id*. at *6-12.

Plaintiffs respectfully submit that the *Kuzmin* case is inapposite. Plaintiffs here did not fail to submit a Civil Cover Sheet. They corrected the omission after it was brought to their attention, and their original filing did disclose, in the text of the Complaint, the information that was inadvertently omitted from the Civil Cover Sheet. Further, Plaintiffs here communicated promptly with counsel for the Defendant regarding the action and the related bankruptcy case by asking the Defendant's counsel in the related action if they would accept service of the Complaint and whether they objected to Plaintiffs' Motion for Leave to Amend.

These circumstances, Plaintiffs submit, do not rise to the level of a violation of Local Rule 3.3 or, alternatively, they constitute a harmless, corrected error at most. Plaintiffs ask the Court to treat them as no worse than Defendant's failure to include a certificate of conference with this Motion (Local Rule 7(h)), or its failure to confer with Plaintiffs' counsel before filing it (Local Rule 7(a)), or its failure to paginate its appendix consecutively (Local Rule 7(i)).

Finally, Plaintiffs submit that the omission complained of does not justify or even relate to the relief sought in this Motion.

APP_135

## E. The Litigious-Nature Argument Is Likewise Unavailing

Defendant's claims regarding James Dondero's litigiousness are likewise unconnected to the relief they are requesting here. Dondero is not a party to this case. Neither does he control either Plaintiff. APP_16-17.

For this argument, Defendant relies solely on *Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 F. App'x 741 (5th Cir. 2021), and 28 U.S.C. § 1927 ("Any attorney or other person . . . who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."). Neither authority addresses whether jurisdiction appropriately lies here or in the bankruptcy court. It appears that they are cited here merely to raise the specter of potential sanctions.

Plaintiffs respectfully submit that their claims here have merit and are not frivolous. And Defendant's contrary position can and should be addressed in connection with Defendant's pending motion under Rule 12(b)(6) rather than in connection with this Motion.

## F. Plaintiffs' Cross-Motion Should Be Granted

For the same reasons Defendant's Motion should be denied, Plaintiffs' cross-motion should be granted. Presiding over this action will require consideration of non-bankruptcy federal laws regulating interstate commerce, as well as their interplay with the Bankruptcy Code. Thus, the mandatory-withdrawal-of-the-reference provision of 28 U.S.C. § 157(d) applies.

Moreover, the bankruptcy court's jurisdiction is limited, both by § 157(d) and by plan confirmation. *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *Bank of La. v. Craig's*

---

APP_136

*Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390–91 (5th Cir.2001) (explaining that, "after confirmation of a reorganization plan, a stricter post-confirmation standard applies," and "after a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.").

No authority requires this Court to refer this action to the bankruptcy court, only to have it return on a motion for withdrawal of the reference. The opposite is true. *In re Harrah's Entm't*, No. 95-3925, 1996 U.S. Dist. LEXIS 18097, at *11 (E.D. La. 1996) (Clement, J.). Thus, this Court should deny Defendant's Motion, withdraw the reference under § 157(d), and retain jurisdiction over this action.

## VI.

## CONCLUSION

For all of these reasons, Plaintiffs respectfully submit Defendant's Motion should be denied.

APP_137

Dated:  June 29, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

_/s Jonathan Bridges_
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
   jeb@sbaitilaw.com

**Counsel for Plaintiffs**

---

APP_138

**Exhibit 5**

Debtor's Reply in Support of Debtor's Motion to Enforce the Order of Reference

Case No. 21-00842-B [Dkt. No. 42]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | § § § § § § § § § § § § | |
| Plaintiff, | | Case No. 3:21-cv-00842-B |
| vs. | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | | |
| Defendants. | | |

**DEBTOR'S REPLY IN SUPPORT OF DEBTOR'S MOTION TO ENFORCE THE
<u>ORDER OF REFERENCE</u>**

1934054210713000000000007
APP_140

The Debtor submits this reply in support of the *Debtor's Motion for an Order to Enforce the Order of Reference* [D.I. 22] (the "<u>Motion</u>").[1] In further support of its Motion, the Debtor states as follows:

## I.  **PRELIMINARY STATEMENT**[2]

1.  Plaintiffs argue that the Court should deny the Motion because (i) mandatory withdrawal is required under 28 U.S.C. § 157(d); (ii) the Bankruptcy Court lacks jurisdiction to adjudicate the Complaint; and (iii) their violation of Local Rule 3.3 is harmless because withdrawal of the reference was inevitable. Plaintiffs' arguments fail for several reasons.

2.  ***First***, mandatory withdrawal does not apply. The Complaint does not require substantial and material consideration of non-bankruptcy federal law. Rather, it involves application of well-settled law, including law from the Supreme Court, to address four fundamental issues: (a) did the Defendants owe Plaintiffs a fiduciary duty under the Advisers Act; (b) the scope of such duty and if it was breached; (c) remedies and damages for any breach; and (d) if a violation of the Advisers Act is a predicate act under RICO. Bankruptcy courts routinely adjudicate these issues. None of them require mandatory withdrawal.

3.  ***Second***, the Bankruptcy Court has jurisdiction to adjudicate the Complaint. Bankruptcy jurisdiction is determined when the facts giving rise to the claim arose, not when a lawsuit is filed. The facts underlying the Complaint arose ***prior*** to confirmation (and would constitute an administrative claim if a claim exists); the Plan has not yet become effective; and the Debtor's assets have not vested in the Reorganized Debtor. Under Fifth Circuit precedent, the

---

[1] All capitalized terms used but not defined herein have the meanings set forth in *Defendant Highland Capital Management, L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference* [D.I. 22] (the "<u>Memorandum</u>").

[2] Concurrently herewith, the Debtor is filing the *Appendix in Support of Debtor's Reply in Support of the Debtor's Motion to Enforce the Order of Reference*. Citations to the Appendix are notated as follows: Appx. #.

APP_141

Bankruptcy Court has jurisdiction to adjudicate the Complaint as it is integrally related to the Bankruptcy Court's prior approval of the HarbourVest Settlement.[3] Even if a narrower standard is appropriate, which it is not, the Bankruptcy Court has "related to" jurisdiction.

4.      ***Third***, Plaintiffs' failure to follow Local Rule 3.3 is not harmless. Had they followed the Rule, the Complaint would likely have been referred to the Bankruptcy Court and, under the local bankruptcy rules,[4] the **Bankruptcy Court** would have conducted a status conference on withdrawal of the reference and provided a recommendation to this Court as to whether mandatory withdrawal applies. Plaintiffs conveniently filed an inaccurate Civil Cover Sheet[5] and could not explain why the Complaint did not refer to 28 U.S.C. § 1334 as a jurisdictional predicate.[6] Plaintiffs' goal[7] here (and its wider strategy) is to avoid the Bankruptcy Court and allow it no input on which court should adjudicate the Complaint.[8]

## NO SUBSTANTIAL AND MATERIAL CONSIDERATION OF FEDERAL LAW

5.      Withdrawal of the reference is required under 28 U.S.C § 157(d) if a matter requires "substantial and material consideration" and "significant interpretation of federal laws" rather than a "straightforward application of a federal statute to a particular set of facts." *In re Nat'l Gypsum*,

---

[3] The claims in the Complaint are barred by *res judicata* for the reasons set forth in the *Memorandum* (Appx. 1 at 29-30) and *Debtor's Reply in Support of Motion to Dismiss Complaint* filed concurrently herewith.

[4] Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas, Rule 5011-1.

[5] Plaintiffs filed an amended Civil Cover Sheet [D.I. 33] but failed to disclose another related matter: the appeal of the HarbourVest Settlement pending in the District Court for the Northern District of Texas.

[6] Appx. 2 at 109-110.

[7] Plaintiffs attempt to distance themselves from Mr. Dondero and the vexatious litigation he has initiated directly and through his related entities. Mr. Patrick's testimony that Mr. Dondero does not control the litigation was controverted and is contradicted by Mr. Patrick's own testimony and that of Mr. Dondero, and Grant Scott. *See, e.g.,* Appx. 2 at 137-141, 155-156, 189-191, 200-201, 213, 234-240, 242; Appx. 3 at 339-380. Further, the Bankruptcy Court found in the Confirmation Order that Mr. Dondero was coordinating his related entities' efforts to "burn down the Debtor" through vexatious litigation. *See* Appx. 4 at 398-400, 436-438. A list of this litigation was included in the appendix to the Memorandum; however, it is outdated as Mr. Dondero has continued to litigate. An updated list is Appx. 5 at 543. The Motion should be viewed in the context of this litigation.

[8] The Bankruptcy Court conducted a hearing on the Contempt Motion on June 8, 2021, and subsequently said it will find certain defendants in that action, which may include Plaintiffs, in contempt. Appx. 2 at 322-323. The Bankruptcy Court has not yet issued its written order but intends to do so shortly. Appx. 6 at 676.

2

APP_142

14 B.R. 188, 192-93 (N.D. Tex. 1991); *see also Rodriguez v Countrywide Home Loans, Inc.,* 421 B.R. 341, 347-8 (S.D. Tex. 2009) (adopting majority view requiring "material and substantial consideration of non-Bankruptcy Code federal law" for mandatory withdrawal). "Consideration" means something more than the mere process of examining, thinking about, or taking into account." *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 953-54 (7th Cir. 1996) (internal quotations omitted). Simply asserting federal law is insufficient and mandatory withdrawal only applies when a matter requires something "more than mere application of existing law to new facts." *Vicars*, *96 F.3d at 953-54; City of N.Y. v., Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) (mandatory withdrawal requires "significant interpretation, as opposed to simple application, of federal laws"). "[M]andatory withdrawal is to be applied narrowly" to "prevent 157(d) from becoming an 'escape hatch.'" *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist. LEXIS 101134, at *6 (N.D. Tex. Oct. 1, 2009), *aff'd* 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009).

6.     Plaintiffs attempt to meet this stringent standard by exaggerating the complexity of their claims. But, their claims are simple and straightforward: (1) (a) did Defendants owe Plaintiffs a fiduciary duty under the Advisers Act; (b) what was that duty and was it violated; and (c) if violated, what are the remedies and potential damages and (2) is the securities violation a predicate act under RICO? These are not difficult questions or outside the Bankruptcy Court's expertise.

7.     **Fiduciary Duty under the Advisers Act.** It is well-settled that, with limited, inapplicable exceptions, Section 206 of the Advisers Act[9] creates a fiduciary duty to an investment adviser's "client" (*i.e.*, the person or entity that is the counterparty to the investment management agreement) but not to an underlying investor in the "client." *Goldstein v. SEC*, 451 F.3d 873,

---

[9] Plaintiffs cite Rule 206(4)-8 of the Advisers Act, but Rule 206(4)-8 "does not create under the Advisers Act a fiduciary duty to investors or prospective investors in a pooled investment vehicle not otherwise imposed by law" or "a private right of action." Inv. Adv. Act Rel. No. 2628 (Aug. 3, 2007), Appx. 12 at 843-844.

3

APP_143

881(D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund [i.e., the client], not to the fund's investors. . . If the investors are owed a duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.");[10] *see also, e.g., SEC v. Northshore Asset Mgmt.*, 2008 U.S. Dist. LEXIS 36160, at *18-20 (S.D.N.Y. May 5, 2008) (dismissing a claim that an investment adviser owed a duty to a fund's investors rather than just the fund); *SEC v. Trabulse*, 526 F.Supp.2d 1008, 1016 (N.D. Cal. 2007) (same). HCLOF is a fund managed by HCFA, an affiliate of the Debtor. The DAF and CLOH are investors in HCLOF. The Debtor and HCFA's duties do not run to investors in HCLOF. The Debtor has never had a management agreement or client relationship with CLOH and owes it no fiduciary duty. The Debtor, at all relevant times, was party to a management agreement with the DAF and owed DAF certain duties under the agreement.[11] This analysis is not complicated and only requires a straightforward application of federal law to the facts.

8.     **The Scope of the Fiduciary Duty and Breach.** An adviser's fiduciary duty is satisfied by disclosure. "To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship." *See Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18, Effective July 12, 2019, Appx. 8 at 722-723. The law is well-established; includes Supreme Court jurisprudence; and is not based on interpretation of SEC releases. *See, e.g., SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963); *Laird v. Integrated Resources,*

---

[10] There are limited exceptions to *Goldstein*, which rely on specific features in the relationship between the adviser and the investor that are not applicable here. *See U.S. v. Lay*, 612 F.3d 440, 444 (6th Cir. 2010) (only one investor in the fund); *SEC v. Sentinel Mgmt. Grp., Inc.*, 2012 U.S. Dist. LEXIS 57579, at *13 (N.D. Ill. Mar. 30, 2012) (investment guidelines were personalized for each individual investor); *Goldenson v. Steffens*, 802 F. Supp. 2d 240, 268 (D. Me. 2011) (allegations adviser had provided personalized advice to investor).

[11] The Debtor and the DAF entered into that certain *Second Amended and Restated Investment Advisory Agreement,* effective from January 1, 2017 (the "DAF Agreement"). The DAF Agreement terminated on February 28, 2021.

APP_144

*Inc.*, 897 F.2d 826, 831-36 (5th Cir. 1990). Adjudicating this issue only requires determining if appropriate disclosures were made.[12]

9.    **Remedies for Breach of Duty.** Assuming, *arguendo*, the Debtor breached its fiduciary duty to the DAF under the Advisers Act, there is no private right of action for such breach. *Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 13-14 (1979) ("[W]e hold there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable [on a client].")[13] The **only** remedy the DAF has for breach of fiduciary duty is to void the DAF Agreement (which has already been terminated), and the DAF cannot seek damages for breach of fiduciary duty (with the possibility of restitution). *See, e.g., Transamerica*, 441 U.S. at 13-14; *Corwin*, 788 F.2d at 1066; *Douglass*, 900 F.Supp.2d at 746.

10.    **Bankruptcy Courts Apply the Advisers Act.** Bankruptcy courts routinely analyze federal securities laws. In fact, prior to the commencement of the Debtor's case, the Debtor, under Mr. Dondero's control, was heavily involved in the bitterly contested *Acis* bankruptcy. Appx. 1 at 15. HCLOF invested in certain CLOs managed by Acis. Mr. Dondero owned and controlled Acis prior to the appointment of a chapter 11 trustee in the *Acis* bankruptcy and controlled HCLOF prior to the Bankruptcy Case. In *Acis*, the Debtor (controlled by Dondero) brought claims **in the Bankruptcy Court** alleging Acis was liable to it for breach of fiduciary duties under the Advisers

---

[12] Exhibit A to the DAF Agreement includes pages of disclosures, including the following: (1) "None of the [Highland Group] . . . is precluded from engaging in or owning an interest in. . . investment activities of any kind, whether or not such ventures are competitive with [the DAF]" and (2) "[T]he Highland Group. . . may actively engage in transactions in the same securities sought by [the DAF] and, therefore, may compete with [the DAF] for investment opportunities or may hold positions opposite to positions maintained by [the DAF]." Appx. 7 at 694-695.

[13] *See also Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502 (3rd Cir. 2012) ("With the exception of a private remedy relating to certain investment advisory contracts, 'the [Advisers] Act confers no other private causes of action, legal or equitable.'") (citations omitted); *Corwin v. Marney, Orton Inv.*, 788 F.2d 1063, 1066 (5th Cir. 1986) (affirming dismissal of claims under the Advisers Act "because the investors had no private causes of action"); *Douglass*, 900 F.Supp.2d at 746-47 (same).

Act – asserting nearly identical claims to those made in the Complaint. Appx. 9 at 757-758.
Plaintiffs' position is an about-face from Mr. Dondero's prior position, and their argument that the
Bankruptcy Court cannot adjudicate these disputes is disingenuous.

11.     Further, 11 U.S.C. § 523(a)(19) requires bankruptcy courts to determine whether
there were violations of "federal securities laws (as that term is defined in section 3(a)(47) of the
Securities Exchange Act of 1934),[14] any of the State securities laws, or any regulation or order
issued under such Federal or State securities laws. . ." in connection with dischargeability. As part
of this analysis, bankruptcy courts look to, among other things, the applicability of the Advisers
Act. *See, e.g., Tillman Enters., LLC v. Horlbeck (In re Horlbeck)*, 589 B.R. 818, 832 (Bankr. N.D.
Ill. 2018) ("bankruptcy courts have jurisdiction to determine liability on an underlying securities
claim for purposes of § 523(a)(19)" and "liability under § 523(a)(19) cannot be supported by an
alleged violation" of the Advisers Act as there is no private remedy or "actionable claim"); *Tradex
Global Master Fund SPC, Ltd. v. Pui-Yun Chui (In re Pui-Yun Chui)*, 538 B.R. 793, 806-08 (Bankr.
N.D. Cal. 2015) (same).[15] Bankruptcy court analysis of the Advisers Act is not limited to Section
523(a)(19). *See Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*, 485 B.R. 604
(Bankr. W.D. Wash. 2013) (dismissing complaint alleging that defendant owed a fiduciary duty to
an investor under the Advisers Act for failure to state a claim); *Living Benefits Asset Mgmt. v.
Kestrel Aircraft Co. (In re Living Benefits Asset Mgmt.),* 587 B.R. 311, 317-20 (N.D. Tex. 2018)
(affirming bankruptcy court's rulings under the Advisers Act), *aff'd* 916 F.3d 528 (5th Cir. 2019);

---

[14] Section 3(a)(47) of the Securities Exchange Act of 1934 (the "Exchange Act") defines "securities laws" as "the
Securities Act of 1933 (15 U.S.C. 78a et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), the
Sarbanes-Oxley Act of 2002, the Trust Indenture Act of 1939 (15 U.S.C. 77aaa et seq.), the Investment Company Act
of 1940 (15 U.S.C. 80a-1 et seq.), *the Investment Advisers Act of 1940* (15 U.S.C. 80b et seq.), and the Securities
Investor Protection Act of 1970 (15 U.S.C. 78aaa, et seq.)."

[15] *See also King v. Skolness (In re King)*, 624 B.R. 259, 301 (Bankr. N.D. Ga. 2020) (bankruptcy court could determine
liability under state and federal securities laws for purposes of § 523(a)(19)); *Holzhueter v. Groth (In re Holzhueter)*,
571 B.R. 812, 822-24 (Bankr. W.D. Wis. 2017) (same).

6

*In re Acis Capital Mgmt. L.P., et al.*, Case No. 18-30264-sgj11, D.I. 549 (Bankr. N.D. Tex. Sept. 4, 2018) (finding the Advisers Act did not prohibit assumption of a management agreement under Section 365).

12.     **Plaintiffs Cite No Applicable Case Law.** Plaintiffs wave the red flag of "securities laws" and cite two factually inapposite cases to support their argument. ***First***, they cite *In re Harrah's Entertainment*, 1996 U.S. Dist. LEXIS 18097 (E.D. La. Nov. 26, 1996), which has nothing to do with the Advisers Act. *Harrah's* involved a class action arising from the issuance of $435 million in publicly-traded debt; claims that the prospectus violated the Exchange Act; and attempts to hold the issuer's partners liable for the issuer's actions under the Exchange Act. The district court ruled that mandatory withdrawal applied because of the foregoing factors; however, none of them apply here. There is no public issuance; no retail investors; no class action; no derivative liability; no applicability of the Exchange Act; and no complicated factual analysis. Plaintiffs' Advisers Act claims require only the straightforward application of settled law to the facts in a dispute between two private parties. ***Second***, Plaintiffs cite *Belmont* for the proposition that there is "considerable 'confusion'" because "federal law (the Advisers Act) provides, 'the duty and the standard to which investment advisers are to be held,' but 'the cause of action is presented as springing from state law.'" Appx. 10 at 788. Plaintiffs ignore *Belmont's* holding. *Belmont* confirms no private right exists under the Advisers Act. *Belmont*, 708 F.3d at 502. The only "confusion" is if ***state, not federal, law*** creates a private right. *Id.* (finding the prohibition on private rights in the Advisers Act "ought to call into serious question whether a limitation in federal law can be circumvented simply by hanging the label 'state law' on an otherwise forbidden federal law claim" but recognizing split on state law claims). 28 U.S.C. § 157(d) deals with federal law, and state law claims are irrelevant.

7

APP_147

13.    __The Advisers Act Is Not a Predicate for RICO:__ Plaintiffs allege the violation of

the Advisers Act, among other things, in connection with a sale of a security (the HCLOF interests)

is a predicate act. Appx. 11 at 826-827. However, RICO expressly excludes securities fraud as a

predicate act. 18 U.S.C.A. § 1964(c) ("[N]o person may rely upon any conduct that would have

been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO].").[16]

Plaintiffs' RICO claim is for securities fraud; is barred by statute; and cannot support mandatory

withdrawal. *See, e.g., MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 273-80 (2d Cir.

2011) (barring RICO claims arising out of the operation of a Ponzi scheme because they involved

a purchase or sale of a security despite no private right of action existing); *Affco Invs. 2001 LLC

v. Proskauer Rose L.L.P.*, 625 F.3d 185, 189-91 (5th Cir. 2010) (same).[17]

## THE BANKRUPTCY COURT HAS JURISDICTION

14.    "Related to" jurisdiction exists if resolution of a dispute would have a "conceivable

impact on the estate." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987). A judgment

against the Debtor would significantly impact the estate and there is "related to" jurisdiction.[18]

---

[16] *See also* H.R. Rep. No. 104-369, at 47 (1995) ("The Committee intends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action. In addition, the . . . Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.").

[17] Plaintiffs' additional arguments to support mandatory withdrawal are easily disposed of. First, there is no contention that the HarbourVest Settlement Order released Plaintiffs' claims and this issue is made up. Second, there is no issue regarding whether *res judicata* applies to claims not yet accrued. The Debtor's alleged breach of duties raised in the Complaint occurred prior to approval of the HarbourVest Settlement. Third, *res judicata* is an issue, but there is no "federal issue" to consider. *See Rothstein v. Kuosenfung*, 2009 U.S. Dist. LEXIS 68329, at *4-5 (S.D.N.Y. July 29, 2009) (finding movant's Advisers Act claim barred by *res judicata* under typical analysis); *Pt Pukuafu Inda v. SEC*, 2009 U.S. Dist. LEXIS 92986, at *18 (E.D. Mich. Oct. 6, 2009) (same). Lastly, Plaintiffs' jury trial waiver argument is a red herring. The DAF waived its jury trial right in the DAF Agreement. The Debtor has not argued that CLOH waived its jury trial rights (if any). It argues the Debtor owes no fiduciary duty to CLOH and that no private right of action exists under the Advisers Act. The Court should reject the attempt to create controversy and a federal issue where none exists. *See, e.g., Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.)*, 2015 U.S. Dist. LEXIS 74006, at *21-23 (D. Me. June 8, 2015) (finding no mandatory withdrawal when movant simply "tries to kick up some dust to make the relevant analysis seem complicated").

[18] A proceeding "relates to" a proceeding under title 11 *even if it arises from post-petition conduct* if "it affects the estate, not just the debtor." *Wood*, 825 F.2d at 94 (emphasis added).

DOCS_NY:43654.3 36027/002

APP_148

15.     Plaintiffs argue that because the Bankruptcy Court confirmed the Plan its jurisdiction is limited and determined under the restrictive standard in *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores, Inc.),* 266 F.3d 388 (5th Cir. 2001). *Craig's Stores* did hold that a bankruptcy court may **lack** jurisdiction over **post-confirmation claims based on post-confirmation activities** but not that a bankruptcy court **loses** jurisdiction over **pre-confirmation claims based on pre-confirmation activities** just because of confirmation. *Newby v. Enron Corp. (In re Enron Corp. Sec.),* 535 F.3d 325, 335-336 (5th Cir. 2008) *citing Craig's Stores,* 266 F.3d at 389-90. Here, Plaintiffs' alleged claims arose from the HarbourVest Settlement and **prior to** confirmation of the Plan.

16.     Based on *Craig's Stores* and other decisions,[19] courts developed a six-factor test to determine if there is "related to" jurisdiction post-confirmation: (1) when the claim arose; (2) what provisions in the plan exist for resolving disputes and whether the plan retains jurisdiction; (3) if the plan has been substantially consummated; (4) the parties involved; (5) if state or bankruptcy law applies; and (6) indices of forum shopping. *Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.),* 309 B.R. 217 (Bankr. N.D. Tex. 2004); *Ebner v. Woodforest Partners, L.P. (In re EBCO Land Dev., Ltd.),* 2008 Bankr. LEXIS 1207 (Bankr. S.D. Tex. Apr. 17, 2008).

17.     Even if the more restrictive standard applies, these factors support bankruptcy court jurisdiction in this case. The claims in the Complaint arose from the HarbourVest Settlement (which occurred pre-confirmation) and, if they exist, are administrative claims;[20] the Plan provides

---

[19] *See EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.),* 430 F.3d 260 (5th Cir. 2005); *U.S. Brass Corp. v. Travelers Ins. Group (In re U.S. Brass Corp.),* 301 F.3d 296 (5th Cir. 2002); *In re Case,* 937 F.2d 1014 (5th Cir. 1991).

[20] The causes of action asserted in the Complaint arose post-petition/pre-confirmation and thus the Complaint is, in effect, a motion for payment of an administrative claim under 11 U.S.C. § 503; should have been filed in the Bankruptcy Court; and is subject to allowance under the Bankruptcy Code and the Plan. A request for payment of an administrative claim is a core proceeding under 28 U.S.C. § 157(B)(2)(A) and (O), and arises in and under title 11. *See, e.g., Piper Aircraft Corp. v. Calabro (In re Piper Aircraft Corp.),* 169 B.R. 766, 776 (Bankr. S.D. Fla. 1994) (in tort context, administrative claim arises from a transaction with the debtor-in-possession, and that transaction must

9

a procedure for administrative claims; the Plan has not been substantially consummated;[21] the defendant is the Debtor (and possibly its CRO/CEO); and Plaintiffs are forum shopping.[22]

## NO WASTE OF JUDICIAL RESOURCES

18.   Granting the Motion would give this Court the benefit of the Bankruptcy Court's recommendation on mandatory withdrawal as required by the local rules, which require a party to file a motion for withdrawal with the bankruptcy clerk so the bankruptcy court can make a report and recommendation to this Court.[23] This is particularly important here as the Bankruptcy Court is very familiar with the parties and the issues, having conducted the evidentiary hearing to approve the HarbourVest Settlement.[24] The Bankruptcy Court's report and recommendation will aid this Court in analyzing whether withdrawal is appropriate. Plaintiffs' attempts to maneuver around the Bankruptcy Court should not be rewarded.

---

have benefitted the debtor in the operation of its post-petition business.). Once paid or disallowed, Plaintiff's administrative claim will be discharged under 11 U.S.C. § 1141(d)(1).

[21] There is recognition that while 11 U.S.C. § 1141 references confirmation of the plan, the "Effective Date is the date upon which a *confirmed* plan becomes operative and distribution of property and cash is commenced." *See* Benjamin Weintraub & Michael J. Crames, *Defining Consummation, Effective Date of Plan of Reorganization and Retention of Postconfirmation Jurisdiction: Suggested Amendments to the Bankruptcy Code and Bankruptcy Rules*, 64 Am. Bankr. L.J. 245, 277 (1990) (emphasis added); *see also* 11 U.S.C. § 1129 (allowing confirmation only if certain requirements are met, including nine referencing "the effective date of the plan").

[22] Plaintiffs, without any authority, contend that confirmation is a significant event in the jurisdictional analysis. As the *Ebner* court stated: "An action impacting a confirmed, but not substantially consummated, plan would have an impact on the debtor-creditor relationship, a factor which favors continuing jurisdiction. *See Craig's Stores*, 266 F.3d at 391." *Ebner* at *20-21. The Plan is not effective and has not been substantially consummated. *See* 11 U.S.C. § 1101(2). And it makes sense that the jurisdictional analysis of a dispute arising before a plan is effective should be more expansive. The rationale for narrowing post-confirmation jurisdiction is that the debtor is no longer under the supervision and control of the bankruptcy court; has emerged from bankruptcy; and is continuing to operate its business unfettered by the strictures of the Bankruptcy Code. *Craig's Stores*, 266 F.3d 390. Because the Plan in this case is not yet effective, the Debtor's assets have not vested in the Reorganized Debtor and the Debtor continues to operate under the strictures of the Bankruptcy Code. Plaintiffs cite no cases to support a restrictive view of bankruptcy court jurisdiction in the post-confirmation, pre-effective date period.

[23] Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas, Rule 5011-1.

[24] Plaintiffs also argue allowing the Bankruptcy Court to adjudicate the *res judicata* defense is inappropriate because the *second court* determines if *res judicata* applies, not the first. Plaintiffs' argument misses the point. The Bankruptcy Court will be the *second court* if the Order of Reference is enforced and will evaluate the *res judicata* argument as the court presiding over the Complaint. Who better to determine if the proceedings in the *first court* (*i.e.* the HarbourVest Settlement) are *res judicata* in the second court than the Bankruptcy Court?

10

Dated: July 13, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

11

APP_151

**Exhibit 6**

Order of Reference
Adv. Proc. No. 21-03067 [Dkt. No. 64]

APP_152

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., and | § | |
| CLO HOLDCO, LTD., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0842-B |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., HIGHLAND | § | |
| HCF ADVISOR, LTD., and | § | |
| HIGHLAND CLO FUNDING, LTD., | § | |
| | § | |
| Defendants. | § | |

## ORDER OF REFERENCE

Pursuant to 28 U.S.C. § 157 and this District's Miscellaneous Order No. 33, this case is hereby **REFERRED** to Judge Stacey G. C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No. 19-34054. The Clerk of this Court and the Clerk of the Bankruptcy Court to which this case is hereby referred are directed to take such actions as are necessary and appropriate to cause this matter to be docketed as an Adversary Proceeding associated with the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Case No. 19-34054.

SO ORDERED.

SIGNED: September 20, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 1 -



1934054210929000000000076

APP_155

**Exhibit 7**

Transcript Regarding Hearing Held November 23, 2021 re: Motion Hearing

Adv. Proc. No. 21-03067 [Dkt. No.146-1]

```
                    UNITED STATES BANKRUPTCY COURT
                  NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                        .   Case No. 19-34054-11(SGJ)
                              .
HIGHLAND CAPITAL              .
MANAGEMENT, L.P.,             .
                              .
                              .
          Debtor.            .
. . . . . . . . . . . . . . .
                              .   Adv. No. 21-03067(SGJ)
CHARITABLE DAF FUND, LP,      .
et al.,                       .
                              .
          Plaintiffs,        .   Earle Cabell Federal Building
                              .   1100 Commerce Street
         v.                   .   Dallas, Texas  75242
                              .
HIGHLAND CAPITAL,             .
MANAGEMENT, L.P., et al.,    .
                              .
          Defendants.        .   Tuesday, November 23, 2021
. . . . . . . . . . . . . . .    9:40 a.m.


                    TRANSCRIPT OF HEARING ON
         PLAINTIFFS' MOTION TO STAY ALL PROCEEDINGS (55);
     PLAINTIFFS' MOTION TO STRIKE REPLY APPENDIX (47); AND
         DEFENDANTS' MOTION TO DISMISS COMPLAINT (26)

              BEFORE HONORABLE STACEY G. JERNIGAN
              UNITED STATES BANKRUPTCY COURT JUDGE
```

TELEPHONIC APPEARANCES CONTINUED ON NEXT PAGE.

Audio Operator:          Hawaii S. Jeng

Proceedings recorded by electronic sound recording, transcript
                 produced by a transcript service.

---

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

2

TELEPHONIC APPEARANCES:

For CLO Holdco, Ltd.:          Sbaiti & Company PLLC
                               BY:  MAZIN AHMAD SBAITI, ESQ.
                               JP Morgan Chase Tower
                               2200 Ross Avenue, Suite 4900 W
                               Dallas, Texas 75201

For Highland Capital          Pachulski Stang Ziehl & Jones LLP
Management:                    BY:  JOHN MORRIS, ESQ.
                               780 3rd Avenue, 34th Floor
                               New York, NY 10017

                               Pachulski Stang Ziehl & Jones LLP
                               BY:  JEFFREY N. POMERANTZ, ESQ.
                               10100 Santa Monica Blvd., 13th Floor
                               Los Angeles, California 90067

For Highland CLO              Brobeck Phleger & Harrison
Funding, Ltd.:                BY:  JONATHAN W. JORDAN, ESQ.
                               4801 Plaza on the Lake
                               Austin, Texas 78746

                               King & Spalding LLP
                               BY:  PAUL RICHARD BESSETTE, ESQ.
                               500 West 2nd Street, Suite 1800
                               Austin, Texas 78701

APP_156

3

**INDEX**

                                                                    PAGE

PLAINTIFFS' MOTION TO STAY ALL PROCEEDINGS (55)
  Court's Ruling - Denied                                           29

PLAINTIFFS' MOTION TO STRIKE REPLY APPENDIX (47)
  Court's Ruling - Denied                                           32

DEFENDANTS' MOTION TO DISMISS COMPLAINT (26)
  Court's Ruling - Under Advisement                                 103

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_157

4

 1              THE COURT:  Good morning.  Please be seated.

 2              All right.  We have a setting in the Charitable DAF

 3    Fund, et al., v. Highland, Adversary 21-3067.  We have three

 4    motions that are set.

 5              Let me get appearances from the Plaintiffs' counsel

 6    first.  Go ahead.

 7              MR. SBAITI:  Good morning, Your Honor.  This is Mazin

 8    Sbaiti for the Plaintiffs.

 9              THE COURT:  Okay.  Thank you.

10              Now for the Defendants, who do we have appearing?

11              MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

12    Pomerantz and John Morris from Pachulski Stang Ziehl & Jones.

13    Your Honor, before -- I understand Your Honor is going to take

14    up the motion to stay first.

15              Before Your Honor does so, I have a procedural issue

16    relating to that motion that I would like to address the Court

17    after appearances are made.

18              THE COURT:  All right.  I assume that's all the

19    lawyer appearances for this adversary.

20              MR. JORDAN:  Your Honor?

21              THE COURT:  Oh, go ahead.

22              MR. JORDAN:  Your Honor, we are a nominal defendant,

23    but John Jordan on behalf of Highland CLO Funding, Ltd.

24              THE COURT:  Okay.  Thank you.  Sorry about that.

25              MR. BESSETTE:  And, Your Honor, Paul Bessette, Mr.

5

1  Jordan's colleague is on the phone, as well.

2        THE COURT:  Okay.  Thank you.

3        All right.  Anyone else I missed?

4     (No audible response)

5        THE COURT:  All right.  Mr. Pomerantz, your

6  procedural issue?

7        MR. POMERANTZ:  Thank you, Your Honor.

8        Your Honor, I must once again bring to this Court's

9  attention a violation of the Court Rules by the various counsel

10  representing Mr. Dondero.  This time it's by Mr. Sbaiti.

11        When the district court entered its order granting

12  Highland's motion to enforce the reference and referring this

13  matter to Your Honor, there were three matters on the Court's

14  docket, district court's docket that got transferred.  First

15  was the motion to dismiss, second was the motion to stay, and

16  third was the motion to strike, which essentially has been

17  rendered moot.

18        The briefing was complete with respect to the first

19  two matters, the motion to dismiss and the motion to stay.  And

20  all that remained for the Court to do was to set a hearing and

21  have oral argument.  Your Honor, on October 13th, Your Honor

22  set a hearing for today for each of those two motions.

23  Nevertheless, on November 10th, almost a month after the Court

24  set the matters for hearing and after pleadings were closed,

25  Plaintiffs filed what they called their amended motion to stay.

**APP_159**

6

1          As an initial matter, Your Honor, the amended motion
2    was not even filed in this adversary proceeding initially.  It
3    was filed in the main case, and there was an error that Mr.
4    Sbaiti corrected on November 18th, five days before this
5    hearing.  Plaintiff did not ask for leave of court to file any
6    further pleadings.  They did not provide the time under the
7    local rules for response.  And, in fact, they raised additional
8    arguments in their amended motion.

9          Well, Your Honor, we can certainly argue to the Court
10   that the amended motion constitutes a new motion, is untimely,
11   and the hearing should be continued to allow us to file a
12   response.  We're not going to do that, Your Honor.  As I will
13   discuss when it's my time to response substantively to the
14   motion, the new arguments to stay the proceedings, the amended
15   motion are equally as frivolous as the arguments contained in
16   the original motion.

17         But I bring this to the Court's attention because,
18   again, it's extremely frustrating to have the lawyers
19   representing Mr. Dondero's related entities continue to act as
20   if the rules do not apply to them.  Your Honor will recall just
21   a week or so ago, Your Honor made a -- we had a similar issue
22   in connection with the motion to dismiss.  Failure to follow
23   the rules is unprofessional, and it's disrespectful not only to
24   Highland's professionals but also to the Court and it
25   interferes with Your Honor's ability to control your docket and

**APP_160**

7

1  sufficiently prepare for contested matters.

2          At some point, Your Honor, there should be real

3  consequences for the continued violation of the rules.  Having

4  said that, Your Honor, we are prepared to go forward with the

5  motion to stay today.

6          THE COURT:  All right.  Mr. Sbaiti, what say you?

7  I'm looking at Docket Entry Number 69 in the adversary

8  proceeding that was filed last Thursday.  So, obviously, very,

9  very late in the game, shall we say.  What is your response to

10 this?

11         MR. SBAITI:  Your Honor, that was not filed in the

12 adversary as an error.  When we asked one of our paralegals to

13 file it, we're not as familiar with the bankruptcy court system

14 and it was an error.  It was corrected once the lawyers

15 realized it, which was last -- which was on November the 18th.

16 It was filed in, I guess in the main case.  But it was simply

17 an inadvertent error, Your Honor.

18         MR. POMERANTZ:  I would add, Your Honor, the original

19 motion filed inadvertently was November 10th.  It still was not

20 timely.  I think Mr. Sbaiti needs to answer the question of why

21 that was filed untimely, okay.

22         THE COURT:  All right.  Thank you, Mr. Sbaiti.

23         So, one of my pet peeves in life is people blaming

24 paralegals, by the way.  But be that as it may, as Mr.

25 Pomerantz points out that it was still untimely the motion

**WWW.LIBERTYTRANSCRIPTS.COM**

8

1  filed in the underlying bankruptcy case November 10th.  So what

2  is your --

3          MR. SBAITI:  Your Honor, when we looked at the motion

4  and looked at the progression of the case, we filed an amended

5  motion simply to clarify our position.  And really I don't

6  think we've changed our arguments all that much.  We simply

7  clarified our position.  We've seen amended motions filed in

8  the bankruptcy in our prior dealings, and so at that point, we

9  felt like there wasn't a rule explicitly saying we couldn't

10 have an amended motion.

11         But if it's untimely, Your Honor, you know, we don't

12 think it changes the underlying arguments.  As Mr. Pomerantz

13 said, we don't think there's any prejudice to Highland either.

14         THE COURT:  All right.  Well, just to be clear, you

15 know, it's one thing in an underlying bankruptcy case to file

16 an amended motion after you've gotten a motion set for hearing

17 that might slightly adjust, you know, facts or relief sought.

18 And, of course, we independently look at it when it happens in

19 an underlying case to see do we need more notice to affected

20 parties.

21         But in an adversary proceeding, you know, you just

22 don't do this.  All right?  If you have some sort of

23 exceptional circumstances, you can file I guess a motion to

24 amend because I got to include this new information that didn't

25 exist.  But you just don't do this, okay?

9

1          So I don't -- could you be clear what was the new

2   information?  What was the new information that had to be

3   brought before the Court suddenly?

4          MR. SBAITI:  Your Honor, there wasn't new

5   information.  We were simply giving notice of our understanding

6   of where the legal arguments were going.  The reason being is

7   that after those motions were filed and recently, the debtor

8   took the position in two other cases that they should be

9   dismissed pursuant to the permanent injunction.

10         And so that clarified for us at least a couple of

11  arguments that were unclear to us where the debtor stood on

12  whether or not the permanent injunction would be a basis to

13  dismiss or stay any of the claims that were pending.  There are

14  two other claims pending in district court.  Since we had filed

15  that motion, the debtor filed a motion to reconsider the stays

16  that were granted in those two courts.  And then they also

17  moved to dismiss on the basis of the permanent injunction.

18         And so given that the debtor took the position that

19  they were willing to dismiss those cases based upon the

20  permanent injunction, it in many ways contravenes the position

21  they took in response to our motion which is that the -- for

22  example, they somewhat take the position in Paragraph 22, it

23  wasn't as clear then but it's clear -- it seems clearer now

24  that the permanent injunction is not relevant to whether or not

25  the case can go forward in any capacity.

10

1          And so we simply wanted to incorporate that, but it's

2    mainly legal argument about the choices that are before the

3    Court.  That was really it.  I mean, theoretically, I would

4    have made them for the first time during oral argument and we

5    thought we were doing something good by giving -- apprising the

6    Court in writing and giving notice of these arguments to the

7    other side by filing an amended motion.  We didn't add new

8    evidence or anything like that.

9          MR. POMERANTZ:  Your Honor, that argument is

10   completely disingenuous because our motion to dismiss and

11   motion for reconsideration that Mr. Sbaiti refers to is several

12   weeks ago, okay.  It wasn't November 10th.  It was several

13   weeks ago.

14         I will respond substantively why Mr. Sbaiti is wrong

15   and there's no inconsistent positions when it's my time to

16   speak.  But for Mr. Sbaiti to say he was doing us a favor and

17   he was reacting to recent new information is just wrong, Your

18   Honor.  And they should just not be continued to allowed to get

19   away with flouting the rules.

20         THE COURT:  All right.  Well, let me just say I'm

21   confused, maybe I should say baffled, about this amended

22   motion.  You know, the motion to dismiss that is before the

23   Court for oral argument today isn't about the injunction, isn't

24   about the plan injunction.  It's about res judicata and other

25   12(b)(6) arguments.

**WWW.LIBERTYTRANSCRIPTS.COM**

11

1          So I'm confused and I think, you know, it's been

2    clear for many months in this adversary proceeding, in

3    particular, the debtor's position on the plan injunction,

4    particularly, you know, in the whole argument on the motion to

5    leave to add Mr. Seery as a defendant.

6          So I'm confused, but we're going to go forward on the

7    argument today, whatever argument you want to make.  And you've

8    been, I guess, forewarned.  I will say that these last-minute

9    amended motions are not going to be tolerated, are not going to

10   be considered.  And so, you know, I hope you won't do it again.

11   Your firm has already been sanctioned once in this adversary

12   proceeding.  I'm sure we all remember.

13         So, you know, I'm just kind of baffled why you would

14   take a chance filing an amended motion without leave or somehow

15   getting it to the attention of the Court or running it by the

16   other parties for their consent to you doing it.  But we're

17   going to go forward and just hear the arguments, okay.  And so

18   --

19         MR. SBAITI:  Thank you.

20         THE COURT:  -- I'll hear your argument.

21         I'm letting people know I don't know where this time

22   estimate came on the calendar today, three hours.  I don't know

23   if someone specifically expressed that.  But I'm letting you

24   know at noon I have a swearing-in ceremony that I'm doing back

25   in my chambers.  So I will stop at noon Central time.

**WWW.LIBERTYTRANSCRIPTS.COM**

12

1          And so does anyone think that's going to be a

2     problem?

3          MR. SBAITI:  It should not be, Your Honor, from our

4     perspective.

5          THE COURT:  Mr. Pomerantz?

6          MR. POMERANTZ:  I don't believe so.  Mr. Morris is

7     going to handle the motion to dismiss which is going to be the

8     bulk.  My presentation on the motion to stay is only going to

9     be around ten minutes or so.

10          THE COURT:  Okay.  Thank you.

11          Mr. Sbaiti, your argument on the motion for stay.

12          MR. SBAITI:  Thank you, Your Honor.

13          Your Honor, may I share my screen?

14          THE COURT:  You may.

15          MR. SBAITI:  I have a PowerPoint that can kind of --

16          THE COURT:  Okay.  You may.

17          MR. SBAITI:  -- walk us through.  Thank you.

18          Is Your Honor able to see my screen?

19          THE COURT:  I can, yes.

20          MR. SBAITI:  Thank you, Your Honor.

21          Your Honor, what I would point you to is, first, the

22     injunction language.  This is what Your Honor's permanent

23     injunction says, and this is really what animates our motion to

24     stay.  Out motion to stay is derived specifically because my

25     clients and I feel like our case has been enjoined by this

13

1  injunction, if not completely disposed of.

2          The language says that we're an enjoined:

3          "An enjoined party is permanently enjoined from

4          commencing, conducting, or continuing in any manner

5          any suit, action, or other proceeding of any kind

6          including any proceeding in a judicial, arbitral,

7          administrative, or other forum against or affecting

8          the debtor or the property of the debtor."

9          And then (v) of that injunction says:

10          "or acting or proceeding in any manner in any place

11          whatsoever that does not conform to or comply with

12          the provisions of the plan."

13          One of the things that was suggested in Paragraph 22

14  of their response was that the DAF and Holdco are not enjoined

15  parties.  But the final plan defines an enjoined party in

16  Article 1(b)(56) as any entity who has or -- all entities who

17  have held, hold, or may hold claims against the debtor; any

18  entity that has appeared and/or filed any motion, objection, or

19  other pleading in this Chapter 11 case regardless of the

20  capacity in which such entity appeared and any other party in

21  interest.  And, five, the related persons of each of the

22  foregoing.

23          Article 1(b)(22) defines a claim as any claim that's

24  defined in Section 1015 of the Bankruptcy Code.  And Section

25  1015 of the Bankruptcy Code defines a claim as a right to

**APP_167**

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 02/21/23   Page 172 of 508   PageID 543
Exhibit 1   Page 172 of 305

14

1  payment whether or not such right is reduced to judgment,

2  liquidated, unliquidated, fixed, contingent, matured,

3  unmatured, disputed, undisputed, legal, equitable, secured, or

4  unsecured.

5         So given this definition, when we've read this

6  injunction, we believed that we were enjoined parties, the DAF

7  and Holdco were both enjoined parties.  They had appeared in

8  the -- they have claims.  Obviously, those are the claims being

9  asserted here.

10         And so going back to the injunction language, we

11  believe this lawsuit has been disposed of by this permanent

12  injunction.  We believe there's really only one or two things

13  that should probably happen with this lawsuit.  Either it could

14  be dismissed based upon the permanent injunction or what we

15  proposed in our motion to stay is that the Court exercise its

16  inherent authority to simply stay the case pending the appeal

17  of this language, which is up on appeal in the Fifth Circuit

18  right now.

19         If that language, and if the injunction gets affirmed

20  by the Fifth Circuit, then certainly the dismissal can happen

21  once that affirmance happens and there's no harm, no foul, and

22  no one's wasted any time.

23         If they're not, if it's overturned, then, obviously,

24  the injunction would be vacated, presumably by the Fifth

25  Circuit.  And at some point, if the Court decides not to enter

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_168

15

1  a similar injunction that would likewise dispose of this case,

2  then the case could proceed on the merits.

3        The issue we've identified both in our original

4  motion and as we fleshed out in our -- as a matter of law in

5  our amended motion to simply put a finer point on it is that

6  the merits are now -- have been disposed of.  This injunction

7  ends this case, at least as far as we read it.  It ends this

8  case irrespective of the underlying merits of the lawsuit,

9  which means that the lawsuit merits themselves have become moot

10  and any opinion or any attempt to resolve it is obviously an

11  advisory opinion by the Court.

12        So we really only see two ways that this could go

13  right now without either gutting the injunction or

14  circumventing it completely, which is to say that either the

15  case should be dismissed based upon the permanent injunction or

16  the case should be stayed based upon the permanent injunction.

17        Mr. Pomerantz or the debtors' brief suggests that,

18  well, the injunction doesn't prevent hearing pending motions.

19  But I would respectfully disagree with that.  If you look at

20  the language, "commencing, conducting, or continuing in any

21  manner in any suit, action, or other proceeding against or

22  affecting the debtor."

23        As 12(b)(6) hearing, I would imagine, was intended to

24  fall under the umbrella of a proceeding.  And us arguing a

25  12(b)(6) motion would us be conducting and maybe even

**WWW.LIBERTYTRANSCRIPTS.COM**

16

1  continuing the suit because we're trying to protect the merits

2  of the suit, which as I said are at this juncture already moot.

3        And so it comes down to I think a very simple

4  question, which is what do we do at this juncture.  Do we just

5  simply dismiss the lawsuit in light of this permanent

6  injunction or stay the lawsuit in light of this permanent

7  injunction?

8        The debtor makes a lot of hay out of the fact that,

9  well, there are special rules that apply when you're trying to

10 stay a case pending appeal.  But if you look at all of their

11 case law, it has to do with different circumstances where an

12 appeal -- where there's a matter on appeal that could

13 substantially affect the resolution of the case, which here we

14 think it actually could.  But in those cases, those appeals

15 would affect the resolution of the case on the merits; whereas,

16 here, the question goes to whether or not a permanent

17 injunction that really has stopped us all in our tracks.

18       As soon as we understood this injunction and its

19 scope, we're the ones who reached out to the debtor's counsel

20 and asked them on a meet-and-confer whether or not they would

21 just agree to stay the matter.  And we were a little bit

22 surprised by their reaction when they first didn't think that

23 this applied to our case, and we didn't understand how.  And

24 then they changed their mind, said it did apply to our case but

25 they didn't think that we should stay the case.  And they

**WWW.LIBERTYTRANSCRIPTS.COM**

17

1  didn't suggest let's just dismiss it based upon the permanent

2  injunction.

3       So it kind of comes down to the same small -- same

4  simple issue, Your Honor.  There's this permanent injunction,

5  and I don't think there's any way for us to get around it at

6  this juncture.

7       THE COURT:  Mr. Pomerantz:

8       MR. POMERANTZ:  Yes, Your Honor.

9       I'm going to respond to several of the arguments Mr.

10 Sbaiti made in his motion, which apparently he's abandoned

11 because he only is focused on the injunction.  And I'm also

12 going to tell Your Honor, what our arguments are because

13 despite Mr. Sbaiti's efforts, he's completely misquoted them.

14      So in the motion and the amended motion, the

15 Plaintiffs make several arguments why this Court should stay

16 the matter.  First, they argue they're entitled to a stay

17 because the exculpation provision in the plan prohibits them

18 from proceeding against the Defendants in the action.  And

19 there are several problems with that argument.

20      First, Mr. Sbaiti and the Plaintiffs don't even

21 attempt to meet the Fifth Circuit's standards for a stay

22 pending appeal because, of course, they can't.  Mr. Sbaiti's

23 trying to sidestep the grounds for a stay pending appeal by

24 arguing it doesn't apply just is incorrect.

25      They would have to show that there is a likelihood of

18

1  success on the merits, they would suffer irreparable harm, the

2  debtor wouldn't suffer irreparable harm, and there is -- public

3  interest supports a stay.  They can't do any of them.

4       In fact, as Your Honor is well aware, Your Honor

5  denied the actual appellants in that suit, in that order, the

6  confirmation order, a stay pending appeal and that was denied

7  by the district court and also denied by the Fifth Circuit

8  Court of Appeals.

9       The Plaintiffs didn't object to the plan, they are

10  not parties to the appeal, and they never sought a stay pending

11  appeal.  So they really can't explain why they as really

12  strangers to the appeal are entitled to a stay of the

13  effectiveness of the plan when the actual appellants to that

14  order were denied a stay pending appeal up through the

15  appellate ladder.

16       Second, notwithstanding Mr. Sbaiti's arguments in the

17  motion, the exculpation provision is neither as broad nor does

18  it affect all the parties that are subject to this litigation.

19  There are three Defendants in the complaint.  The only

20  Defendant that is covered by the exculpation provision is the

21  debtor.  The exculpation provision does not apply HCF Advisors,

22  and it does not apply to Highland CLO Funding.

23       Also, while the exculpation provision does apply to

24  the debtor, it only exculpates the debtor from claims of

25  negligence.  The complaint raises a variety of causes of action

**WWW.LIBERTYTRANSCRIPTS.COM**

19

that have nothing to do with negligence and would not be

covered by the exculpation provision.

        But, Your Honor, the biggest problem with their

argument that the exculpation provision supports a stay is that

the exculpation -- the appeal of the exculpation provision has

nothing to do with this case.  Why?  Because the Fifth Circuit

appeal concerns whether the exculpation provision is

appropriate for parties other than the debtor.  The debtor is

the only Defendant in this case that obtains the benefit of the

exculpation.

        And there is no dispute, there was no dispute at

confirmation, there's no dispute in the case law, there's no

dispute in Pacific Lumber, there's no dispute in the appeal

that a plan can exculpate the debtor.  So the Fifth Circuit

appeal doesn't implicate the exculpation provision and cannot

support a basis for a stay.

        The next argument Mr. Sbaiti makes is the injunction

provision, and the injunction provision is on appeal to the

Fifth Circuit.  But the aspect of the appeal of the injunction

is not the provision that Mr. Sbaiti points to.

        And, again, as with the exculpation provision, the

same arguments about failure to obtain a stay, failure to be

party to the appeals, and failure to object to the plan apply,

as well.  But as is the case with the exculpation provision,

the resolution of the appeal of the injunction provision will

20

1  not affect this case in any way.

2          They point to the portion of the injunction that

3  prohibits enjoined parties from directly or indirectly

4  continuing, commencing, or conducting in any manner any suit or

5  action proceeding against the debtor.  They argue that they

6  cannot proceed without violating the injunction because the

7  injunction was intended to put all litigation against the

8  debtor to an end.

9          But, of course, Your Honor, that is not true.  That

10  is not what the injunction is.  The issue on appeal before the

11  Fifth Circuit as it relates to the injunction is whether the

12  injunction impermissibly enjoins parties from enforcing their

13  rights with respect to post-effective date commercial

14  relationships with the reorganized debtor.  And, of course, we

15  argue that it's appropriate, but it has nothing to do with the

16  provision Mr. Sbaiti identified.

17          The appeal does not impact in any way whether a plan

18  can enjoin prosecution of claims that arose prior to the

19  effective date.  And, of course, such a plan provision is

20  completely appropriate and is customary.  The plan provided the

21  debtor as the plan provides all debtors with a fresh start and

22  enjoins litigation against the debtor.

23          But importantly, Your Honor, that does not mean as

24  Plaintiffs argue that any liability for pre-effective date

25  conduct just goes away and that creditors are left without a

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 02/27/23   Page 179 of 508   PageID 550

Exhibit 11   Page 22 of 235

21

1 remedy to pursue claims against the debtor for pre-effective

2 date conduct.

3          Rather, if they have a pre-petition claim in lieu of

4 their litigation that's pending, they file a pre-petition claim

5 against the estate and that matter is resolved in the claims

6 objection procedure.  Or, as in the case here, when they make

7 an allegation that there is a post-petition claim, what do they

8 do?  They file a request for payment of an administrative

9 claim, and this Court addresses the validity of the

10 administration claim.  The lawsuit pending in another

11 jurisdiction stops, but the claim has to be resolved in the

12 bankruptcy court.

13          The only conduct that the injunction really prohibits

14 is them from proceeding with actions in other courts.  It does

15 not deny them a remedy.  Accordingly, their argument that they

16 cannot proceed with claims against the debtor because of the

17 injunction provision just lacks any merit and can't form the

18 basis for a stay.

19          Plaintiffs' next argument in their briefing is that

20 if the Court refuses to stay the complaint, they will file a

21 motion to withdraw the reference of this matter to the district

22 court.  Your Honor, this is the biggest head-scratcher of them

23 all given how this complaint ended up before Your Honor.  This

24 exact issue and Plaintiffs' arguments as to why the reference

25 should be withdrawn have already been fully briefed and decided

22

1 by the district court.

2        As Your Honor may recall, the Plaintiff filed this

3 action in the district court, conveniently failing to include

4 the bankruptcy case as a related case or mentioning that the

5 bankruptcy courts have related jurisdiction in the filings.

6 Your Honor may have had occasion to review the underlying

7 complaint when the debtor brought a motion for contempt against

8 counsel for Plaintiffs for pursuing a claim against Mr. Seery

9 in violation of Your Honor's January 9th, 2020 and July 16th,

10 2020 orders.

11        Your Honor issued an order finding counsel and

12 various parties in contempt which order is, of course, subject

13 to appeal.  At the time we were litigating the contempt motion,

14 we filed two motions in district court.  The first was a motion

15 to enforce the reference and have the district court send that

16 complaint to Your Honor.  And that motion to enforce the

17 reference is now on Your Honor's docket at Number 22 and 23.

18        The second was the motion to dismiss which is before

19 Your Honor today.  Plaintiffs oppose the motion to enforce the

20 reference arguing that mandatory withdrawal was required

21 because the matter involved consideration of non-bankruptcy

22 federal law, specifically federal securities laws and the

23 Investment Advisors' Act.

24        Plaintiffs further argue to the district court why

25 would you refer the case to the bankruptcy court if it's only

**WWW.LIBERTYTRANSCRIPTS.COM**

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 11    Filed 02/21/23    Page 181 of 508    PageID 552
Exhibit 1    Page 242 of 305

23

1 going to end up back in the district court upon mandatory

2 withdrawal of the reference.  They argue to the district court

3 that would be a complete waste of time.

4        We filed our reply at Docket Number 42 explaining to

5 the district court why mandatory withdrawal of the reference

6 did not apply and why this case should be referred to Your

7 Honor.  And what did the district court subsequently do?  It

8 entered an order referring this action to Your Honor which is

9 why we are here today.

10        Plaintiffs now flout the district court's order of

11 reference by telling the Court that if the Court does not stay

12 the matter, they will file a motion to withdraw the reference

13 before Your Honor, and they attach virtually identical pleading

14 that they filed in opposition to our motion to enforce the

15 reference.

16        Plaintiffs did not disclose in their amended motion

17 that there was a fully-briefed motion to enforce the reference

18 before the district court.  Plaintiffs' argument is

19 disingenuous and designed to mislead the Court.

20        The district court has only agreed that mandatary

21 withdrawal of the reference does not apply and this case

22 belongs in Your Honor.  And while we cannot stop the Plaintiffs

23 from filing any motion before this Court, we want to put them

24 on notice that if they do file a motion for withdrawal of the

25 reference in light of the facts as I just stated them, we will

**APP_177**

24

1  seek sanctions.

2          In any event, Your Honor, the fact that they may file
3  a motion for withdrawal of the reference at some point in the
4  future is not grounds to stay the matter.

5          Lastly, Your Honor, Plaintiffs argued in the opening
6  that Highland's position today in opposing the motion to stay
7  is inconsistent with positions Highland has taken in two other
8  lawsuits commenced by the Sbaiti firm.  Like all of their other
9  arguments, they misrepresent the facts and are frivolous.

10         The Sbaiti firm filed a complaint on behalf of the
11 DAF in the district court arguing that Highland mismanaged
12 (audio drop).  That complaint followed in the heels of an
13 almost identical complaint filed by Dugaboy asserting the same
14 claims.

15         And Your Honor may recall questioning Mr. Sbaiti at a
16 hearing in June how Dugaboy could pursue such a claim in the
17 district court if Dugaboy had a pending proof of administrative
18 claim on file in the bankruptcy case.  Well, soon after that
19 hearing, Your Honor, the Dugaboy complaint was dismissed, and a
20 few days later the DAF complaint was filed.  That complaint has
21 never been served on Highland.

22         The second lawsuit is also a lawsuit filed by the
23 Sbaiti firm on behalf of an entity called PCMG in the district
24 court.  And PCMG previously held less than five one-hundredths
25 of a percent interest in a certain fund managed by highland.

APP_178

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 11    Filed 02/21/23    Page 183 of 508    PageID 554

Exhibit 1    Page 26 of 235

25

1 The lawsuit alleges that Highland acted improperly to sell

2 certain assets of the fund, thereby damaging PCMG.  That

3 complaint has also never been served on Highland.

4        The Plaintiffs sought a stay of those matters before

5 Highland could file a response, and the court -- the district

6 court's entered stays in those matters.  And Highland has filed

7 motions for reconsideration and the motions to dismiss because

8 they violate the injunction.

9        But, importantly, Your Honor, if you read the

10 motions, Highland does not argue that Plaintiffs do not have a

11 remedy for the alleged wrongs they say they suffer.  Rather,

12 Highland's argument is that any claims alleged in those

13 lawsuits, just like any claims alleged in the lawsuit before

14 Your Honor today, must proceed in bankruptcy court as part of

15 the claims objection process.  That's where they will have

16 their day in court.  The lawsuits don't go away.  The

17 injunction prevents them from continuing on in district court.

18        Accordingly, Highland is being totally consistent in

19 all matters, and the litigations may not proceed there but must

20 proceed before Your Honor.  And, of course, none of these three

21 matters are implicated by the Fifth Circuit appeal.

22        Your Honor, the amended motion was procedurally

23 improper and is substantively without merit.  And for all these

24 reasons, we request that the Court deny the stay motion and

25 proceed with the hearing on the motion to dismiss.

**WWW.LIBERTYTRANSCRIPTS.COM**

26

1              Thank you, Your Honor.

2              THE COURT:  All right.

3              Mr. Sbaiti, you get the last word.

4              MR. SBAITI:  Thank you, Your Honor.

5              Your Honor, the administrative claim process that was

6   described as being the way that these claims were supposed to

7   proceed, by the language of the order that we read, does not

8   allow for these claims.  Those claims are limited to a specific

9   category of claims that don't include the claims that are

10  alleged in this lawsuit.

11             And in any event, this lawsuit wasn't filed as an

12  administrative claim.  So if that's the case and it needs to be

13  refiled or reasserted as an administrative claim, then I think

14  that's a subject for another day.  All I know is that we have

15  this injunction right now that either should stay this case

16  pending the appeal, which I'll address the issue on appeal in a

17  moment, or it should be dismissed, perhaps without prejudice so

18  that it can be refiled properly as an administrative claim if

19  that's what's supposed to happen, because I guess this converts

20  the matter.

21             The appeal, the subject of the appeal as to the

22  injunction, Your Honor, the appeal actually encompasses many of

23  the issues that we're talking about in this case.  Now Mr.

24  Pomerantz tries to narrow the scope of what's up on appeal, and

25  that may indeed be the argument that they're going to present

27

 1  to the Fifth Circuit or that they've presented to the Fifth

 2  Circuit.

 3          But the actual issue up on appeal is the

 4  enforceability and validity of the order for a variety of

 5  reasons which includes the provision that we're talking about

 6  and the enforceability of the provision that we're talking

 7  about because it gets rid of particular claims.  And I guess

 8  the argument back is, no, it doesn't because there's now an

 9  alternative means of going there.

10          Mr. Pomerantz says that we shouldn't have proffered a

11  motion to enforce the reference.  That proffer, however, was

12  because Judge Boyle's reference to this Court didn't deal with

13  our motion to -- our cross-motion to withdraw the reference.

14  All it dealt with was their motion to enforce the reference as

15  a -- to enforce the standing order in the district court.  And

16  that's all she ordered was she cited the standing order and the

17  statutes, I think it's 157(a), and that's really all it did.

18          So it left open the question of whether she wanted

19  Your Honor to deal with the withdrawal of the reference

20  specifically as to the 12(b)(6) issue in the first instance.

21  It didn't resolve the question.  It doesn't purport to resolve

22  that question.  And it's not unheard of for the district court

23  then to send the matter to the bankruptcy court and then to

24  piecemeal which proceedings the withdrawal of the reference is

25  applicable to and then all the other proceedings would stay

**WWW.LIBERTYTRANSCRIPTS.COM**

28

1 with Your Honor or with the bankruptcy court.

2          So we weren't flouting the district court's order,

3 and we certainly weren't flouting any of the previous orders.

4 And the threat of a sanction for simply exercising our rights

5 in due course is not well taken.

6          Now Mr. Pomerantz says, well, the DAF and CLO Holdco

7 are not parties to the appeal.  I don't think that's relevant

8 because if the provision is struck by the Fifth Circuit, it's

9 not only struck for the appellants, it's struck as to all.

10 It's either valid or it's invalid.  And even if it's declared

11 to be invalid only as to the appellants, it's not suddenly

12 valid as to everyone else who didn't appeal.  That's not

13 generally how these appeals have worked.

14          If the Court doesn't stay this matter, Your Honor,

15 and doesn't dismiss it, we still maintain, Your Honor, that as

16 it stands today, the question on the merits have been mooted

17 and we cannot proceed.  I think what Mr. Pomerantz is hoping

18 for or the debtor is hoping for is a provision where our hands

19 are potentially tied to argue the motion.

20          And if the Court tells us they're not, then we'll

21 certainly argue the 12(b)(6).  But what I don't want to do is

22 argue a 12(b)(6) motion that on its face appears to violate the

23 permanent injunction and then be held in contempt for violating

24 that injunction.

25          And so that's why we've asked for the Court to either

29

1  stay the matter under its inherent jurisdiction or to -- if

2  you're going to -- if it's not going to be stayed, then we

3  believe it has to be dismissed according to the permanent

4  injunction as it stands right now.

5            THE COURT:  All right.

6            The motion to stay is denied.  The amended motion to

7  stay is likewise denied.  This is an odd argument.  I guess one

8  might say the traditional four-factor test for a stay of a

9  proceeding has really not been the subject of the argument here

10 for a stay.

11           So suffice it to say the four-prong test for a stay,

12 you know, hasn't been met here.  There hasn't been a showing of

13 substantial likelihood of success on the merits or irreparable

14 injury if the stay's not granted or a stay will not

15 substantially harm others or the stay would serve a public

16 interest.

17           But going on to the arguments that were focused on by

18 movant, I just don't think that you have shown that, you know,

19 either the exculpation clause or the injunction provisions of

20 the plan somehow tie your hands in arguing the 12(b)(6) motion,

21 defending against the 12(b)(6) motion today or I just think

22 that your arguments reflect, frankly, a misunderstanding of how

23 the injunction language and exculpation language applies here.

24           So the motion for stay is denied, and I will ask Mr.

25 Pomerantz to submit an order reflecting the Court's ruling.

**WWW.LIBERTYTRANSCRIPTS.COM**

30

1     So it looks like we have another procedural matter,

2  Mr. Sbaiti.  You filed a motion to strike reply appendix of the

3  Plaintiffs quite a while back.  So did you want to present

4  that?

5     MR. SBAITI:  Yes, Your Honor.  I think it's a very

6  simple procedural issue.

7     Generally, a party that files a 12(b)(6) is limited

8  to the four corners of the complaint.  And if there's a

9  contract incorporated or a document incorporated as an

10 intrinsic part of the complaint, you know, that's usually

11 considered under the 12(b)(6) motion.

12    What the Defendants did, what the debtor here did is

13 they filed a bunch of evidence in their 12(b)(6), essentially

14 attempting to argue it as a summary judgment.  We raised that

15 in our response.  So as part of our response, we objected to

16 all the evidence.  But then on the reply, they filed a bunch

17 more evidence both without leave and improperly, basically

18 sandbagged us.

19    And so we raised two points for striking that

20 evidence.  One was akin to the first argument, which is it's

21 not an evidentiary hearing.  It's not an evidentiary process in

22 the first instance.  A 12(b)(6) motion has to assume that the

23 facts pled are true, and then the question is whether they

24 state a claim.

25    And, secondly, adding them to the reply is especially

**WWW.LIBERTYTRANSCRIPTS.COM**

31

1  egregious because the reply is the last word.  And we didn't
2  have an opportunity to respond, and we also don't think it's
3  relevant nor should we have to respond to a whole bunch of
4  extra evidence that was attached.

5          That's essentially the basis of our motion, Your
6  Honor.

7          MR. POMERANTZ:  Your Honor, the simple answer to the
8  issue is we filed the reply of the appendix in connection with
9  the motion to enforce the reference.  We didn't file it in
10 connection with the motion to dismiss.  The motion to enforce
11 the reference is moot.  So what Mr. Sbaiti, his whole argument
12 doesn't make any sense.

13         As a substantive matter, just there wasn't any
14 evidence.  It was pointing to court pleadings, orders, and
15 stuff.  So it's irrelevant.  I don't know why it's still on the
16 docket.  It shouldn't be on the docket since it related to the
17 motion to enforce the reference.

18         THE COURT:  All right.  Mr. Sbaiti, did you just
19 simply --

20         MR. SBAITI:  Your Honor, much of that evidence was --

21         THE COURT:  -- misunderstand or what?

22         MR. SBAITI:  I think we might have because it was
23 filed as a separate item, and it may have been miscalendared or
24 misapplied on our system.  But the way it was presented to us
25 when we got it was it appeared to be evidence in support of,

**WWW.LIBERTYTRANSCRIPTS.COM**

32

 1  well, I guess both, but certainly evidence that was averted to

 2  in the reply.

 3          But if they're saying that the Court's not going to

 4  consider it, then that moots the motion and I think we can move

 5  on.

 6          MR. POMERANTZ:  Yes, Your Honor.  I had nothing to do

 7  with his motion.  I guess there was another mistake on their

 8  end.  I guess that stuff happens occasionally.

 9          THE COURT:  Okay.  All right.  So I'll deny it as

10  based on a mistake that's been acknowledged here.  And so with

11  that, let's have an order cleaning that up, as well, Mr.

12  Pomerantz, please.

13          With that, we'll move on to the Defendants' motion to

14  dismiss complaint.  I think, Mr. Pomerantz, you said Mr. Morris

15  will be making this argument?

16          MR. POMERANTZ:  That is correct, Your Honor.

17          THE COURT:  All right.

18          Mr. Morris, I'll hear your argument.

19          MR. MORRIS:  Good morning, Your Honor.  John Morris

20  for Pachulski Stang Ziehl & Jones for the reorganized debtor.

21  Can you hear me okay?

22          THE COURT:  I can.  Thank you.

23          MR. MORRIS:  Okay.

24          Your Honor, this is a bit like Groundhog's Day.  I

25  believe that we're going to spend the next half hour or an hour

**WWW.LIBERTYTRANSCRIPTS.COM**

33

1  discussing the very issues that were before the Court earlier

2  this year on the HarbourVest 9019 motion.

3        As the Court will recall from the June 8 hearing,

4  there is a complaint that's been filed ostensibly by the DAF

5  and CLO Holdco.  As Your Honor will recall, the testimony

6  established that Mark Patrick had just been installed as the

7  trustee, had no knowledge of the prior events, and Mr. Dondero

8  and Mr. Sbaiti spent quite some time together formulating this

9  particular complaint that is nothing less than a collateral

10 attack on the Court's prior order.

11       I'd like to, if I can, just walk through a PowerPoint

12 presentation to try to make the debtor's position quite clear,

13 if I may.

14       THE COURT:  You may.

15       MR. MORRIS:  And I would ask my assistant, Ms. Canty

16 (phonetic), to put up the first slide.

17       Your Honor, you'll recall that last December, the

18 debtor filed its motion under Rule 9019 for court approval of a

19 settlement.  The debtor was completely and utterly transparent

20 in what the terms of the settlement were.

21       Very briefly, as set forth in Appendix 2 or Exhibit 2

22 which was the motion itself, in Paragraph 32, Your Honor, the

23 debtor set forth the terms of the transaction for which it was

24 seeking approval.  Those terms included in the very first

25 bullet point a statement that HarbourVest shall transfer its

APP_187

34

1  entire interest in CLOF to an entity to be designated by the

2  debtor.

3          And that's an important point that we'll talk about

4  in a number of different contexts, Your Honor.  The debtor made

5  it very clear at the very first moment of this matter that it

6  was not going to acquire the asset but the asset was going to

7  be transferred to an entity to be designated by the debtor.

8  The debtor's motion filed last December clearly stated the

9  value of the interest that it would be acquiring in return.

10 That was also set forth in Paragraph 32 in a footnote.

11         It didn't say that it was the fair market value.  It

12 said the method of valuation was the net asset value and gave a

13 valuation date of December 1st so that all parties in interest

14 who received the motion understood the economics of the deal.

15 And the deal that the debtor was asking the Court to approve

16 was one whereby HarbourVest would receive certain claims and in

17 exchange for those claims, they were going to transfer their

18 interest in CLO -- HCLOF.

19         The debtor also filed on the docket for all to see a

20 copy of the settlement agreement.  The settlement agreement

21 sets forth the terms of the deal, including again the statement

22 that HarbourVest "will transfer all of its rights, title, and

23 interest in HCLOF."  It actually says to an affiliate or an

24 entity to be designated by the debtor.  And the transfer

25 agreement itself was also put on the docket.

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 14-11   Filed 02/21/2305 Page 193 of 508   PageID 564
Exhibit 11   Page 262 of 305

35

1           So that's where things stood just before Christmas.

2    I know that there's some due process and other type arguments

3    that are in the Plaintiffs' opposition to the motion.  But, of

4    course, the undisputed facts are that the debtor timely filed

5    the motion.  The time period was consistent with all applicable

6    rules.  Nobody ever asked the debtor for an extension of time.

7    Nobody ever filed a motion for an extension of time.  And so

8    those due process arguments I think carry no weight at all.

9           So the debtor filed the motion.  And if we can go to

10   the next slide, we see what the responses were, and there were

11   several.  All of the responses, the only responses were

12   objections to the motion filed by Mr. Dondero and his certain

13   of his affiliated entities.

14           Mr. Dondero's objection can be summarized as follows.

15   He made the following observations and asserted the following

16   objections to the proposed settlement.  The first thing he said

17   is that the settlement far exceeds the bounds of

18   reasonableness.  Now, of course, one cannot make a

19   determination of reasonableness without having an understanding

20   of value.  The debtor was giving something and it was getting

21   something.

22           And so Mr. Dondero understood that the issue of value

23   was front and center.  If there was any mistake about it, he

24   also noted that he understood that as part of the settlement

25   and, again, I've written this incorrectly, HarbourVest will

36

1  transfer its entire interest in HCLOF to the debtor.  That is

2  not what Mr. Dondero understood.  In fact, Mr. Dondero

3  understood that it would transfer its entire interest in HCLOF

4  "to an entity to be designated by the debtor," again, making it

5  clear that he knew exactly what the debtor was doing here.  And

6  that can be found at Appendix 4 in Footnote 3 on Page 1 if you

7  want the exact quote from Mr. Dondero's pleading.

8          In the same footnote, he also specifically

9  acknowledges that he understood the valuation.  He understood

10 the method valuation.  He understood the valuation date of

11 December 1st.  And he urged the Court in his pleading to

12 scrutinize the settlement to make clear that the available

13 value of the investment should be realized by the debtor's

14 estate.

15         And this is such a critical point, Your Honor.  His

16 concern was that by placing the value in an entity other than

17 the debtor itself, that the Court wouldn't have jurisdiction

18 over that asset.  That was his concern.  So not only did he

19 understand that the asset was going to be transferred to an

20 affiliate, he wanted to make sure that this Court had

21 jurisdiction over the asset.

22         And, of course, Mr. Seery in his testimony and

23 otherwise, we provided the Court with all the comfort it needed

24 to know that even though it was being assigned to a special-

25 purpose vehicle wholly-owned by the debtor, it would

**WWW.LIBERTYTRANSCRIPTS.COM**

37

1  nevertheless be subject to the Court's jurisdiction.

2          Mr. Dondero's trusts also filed an objection if we

3  can go to the next slide.

4          Dugaboy and Get Good represented by Douglas Draper

5  made the following observations and asserted the following

6  objections to the HarbourVest Settlement.  They, too, made

7  clear that they understood that the asset was going to be

8  transferred to an entity designated by the debtor.  They, too,

9  acknowledge that they understood that the debtor was valuing

10 the asset at approximately $22 million as of December 1st.  And

11 their objection was that the Court couldn't evaluate the

12 settlement without knowing how the asset was valued, without

13 knowing whether the debtor could acquire the asset, very

14 critical point.

15         These are the points that are made in the complaint.

16 These are the exact same points that are made in the complaint.

17 And also the Court couldn't evaluate the settlement unless they

18 understood that the value would be inure to the benefit of the

19 debtor's estate, again, mimicking Mr. Dondero's concern that by

20 placing the asset in an affiliate of the debtor, that it might

21 not be subject to the Court's jurisdiction.

22         Finally, and most importantly, if we can go to the

23 next slide.  The Plaintiff, CLO Holdco, filed an objection to

24 the 9019 motion.  And this is just so critical.  And this is

25 the Groundhog Day aspect that I specifically speak of.  CLO

APP_191

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 11    Filed 09/12/25    Page 196 of 508    PageID 567
Exhibit 11    Page 292 of 305

38

1  Holdco's objection was based solely on its assertion that it

2  had a superior right to the opportunity to acquire the asset

3  that was being transferred by HarbourVest.  It only made one

4  argument in support of its contention that it had a superior

5  right, but that argument was specifically premised on the

6  membership agreement, Section 6.1 and 6.2 of the membership

7  agreement.

8          CLO Holdco, the Plaintiff in the underlying action,

9  argued to this Court that HarbourVest had no authority to

10  transfer the asset without complying with the right of first

11  refusal that would give CLO Holdco the opportunity to take the

12  asset for itself.  That's what this Court was told.  CLO Holdco

13  didn't make this argument fleetingly.  They provided an

14  extraordinarily detailed analysis of Sections 6.1 and 6.2 of

15  the membership agreement and concluded "that HarbourVest must

16  effectuate the right of first refusal before it can transfer

17  its interest in HCLOF.  That was the objection.  Objections

18  have consequences, as Your Honor knows.

19          If we can go to the next slide.

20          By filing an objection, CLO Holdco and the trusts and

21  Mr. Dondero became participants in the litigation.

22  Notwithstanding the Plaintiffs' arguments to the contrary, when

23  they file the objections, they participate in what's called a

24  contested matter.  And in a contested matter, they had every

25  right to take all discovery on any issue that was related to

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 02/01/23   Page 197 of 508   PageID 568
Exhibit 1   Page 240 of 305

39

1  the 9019 motion, including the transfer, the disposition of the

2  asset to an affiliate of the debtor, the valuation of the asset

3  that's being received, the merits of the settlement itself, the

4  causes of action, whether, you know, what communications that

5  were, the negotiations, what did Mr. Seery and Mr. Pugatch

6  discuss?  Right?

7          They could have taken any discovery they wanted.  And

8  they did avail themselves of discovery, in fact.  They did -- I

9  don't know why they did what they did, but they chose to take

10 one deposition, and that was Mr. Pugatch, okay.

11         His deposition transcript, I think is at Exhibit 7,

12 or Appendix Number 7, and it was a long deposition.  It really

13 was.  And they asked Mr. Pugatch at the deposition if he knew

14 what the value of the asset that was being transferred was.

15 And he said $22.5 million.  So it wasn't just Mr. Seery or the

16 debtor who was subscribing to this valuation.  The party on the

17 other side of an arm's length negotiation was subscribing to

18 the exact same valuation.

19         The Plaintiffs could have taken whatever discovery

20 they wanted.  This is a full and fair opportunity to

21 participate in the litigation.  We proceeded to trial.  Before

22 we got there, actually, the debtor filed its response to CLO

23 Holdco's objection and proffered its own very detailed and

24 apparently very persuasive analysis that CLO Holdco's objection

25 was without merit, that CLO Holdco had no right of first

40

1   refusal under the facts and circumstances as they existed, and

2   with Grant Scott, Mr. Dondero's childhood friend at the helm,

3   we got to Court for the contested hearing on the debtor's 9019

4   motion, and CLO Holdco withdrew their objection.

5            And I've put up on the screen just an excerpt of the

6   transcript because, you know, when we talk about whether or *res*

7   *judicata* should apply, because was there a hearing on the

8   merits?  Was there a decision on the merits?  Just look at the

9   words of CLO Holdco's lawyer.  "CLO Holdco has had an

10  opportunity to review the reply briefing and after doing so has

11  gone back and scrubbed the HCLOF corporate documents based on

12  our analysis of Guernsey law."

13           And some of the arguments of counsel in those

14  pleadings and our review of the appropriate documents, counsel

15  obtained the authority from Mr. Scott to withdraw the CLO

16  Holdco objection based on the interpretation of the member

17  agreement.  We were grateful for that and the Court

18  specifically said in response, "That eliminates one of the

19  major arguments that we had anticipated this morning."

20           Apparently, the Plaintiffs believe that those events

21  have no meaning and that this Court's reliance on CLO Holdco's

22  substantive withdrawal of its objection has no meaning.  I

23  think they're wrong, and we'll get to that in a moment.

24           We proceeded with the hearing.  Mr. Seery and

25  Mr. Pugatch testified at length.  If you look at Footnote 3,

**WWW.LIBERTYTRANSCRIPTS.COM**

41

1  you'll see Mr. Seery testified for almost 70 pages of

2  testimony.  Mr. Pugatch testified for almost 45 pages of

3  testimony.  His testimony was exhaustive.  And, again, any of

4  the objecting parties had the right to ask whatever questions

5  they want.

6       But I do want to just note a few things that aren't

7  up on the screen right now.  If you go to Appendix 9, Your

8  Honor, which is the transcript of the hearing, at Page 13, you

9  will see that the very first thing I discussed in my opening

10 statement was the economics and how with a valuation of $22.5

11 million this deal made sense for the debtor.

12      You will see from Pages 30 to 42 there is extensive

13 testimony from Mr. Seery about the amount and the value of the

14 asset.  But the most important part of Mr. Seery's testimony is

15 that he explains how it came to be that HarbourVest agreed to

16 transfer its interest in HCLOF to an affiliate of the debtor.

17 And that came about, not because Mr. Seery or the debtor was

18 initially at all interested in doing this.  The whole idea

19 originated with HarbourVest.

20      They wanted to extract themselves from the Highland

21 platform.  They wanted to give this piece up.  So there's no

22 conspiracy going on here.  The unrebutted testimony that all of

23 the objecting parties had an opportunity to challenge was that

24 the whole idea originated with Mr. Pugatch and with

25 HarbourVest.  I think that's an important point to take into

**WWW.LIBERTYTRANSCRIPTS.COM**

42

1  account.

2          And finally, again, from the hearing, if you look at

3  at Appendix 9, you'd also find that Mr. Pugatch, again,

4  testified, as he had in his deposition, as to the value of the

5  interest being transferred.  So we completed the testimony.  We

6  rested our case having had a full and fair opportunity to

7  contest the motion.  The objecting parties rested as well.  And

8  we got to the point where we had to prepare the notice, and we

9  were discussing that at the hearing, if we can go to the next

10  slide.

11          And it's very important, because again, this was all

12  done transparently, and it was all done on the record.  And

13  after the close of evidence, I addressed the order that was

14  going to be prepared.  I specifically said that I wanted to

15  make clear that we were going to include a provision, "that

16  specifically authorizes the debtor to engage in, to receive

17  HarbourVest the asset, you know, the HCLOF interest," right.  I

18  wanted everybody to know that was what was going to happen, and

19  then I said, "The objection has been withdrawn."  I think the

20  evidence is what it is and we want to make sure that nobody

21  thinks they're going to go to a different court somehow to

22  challenge the transfer.  But yet, that is exactly what the

23  complaint seeks to do.

24          Having put everybody on notice as to where we were

25  going, as to what the evidence showed, the debtor drafted and

**WWW.LIBERTYTRANSCRIPTS.COM**

43

 1  the Court adopted an order, and the order says, among other

 2  things, that HarbourVest was authorized to transfer its

 3  interest to the debtor.  Actually, it says, "to a wholly owned

 4  and controlled subsidiary of the debtor," pursuant to the

 5  transfer agreement, "without the need to obtain the consent of

 6  any party or to offer such interest first to any other investor

 7  in HCLOF."  So the Court heard the 9019 motion pursuant to a

 8  Bankruptcy Rule and entered and order that was unambiguous and

 9  that the Plaintiffs did not appeal from.

10          We can go to the next slide.

11          At a very high level, Your Honor, it is just crystal

12  clear that the complaint is just inextricably intertwined with

13  the 9019 proceedings and the order itself.  I think Mr. Sbaiti

14  would agree with me that but for the order that approved the

15  transfer of the asset and the testimony about the value of that

16  asset, they have no claims.

17          Every single claim is predicated on what happened in

18  the 9019 hearing.  Every single claim is predicated on the

19  Court's order approving the transfer of the asset and the

20  testimony and evidence that was adduced in relation to that

21  asset.

22          There were really only two issues that the Court -- I

23  mean, if you want to think about it at its most simplistic

24  level, the Court was being asked to assess, is it fair, is it

25  reasonable, is it legally permissible for the debtor to give

APP_197

44

1  something.  In this case, allowed claims and releases, and to

2  get something in return.  In this case, HarbourVest's interest

3  in HCLOF and releases in return.  And that is really the

4  gravamen of the complaint.

5         The complaint is based whether it's breach of

6  fiduciary duty or RICO or breach of contract or tortious

7  interference, whatever the claim is, none of them exist if the

8  debtor doesn't get this.  They just don't exist.  And that is

9  why the complaint and the proceeding are inextricably

10 intertwined.  And if you just take a look at just one paragraph

11 of the pleading, it says at the core of this lawsuit is the

12 fact that HCM, that's the then debtor, purchased the

13 HarbourVest interests in HCLOF for $22.5 million knowing that

14 they were worth far more than that.  There's not a cause of

15 action that exists in the complaint that isn't dependent on

16 Paragraph 36.

17        So if we can go to the next slide with that

18 background, I'd like to argue why under 12(b), the complaint

19 should be dismissed because the claim should be barred under

20 the doctrine of *res judicata*.  Luckily, Your Honor, there is at

21 least one area of agreement between the parties here, and that

22 is the purpose of the doctrine and the elements that have to be

23 satisfied in order to meet the burden of proof necessary to

24 have the claims barred.  And in Footnote 1, you can -- I've

25 tried to just be helpful to the Court to show that we may not

APP_198

45

1  cite to the exact same cases, but the parties agree that the

2  doctrine is intended to foreclose the re-litigation of claims

3  that were or could have been raised in a prior action and that

4  there's four elements that have to be satisfied for the

5  doctrine to apply.

6          The parties have to be either identical or at least

7  in privity, the judgment in the prior action had to have been

8  rendered by a court of competent jurisdiction.  Number three,

9  the prior action had to have been concluded by a judgment on

10 the merits.  And the last one is that the same claim or cause

11 of action was involved in both suits.  So I just want to spend

12 a few minutes now, Your Honor, going through those four

13 elements to show the Court how easily the reorganized debtor

14 meets this standard.

15         If we can go to the next slide, I can take care of

16 the first two elements very quickly.

17         The first element, the debtor asserted that the

18 Plaintiffs were parties or in privity with parties to the prior

19 proceeding.  That's at Paragraph 17 of the motion to dismiss.

20 The debtor relies on the deposition testimony of Grant Scott,

21 who was then the trustee of the DAF.

22         CLO Holdco is a wholly-owned subsidiary of the DAF,

23 or wholly controlled, in any event, and Mr. Scott's testimony

24 was that he was the only director and there were no employees

25 of either entity.  So we, in our motion, put forth evidence to

**APP_199**

46

1  establish the first element, and I don't believe, maybe I've

2  missed it.  I don't believe that the Plaintiffs have contested

3  that element.  If they have, I think Mr. Scott's testimony will

4  carry the day, in any event.

5        The second element as to whether or not a court of

6  competent jurisdiction is the entity or the court that rendered

7  the ruling.  Of course, that's been met, too.  The Plaintiffs,

8  in their opposition to the motion to dismiss, suggested that

9  the bankruptcy court would have lacked jurisdiction if their

10 cross motion to withdraw the reference was granted.  They said

11 if the district court decides that mandatory withdrawal

12 applies, then it cannot find that the bankruptcy courts already

13 entered final judgment was rendered on Plaintiffs' causes of

14 action and had jurisdiction to do so.  I think that's just a

15 clear misstatement of the law.

16       But in any event, Your Honor, at this point, I

17 believe it's irrelevant because the district court, in fact,

18 sent the case back to Your Honor and back to this Court.  And

19 so, at the end of the day, Plaintiffs' argument doesn't hold

20 water because of the district court's ruling, which can be

21 found -- the order of reference can be found at Docket

22 Number 64.  And so I think that easily takes care of the second

23 prong.

24       The third prong is whether -- if we can go to the

25 next slide -- the prior proceeding resulted in a judgment on

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_200

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 04/21/23   Page 205 of 508   PageID 576
Exhibit 1   Page 202 of 305

47

 1  the merits.  And this is really the critical point, Your Honor.

 2  As the Court knows, the whole doctrine of *res judicata* is

 3  designed to prevent, as the parties agree, the re-litigation of

 4  claims.  Stated another way, it's to bring finale.  It's to

 5  make sure that the Court doesn't hear the same claims and the

 6  same issues that either were brought or that could have been

 7  brought in a prior proceeding.  And so, we believe that we

 8  easily meet the standards set forth in the third prong.  The

 9  9019 order necessarily determined that the *quid pro quo* that I

10  described earlier was fair, reasonable, and legally

11  permissible.

12          Notwithstanding their assertions to the contrary, the

13  Plaintiffs are most definitely seeking to unwind at least one

14  half of the Court's order by belatedly claiming that they are

15  entitled to the benefit of the bargain while leaving Highland

16  burdened, frankly, with the claims that HarbourVest got as part

17  of the deal.  I will tell you, Your Honor, and this is

18  argument, the debtor would never have asked for, and I don't

19  believe that the Court would ever have granted, the 9019 motion

20  if they thought that there was a risk in the future that

21  Highland wouldn't get the benefit of the bargain and it was

22  incumbent upon CLO Holdco and the DAF, and frankly, any party

23  in interest, to stand up and be counted and tell the Court and

24  the debtor, why the debtor was not entitled to do this deal and

25  CLO Holdco did that.  They actually did.

1          They stood up and they filed an objection and they

2    said we have a superior right to this asset in the form of a

3    right of first refusal.  They wound up folding in the face of

4    persuasive argument, and I respect the lawyer who did that.  I

5    just do.  But that was the time to speak up, and that's why it

6    is on the merits because that is exactly what *res judicata* is

7    intended to do.  It's intended to have everybody put your cards

8    on the table.  You don't put one card on the table and say, I'm

9    going to challenge this under 6.2 of the members agreement, but

10   I'm not going to tell you that I also think you owe me a

11   fiduciary duty under the Advisors Act or as the control party

12   or under any other theory that they had.  They can't do that.

13   That's exactly what the problem is here.

14          If we can go to the next slide.  Is it a judgment on

15   the merits?  The debtor and the Court relied on CLO Holdco's

16   representation that it was withdrawing its argument, its claim,

17   its contention, its assertion that it had a superior right to

18   obtain the HarbourVest interest in HCLOF.  Again, they did so

19   not whimsically, not because Mr. Kane was going to be out of

20   town and he couldn't make the hearing.  He did it after, and I

21   don't think this matters frankly, but I think it's worth noting

22   that he did it after an extremely careful analysis.  I would

23   tell you, Your Honor, that -- well, I would argue, Your Honor,

24   that even if Mr. Kane at CLO Holdco had never filed an

25   objection, if they'd never filed -- if they'd gotten notice

49

1  that this was happening and they sat silently, that would have

2  been enough for *res judicata* because the issue before the Court

3  was whether it was legally permissible for the debtor to

4  acquire this asset.

5          And if they had an obligation, if they owed a duty to

6  another party, it wouldn't have been legally permissible.  And

7  if somebody believed that it wasn't legally permissible because

8  a duty was owed to them, they had an obligation to speak up.

9  And so I think it's very important, particularly for the

10 collateral estoppel argument that I'll make in a moment, that

11 CLO Holdco did in fact file an objection.  It was based on the

12 breach of contract claim that's in their complaint.  It's the

13 exact same claim.  And they withdrew it.  I think it's very,

14 very important.  I think it highlights why *res judicata*

15 applies.  I think it is the linchpin of the collateral estoppel

16 argument.

17         But at the end of the day, I think if they say

18 nothing, they should be estopped or precluded under *res*

19 *judicata* from now asserting -- it would be like -- I was

20 thinking about this earlier, Your Honor.  If you'll remember

21 earlier this year, Mr. Dondero and his entities have kind of a

22 habit of withdrawing objections at the last minute.  We had a

23 couple of sale hearings earlier this year.  And the issue was

24 valuation, you know, and the process, and could the debtor meet

25 its burden of proving that the sale outside of the ordinary

**WWW.LIBERTYTRANSCRIPTS.COM**

50

1   course of business was in the debtor's best interest.  And they
2   sold that restaurant.  And Mr. Dondero objected.  And at the
3   last second, they withdrew the objection.  Did they sue
4   tomorrow?  Does Your Honor really think that they could bring a
5   lawsuit tomorrow and say they just found a document or theory
6   on which the debtor had an obligation to give them a right of
7   first refusal, even though we've already closed on the
8   transaction, even though they were given notice of the
9   transaction, even though they filed an objection to the
10  transaction, even though they withdrew the objection?  Would
11  the Court tolerate for one second a new pleading tomorrow from
12  Mr. Dondero that the debtor actually had a fiduciary duty to
13  give him a right of first refusal to buy that asset under
14  whatever theory, just because he pleads it and the Court has to
15  accept as true the allegations in the complaint?  I think not.
16  And I think it's worth thinking about that to highlight just
17  how -- just how wrong this is.

18          Continuing on.  You know, the Plaintiffs in
19  opposition say it can't be a trial on the merits because we
20  weren't parties.  Of course they were parties.  Again, they
21  filed an objection.  They were the parties to the contested
22  matter, full stop.  They rely on a case called Applewood and
23  they say, this is the very first point they make in their
24  brief.  Applewood, if it wasn't *res judicata* in Applewood, how
25  could it possibly be *res judicata* here?  But the facts are just

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_204

51

1  so inapposite, right?

2         In Applewood, you had a garden variety plan and

3  release where the debtor and the officers and directors got a

4  discharge.  No objection to it.  And a secured lender later on

5  sought to sue guarantors who happened to be officers and

6  directors.  And the court, not surprisingly, said that the

7  confirmation order wouldn't prevent the secured lender from

8  going after the officers and directors, not in their

9  capacities, as such, but in their capacity as guarantors, which

10 were never part of the confirmation order.  That just doesn't

11 apply here because here, we have the debtor making a motion

12 before the Court in which it sought permission and authority to

13 acquire a particular asset.  Anybody who had a claim to that

14 asset should have stepped forward and put their cards on the

15 table.

16         And again, CLO Holdco put their cards on the table

17 and they lost, and they folded.  To use the poker analogy, they

18 folded.  And to hear them come into Court today and say we're

19 going to sue you because I reshuffled the deck, it's not right

20 and Applewood has no relevance.

21         Finally, Your Honor, you know, it's not on the

22 merits, they say, because you know, Mr. Seery and the debtor

23 hid the true value of the asset, and had we only known the true

24 value of the asset, we would have made all of these other

25 claims.  The fact of the matter is, you either have a fiduciary

APP_205

52

1  duty or you don't.  And if you had a fiduciary duty, they

2  should have spoken up and they did only under 6.2, but they

3  did.

4          But here's the important part, Your Honor.  Take the

5  allegations as true.  You have to take all of the allegations

6  as true, not just some of them.  And if you look at

7  Paragraph 127 of the complaint, and I would ask Ms. Canty to go

8  to Appendix 11 and let's just put Paragraph 127 up on the

9  board.

10         Here's the irony of the whole thing, right.  The

11  whole complaint is based on the fact that somehow Mr. Seery was

12  engaged in insider trading.  They accused him of insider

13  trading, and they say he didn't disclose the full value of the

14  asset.  Just read Paragraph 127.  James Dondero, who was on the

15  board of MGM, is the tippee.  You've got an insider trading

16  case -- I mean, I don't represent MGM.  I'm not with the SEC.

17  I don't know why Mr. Dondero thought he should be telling

18  Mr. Seery in December, 2020.  It's not clear if it was before

19  or after the 9019 motion was filed.  But Mr. Dondero is the

20  very source of information -- you can't make this up.  He's the

21  very source of the information that he now complains Mr. Seery

22  didn't disclose.

23         Of course, Mr. Dondero, the trust, CLO Holdco could

24  have asked Mr. Seery at any time, how did you come up with your

25  valuation?  Mr. Dondero, knowing that he had supplied to

**WWW.LIBERTYTRANSCRIPTS.COM**

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 05/24/23   Page 211 of 508   PageID 582

53

1  Mr. Seery, according to Paragraph 27, please take it as true

2  for purposes of this motion only.  He's the source of the

3  inside information.  And now he has the audacity to come to

4  this Court, notwithstanding the Court's approval, all of the

5  time and money and effort spent in the 9019 process, and say,

6  Mr. Seery was wrong because he didn't tell CLO Holdco and the

7  DAF about the information that Mr. Dondero gave to Mr. Seery.

8  It's not right.

9        It was a judgment on the merits.  And if Mr. Dondero

10 or the DAF or CLO Holdco or the trust wanted to challenge the

11 valuation, they had every opportunity to do so.  And based on

12 Paragraph 127, if the Court accepts it as true, shame on them.

13 Shame on them for not pursuing this issue before.  The guy gave

14 Mr. Seery, according to this allegation, and I'm just going to

15 leave it there, inside information.  And he sits there in

16 silence, right?  It says, look at the last sentence: "The news

17 of the MGM purchase should have caused Seery to revalue HCLOF's

18 investment."  Seriously?

19       The third element is (indiscernible).  The fourth

20 element, if we can go to the next slide.

21       Are they the same claims?  Did the claims arise from

22 the same set of operative facts?  I've addressed this pretty

23 clearly already, so I don't want to belabor the point.  But

24 obviously, both the 9019 motion and the complaint arise solely

25 from the debtor's settlement with HarbourVest.  The debtor's

APP_207

54

1  acquisition of HarbourVest's interest in HCLOF and the debtor's

2  valuation of that interest.  Without those three facts, there

3  is no complaint.  It's just not credible to argue that the

4  fourth element is not met.

5          The case law is clear.  It's quoted in the

6  Plaintiffs' opposition.  It's not just the test of whether the

7  claims are the same.  It's whether the claim is the same as

8  that which was brought or could have been brought.

9          In their opposition, the Plaintiffs contend that the

10 claims "did not write them until after the settlement was

11 consummated," and that the first time the plaintiffs heard

12 about the valuation of HarbourVest's interests was at the

13 January 14, 2021, hearing.  I think I quoted that.  If you

14 look, I don't know if it's Page 10 or Paragraph 10; the way I

15 wrote it, it's probably Page 10.  I think that's a quote right

16 out of there.  But of course, as we saw the debtor disclosed

17 the valuation in its very initial motion, CLO Holdco's counsel

18 elicited valuation testimony directly from Mr. Pugatch, so that

19 was before the hearing.

20         And of course, Mr. Dondero and the trusts both cited

21 in their objections the valuation.  The notion that this was

22 not right, just -- it's contradicted by their own conduct,

23 their objections, their questions in deposition, the

24 information that was contained in the motion that they objected

25 to.

55

1          I do want to go off-script for just a minute, if we

2   could just take that down because I know that this is probably

3   something that Mr. Sbaiti may argue.  And that is, well, gee,

4   but you have to take the allegation as true that Mr. Seery

5   wasn't honest, that Mr. Seery lied to the court.  I don't

6   understand why there's not a fraud cause of action in there,

7   but there's not.  But that's their theory.

8          And gee, how does he get to skate away Scott free if

9   he's allowed to do that with impunity, right?  I will tell you,

10  Your Honor, of course you've seen Mr. Seery many times.  You've

11  made your own assessments of his credibility.  I'm not here to

12  argue the merits, but I will just say that the Defendants, if

13  ever forced to, will contest the allegation.

14         But here's the thing, and here's the important point

15  about, you know, whether or not he could lie with impunity and

16  say, I suspect that's where Mr. Sbaiti is going to want to go.

17         Mr. Seery said what he said.  And he had a reason to

18  speak, and he spoke, and he said what he said and he told

19  everybody who would listen exactly what he was doing and how he

20  was doing it.  For whatever reason, the objectors put the

21  valuation front and center.  It's right in their objections.

22  They noted the objections.  But for whatever reason, they did

23  nothing.

24         Whether they were negligent or whether they were

25  lying in wait is kind of irrelevant.  They had a full and fair

**WWW.LIBERTYTRANSCRIPTS.COM**

56

1  opportunity to contest this issue.  And if they had done so,

2  and the evidence proved what they're now alleging, they can't

3  tell you what would have happened.  So, you know, HarbourVest

4  may have taken a different position.  The Court may have done

5  something.

6           We're never going to know now because Mr. Seery and

7  the debtor are getting away with something, but because they

8  put in evidence that went unchallenged by Mr. Dondero and the

9  Plaintiffs.  It simply went unchallenged.  And they say, oh,

10  gee, that's because we didn't know.  Well first of all, you

11  didn't ask.  And second of all, again, the source of the inside

12  information, the reason that Mr. Seery should have known the

13  asset was worth more.  The reason that he should have refrained

14  from trading and not engaged in insider information was

15  Paragraph 127.  It was Mr. Dondero.

16           Here's another thing.  If -- if again Mr. Seery had

17  not been honest with the Court and that was ever brought out,

18  Maybe HarbourVest -- maybe HarbourVest would have had a right

19  to complain.  There's a lot in the complaint about oh,

20  HarbourVest was misled.  The actual evidence that's in the

21  record, and this is part of res judicata, Mr. Seery testified

22  very clearly to the arm's length negotiation that took place.

23  He told the Court under oath that the negotiations were

24  contentious.

25           He told the Court under oath that in order to try to

57

1  resolve the case, he and Mr. Pugatch went off and had their own

2  private conversation without lawyers.  They could have taken

3  discovery on any of that, right.  What did you guys talk about?

4  It's certainly not privileged.  They had every opportunity.

5  But what we do know is that Mr. Pugatch under oath, in

6  deposition, and at trial, said the value is $22.5 million.

7          So I don't think Mr. Pugatch or HarbourVest is ever,

8  ever, every going to complain about the transaction they did.

9  Because of what the evidence simply shows.  But again, you've

10 got the Plaintiffs in their complaint saying that somehow the

11 debtor and Mr. Seery in negotiating this transaction has now

12 exposed the debtor to liability.  It just makes no sense.

13         So there was a time and there was a place to

14 challenge Mr. Seery.  Somebody, you know, maybe HarbourVest

15 could have done something, maybe they could still do something.

16 I don't know.  If they really think that there's a problem,

17 maybe we'll hear from HarbourVest someday.  But the Plaintiffs

18 have no right to complain.  They just don't.  They knew

19 everything.  They were the source of the inside information.

20 They sat on their hands, and they shouldn't be allowed to do

21 what they're doing now.

22         If we can go to the next slide.  I want to move to

23 the next theory and try to finish this up.  The next theory is

24 that the Plaintiffs' claims are barred by judicial estoppel.

25 The judicial estoppel argument is really, really very

**WWW.LIBERTYTRANSCRIPTS.COM**

58

1  straight-forward.  And it's important because if the Court

2  thinks about this the way I do, it's that the whole issue of

3  valuation is completely irrelevant to the Plaintiffs unless

4  they can show that they were owed some kind of duty, that they

5  had some superior right to acquire the asset.  But that's

6  exactly the issue that CLO Holdco relied upon and withdrew and

7  should now be estopped from pursuing.  Right.

8       The legal standard, again the parties agree on, that

9  in order to be estopped, the party must take an inconsistent

10 position.  And the party must have convinced the Court to

11 accept that position.  Again, both prongs are easily met here

12 in just a few sentences from the January 14 hearing.  You have

13 Mr. Kane saying that he understands and acknowledges and admits

14 that they have no superior right to the investment.  And the

15 Court relying on that very representation in declining to

16 conduct a hearing and render a ruling on the merits of the

17 claim that was withdrawn.  The objection that was withdrawn.

18      And for the avoidance of doubt, after Mr. Draper

19 spoke on behalf of the Trust, the Court, at Page 22 engaged in

20 the following colloquy.  The Court asked Mr. Draper:

21      "THE COURT:  Were you saying that the Court still

22           needs to drill down on the issue of whether the

23           debtor can acquire HarbourVest's interest in HCLOF.

24      "MR. DRAPER:  No.

25      "THE COURT:  Okay.  I was confused whether you were

**WWW.LIBERTYTRANSCRIPTS.COM**

59

1        saying I needed to take an independent look of that.

2        Now that the objection has been withdrawn of CLO

3        Holdco, you're not pressing the issue.

4        "MR. DRAPER:  No.  I am not."

5        Okay.  You can call it res judicata, you can call it

6  judicial estoppel, collateral estoppel, the two prongs are

7  easily met.  They're taking an inconsistent position today and

8  through all kinds of different theories, including the one that

9  they withdrew, the Plaintiffs assert that they had a superior

10 right to acquire the interest from HarbourVest.

11       And they should have asserted those rights at the

12 hearing.  That was the time.  And they should be estopped now

13 from taking a completely inconsistent position from the one

14 that was before the Court.  And I just do want to point out,

15 the statement from a case called Hall vs. G.E. Plastic.  And

16 it's interesting, Your Honor, because there's only a few cases

17 that I focused on, because this is really more fact intensive.

18 And there isn't a dispute as to the, you know, the elements of

19 these matters.

20       But it is interesting that the Plaintiffs, you know,

21 generally ignore all of the cases that we cite to.  One which

22 is Hall vs. G.E. Plastic, where the Court said that the focus

23 on the prior success or judicial acceptance requirements is to

24 minimize the degree of a party contradicting a Court's

25 determination, based on a party's prior position.  That's the

**WWW.LIBERTYTRANSCRIPTS.COM**

60

 1  whole point of the exercise.  You can't do this.  You can't do
 2  this.

 3       Just quickly, that leaves the individual arguments as to
 4  each of the five causes of action and I just want to go through
 5  some highlights.  There's a negligence claim, Your Honor.  And
 6  we did not file a pleading, but the Court can certainly take
 7  judicial notice of the fact that the effective date has
 8  occurred.  Under the effective date, the plan is now effective.
 9  That includes the exculpation clause, as Mr. Pomerantz, I think
10  accurately and without contradiction pointed out earlier, the
11  exculpation clause applies specifically to the debtor and to
12  negligence claims.  And that's not a matter that's at all
13  subject to appeal.

14        So I think just to add to the arguments that we have
15  in our papers, which I adopt and do not abandon for any
16  purpose, I would add to the argument on negligence, that it's
17  now precluded, as a result of the plan becoming effective.

18       The fiduciary duty count suffers from numerous defects.  I
19  just want to point out a couple of them.  They don't respond to
20  the argument under Corwin, that under the Advisor's Act, there
21  is no private right of action to sue for damages arising from a
22  breach of fiduciary duty.  This claim rears its head in
23  virtually every single complaint.  They've never addressed
24  Corwin.  Corwin is binding on this Court, and it is unambiguous
25  that there is no private right of action to sue for damages for

APP_214

61

1  breach of fiduciary duty under the Advisor's Act.

2          They ignore Goldstein.  Goldstein is not from the

3  Fifth Circuit, but it's very persuasive authority that advisors

4  do not owe fiduciary duties to their individual investors.

5  Instead, they owe fiduciary duty to their client.  Their client

6  is the entity with whom they're in contractual privity.  And so

7  in this case, there's no fiduciary duty there, either.

8          The breach of contract claim.  Again I just -- I

9  would just say quickly, Your Honor, it's barred under judicial

10  estoppel.  Even if it wasn't, it's clear based on Mr. James'

11  analysis and admission that the debtor's, or the reorganized

12  debtor's interpretation of 6.2 is accurate.  And you know, I

13  said this in the beginning.  Now let me tie it in a bow because

14  the breach of contract claim, and the tortuous interference

15  claim are both tied to the same thing.  And that is the

16  assertion that the Plaintiffs had a right under the membership

17  agreement, a right of first refusal.

18          And they basically say that the debtor was playing

19  games.  That they shouldn't be able to get through 6.2 by

20  assigning it to an affiliate.  And that's where I go back, Your

21  Honor, and just remind the Court that the debtor told the whole

22  world exactly what they were doing in their motion.  And their

23  objections, Mr. Dondero and the Trusts both acknowledge to the

24  whole world that they understood exactly what was happening.

25          In fact, their concern was not that it was going to

62

1  the debtor, but that it might be going to an affiliate outside

2  of the bankruptcy court's jurisdiction.  And for them to now

3  say, having taken all of those positions -- talk about

4  inconsistent positions.  They should be barred from saying

5  today, that the use of an affiliate to effectuate the

6  transaction was wrongful, because they actually told the Court

7  that they needed to -- that the Court needed to make sure that

8  it had jurisdiction over the very entity they now say somehow

9  shouldn't have been allowed to get the asset.

10         It's a bit much.  So that takes care of the tortuous

11  interference.

12         The RICO claim, Your Honor, again is a motion.

13  There's so many different aspects to it.  But I don't think the

14  Court needs to get past the Supreme Court holdings in HJ, Inc.

15  Again, just simply ignored by the Plaintiffs in their

16  opposition to the motion to dismiss.  In HJ, Inc., the Court --

17  the Supreme Court did an exhaustive analysis to try to

18  determine and ultimately did determine, what a pattern of

19  racketeering activity meant.  And the Supreme Court came to the

20  following formulation.  That it had to have two or more

21  predicate related offenses that amounted to a threat of

22  continued criminal activities.

23         You know, the notion here is that the debtor and Mr.

24  Seery engaged in insider trading.  We've already -- I've

25  already mentioned that according to the complaint, which the

**WWW.LIBERTYTRANSCRIPTS.COM**

63

1   Court can take as true. Mr. Dondero, himself, was the tippee.

2   But be that as it may, they don't come close to meeting the

3   very high standards set forth by the Supreme Court in HJ, Inc.

4   to show that whatever conduct Mr. Seery and the debtor engaged

5   in, and if you take the allegations as true, in not telling

6   what the fair value of the asset was, that that doesn't amount

7   to a hill of beans for purposes of RICO. That you don't have

8   any, I think predicate acts. I think here's the Court,

9   predicate acts extending over a few weeks or months,

10  threatening no future criminal conduct, do not meet RICO

11  pleading grounds. Right.

12       Security fraud claims cannot be predicate acts for

13  purposes of RICO. That is also clear. And that is really, I

14  mean they say mail, wire and fraud. But what's really at heart

15  is the 10(b)(5). Okay, it's the 10(b)(5) claim. Again, Mr.

16  Seery being -- I mean Mr. Dondero being the tippee. But those

17  are just some of the reasons.

18       None of, you know, that the RICO claim fails. You

19  know, I'll otherwise rely on the papers, unless the Court has

20  specific questions as to any of the other pieces of the motion

21  to dismiss the RICO claim, or any other aspect of the

22  Defendants' motion. I think this is clear. I think we win, no

23  matter how you slice it. It's just wrong. It's just wrong.

24     This Court will never, ever have a final order if Mr.

25  Dondero is able to engineer complaints such as this, which seek

**WWW.LIBERTYTRANSCRIPTS.COM**

64

1   to assert claims that absolutely positively could have and

2   should have been brought at the time the debtor made its

3   motion.

4           Unless the Court has any questions, I have nothing

5   further.

6           THE COURT:  I do not.  All right.

7           Mr. Sbaiti, I'm going to let you have as much time as

8   Mr. Morris.  He took 55 minutes.  As I mentioned, I have a hard

9   stop at 12:00 to do a swearing in ceremony.  So if you're not

10  finished in 40 minutes, then I'm going to have to take a break

11  and come back and let you finish.  All right?

12          MR. SBAITI:  Thank you, Your Honor.  Although I don't

13  think I'm going to be much longer than 35-ish minutes.

14          THE COURT:  Okay.

15          MR. SBAITI:  if not less.

16          THE COURT:  Okay.

17          MR. SBAITI:  I think you'll be able to be done by --

18  we'll be able to be done by noon.

19          THE COURT:  All right.  Thank you.

20          MR. SBAITI: Thank you, Your Honor.  Your Honor, may I

21  share my screen?

22          THE COURT:  You may.

23          MR. SBAITI:  Thank you, Your Honor.  Do you see my

24  Power Point, Your Honor?

25          THE COURT:  I do.

**APP_218**

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 06/10/23   Page 223 of 508   PageID 594
Exhibit 11   Page 222 of 305

65

 1          MR. SBAITI:  Thank you, Your Honor.  I don't know

 2    what which one you see.  Is it the --

 3          THE COURT:  I see presentation.

 4          MR. SBAITI:  With the full page?

 5          THE COURT:  Yes, uh-huh.

 6          MR. SBAITI:  Okay, yeah, great.  I just want to make

 7    sure we're on the right page.  Thank you, Your Honor.  So Your

 8    Honor, the defendant debtor is a registered investment advisor.

 9    And it all begins with that.  And this where the distinctions

10    between what happened in the 9019 and I'll get to the elements

11    of res judicata through argument.

12          But the first thing that has to be identified is that

13    the Defendant is a registered investment advisor.  The

14    objection filed by Holdco back during the 9019 was an objection

15    against HarbourVest selling its interest by filing the right of

16    first refusal.  It did not deal with the investment advisor

17    feature of Highland's relationship.  And I'll get to why the

18    9019 doesn't preclude these arguments today.

19          This is essentially the structure.  Highland was the

20    investment advisor of HCLOF, and Holdco is an investor in

21    HCLOF.  And so Highland would owe a fiduciary duty under the

22    Advisor's Act against -- to CLO Holdco.

23          Highland also had a direct advisor relationship with

24    the DAF.  And so under the Investment Advisor's Act, it owed

25    fiduciary duties to both of those entities.  The law governing

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 1-11    Filed 07/12/23    Page 224 of 508    PageID 595
Exhibit 11    Page 37 of 305

66

 1  registered investment advisors is that it's a federally

 2  recognized and defined fiduciary duties.  The fiduciary duty to

 3   there's a fiduciary duty to affirmatively keep the advisee

 4  informed and the fiduciary duty not to self-deal, i.e., not to

 5  trade ahead of an advisee and opportunity that an advisee would

 6  want or expect and without the advisee's expressed informed

 7  consent.

 8          This is a federally recognized and defined fiduciary

 9  duty and it's actionable under state fiduciary duty laws.

10  While Mr. Morris ended his argument by saying we didn't deal

11  with their case law saying that there's no private right of

12  action under the Advisor's Act, the fact of the matter is that

13  Judge Boyle, about ten years ago, found that a state -- the

14  breach of fiduciary duty claim can be predicated on breaches of

15  federally imposed fiduciary duties under the Advisor's Act.

16  And that's what Douglass v. Beakley held.  And that's actually

17  what we cited in our response.  So I'm not sure why he would

18  argue that we haven't addressed the issue of where does this

19  private right of action come from.

20          Federal Law supplies the rules of the relationship

21  and State Law provides the cause of action for those breaches.

22  Now the scope of that has been expounded upon by many cases.

23  The Fifth Circuit held in Laird, as a fiduciary, the standard

24  of care to which an investment advisor must adhere imposes an

25  affirmative duty of utmost good faith and full and fair

APP_220

67

1 disclosure to all material facts, as well as an affirmative

2 obligation to employ reasonable care to avoid misleading his

3 clients.

4        The word "affirmative" there is important because it

5 means the investment advisor is not supposed to wait to be

6 asked.  The investment advisor as an affirmative duty to

7 proactively provide the information to the client.

8        The next standard comes from the SEC.  We call it the

9 SEC interpretation letter.  It's a release that came out in

10 2019.  And to meet it's duty of loyalty, an advisor must make

11 full and fair disclosure to its clients of all material facts

12 relating to the advisor relationship.  Material facts relating

13 to the advisor relationship include the capacity at which the

14 firm is acting with respect to the advice provided.

15        The SEC had another release in 2000 -- or excuse me,

16 in that same release, the SEC said the duty of loyalty requires

17 that an advisor not subordinate its clients interests to its

18 own.  In other word, an investment advisor must not place its

19 own interest ahead of its clients' interests.  An advisor has a

20 duty to act in the client's best interest, not its own.

21        The SEC general instruction three to part 2 of Form

22 ADV, that every investment advisor has to pull out.  And this

23 is cited in our papers.  As a fiduciary, you must also seek to

24 avoid conflicts of interest with your clients, and at a

25 minimum, make full disclosure of all material conflicts of

APP_221

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 1-1    Filed 02/21/23    Page 226 of 508    PageID 597

Exhibit 1    Page 59 of 205

68

1  interest between you and your clients that could affect the

2  advisor relationship. This obligation requires that you provide

3  the client with sufficiently specific facts, so that the client

4  is able to understand the conflicts of interest you have, and

5  the business practices in which you engage, and can give

6  informed consent to such conflicts or practices or reject them.

7       And, finally, the Third Circuit in <u>Belmont</u> said:

8       "Under the best interest test, an advisor may benefit

9       from a transaction recommended to a client if, and

10      only if, that benefit, and all related details of the

11      transaction are fully disclosed."

12      These fiduciary duties are unwaivable by the advisor.

13 Any condition, stipulation or provision binding any person to

14 waive compliance with any provision of this subchapter, or with

15 any rule, regulation or order thereunder shall be void.

16      So the lawsuit does not allege that the HarbourVest

17 settlement should be undone or unwound.  I'd like to move to

18 that point.  Mr. Morris says well, you have to unwind half of

19 the settlement.  Maybe HarbourVest doesn't have to give back

20 what it got, but Highland would still be saddled with the cost

21 of the settlement, but not with the benefit of the settlement.

22      Well, actually that's not true.  There's two points

23 that we would make on that.  Number one, our suit is a suit for

24 damages.  In other words, the suit would be a suit for money

25 damages, based on the difference between the value of the asset

APP_222

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 11    Filed 07/21/23    Page 227 of 508    PageID 598
Exhibit 11    Page 272 of 305

69

1  and what HarbourVest or what the actual value of the asset that

2  was represented, $22.5 million.  So the second point, though,

3  is that even under a situation where CLO or Holdco or the DAF,

4  or even HCLOF were to purchase the HarbourVest suit, the

5  expectation would obviously be that they'd pay the $22.5

6  million that Highland paid for it.

7         So Highland is -- so it's not unwinding, and there's

8  no saddling Highland with a burden that they didn't otherwise

9  have, I think that's a misrepresentation.  But we're not

10 seeking to unwind the lawsuit -- or excuse me, unwind the

11 settlement.

12        Now Mr. Morris is correct, the representation of

13 value by Mr. Seery is -- is one of the main points here.  And

14 the representation was that the value of the entire asset.  Not

15 just the shares of MGM, but the value of the entire asset was

16 $22.5 million.  So in other word, nearly half of HCLOF was

17 represented to be worth $22.5 million.  It was argued by

18 counsel on Page 14 of the January 14th transcript, and then on

19 Page 112 of that transcript, Mr. Seery specifically says the

20 current value is right around $22.5 million.

21        Now that was also in some of the filing papers and

22 Mr. Morris put up the evidence to Your Honor that Mr. Pugatch,

23 on behalf of HarbourVest also parroted that number.  But

24 there's not any evidence today about where that number came

25 from, or whether he was simply relying on Highland's

**APP_223**

70

1  representation of that value.

2          Now as a general rule, in these 12(B)(6) motions, as

3  I said before, we don't look at the evidence because the whole

4  point of discovery is to find out what's behind a lot of the

5  evidence.  That's been quoted.  The amount of evidence that

6  went into the 9019 motion as not necessarily full-blown

7  discovery.

8          I understand Mr. Morris saying well, they could have

9  asked the question.  But as I just showed you, they shouldn't

10 have to ask the question.  There should be fair and full

11 disclosure of all the material facts.  And if it turns out,

12 which we believe it is true, that by January, the value of

13 HCLOF was twice what it was represented, or the HarbourVest

14 portion of HCLOF was twice as to what it was represented,

15 that's a material omission that Highland had an affirmative

16 duty to not misrepresent.  Irrespective of the questions being

17 asked.

18         The DAF found out later on that the representation of

19 the value wasn't true.  Now Mr. Morris talked for a very long

20 time about all the opportunities that somebody, Mr. Dondero,

21 somebody other than CLO Holdco.  In addition to CLO Holdco,

22 could have asked the magic question to find out whether or not

23 they were telling the truth.  But that runs right in the face

24 of the standards set forth by the SEC and by the Courts as to

25 the affirmative obligation of an advisor to disclose all the

71

1  material benefits that they're going to get as part of a trade.

2  The idea being that when you're a registered investment advisor

3  and you want to engage in a transaction, you make a full

4  disclosure and say this is the transaction.  It's worth 41, but

5  I'm paying 22-1/2.  But here's why I'd like to be able to do

6  it.  And then that's the discussion that happens.

7         That clearly didn't happen here.  And when it turned

8  out that there was this entirely huge upside that they were

9  gaining the benefit of, and maybe HarbourVest didn't care, that

10 that was a false statement.  Now the reason we don't have a

11 common law fraud claim, or that we don't necessarily hang our

12 hat on a fraud claim is we don't have enough evidence as it

13 stands today, to specifically say that Mr. Seery intentionally

14 misrepresented that.  Although we believe that it was grossly

15 reckless of him to do so.  But we don't really need a fraud

16 claim with a gross recklessness standard.  We have a breach of

17 fiduciary duty, which basically gets us to the same place.

18        So the timeline we have is September 30th was the

19 last valuation of HCLOF assets provided by HCMLP.  And the

20 value of HCLOF, at that time, or the HarbourVest of that value,

21 would have been about 22.5 million.  So what it appears to be

22 is that in January or in late December, the valuation that was

23 being done -- what was being reported, wasn't the current

24 valuation.  It was the valuation as of the end of the third

25 quarter of 2020.

**WWW.LIBERTYTRANSCRIPTS.COM**

72

1          On December 22nd, the motion to approve the

2   settlement with HarbourVest was filed.  HCMLP should have had

3   or would have had up-to-date valuations of the HCLOF assets,

4   but didn't necessarily disclose them as being different than

5   the 22.5 million.  On January the 14th, Your Honor, held the

6   9019 hearing.  And then that same day, Your Honor entered the

7   approval order.

8          And finally, in March, the DAF learns the true value

9   of HLOF assets as of January 2021 and starts to look into it.

10  Now Mr. Morris makes much of the fact that well, Mr. Dondero at

11  least knew that he had tipped them off, Mr. Seery.  And if you

12  actually read Paragraph 127, you'll see specifically what it's

13  purported that he said.  He said stop trading in the MGM

14  assets, because MGM might be in play.  So you can't trade

15  because I'm an advisor, Mr. Dondero's an insider, he's the

16  tipper, not the tippee.  Mr. Seery becomes the tippee under

17  that theory of the case, and he has to, and is required to,

18  because of their affiliation at the time, he's required to

19  cease trading.  And that was the purpose of saying that.

20         The collateral issue that we point is that he at the

21  very least knew about that, and that should have caused him to

22  revalue, if he hadn't done so at the time.  Not that, knowing

23  that alone is sufficient to know what the value of HCLOF

24  actually was on that date.  That's a complete misrepresentation

25  of the point and purpose of that allegation.

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 11    Filed 07/21/23    Page 231 of 508    PageID 602

73

1            And as Your Honor knows, under 12(B)(6)

2    jurisprudence, the way this is supposed to go is we get the

3    benefit of every inference based upon the allegations, not the

4    movant.  So the first violation is that the debtor as an IRA

5    failed to affirmatively disclose the true current valuation of

6    HCLOF and failed to keep the DAF and CLO Holdco reasonably

7    informed of the value of the assets.

8            And the debtor as an IRA, failed to obtain CLO

9    Holdco's with the DAF's informed consent before it traded in

10   the asset, because it didn't have all of the information.  The

11   typical remedy for breach of fiduciary duty is typically

12   damages for any loss suffered by the Plaintiff as a result of

13   the breach.  I don't think there's a debate there.

14           So now we get to Mr. Morris' key argument.  His key

15   argument is that we should be talking about res judicata.  The

16   elements of res judicata and I think we agree is you have to

17   have identical parties in the action; the prior judgment was

18   rendered by a Court of competent jurisdiction; the final

19   judgment was final on the merits, and the cases involved the

20   same causes of action or the same transaction and nexus of

21   facts.

22           Now I'm going to skip to three, because I think

23   that's one of the key points that we disagree with them on.

24   There is no case, Your Honor, that we could find, and no case

25   that I read them citing that says an order on an 9019 has

74

1  preclusive effect under res judicata under an objector to the

2  settlement.  We looked.  We looked in the Fifth Circuit.  We

3  looked outside of the Fifth Circuit.  No District Court, no

4  Fifth Circuit Court of Appeals' opinion we could find held that

5  a 9019 order has res judicata effect on an objector's

6  objection.  And I think the reason is pretty simple.  Is it

7  doesn't.

8          Because the Plaintiff's claims, here our claims

9  hadn't even accrued.  We have a four year statute of

10 limitations, but I think more importantly is that, as the Fifth

11 Circuit said, the 9019 motion grants the Court discretion.

12 It's not supposed to be a mini trial.  The Court can approve a

13 settlement over even the valid objection of an objector.  It's

14 not a trial on the merits.  It's not supposed to be a trial on

15 the merits.  It's not supposed to be a disposition on the

16 merits.

17         So the fact that Your Honor could have approved the

18 9019 settlement with HarbourVest, even if we had a valid

19 objection, means this isn't a disposition on the merits, as res

20 judicata would envision.  It wasn't a trial on the merits, even

21 though it was withdrawn.

22         The other elements that we would point out to is that

23 neither the DAV nor Holdco were parties to the dispute between

24 HarbourVest and Highland.  And this keys off of the issue that

25 I just raised.  The cases that are cited by the debtor to Your

**APP_228**

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 1-11   Filed 12/16/22   Page 233 of 508   PageID 604

75

1  Honor all have to do with where one of the settling parties is

2  trying to undo the settlement for some collateral reason.  And

3  the Courts have held, no, that's res judicata, because you were

4  a party to the action.  HarbourVest brought the claims against

5  Highland.  Highland settled those claims.

6        CLO Holdco was collateral to that settlement, it's

7  not a -- excuse me, collateral to that dispute.  It's not a

8  party to that dispute.  Its claims weren't being resolved by

9  the settlement.  And while you have a notice to all creditors

10 and those objections can be raised, there was not inherently

11 any manner for resolving those objections on their own merits.

12 Only -- it was only resolved in so far as deciding whether or

13 not the settlement was in the best interest of the debtor,

14 which Your Honor decided, and we don't challenge that.  But we

15 do argue that it caused damages and the debtor shouldn't get

16 off for those damages.

17        The fourth element is that the --

18        THE COURT:  Just for the record, the standard in a

19 9019 context is not best interest of the debtor, right?

20        MR. SBAITI:  Your Honor, I mean that's what the rule

21 says and Your Honor's order --

22        THE COURT:  That is not what the rule says.  The rule

23 is actually very sparsely worded and then we have Fifth Circuit

24 case law and U.S. Supreme Court law that talk about what the

25 standard is.

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_229

76

1          MR. SBAITI:  Yes, Your Honor.  And there are five --

2          THE COURT:  And it's -- is it fair?

3          MR. SBAITI:  There are five elements.

4          THE COURT:  Is it fair and equitable and in the best

5    interest of the estate given a long list --

6          MR. SBAITI:  Correct, Your Honor.  And I didn't mean

7    to --

8          THE COURT:  -- of considerations that the Court is

9    supposed to consider that "bear on the wisdom of the

10   settlement."  Okay.  So it's actually much more involved, is my

11   point, than is it in the best interest of the estate.  Is it in

12   the best interest of the estate and fair and equitable given

13   all factors bearing on the wisdom of the compromise?  And then

14   we have a long laundry list of things the Court should consider

15   as part of that analysis.

16         MR. SBAITI:  That's a --

17         THE COURT:  I just bring that up because if I'm still

18   -- my brain is still stuck five minutes ago on your comment

19   that you can't find any case saying that an order approving a

20   9019 compromise has res judicata effect on creditors.  And it's

21   -- let me just say it's shocking to me that someone would argue

22   otherwise.  Bankruptcy is a collective proceeding --

23         MR. SBAITI:  Your Honor --

24         THE COURT:  -- where creditors can weigh in and

25   object and raise whatever arguments they think the Court should

**WWW.LIBERTYTRANSCRIPTS.COM**

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 07/31/23   Page 235 of 508   PageID 606

Exhibit 11      Page 278 of 305

77

1  consider that bear on the wisdom of the compromise.  And the
2  Fifth Circuit in Foster Mortgage has said the Court should give
3  great deference to the views of the creditors, the paramount
4  interest of creditors.

5        So it's a really sort of shocking proposition that
6  the order approving a 9019 compromise wouldn't have res
7  judicata effect on all parties and interests who got notice of
8  that.  So if you have any elaboration on that, I'd like to hear
9  it.

10       MR. SBAITI:  Your Honor, we looked at the Fifth
11  Circuit cases that they cited, which I believe included that
12  case.  And even in that case, the point that we made in our
13  papers and the point I was trying to arrive at is that among
14  the factors, yes, the Court should give great deference to the
15  creditors.  But among the factors is not that the objections
16  lack merit or are meritless or that they wouldn't be winnable
17  if they were simply standalone claims.

18       And that was really the only point I was trying to
19  make is that Your Honor has discretion.  Granted it's -- as you
20  mentioned, it's not unfettered discretion.  It's bounded by
21  standards and there are -- there is, I know, about five
22  standards Your Honor has to consider or the Court has to
23  consider.  But among those, that laundry list of standards, is
24  not that the Court finds that any objection lacks merit.  And
25  that was really the only point I was making.

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 11    Filed 02/21/23    Page 236 of 508    PageID 607

78

1          And in terms of the case law, we looked at the Fifth

2   Circuit.  We looked, frankly, outside the Fifth Circuit as much

3   as we could, and because this is actually not an easy one to

4   research, as it turned out, despite the language.  And we also

5   looked for district court opinions in the Fifth Circuit to see

6   did any district court or did any court of appeals give this

7   type of approval to the standard that a 9019 order has res

8   judicata effect on a claim raised in an objection by a

9   creditor.

10         And we couldn't find any and I read all the cases

11  that Mr. Morris cited in his papers, and they didn't cite one

12  that explicitly said that.  They tried to drive at it through

13  insinuation that, well, if the Court has to give great

14  deference or if the Court has to take into account the

15  underlying facts and the fact that there is discovery, surely

16  that must mean this is akin to the trial on the merits.  And I

17  think that's where we simply disagree in good faith.  I'm not

18  ascribing any bad intention.  But we disagree that that's where

19  the law goes.

20         Res judicata is not -- while it's supposed to stop

21  the relitigation of issues, it is predicated on there having

22  been actual litigation of those issues.  And when HarbourVest

23  and Highland settle a case and my clients show up with an

24  objection, even though they withdraw an objection, that, in our

25  opinion -- and we're asking the Court to see it our way -- is

**WWW.LIBERTYTRANSCRIPTS.COM**

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 02/01/23   Page 237 of 508   PageID 608
Exhibit 11   Page 232 of 305

79

1 not trial on the merits.  It's not a disposition on the merits

2 of the objection in and of itself.  Some objections we can --

3          THE COURT:  But the context matters.  In the context

4 of a 9019 compromise, the hearing is about look at the bonafide

5 ease of the settlement.  And it's either fair and equitable and

6 in the best interest of the estate or not.  And an objector can

7 say this is a terrible settlement and here's why it's a

8 terrible settlement and let me cross-examine the movant and let

9 me put on my own witness that will enlighten the Court as to

10 why this is a terrible settlement, why I say terrible, why it's

11 not fair and equitable.

12          That's your chance to convince the Court, don't

13 approve this settlement because there are, you know, 14

14 problems with it.  And if you convince the Court, then you

15 convince the Court and it's not approved.  If you don't, you

16 appeal, and we do have an appeal of the settlement order.

17          So, again, I'm not understanding the "res judicata

18 doesn't apply" argument.

19          MR. SBAITI:  Your Honor, if I could riff on two

20 points based upon what you just said, if I could address those.

21          The first is there are clearly two kinds of

22 objections that get -- at least two kinds of objections that

23 get raised in these 9019 approval hearings.  The two that you

24 heard recounted, some were this is bad for the estate.  There's

25 reasons why we don't think the estate will benefit from it and

**WWW.LIBERTYTRANSCRIPTS.COM**

80

1 it will be harmed from it.

2          And those types of objections, which I believe mostly

3 comprise the objections that Mr. Morris was talking about

4 because they are concerns for the estate.  And so creditors who

5 want to get money from the estate are concerned that the

6 settlement will not enter (phonetic) to the benefit of the

7 estate, and therefore, not enter to their benefit as creditors.

8 That's number one.

9          But those don't adhere in a lawsuit.  Those aren't

10 claims for damages that the settlement is going to create for

11 the person objection or for the party objecting.  There's a

12 whole separate set of objections similar to the ones HCLO

13 Holdco raised where that what inheres in the objection is this

14 is actually going to cause us some kind of damage.

15          And so, the factors though, don't require the Court

16 in those second set of instances to say, well, you know what?

17 Not only do I think you're wrong, but I think that your

18 lawsuit, the underlying causes of action that give rise to this

19 objection, have no merit on their own face, that the discovery

20 is not there to support them, that a jury is not going to find

21 there.  I am now the trier or the Court is now the trier of

22 fact on the merits of the underlying causes of action that

23 animate the objection.

24          And that's where I believe we're diverging with the

25 debtor on the law.  It goes too far to say that a 9019 hearing

1  where the Court in the end has discretion to approve it, even

2  over a meritorious objection by any party, regardless of what

3  bucket of objections the objection falls into.  It goes -- our

4  argument today, Your Honor, and we're asking the Court to see

5  it our way, is that that would go too far.  That an actual

6  cause of action shouldn't be eradicated simply because of the

7  9019 process because, as you pointed out, the Court does have

8  to go through a litany of factors.

9           And if the Court determines that it's fair and it's

10 more equitable to overrule the objection, the Court has that

11 discretion.  And we're not here to unwind that discretion.

12          But the settlement process did violate certain

13 obligations and did cause my client damages.  And that's what

14 we're saying isn't precluded.

15          THE COURT:  Okay.

16          MR. SBAITI:  The fourth element, Your Honor, which I

17 guess in many ways maps on to the argument I just made to Your

18 Honor is that the cases, the underlying cases, do not involve

19 the same claims.  Plaintiffs' claims arise from the settlement

20 process itself and not from the underlying issues being settled

21 between HarbourVest and Highland.  So that's why we think at

22 least three of the four elements aren't met here.  And we'll

23 reserve on the papers, you know, whether jurisdiction was

24 applicable because I think that's probably water under the

25 bridge at this point in the oral argument.

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 11    Filed 03/21/23    Page 240 of 508    PageID 611

82

1          Now, Mr. Morris attacks the case that we cite,

2    Applewood Chair vs. Three Rivers Planning.  And he argues that,

3    well, this is not applicable.  And the argument he made however

4    was he put it in the context of, well, the parties there, the

5    issue was you had guarantors who were not parties in their

6    capacity as guarantors.  But that's not actually what the Court

7    held.

8          The Court didn't say that the release wasn't

9    applicable to them because they didn't appear as parties in

10   their guarantee capacities.  They -- the Court held that, well,

11   the specific discharge language doesn't enumerate those

12   specific guarantees, and so therefore it's not released.

13         And where this dovetails, we believe, as closely as

14   we can, this isn't a 9019 case.  This is a final confirmed

15   plan.  But where it dovetails with what our argument is, is

16   that the Court there as well was essentially saying the

17   underlying causes of action weren't really presented to us, so

18   we're not -- we -- and the confirmation of the plan didn't

19   involve disposing of them, so we're not going to say that they

20   are precluded.  And we think that that's as close an analogy as

21   we've found in the Fifth Circuit to the issues here today.

22         So I would say, Your Honor, that we believe that

23   dispenses with the res judicata argument.  The judicial

24   estoppel argument, they conflate the language.  I'll go back to

25   this for a second.  They conflate the language of judicial

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 03/24/23   Page 241 of 508   PageID 612

83

1  estoppel on the success of the claim.  None of the cases they

2  cite on judicial estoppel involved where a party took a

3  position, withdrew their argument, and then the Court moved on.

4        Mr. Morris tries to convert a judicial estoppel claim

5  into a judicial reliance claim, which is not the purpose of the

6  doctrine and is not the doctrine at all.  The doctrine is that

7  if you take a successful position in one court, you can't take

8  the opposite position in another court.  CLO Holdco didn't take

9  a successful position in one court and then change its position

10 later on.  In fact, its positions, as Mr. Morris stated, are

11 remarkably similar.  They're not inconsistent, which is the

12 problem with their judicial estoppel argument.  And we -- I

13 think we fairly briefed that in our papers and we'll otherwise

14 rest on the papers.

15       To deal -- to address the actual claims, again, I

16 come back to the idea of a fiduciary duty claim, which is our

17 lead claim.  And to be clear, it's a state claim predicated on

18 the violation of federally imposed fiduciary duties.

19       And I'm looking for a clock to make sure I'm not

20 abusing Your Honor's time, and I don't have one right in front

21 of me because my screen -- my screen is up.

22       Your Honor, the Douglass v. Beakley case is, like I

23 said, is Judge Boyle's case.  It specifically provides a cause

24 of action based upon violations of the Advisers Act.  We also

25 cite about four or five other cases in footnote 8 of our

84

1  response from other circuits, including the Third Circuit, the

2  Belton case that I referred to earlier, all of which held that,

3  yes, a state fiduciary duty claim can be predicated on breaches

4  of a federal Advisers Act violation.

5         The other point that they make on the fiduciary duty

6  claim is they argue HCMLP doesn't owe fiduciary duties to CLO

7  Holdco.  And the cases they cite, Your Honor, we dealt with in

8  the papers why they were distinguishable, because in those

9  cases they were dealing with the fact that there wasn't any

10 harm or any direct relationship.  But what they ignore is the

11 actual language of the Advisers Act, which is important.

12        Well, first of all, Mr. Seery admitted in his own

13 testimony during the approval hearing in July of 2019 that he

14 says, "We owe."  He says, "There are third party investors in

15 the fund -- in these funds who have no relation whatsoever to

16 Highland, and we owe them a fiduciary duty both to manage their

17 assets prudently, but also to seek to maximize value."  I think

18 Mr. Seery was absolutely correct when he said that.  Highland

19 owes fiduciary duties to the investors in the funds that

20 Highland manages.  The core of our case is that Highland is

21 using or abusing the assets of the funds it managed in HCLOF

22 for its own enrichment, which is a classic breach of fiduciary

23 duty case under the Advisers Act.

24        Now -- excuse me.  The other point that I would say,

25 Your Honor, is that there is a statutory basis for us to argue

Case 21-03067-sgj    Doc 146-1    Filed 01/23/23    Entered 01/23/23 13:53:50    Desc
Case 3:22-cv-02802-S    Document 11    Filed 08/26/2805 Page 243 of 508    PageID 614

85

 1  a breach of fiduciary duty.  Excuse me.  I didn't mean to stop

 2  sharing.  I apologize.

 3          Are you back with me, Your Honor, on my --

 4          THE COURT:  Yes.

 5          MR. SBAITI:  -- PowerPoint?

 6          THE COURT:  Yes.

 7          MR. SBAITI:  Sorry about that, Your Honor.  I just

 8  hit the wrong thing.  I'm not very technologically savvy.  Here

 9  we go.

10          So Holdco is an investor in HCLOF, which is a pooled

11  investment vehicle.  A pooled investment vehicle under the case

12  law we cite is simply defined as an investment vehicle that

13  doesn't publicly solicit investors and has few than 100

14  investors.  Highland advises it.  That's the same holding in

15  TransAmerica Mortgage, by the way, which we also cite.

16          15 U.S. C. Section 80(b)(6) establishes the federal

17  fiduciary standards to govern the conduct of registered

18  investment advisers.  That's also the TransAmerica case.  15

19  U.S.C. Section 80(b)(6)(D) delegated to the SEC the power to

20  decide the scope of those duties that are imposed under the

21  statute.  And so the SEC enacted 17 C.F.R. Section 275.206(4)-

22  8.

23          And it expressly states, and we cite the statute or

24  the regular in full in our papers, that the fiduciary duties

25  are owed to investors in the pooled investment vehicles.  It

86

1  specifically says that.  It talks about two different duties

2  owed and they're owed to the investors in the vehicles, which

3  means they're owed to Holdco as an investor in HCLOF, which is

4  the vehicle that Highland manages.

5        It's black and white in the regulation.  And we

6  haven't seen any response.  There was no response of that in

7  the reply that was filed, Your Honor.  And so the argument that

8  there's not a fiduciary duty owed to Holdco because it's merely

9  an investor in HCLOF simply doesn't comport with the law.

10        And finally, the petition lays out the basis for our

11  claims including the applicable federal and state law.

12  Plaintiffs' response lays out why the legal arguments aren't

13  opposite at the 12(b)(6) stage and Rule 9(b) is met where

14  necessary under the federal claim.  And I'm trying to unshare

15  so that I can get back to regular argument.

16        I'd like to briefly address Mr. Morris' argument,

17  Your Honor.  Your Honor, I re-raise my argument that I made

18  before, which is that a 12(b)(6) motion and hearing is not the

19  appropriate time for all the evidence that was poured in here.

20  And I understand Mr. Morris' contention, well, it's really hard

21  to ignore all the history of this case.  But a lot of that

22  history really boils down to things that were actually admitted

23  in the complaint.  The complaint recognized there was a 9019.

24  But what Mr. Morris wants to do is go beyond that and to go to

25  what people said and what they must have meant.  What Mr.

**WWW.LIBERTYTRANSCRIPTS.COM**

87

1  Dondero must have meant in his objection, what Dugaboy must

2  have meant by their objection, what Mr. Pugatch must have meant

3  by his testimony.

4         All of that is highly improper at this stage of the

5  proceeding, Your Honor.  It's outside of the 12(b)(6) confines.

6  It's outside the four corners of the complaint.  And we object

7  to all of that evidence being considered.

8         THE COURT:  Let me --

9         MR. SBAITI:  The question we --

10        THE COURT:  Let me ask you about that procedural

11 point.

12        MR. SBAITI:  Yes, Your Honor.

13        THE COURT:  As we know, 12(d) provides that if

14 matters outside the pleadings are presented to and not excluded

15 by the Court in a 12(b)(6) motion, the motion must be treated

16 as one for a summary judgment under Rule 56 and all parties

17 must be given a reasonable opportunity to present all the

18 material that is pertinent to the motion.

19        Are you -- what are you arguing?  That I should treat

20 it as a motion for summary judgment and give you more time to

21 present other materials?  I mean, you both presented an

22 appendix, okay.  And I'm telling you we're seeing this more and

23 more, I've noticed.  People are going beyond the four corners

24 of a motion to dismiss and attaching things.  And there's some,

25 you know, Fifth Circuit authority that says, well, if what is

**WWW.LIBERTYTRANSCRIPTS.COM**

88

1  attached is integral to understanding, you know, an allegation

2  or whatever in the pleading, you know, there is some discretion

3  to go outside the four corners.

4          So I'm trying to understand the point you're making

5  with this.  Are you saying I should treat it as a motion for

6  summary judgment or do these attachments really -- you know, do

7  I have authority under the Fifth Circuit to consider them as

8  part of the 12(b)(6) motion or not?

9          MR. SBAITI:  Typically, in our experience, Your

10 Honor, is when a summary or when a 12(b)(6) is going to be

11 treated as summary judgment under 12(d), the Court says that

12 and then the parties are given an opportunity, as you said, to

13 go do some discovery in order to put together the evidence and

14 materials to then come back and respond as a summary judgment.

15 We responded to a 12(b)(6) and objected to the evidence.  If

16 the Court wants to treat it as a summary judgment, then we

17 would ask for an opportunity for -- to conduct discovery in

18 order to be able to respond as a summary judgment motion, but

19 we didn't -- because we responded to a 12(b)(6) --

20         THE COURT:  You did the same thing though.  You did

21 the same thing in your response.  You submitted an appendix of

22 evidence, if you want to call it evidence.  As someone pointed

23 out, it's stuff from the bankruptcy court record.  I don't

24 think it went beyond what was already in the bankruptcy court.

25         MR. MORRIS:  And if I -- can I be heard on this, Your

APP_242

89

```
 1  Honor?

 2            THE COURT:  You can.  You can.

 3            MR. MORRIS:  Just to respond.  This is really quite

 4  simple.  The motion to dismiss is based on res judicata.  Res

 5  judicata necessarily requires a review of what happened in

 6  connection with the prior hearing.  There's nothing that we

 7  have identified or put forth in the appendix or on our exhibit

 8  list except for the pleadings in the 9019, the transcripts, the

 9  one deposition transcript, the one trial transcript, the

10  settlement agreement, the transfer agreement.  I'd love to know

11  what the Court couldn't or shouldn't take judicial notice of.

12  There is no emails.  There is no -- there is no -- there is no

13  extrinsic evidence, if you will.  All of this is either on the

14  docket or was presented as part of the hearing.

15            THE COURT:  Yeah.  I'm just trying to ferret --

16            MR. MORRIS:  And it's necessary.  And it's necessary

17  for the motion.

18            THE COURT:  Yeah.  I'm just trying to ferret out the

19  procedural position that's being asserted here.  And I don't

20  have the case cites off the top of my brain, but there is

21  authority from at least the Northern District judges, if not

22  the Fifth Circuit, saying in a 12(b)(6) motion I can take

23  judicial notice of items in the record.  And then, you know,

24  there -- I know there's Fifth Circuit authority saying I can go

25  beyond the four corners in a 12(b) context if it's just basic,
```

90

1  you know, explaining things that are in allegations.  You know,

2  such as --

3            MR. SBAITI:  May I address that, Your Honor?

4            THE COURT:  -- such as if a contract is in dispute,

5  okay.  Like there's no way you can have a cause of action under

6  the contract and here's the contract.  So I'm just trying to

7  nail down your procedural position here.

8            MR. SBAITI:  Your Honor, the distinction I was trying

9  to make that I don't think I put as artfully as I might be able

10 to put now is in a 12(b)(6) if there's a contract, as you said,

11 if there's a legal document, a contract and order that's

12 integral to the case, Your Honor can take judicial notice of

13 that.  Generally, a court can take judicial notice of filings

14 in a bankruptcy, the fact that they were filed.

15           So the transcripts, which Your Honor can't take

16 judicial notice of, is the truth of those.  And that was what I

17 was objecting to is it's one thing for him to say an objection

18 was filed and therefore, because an objection was filed, that

19 should be it.  That was your only chance.  I'm not saying Mr.

20 Morris can't make that argument.

21           But when he goes beyond the fact of the filing or the

22 fact that there was a transcript or the fact that there was a

23 deposition and starts to read from the depositions or read from

24 the filings and say this is what those mean, that goes against

25 the 12(b)(6) parameters because, number one, now it's

**WWW.LIBERTYTRANSCRIPTS.COM**

91

1    substantive evidence and not simply a judicial notice of

2    something that's right there in front of the Court, i.e.,

3    something on its own docket.  Because those statements and the

4    interpretation of those statements are subject to credibility

5    findings.  They're subject to clarification.  They're subject

6    to rebuttal.  That's the purpose of discovery.

7            And so if Your Honor -- and Mr. Morris is right.

8    Usually, res judicata involves knowing what happened in the

9    prior proceedings.  So if all he wants to do is rest on the

10   fact that an objection was filed by CLO Holdco and maybe even

11   other people, and that should be it and he thinks that's enough

12   for Your Honor to say res judicata applies, then I don't think

13   we have a problem.  It's when he goes beyond that and says,

14   Your Honor, these people must have known and this is what they

15   meant by their argument, that's what I'm asking Your Honor not

16   to consider.  And if Mr. Morris wants you to consider that,

17   that's a summary judgment motion and we should have the

18   opportunity to do discovery at the very least into the issues

19   he has now raised as supporting his res judicata defense which

20   he has the burden of proof on.

21           MR. MORRIS:  Your Honor, this is one of the strangest

22   arguments I have ever heard.  I'm allowed to offer the Court

23   and the Court is allowed to accept the documents, but I'm not

24   allowed to read them.  I'm not allowed to make arguments.  I

25   don't understand what that even means.  If it were a contract,

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_245

92

1  I would be allowed to put the contract in front of Your Honor,

2  but I wouldn't be able to argue why the contract doesn't say

3  what the Plaintiff says.  I don't get it.

4          THE COURT:  Okay.

5          MR. MORRIS:  That's --

6          THE COURT:  Just I've heard enough on this.  I don't

7  think we have moved into Rule 12(e), that realm of me needing

8  to treat this as a motion for summary judgment.  I think the

9  so-called evidence, the appendix that was attached to the

10 motion as well as the appendix that was attached to Plaintiffs'

11 response, it's stuff that I can take judicial notice of that's

12 in the record of this Court and I can look at it.  You know, it

13 is what it is, the record of this Court.

14         All right.  So I have nine people waiting in

15 chambers.  I'm trying to figure out should I take a break now

16 or are you fairly close to wrapping up.  Either answer is fine,

17 Mr. Sbaiti.  I just need to figure out who I make wait here.

18         MR. SBAITI:  I have -- oh, I'm sorry.  I didn't mean

19 to interrupt you, Your Honor.  I was just going to say I have

20 five minutes left, but I know Mr. Morris probably wants to come

21 back.  So if you want to break now and we can come back at

22 whenever the Court wants us to, we can do so.

23         THE COURT:  All right.  Why don't you make your final

24 five minutes and then we'll take a break?

25         MR. SBAITI:  Okay.  Thank you, Your Honor.

**WWW.LIBERTYTRANSCRIPTS.COM**

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 09/24/23 Page 251 of 508   PageID 622
Exhibit 1   Page 242 of 305

93

1          I just wanted to address some of the arguments that

2    Mr. Morris raised in his argument.  The first thing is -- and I

3    addressed this in part -- but Mr. Morris makes a big deal about

4    paragraph 127 of the complaint and essentially suggests that

5    we're the -- or that Mr. Dondero is the perpetrator of a

6    nefarious scheme.  Whereas, what the pleading actually says,

7    and I again encourage Your Honor to re-read -- to read it

8    specifically, is that Mr. Dondero warned Mr. Seery not to trade

9    in the stock and not to make any transactions because the stock

10   was going to appreciate in value.

11          That has two implications for us, Your Honor.  Number

12   one, it means Mr. Seery was a tippee of insider information,

13   and number two, it means that Mr. Seery, if he did trade on

14   that information or if he did pass that information on to

15   someone else, that is a problem from the Advisers Act

16   standpoint, which is really the only purpose of saying that.

17          While paragraph 127 also says that that should have

18   caused Mr. Seery to revalue the NAV of HCLOF, it does not state

19   and we did not plead that the entire value of HCLOF is tied to

20   the MGM stock.  So the insinuation that that somehow gave us

21   inside information about what the true value of HCLOF was and

22   we should have known or that Mr. Dondero should have known is

23   simply untrue.

24          The other argument Mr. -- that Mr. Morris likes to

25   harp on is that CLO Holdco withdrew its argument, but he

**WWW.LIBERTYTRANSCRIPTS.COM**

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 09/25/23   Page 252 of 508   PageID 623
Exhibit 1   Page 252 of 305

94

1  characterizes Mr. Kane's withdrawal testimony -- as he says,

2  Mr. Kane admitted that CLO Holdco lacked the superior right to

3  obtain the HarbourVest.  If you read the very language that was

4  highlighted on Mr. Morris' slide, that's not what Mr. Kane

5  says.  Mr. Kane says, "We've gone back to the drawing board.

6  We've read your reply.  And my client has given me permission

7  to withdraw the argument or withdraw the objection."  That's

8  all he said.  There was not an admission that he was wrong.

9  There was not an admission that they had made a mistake.  There

10 was simply an admission that they decided to withdraw the

11 objection for whatever reason.

12         Lastly, on the specific claims --

13         THE COURT:  That's not an accurate description of the

14 record.  He said he looked at --

15         MR. SBAITI:  Your Honor, I was reading it along with

16 him.

17         THE COURT:  -- Guernsey Law.  And I don't know if his

18 words were deep dive.

19         MR. SBAITI:  Yeah.

20         THE COURT:  But he had looked at the agreements

21 extensively.  That's just not what he said.

22         MR. SBAITI:  And he said he was with -- Your Honor,

23 he said he was withdrawing.  He didn't say we were wrong.  He

24 didn't say we don't have a claim.  What he said was, "We're

25 withdrawing the objection."

**APP_248**

95

1          THE COURT:  After doing an extensive look at the

2    agreements in Guernsey Law, okay, so.

3          MR. SBAITI:  Sure.  But, Your Honor, he might have --

4    he could just as easily thought we have a chance, but it's not

5    a good one.  And frankly, we'll be here for 20 days and we're

6    withdrawing it for that reason because we'll live to fight

7    another day.  Your Honor, there's an innumerable number.  To

8    simply say that he admitted that they didn't have a correct

9    claim, it's just he didn't say that.  That's all.  That's the

10   only point I'm making.

11         Your Honor, I don't disagree with the debtor that the

12   Court's exculpation clause gets rid of the negligence claim

13   which was obviously filed before the effective date, so that

14   claim is gone.

15         And I think the last argument that Mr. Morris makes

16   on the RICO claim is the federal court, the Supreme Court

17   standard for pleading a RICO claim, that acts that only

18   continue for a few weeks are not -- don't set out a RICO claim.

19   Your Honor, in our response to that, we actually submitted an

20   amended complaint that shows that the type of acts we're

21   talking about, the pattern of the debtor using its investor

22   vehicles assets to liquidate is a long pattern and practice

23   than simply the HarbourVest suit.  And so, we move to amend on

24   that basis to satisfy that pleading defect, which is the main

25   one that they focused on.

96

1          That's all I have, Your Honor.

2          THE COURT:  All right.  Thank you.

3          We're going to take a 15 minute break and come back.

4   I'll ask Mr. Jordan and Mr. Bessette did they have anything

5   they wanted to say today.  I know they joined in the debtor's

6   motion.  And then we'll let Mr. Morris have rebuttal.

7          All right.  So we'll be back in 15 minutes.

8          THE CLERK:  All rise.

9          MR. MORRIS:  Thank you, Your Honor.

10     (Recess at 12:05 p.m./Reconvened at 12:23 p.m.)

11          THE CLERK:  All rise.

12          THE COURT:  All right.  Please be seated.

13          We're back on the record in Charitable DAF v.

14   Highland Capital.  All right.  So I promised I was going to go

15   back to counsel for Highland CLO Funding, Ltd.  So Mr. Jordan,

16   Mr. Bessette, is there anything you wanted to say for oral

17   argument?

18          MR. JORDAN:  Thank you, Your Honor.  John Jordan on

19   behalf of HCLOF.

20          Our points are two procedural points.  The first is

21   as the Court anticipated, in our motion to dismiss filed back

22   in August, we joined in the motion to dismiss of Highland.  And

23   so to the extent that the Court after deliberation is inclined

24   to grant that motion, we would ask that as a joining party,

25   HCLOF be pulled along with that.

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 11   Filed 02/21/23   Page 255 of 508   PageID 626
Exhibit 11   Page 292 of 305

97

1            The second procedural point is that back in our

2   motion to dismiss, we pointed out that the complaint does not

3   actually allege anything against HCLOF.  In the story, we're

4   essentially the football and neither Oklahoma nor UT.  And we

5   pointed that out as an additional argument to what you've heard

6   today.  That motion was never responded to.  The deadline by

7   agreement was extended to October 11th.  And the lack of

8   response was, we believe, not inadvertent but simply an

9   acknowledgment that HCLOF is not a party that anything is being

10  claimed against.

11           It particularly makes sense since effectively and in

12  rough numbers, they're half owned by both sides.  So for every

13  dollar that HCLOF spends hanging around the case, the parties

14  are paying essentially 100 cents collectively.  So for that

15  reason, we would ask, and subject to Mr. Sbaiti's input,

16  whether the Court would ask us or direct us to upload an order

17  granting our motion as unopposed.  We just feel like we don't

18  have any role in this case.

19           THE COURT:  All right.

20           Mr. Sbaiti, what about that?

21           MR. SBAITI:  Your Honor, they were originally added

22  as a nominal party.  And as a nominal party, because of the

23  potential need to have a derivative action, I think that based

24  upon Highland's arguments and the arguments that we had, I

25  don't think the derivative action is necessary for us to

**WWW.LIBERTYTRANSCRIPTS.COM**

98

1  maintain on a go-forward basis.  And so we don't oppose them

2  being dismissed.

3          THE COURT:  All right.  Then I assume, Mr. Morris,

4  you don't have any problem with this, correct?

5          MR. MORRIS:  No, Your Honor.

6          THE COURT:  Okay.  So I'll look for the parties to

7  submit an agreed order of dismissal of HCLOF after the hearing.

8  All right?

9          MR. JORDAN:  Thank you, Your Honor.

10          THE COURT:  All right.  Mr. Morris, you get the last

11  word.

12          MR. MORRIS:  Thank you, Your Honor.  I hope to be

13  relatively brief.  I really just want to focus on the arguments

14  concerning whether or not the order that was entered by this

15  Court was an order that was entered on the merits.

16          As the Court is well aware, a 9019 motion filed by a

17  debtor is done so on notice.  It is to give all parties in

18  interest an opportunity to be heard, not just as to whether or

19  not the debtor meets its burden of proof under Rule 9019 but

20  whether or not the Court can find, as it must, that the

21  proposed settlement is in the best interest of the estate.

22          The purpose of -- I mean that is the purpose of the

23  giving notice so that everybody has a chance to be heard.  The

24  questions that the Court asked, the questions that every

25  bankruptcy court asks in a 9019 is can the debtor do this deal,

**WWW.LIBERTYTRANSCRIPTS.COM**

99

1  should the debtor do this deal, is it in the best interest of

2  the estate to do this deal.

3          And, you know, the idea that a 9019 order is somehow

4  res judicata only to the parties to a settlement is just

5  something that doesn't make any sense to me because it

6  abrogates so many rules that exist that allows and encourages

7  and requires parties who have objections to be heard.

8          Mr. Sbaiti's clients filed an objection.  They

9  initiated a contested matter.  They obtained rights.  They were

10  litigants.  They are litigants in a contested matter where

11  they're required to tell the Court what objections they have to

12  the settlement, and they did that.

13          Mr. Sbaiti, you know, told me that I wasn't allowed

14  to characterize the words that are used in the documents that

15  have now been admitted by the Court.  And, yet, I heard him say

16  that maybe Mr. Kane (phonetic) really meant to tell Your Honor

17  that he was withdrawing the claim because he was going to save

18  it for another day.

19          I'd just ask the Court to look at the transcript.  I

20  don't have to interpret it at all.  And I'd ask the Court to

21  read the words.  I can put them back up on the screen, but

22  they're pretty short.  It's at Pages 7 and 8 of the transcript

23  of what Mr. Kane told you and what you said in response.  It's

24  on the page, not my interpretation, and what the import of that

25  was.

**WWW.LIBERTYTRANSCRIPTS.COM**

100

1          Mr. Sbaiti believes, I guess, if one is allowed to

2    engage in such conduct without consequence, that one is allowed

3    to allow to file objections, cause the Court and the litigants

4    to participate, to give discovery, to write briefs, to do

5    analyses, withdraw it on the basis of their own good faith

6    analysis of Guernsey law of the documents and somehow say it's

7    irrelevant.  Not what the law is, not what res judicata is

8    intended to do.

9          He should have put all of his cards on the table.  In

10   fact, I think that Mr. Kane believed he was putting all of his

11   cards on the table because that's what he did.  He filed a very

12   comprehensive objection.  He asserted a right to the

13   opportunity that the debtor was proposing to take in the 9019

14   motion.  That's what he was doing.  He was objecting on the

15   basis that he claimed his client had a superior right to this

16   asset.

17         And he didn't -- like I said earlier, Your Honor, I

18   don't think he would be permitted, I don't think these claims

19   would fly today if no objection was filed.  But the fact that

20   there was renders, I think, indisputable that there was a

21   finding on the merits, right.  And the only reason that the

22   Court didn't rule on Mr. Kane's motion, the only reason the

23   Court didn't rule on it is because Mr. Kane withdrew it.

24         Is that really the way this process is supposed to

25   work, that one can tell the Court that after a review of the

**WWW.LIBERTYTRANSCRIPTS.COM**

101

documents, I'm going to withdraw the objection and then file a

claim for damages three months later with a different client,

with a different control person, with a different lawyer?

That's okay under doctrine of res judicata?  I don't think so.

They had a full and fair opportunity.  The fact that

this was somehow -- you know, they're denigrating the fact that

this was a 9019 motion.  There's not supposed to be a mini-

trial.  Your Honor had discretion as to what to do.  Every

court in every bench trial has discretion as to what to do and

whether or not to overrule objections and whether or not to

substain [sic] objections.  That's what judges to.

And there's nothing offensive about the fact that it

happened in the context of a 9019 motion.  They don't get to

sit on their hands and wait to fight another day.  If they

believed that the debtor was exposing itself to liability, and

that's what they actually say in the opposition, that's what I

actually think they say in the complaint, accept it as true,

they believe that the debtor created liability for itself by

rendering -- by entering into this transaction.

Shouldn't they have raised their hand and said you

can't do this deal, right?  And the only response to that --

they have to that is they had no idea about value.  Paragraph

127, Your Honor, Mr. Dondero, the architect of this complaint,

as was proven on June 8th, knew very well about value.  And it

doesn't matter that it was only MGM.  Your Honor commented on

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 1-1   Filed 02/03/23   Page 260 of 508   PageID 631
Exhibit 1   Page 210 of 305

102

1  that at the June 8th hearing in a different context.  But

2  everybody knows, right, it is.  He sits on the board of MGM.

3         And I'm sorry if I called him a tippee instead of a

4  tipper.  But if this complaint goes forward, we'll dig into

5  that real deep.  But there's no reason it ought to, Your Honor.

6  This case ought to be dismissed on res judicata grounds.  It

7  should be dismissed on judicial estoppel grounds.  And it

8  should be dismissed for all the reasons that I said in my

9  argument in my brief.

10        But I do just want to close with one point, and that

11 is to read from a case called Goldstein, which I think I

12 alluded to earlier on this issue of whether there's a fiduciary

13 duty that's owed by an advisor to an investor and a fund:

14            "At best, it is counterintuitive to characterize the

15            investors in a hedge fund as the clients of the

16            advisors.  The advisor owes fiduciary duties only to

17            the fund, not to the fund's investors."

18        There's a lot of discussion about fiduciary duties,

19 Your Honor.  But to the extent that they have any basis to

20 defeat the motion to dismiss on res judicata or collateral

21 estoppel grounds, we hope and we trust and we know the Court

22 will review the case law vigorously to test some of the

23 assertions to that.

24        I have nothing further, Your Honor.

25        THE COURT:  All right.  Well, thank you to all of

**WWW.LIBERTYTRANSCRIPTS.COM**

Case 21-03067-sgj   Doc 146-1   Filed 01/23/23   Entered 01/23/23 13:53:50   Desc
Case 3:22-cv-02802-S   Document 8-1   Filed 02/21/23   Page 261 of 508   PageID 632

103

1  you.

2          As a reminder, I don't think you need it, but as a

3  reminder, I am essentially acting as a magistrate for Judge

4  Boyle in this action.  And whichever way I go on whichever

5  theories, I think she would expect a thorough write-up.  It

6  would, of course, be in the form of a report and recommendation

7  for her to either adopt or not if I dispose of some or all of

8  the counts in the lawsuit.

9          Even to the extent I deny dismissal, even though the

10  rule typically does not require a court to make detailed

11  findings and conclusions in connection with a denial of a

12  motion to dismiss, again, since I'm sitting as a magistrate, I

13  think Judge Boyle would expect some thorough explanations and

14  reasoning from me.

15          So that's my way of saying I'm taking this under

16  advisement.  I am going to drill down on some of the cases that

17  have been argued.  I think some important issues are raised

18  here that need some thorough reasoning.

19          So I will do the best to get this out without too

20  much delay.  I think there's probably zero chance, zero chance

21  I'm going to get it done by the end of the year.  We're just

22  too behind with some of our under-advisements.  But I will try

23  earnestly to get it out fairly soon after the first of the

24  year.  All right?

25          Thank you.  You all have a good holiday.

104

 1          THE CLERK:  All rise.

 2      (Proceedings concluded at 12:37 p.m.)

 3                    * * * * *

 4

 5            **C E R T I F I C A T I O N**

 6          We, DIPTI PATEL, KAREN WATSON, CRYSTAL THOMAS, AND

 7  PATTIE MITCHELL, court approved transcribers, certify that the

 8  foregoing is a correct transcript from the official electronic

 9  sound recording of the proceedings in the above-entitled

10  matter, and to the best of my ability.

11

12  /s/ Dipti Patel_____

13  DIPTI PATEL, CET-997

14

15  /s/ Karen Watson_____

16  KAREN WATSON, CET-1039

17

18  /s/ Crystal Thomas_____

19  CRYSTAL THOMAS, CET-

20

21  /s/ Pattie Mitchell_____

22  PATTIE MITCHELL

23  LIBERTY TRANSCRIPTS          DATE: November 23, 2021

24

**Exhibit 8**

Memorandum Opinion and Order Granting Motion to Dismiss the Adversary Proceeding

Adv. Proc. No. 21-03067 [Dkt. No. 100]

Case 21-03067-sgj Doc 100 Filed 03/11/22    Entered 03/11/22 13:06:25    Page 1 of 26
Case 3:22-cv-02802-S   Document 3-1   Filed 02/21/23   Page 264 of 508   PageID 659
Docket #0100  Date Filed: 3/11/2022



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 11, 2022**

United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | CASE NO. 19-34054-SGJ-11 |
| L.P., | § | (CHAPTER 11) |
|     REORGANIZED DEBTOR. | § | |
| _____ | § | |
| CHARITABLE DAF FUND, L.P., AND CLO | § | |
| CLO HOLDCO LTD., | § | |
| | § | |
|     PLAINTIFFS, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 21-03067 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., HIGHLAND HCF ADVISOR, LTD., | § | |
| AND HIGHLAND CLO FUNDING, LTD., | § | |
| | § | |
|     DEFENDANTS. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS THE ADVERSARY PROCEEDING


1934054220312000000000003
APP_260

I.    **INTRODUCTION**

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. ("Highland," the "Debtor," or sometimes the "Reorganized Debtor") filed a voluntary Chapter 11 petition on October 16, 2019, in the United States Bankruptcy Court for the District of Delaware. That court subsequently transferred venue of the Bankruptcy Case to the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), on December 4, 2019.

Before the court is Highland's motion to dismiss (the "Motion to Dismiss") the Adversary Proceeding. Highland obtained confirmation of a reorganization plan on February 22, 2021, and the plan went effective on August 11, 2021.  The Adversary Proceeding was filed in April 2021 (*i.e.,* after confirmation but before the effective date of Highland's Chapter 11 plan).  There were originally three Defendants named in the Adversary Proceeding: (i) Highland, and (ii) two non-Debtor affiliates which Highland controls that are called Highland HCF Advisor, Ltd. ("HHCFA") and Highland CLO Funding Ltd. ("HCLOF").   Defendant HCLOF was later dismissed by agreement with the Plaintiffs.[2] Highland's CEO, James P. Seery ("Mr. Seery"), was named in the Complaint initiating the Adversary Proceeding (the "Complaint") as a "potential" Defendant but has not been added. The Plaintiffs are two entities that are allegedly controlled and/or directed by James Dondero, Highland's founder and former CEO ("Mr. Dondero"): (i) Charitable DAF Fund, L.P. (the "DAF"), which is a Cayman Island-based hedge fund designated as a "donor-advised fund," originally seeded with funds from Highland, and (ii) CLO Holdco, Ltd. ("CLO Holdco"),

---

[1] Bankruptcy Case No. 19-34054.

[2] At the hearing held on the Motion to Dismiss, the parties announced an agreement that HCLOF would be dismissed from the Adversary Proceeding with prejudice. HCLOF was apparently only named nominally in the Adversary Proceeding and no actual relief was sought against it.  An order dismissing HCLOF was entered on December 7, 2021. Highland and HHCFA were unaffected by the dismissal order.

APP_261

which is also a Cayman Island-based entity, wholly owned and controlled by the DAF. Until at least mid-January 2021, Grant Scott, Mr. Dondero's life-long friend and college roommate, was the sole director of the DAF and also of CLO Holdco (neither of which otherwise had any officers or employees).

The Complaint, which was originally filed in the United States District Court for the Northern District of Texas, Dallas Division ("District Court"), but was referred to the Bankruptcy Court (as further described herein), asserts claims against Highland and HHCFA under the Racketeer Influenced and Corrupt Organizations statute (15 U.S.C. § 1961, et seq. ("RICO")), Breach of Fiduciary Duty, Breach of Contract, Negligence, and Tortious Interference with Contract—all relating to the Debtor's pursuit and effectuation *during the Bankruptcy Case* of a compromise and settlement agreement with a creditor known as HarbourVest, which *agreement was fully vetted and approved by the Bankruptcy Court* (after notice to creditors and parties in interest), pursuant to Federal Rule of Bankruptcy Procedure 9019. Accepting all facts pleaded as true and construing the Complaint in the light most favorable to the Plaintiffs, this court concludes that all of the claims in the Complaint are precluded by the doctrines of collateral estoppel and judicial estoppel. Thus, the Complaint, in its entirety, must be dismissed.

In order to understand the conclusion of this court, one must review matters that happened during the Bankruptcy Case. Although a court generally limits its inquiry on a motion to dismiss to the plaintiff's complaint or any documents attached to the complaint, a court may also take judicial notice of matters that are part of the public record when considering a motion to dismiss. *See T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins.,* No. 4:07–cv–0419, 2008 WL 7627807, at *2 (S.D. Tex. 2008); *Cade v. Henderson*, No. CIV A 01-943, 2001 WL 1012251, at *2 (E.D. La. Aug. 31, 2001). The relevant public record here includes: (a) the HarbourVest

3

Settlement Motion,[3] and the exhibits admitted into evidence in support; (b) the Transfer Agreement;[4] (c) Mr. Dondero's Objection to the HarbourVest Settlement;[5] (d) the Objection to the HarbourVest Settlement of Dugaboy Investment Trust and Get Good Trust (*i.e,* Mr. Dondero's family trusts),[6] (e) CLO Holdco's Objection to the HarbourVest Settlement,[7] (f) the Omnibus Replies;[8] (g) the January 14, 2021 Hearing Transcript at which the Bankruptcy Court considered and approved the HarbourVest Settlement;[9] and (h) the HarbourVest Settlement Order.[10]

## II.    BACKGROUND

The creditor HarbourVest was actually a collective of investors that, in 2017, invested approximately $80 million into the entity known as HCLOF (*i.e.,* the previously dismissed nominal Defendant), thereby acquiring a 49.98% interest in it. HarbourVest filed six proofs of claim against the Debtor in the Bankruptcy Case, totaling $300 million, alleging that the Debtor had committed fraud back in 2017, in connection with its encouraging HarbourVest to invest in and acquire that 49.98% interest in HCLOF. As alluded to earlier, the Debtor and HarbourVest eventually negotiated a settlement of HarbourVest's proofs of claim.

---

[3] Debtor's Motion for an Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, DE # 1625 (the "Settlement Motion"). Note: all references herein to "DE # ____" shall refer to the docket entry number at which a pleading appears in the docket maintained in the Highland main bankruptcy case. All references to "DE # ___ in the AP" refer to the docket entry number at which a pleading appears in the docket maintained in the Adversary Proceeding.

[4] Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, DE # 1631, Exhibit 1.

[5] James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest, DE # 1697.

[6] Objection to Debtor's Motion for an Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, DE # 1706.

[7] CLO Holdco, Ltd.'s Objection to HarbourVest Settlement, DE # 1707.

[8] Debtor's Omnibus Reply in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith, DE # 1731; HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with Harbour Vest and Authorizing Actions Consistent Therewith, DE # 1734.

[9] Transcript of Hearing Held 1/14/2021, DE # 1765.

[10] *Order Approving Debtor's Settlement with Harbourvest (Claims Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith*, DE # 1788 (the "HarbourVest Settlement Order").

APP_263

In December 2020, the Debtor filed a motion in the Bankruptcy Court for an order approving its settlement with HarbourVest (the "HarbourVest Settlement"), pursuant to which, *inter alia*, HarbourVest would significantly reduce its $300 million of alleged claims against the Debtor and transfer its 49.98% interest in HCLOF to an entity designated by the Debtor (the "Transfer"). At the time of the Transfer, the Debtor already owned a 0.6% interest in HCLOF, so the Transfer would give it a controlling interest (49.98% + 0.6% = 50.58%) in HCLOF.

CLO Holdco objected to the proposed HarbourVest Settlement, presumably at the direction of its parent, the DAF. CLO Holdco owned (and still owns) 49.02% of HCLOF. CLO Holdco challenged the HarbourVest Settlement on the grounds that: (i) CLO Holdco had a "Right of First Refusal" to acquire HarbourVest's interest in HCLOF pursuant to the HCLOF Members Agreement among the Debtor, HarbourVest, and CLO Holdco ("HCLOF Members Agreement"), and (ii) HarbourVest had no right to transfer its interest without complying with the purported "Right of First Refusal." Two other objections were lodged against the proposed HarbourVest Settlement, one by Mr. Dondero and the other by Mr. Dondero's two family trusts: The Dugaboy Investment Trust ("Dugaboy") and The Get Good Trust ("Get Good" and, together with Dugaboy, the "Dondero Family Trusts"). Mr. Dondero objected on the grounds that (a) the HarbourVest Settlement was not reasonable or in the best interests of the estate because the Debtor was grossly over-compensating HarbourVest, and (b) it amounted to a blatant attempt to purchase HarbourVest's votes in support of the Debtor's plan. The Dondero Family Trusts raised separate concerns regarding: (a) whether HarbourVest had the right to effectuate the Transfer, and (b) the valuation methodology the Debtor used for the HCLOF interests. Each of the objecting parties had a right to take discovery concerning the HarbourVest Settlement, including the valuation of the HCLOF interests and the Transfer.

5

APP_264

The court held an evidentiary hearing, on January 14, 2021, on the HarbourVest Settlement and heard argument in support of the parties' objections and defenses. Highland's current CEO, Mr. Seery, and a HarbourVest representative, Michael Pugatch ("Mr. Pugatch"), were each called to testify. During the hearing, surprisingly, ***CLO Holdco voluntarily withdrew its objection, which had been premised on its alleged "Right of First Refusal,"*** based on CLO Holdco's "interpretation of the [HCLOF] member agreement."[11] Subsequent to CLO Holdco withdrawing its objection at the hearing, the Bankruptcy Court asked counsel for the Dondero Family Trusts whether they planned to press the issue of the transferability of HarbourVest's interest in HCLOF. In response, counsel responded: "No, I am not. Basically, I think it's the fairness of the settlement. I think the transferability of the interest is separate and apart from the fairness of the settlement itself. I think the fairness -- the transferability was a contractual issue between two parties that the Court does not have to drill down on." Transcript of Hearing Held 1/14/2021, DE # 1765, at 22:5-20.

At the conclusion of the hearing, the Bankruptcy Court overruled the remaining objections (*i.e.,* of Mr. Dondero and the Dondero Family Trusts) and approved the HarbourVest Settlement as fair and equitable and in the best interests of the bankruptcy estate. The HarbourVest Settlement Order made clear that HarbourVest could transfer its interest in HCLOF "without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF."[12]

In summary, pursuant to the HarbourVest Settlement that the Bankruptcy Court approved, HarbourVest, in pertinent part, would (a) transfer its interest in HCLOF to the Debtor or its nominee, (b) be allowed a general unsecured claim against the Debtor in the amount of $45 million,

---

[11] Transcript of Hearing Held 1/14/2021, DE # 1765, at 7:20-8:6.
[12] HarbourVest Settlement Order, DE # 1788.

APP_265

and (c) be allowed a subordinated, general unsecured claim against the Debtor in the amount of $35 million. The HarbourVest Settlement was essentially a recission of the investment HarbourVest had made in HCLOF and also provided HarbourVest allowed, reduced claims against Highland in settlement of its alleged $300 million of damages.

The HarbourVest Settlement Order was appealed by the Dondero Family Trusts, with notice of the appeal being filed in the Bankruptcy Court on February 5, 2021. The Dondero Family Trusts argue on appeal that the Debtor overpaid for the HCLOF interests, and the HarbourVest Settlement was an attempt to gerrymander the Debtor's plan and purchase votes. No stay pending appeal has been approved and the HarbourVest Settlement was implemented. The appeal remains pending before Judge Sam Lindsay in the District Court.[13]

On April 12, 2021, the Plaintiffs, DAF and CLO Holdco, filed the Complaint initiating this Adversary Proceeding in the District Court. The action was assigned to Judge Jane Boyle. *The subject matter of the Adversary Proceeding is entirely centered around the bona fides and permissibility of aspects of the HarbourVest Settlement.* Despite the full vetting in the Bankruptcy Court of the HarbourVest Settlement and an order approving the HarbourVest Settlement—which, by the way, was not appealed by Plaintiffs DAF or CLO Holdco—various torts and other causes of action are now being alleged by DAF and CLO Holdco against the Debtor *relating entirely to the HarbourVest Settlement*. As earlier alluded to, the Complaint raises claims that Highland, while a debtor-in-possession, committed: (1) breach of fiduciary duties to the Plaintiffs; (2) breach of the HCLOF Members Agreement; (3) negligence; (4) RICO violations; and (5) tortious interference.

---

[13] Case No. 3:21-cv-00261-L.

7

On September 20, 2021, Judge Boyle issued an Order of Reference[14] referring this action to be adjudicated as an adversary proceeding related to the Bankruptcy Case, pursuant 28 U.S.C. § 157 and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. Thus, the Complaint is now pending before the Bankruptcy Court.

In its claim for breach of fiduciary duty (**Count 1**), Plaintiffs allege that the Debtor violated its "broad" duties to Plaintiffs under the "Investment Advisers Act of 1940" and the Debtor's "internal policies and procedures" by: (i) engaging in "insider trading with HarbourVest"; (ii) "concealing" the value of the HarbourVest interest; and (iii) "diverting" the investment opportunity in the HarbourVest entities to the Debtor without offering it to Plaintiffs.

In support of its claim for breach of the HCLOF Members Agreement (**Count 2**), Plaintiffs allege that the Debtor breached the "Right of First Refusal" provision therein, by diverting the investment opportunity away from CLO Holdco to the Debtor.

In its negligence claim (**Count 3**), Plaintiffs assert that the Debtor's actions violated the HCLOF Members Agreement and the Debtor's internal policies by failing to accurately calculate the HCLOF interests and failing to give Plaintiffs the Right of First Refusal to purchase the interests.

In their RICO Claim (**Count 4**), Plaintiffs allege that Defendant Highland and two affiliated entities were an "association-in-fact" engaged in a pattern of racketeering activity for this same underlying conduct; namely, failing to disclose the valuation of HCLOF's interest and, ultimately, effectuating the HarbourVest Settlement.

---

[14] District Court Order of Reference, DE # 64 in the AP.

APP_267

Finally, Plaintiffs' tortious interference claim (**Count 5**) is premised on the Debtor's alleged interference with Plaintiff's "Right of First Refusal" under the Members Agreement.

Highland, in response to the Complaint, filed its Motion to Dismiss on May 27, 2021. In the Motion to Dismiss, Highland argues that, based on the previous HarbourVest Settlement contested proceeding, the Plaintiffs' claims are precluded or barred by the doctrines of res judicata, collateral estoppel, [15] and judicial estoppel. Alternatively, Highland also alleges that each of the claims in the Complaint should be dismissed for failing to sufficiently state claims for relief under Rule 12(b)(6). The Motion to Dismiss seeks to have the Complaint dismissed in its entirety.

The Bankruptcy Court held a hearing on Highland's Motion to Dismiss the Adversary Proceeding now before the court. At the conclusion of the Motion to Dismiss hearing, the court took the matter under advisement.

### III.     Legal Analysis

#### A.     Jurisdiction and Authority

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This Adversary Proceeding is, at a minimum, "related to" the Highland Bankruptcy Case. Moreover, it "arises in" a bankruptcy case (making it "core"), in that a claim is being asserted against a debtor (which was not yet a "reorganized debtor" at the time the action was filed) and involves actions of a debtor-in-possession in administering its case. It involves orders of this Bankruptcy Court and activities and litigation over which the Bankruptcy Court presided. This Bankruptcy Court has authority to exercise bankruptcy subject matter jurisdiction here, pursuant to 28 U.S.C. § 157(a) and (b)(2)(A), (B), and (O), and the Standing Order of Reference of

---

[15] The court notes that Highland, in the Brief in Support of the Motion to Dismiss, lists collateral estoppel, in its summary of arguments, as grounds for dismissal of the Complaint. However, nowhere else is collateral estoppel mentioned within the Motion to Dismiss and Brief in Support. Rather, Highland focuses only on res judicata and judicial estoppel.

APP_268

Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. The case was referred to the Bankruptcy Court by the District Court and there are no pending motions to withdraw the reference.

### B. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* Dismissal is proper under Rule 12(b)(6) when, taking the facts alleged in the complaint as true, it appears that the plaintiff "cannot prove any set of facts that would entitle it to the relief it seeks." *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.,* 61 F.3d 288, 289 (5th Cir. 1995). The court may take judicial notice of matters of public record when considering a motion to dismiss for failure to state a claim. *See T.L. Dallas (Special Risks), Ltd.,* 2008 WL 7627807, at *2; Cade, 2001 WL 1012251, at *2.

### C. Res Judicata

The first preclusion doctrine argued by Highland in its Motion to Dismiss is res judicata. [16] Res judicata, otherwise known as "claim preclusion," literally means "the thing has been decided."

---

[16] As mentioned earlier, there is a pending appeal of the HarbourVest Settlement Order. This fact is irrelevant for purposes of Highland's preclusion arguments. The federal rule and the rule in this circuit is that, *despite an appeal, final orders of a court still maintain full force and effect for res judicata and collateral estoppel purposes until reversed on appeal*. *Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.,* 510 F.2d 272, 273 (5th Cir.1975)

APP_269

"Though it is not often the case, a finding of res judicata is appropriate on a motion to dismiss when the res judicata bar is apparent from the face of the pleadings and judicially noticed facts." *See Wade v. Household Fin. Corp. III*, No. 1:18-CV-570-RP, 2019 WL 433741, at *2 (W.D. Tex. Feb. 1, 2019). "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The elements of res judicata are: "(1) the parties are identical or at least in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both suits." *Comer v. Murphy Oil USA, Inc.,* 718 F.3d 460, 466 (5th Cir. 2013) (quoting *Test Masters Educ. Services, Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005)). Dismissal under Rule 12(b)(6) is proper if the elements of res judicata are apparent based on the facts pleaded and judicially noticed. *See Hall v. Hodgkins*, 305 F. Appx. 224, 227–28 (5th Cir. 2008); *Mitchell v. Ocwen Loan Servicing, LLC*, No. 4:18-cv-00820-P, 2019 WL 5647599, at *3 (N.D. Tex. 2019). The fourth element of res judicata can be met where a claim or cause of action relates to the same "transaction, or series of transactions, out of which the [original] action arose." *Ries v. Paige* (*In re Paige*), 610 F.3d 865, 872 (5th Cir. 2010). "When applying this test, the primary question is whether the lawsuits were based on 'the same nucleus of operative fact,' regardless of the relief requested, or the claims brought. *Wade*, 2019 WL 433741, at *3.

Highland argues that, when taking judicial notice of the docket created in connection with the HarbourVest Settlement, it is apparent that the four elements of res judicata are met: (1) CLO

---

("[a] case pending appeal is res judicata and entitled to full faith and credit unless and until reversed on appeal"); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.,* 740 F.2d 1011, 1018 (D.C. Cir. 1984) "([w]e note that the federal rule and the rule in this circuit is that collateral estoppel may be applied to a trial court finding even while the judgment is pending on appeal"); *see Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941) ("To the same effect, in the federal courts the general rule has long been recognized that while appeal with proper supersedeas stays execution of the judgment, it does not—until and unless reversed—detract from its decisiveness and finality").

APP_270

Holdco objected to the HarbourVest Settlement, and the DAF is in privity with CLO Holdco as its 100% parent; (2) the Bankruptcy Court was a court of competent jurisdiction over the HarbourVest Settlement; (3) the Bankruptcy Court entered a final order based upon the merits of the HarbourVest Settlement; and (4) the claims or causes of action arise out of the same "common nucleus of operative facts" as those raised at the HarbourVest Settlement hearing.

To be clear, Highland argues the fourth element of res judicata is met because the claims brought by the Plaintiffs in the Complaint are substantially similar to, and arise from the very same facts, as those allegations that the Plaintiffs put forth during the Bankruptcy Court hearing on the HarbourVest Settlement. In connection with the HarbourVest Settlement, Plaintiff CLO Holdco argued to the Bankruptcy Court that the Debtor: (i) violated the HCLOF Members Agreement by failing to offer such interests to Plaintiffs pursuant to a "Right of First Refusal" provision; and (ii) diverted the investment opportunity to the Debtor without offering it to Plaintiffs. And the other objectors (*i.e.,* the Dondero Family Trusts) argued to the Bankruptcy Court that the Debtor did not accurately value the HCLOF 49.98% interest that was being transferred by HarbourVest back to the Debtor. The Bankruptcy Court overruled all of these arguments.

This court agrees that the claims being brought in the Adversary Proceeding arise from the same "transaction or series of transactions" and are based on the "same nucleus of operative facts" as were litigated and adjudicated in the Bankruptcy Court in connection with the HarbourVest Settlement. The allegations take the form of causes of action for breach of fiduciary duties, breach of contract, RICO violations, and tort claims, but ***all include the very same underlying factual allegations as articulated in connection with the HarbourVest Settlement***.

However, while this court agrees with Highland that CLO Holdco's claims arise from "the same common nucleus of operative fact" as the HarbourVest Settlement, this is not the end of the

APP_271

court's analysis. "Even if the two actions are the same under the transactional test, res judicata does not bar this action unless" the Plaintiffs "could and should have" brought the claims in the Complaint in the prior proceeding. *Osherow v. Ernst & Young (In re Intelogic, Inc.)*, 200 F.3d 382, 388 (5th Cir. 2000). The Fifth Circuit has recognized procedural differences between contested matters under Bankruptcy Rule 9014, such as the HarbourVest Settlement hearing, and adversary proceedings. The Fifth Circuit noted that "[c]ounterclaims are only compulsory in 'adversary proceedings,'" as Bankruptcy Rule 7013 (which adopts Federal Rule of Civil Procedure 13) does not automatically apply to "contested matters" under Bankruptcy Rule 9014. *D-1 Enterprises, Inc. v. Commercial State Bank*, 864 F.2d 36, 39 (5th Cir. 1989). The Fifth Circuit proceeded to suggest, under the "quick motion-and hearing style" of contested matters, a party is not required, or even allowed, to bring all of its claims. *Howe v. Vaughn (Matter of Howe)*, 913 F.2d 1138, 1146 (5th Cir. 1990). The Fifth Circuit clarified that, whether the earlier proceeding that is being suggested as holding res judicata effect is a contested matter or an adversary is not dispositive; rather, it is a factor in determining whether the claim at issue could or should have been effectively litigated in the earlier proceeding. *See id.* at 1146 n.28; *see also Osherow*, 200 F.3d at 388 (the court weighed "whether the bankruptcy court possessed procedural mechanisms that would have allowed" the party to assert claims in the prior contested matter).

It is important to note that the Fifth Circuit has found, on numerous occasions in which the prior proceeding was a contested matter, versus an adversary proceeding, that res judicata still applied. *See, e.g., Osherow*, 200 F.3d at 388-91 (finding res judicata applied to malpractice claims that could have been asserted at a fee hearing); *In re Baudoin*, 981 F.2d 736, 744 (5th Cir. 1993) (ruling that res judicata barred lender liability claims based on loans that had been deemed allowed claims without objection in a previous bankruptcy); *Eubanks v. FDIC*, 977 F.2d 166, 174 (5th Cir.

APP_272

1992) (barring a lender liability action which could have and should have been brought as an objection to the lender's claim in a prior bankruptcy proceeding); *Southmark Properties v. Charles House Corp.,* 742 F.2d 862, 869 (5th Cir. 1984) (applying res judicata to bar a claim that could have been raised as an objection to a claim asserted in a previous bankruptcy reorganization). These opinions came in the context of a cause of action not being asserted to contest a proof of claim in a bankruptcy case. The Fifth Circuit found that objections to claims in the bankruptcy process, generally contested matters, provide procedural mechanisms to bring a claim for affirmative relief under Bankruptcy Rule 3007, which allows the claim objection to be converted to an adversary proceeding.[17] *Osherow*, 200 F.3d at 389-90.

But here, the Bankruptcy Court concludes that the Plaintiffs were not provided with procedural mechanisms needed in order to bring their causes of action in the Complaint during the HarbourVest Settlement contested matter. Despite the "transactional test" being met through a finding that the claims stem from "the same nucleus of operative facts," the procedures of Bankruptcy Rule 9014 do not allow for claims of affirmative relief—whether it be RICO violations, breach of contract, breach of fiduciary duties, or tort claims—to be asserted in response to a Bankruptcy Rule 9019 motion to compromise a controversy. The Fifth Circuit has not addressed procedural mechanisms supporting res judicata in the context of a Bankruptcy Rule 9019 motion to compromise a controversy, where the bankruptcy court is limited to determining whether or not to "approve a compromise or settlement." *See* Fed. R. Bankr. P. 9019(a). Unlike in the context of claim objections, mentioned above, where counterclaims can allow the claim objection to be converted through Bankruptcy Rule 3007 to an adversary proceeding, such causes

---

[17] The court in *Osherow* went on to find that Bankruptcy Rule 9014 gives discretion to the bankruptcy court to allow other rules in Part VII of the Bankruptcy Rules to apply to contested matters. In that case, it suggested the bankruptcy court could have stayed the proceedings and allowed discovery to be commenced under the Part VII Rules to develop the affirmative causes of action to raise in the claim objection.

APP_273

of action have no mechanism to exist in the context of a Bankruptcy Rule 9019 motion. The bankruptcy court is limited to granting or denying a proposed settlement as relief in ruling on a Bankruptcy Rule 9019 motion—regardless of its findings on issues that may also serve for the foundation of the causes of action asserted in the subsequent hearing (*but see* "**Collateral Estoppel**" discussion below). Procedurally, this would not allow the subsequent causes of action to ever be raised, if res judicata were to apply to a contested matter under Bankruptcy Rule 9019, which does not allow for the assertion of counterclaims or other forms of affirmative relief.

Thus, the court finds that the Plaintiffs were not given the procedural mechanisms to bring the causes of action asserted in the Complaint during the pendency of the HarbourVest Settlement contested matter. The court finds that res judicata does not apply as a doctrine to preclude the claims asserted by the Plaintiffs in the Complaint.

### D.    Collateral Estoppel

On the contrary, collateral estoppel ***does*** have applicability here. Arguments potentially relevant to the collateral estoppel doctrine were made by the parties in their pleadings and at the hearing on the Motion to Dismiss (phrased in terms of res judicata), but collateral estoppel *per se* was not addressed independently.[18] The Bankruptcy Court now addresses collateral estoppel *sua sponte*. Raising preclusion doctrines *sua sponte* is in the interest of judicial economy and is appropriate, especially where both actions are before the same court. *See Carbonell v. La. Dep't of Health & Human Res.*, 772 F.2d 185, 189 (5th Cir. 1985).

To be clear, "res judicata encompasses two separate, but linked, preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion." *Hous. Prof'l Towing Ass'n v. City of Hous.*, 812 F.3d 443, 447 (5th Cir. 2016) (quoting *Comer v. Murphy Oil*

---

[18] As mentioned at footnote 15, Highland did make a passing reference to the collateral estoppel doctrine in its Brief in Support of its Motion to Dismiss.

APP_274

*USA, Inc.,* 718 F.3d 460, 466–67 (5th Cir. 2013)). Thus, while res judicata precludes relitigating claims or causes of action that were or could have been previously litigated in a prior action, collateral estoppel is referred to as "issue preclusion" and prevents relitigating the same ***issues or facts*** decided in a prior proceeding. Collateral estoppel precludes only the relitigation of issues or facts ***actually litigated*** in the original action, whether or not the second suit is based on the same cause of action. *Moch v. East Baton Rouge Parish School Board*, 548 F.2d 594, 596 (5th Cir. 1977). "[A] ***right, question, or fact distinctly put in issue and directly determined*** as a ground of recovery by a court of competent jurisdiction collaterally estops a party ... from relitigating the issue in a subsequent action," if the party had reasonable notice and an opportunity to be heard against the claim. *Hardy v. Johns–Manville Sales Corp.,* 681 F.2d 334, 338 (5th Cir. 1982) (emphasis added). "Collateral estoppel applies when, in the initial litigation, (1) the issue at stake in the pending litigation is the same, (2) the issue was actually litigated, and (3) the determination of the issue in the initial litigation was a necessary part of the judgment." *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 323 (5th Cir. 2005). Each condition must be met in order for collateral estoppel to apply. "Collateral estoppel will apply in a second proceeding that involves separate claims if the claims involve the same issue . . . and the subject matter of the suits may be different as long as the requirements for collateral estoppel are met." *In re Devoll*, No. 15-50122-CAG, 2015 WL 9460110, at *3 (Bankr. W.D. Tex. Dec. 23, 2015) (citation omitted).

So were each of these three collateral estoppel factors met? Were the ***same*** facts or issues ***actually litigated*** and was a determination of these facts and issues a ***necessary part*** of approving the HarbourVest Settlement? The Plaintiffs argued, in their response to the Motion to Dismiss, that the Bankruptcy Court did not resolve anything on the merits other than the approval of a

APP_275

settlement, and that was done solely using its discretion to approve a settlement. The court thinks

that this is a mischaracterization of the court's role in approving the HarbourVest Settlement.

In considering a proposed compromise and settlement agreement, a bankruptcy court must

determine whether it is "fair and equitable." *Matter of Jackson Brewing*, 624 F.2d 599, 602 (5th

Cir. 1980); *United States v. AWECO, Inc. (In re AWECO)*, 725 F.2d 293, 298 (5th Cir. 1984), *cert.*

*denied* 105 S. Ct. 244 (1984).   A bankruptcy court applies a three-part test set out in *Jackson*

*Brewing* with a focus on comparing "the terms of the compromise with the likely rewards of

litigation." A bankruptcy court must evaluate: (1) the probability of success in litigating the claim

subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity

and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all

other factors bearing on the wisdom of the compromise. These "other" factors—sometimes called

the *Foster Mortgage* factors[19]—include: (i) "the best interests of the creditors, 'with proper

deference to their reasonable views'"; and (ii) "'the extent to which the settlement is truly the

product of arms-length bargaining, and not of fraud or collusion." *Official Comm. of Unsecured*

*Creditors v. Moeller* (*In re Age Ref., Inc.*), 801 F.3d 530, 540 (5th Cir. 2015) (citations omitted).

In connection with evaluating the HarbourVest Settlement and whether it was "fair and

equitable" and in the "best interests of creditors," and whether it was the "product of arms-length

bargaining, and not of fraud or collusion," the Bankruptcy Court held a multi-hour hearing that

included lengthy direct and cross-examination of multiple witnesses and documentary evidence.

The Bankruptcy Court was required to "appraise [itself] of the relevant facts and law so that [it

could] make an informed and intelligent decision." *See In re Cajun Elec. Power Coop.*, 119 F.3d

349, 356 (5th Cir. 1997). The hearing included considering the arguments and evidence regarding

---

[19] *Connecticut Gen. Life Ins. v. United Cos. Fin. Corp. (In re Foster Mortgage Co.)*, 68 F.3d 914 (5th Cir. 1995).

APP_276

the methodology for the valuation of the HCLOF interest and the existence or non-existence of a "Right of First Refusal." The court heard credible testimony on, among other things, the value of the HCLOF interests from Mr. Seery and Mr. Pugatch. Both witnesses were subject to cross examination. The court heard how the value of the HCLOF interests plummeted nearly $50 million, which was caused, at least in part, by the litigation strategies taken by Highland while it was still under the control of Mr. Dondero.[20] The Plaintiffs allege in the Complaint that Mr. Seery's $22.5 million value of the HCLOF interest was baseless. The Plaintiffs believed the interests had a net asset value ("NAV") of at least $34.5 million on November 30, 2020, and a value of $41.75 million on December 31, 2020, leading up to the HabourVest Settlement hearing. Further, the Plaintiffs allege in the Complaint that Mr. Seery was receiving insider information from Mr. Dondero in December 2020 regarding the HCLOF interests and used improper valuation methods. But, for whatever reason, the Plaintiffs decided not to ask questions of Mr. Seery at the hearing or further challenge Mr. Seery's source or method of valuation for the HCLOF interests at the hearing.[21] The allegations in the Complaint surrounding Mr. Seery's method for valuation of the HCLOF interests were discoverable at the time of the HarbourVest Settlement hearing and directly relevant to the Bankruptcy Court's analysis in approving the HarbourVest Settlement. The Bankruptcy Court found the testimony elicited from Mr. Seery by Highland and the objectors to be credible in ultimately finding a $22.5 million value of the HCLOF interests was reasonable.

---

[20] Transcript of Hearing Held 1/14/2021, DE # 1765, at 96:20-97:24.
[21] Mr. Dondero and CLO Holdco appeared at and examined the HarbourVest witness, Mr. Pugatch, at a deposition before the hearing on the HarbourVest Settlement. Declaration of John Morris, Exhs. 7 & 8 thereto [DE # 2237]. Moreover, it is rather astounding to this court for anyone to suggest that any human being (Mr. Seery or anyone else) knew more, or withheld, any information that wasn't well known to Mr. Dondero and all principals/agents of DAF and CLO Holdco. Mr. Dondero and any personnel associated with DAF and CLO Holdco should have been as (or more) familiar with HCLOF's assets and their potential value than any human beings on the planet—having managed these assets for years.

APP_277

While a bankruptcy court does not delve into the merits of every possible claim that is waived or compromised through a settlement, here, (a) *consideration of the value that the estate was both receiving and paying*, as well as (b) the potential existence of a "Right of First Refusal" that might have prohibited the Transfer contemplated in the HarbourVest Settlement, were very much a focus of the hearing on the HarbourVest Settlement. These are the very same issues that are the gravamen of the Plaintiffs' Complaint. They were very much "actually litigated." The Bankruptcy Court would never have approved the HarbourVest Settlement if it thought the value being exchanged was not fair, or if it thought the HCLOF Interests could not be transferred and that someone might later sue the Debtor, claiming the Transfer was improper. All parties had the chance to argue and present evidence about this. The Bankruptcy Court made a ruling based on the evidence and argument.

Further, the Bankruptcy Court included in the HarbourVest Settlement Order language to specifically avoid any future assertions or litigation as to whether a "Right of First Refusal" prevented the transfer of HCLOF interests to Highland or a Highland designee/subsidiary:

> Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, ***HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor*** pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* ***without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF***. (Emphasis added.)

The court included this express language to document its finding that no "Right of First Refusal" was enforceable under the HCLOF Members Agreement based on the court's analysis of the underlying agreements, as well as representations made by CLO Holdco that it was withdrawing its objection (that was wholly based on the alleged "Right of First Refusal"). A possible "Right of First Refusal" was fully briefed by the Debtor and CLO Holdco (with whom the DAF is in privity,

APP_278

as its 100% parent), and the merits of such was fully considered by this court in approving the HarbourVest Settlement.

Despite this court's conclusion that res judicata does not apply here because procedural mechanisms did not allow an assertion of causes of action in the context of a Bankruptcy Rule 9019 settlement, ***no barrier prevented the Plaintiffs from fully litigating the issues, rights, and facts at the HarbourVest Settlement hearing that form the gravamen of the Complaint***. While the causes of action in the Complaint could not be brought in connection with the HarbourVest Settlement contested matter, the issues and facts underlying the causes of action in the Complaint were fully litigated and ruled on in connection with the HarbourVest Settlement. Those issues were raised in objections and subject to witness testimony at the HarbourVest Settlement hearing and were the primary considerations that had to be evaluated for the Bankruptcy Court to approve of the HarbourVest Settlement. The Complaint fails to allege any facts independent of: (a) an improper valuation by Mr. Seery or (b) a failure by Highland to honor a "Right of First Refusal" in favor of CLO Holdco to support relief under its causes of action. Count 1 in the Complaint alleges that Highland breached a fiduciary duty to the Plaintiffs through diverting a corporate opportunity by not ***first offering*** the HCLOF interests to the Plaintiffs. While labeled as a claim for a "breach of fiduciary" duty, as opposed to a "breach of contract," the arguments are the same. Both counts argue that the HCLOF interests should have been offered to the Plaintiffs who held a superior right to purchase the interests. Again, this argument was presented in CLO Holdco's objection to the HarbourVest Settlement, which was withdrawn by CLO Holdco during the hearing. The Plaintiffs do not get a second bite of the apple at litigating a purported superior right, by dressing it up as different cause of action, when the issue at stake has already been litigated. Thus, both the HarbourVest Settlement and Complaint involve the same issues.

APP_279

In summary, the first and second elements of collateral estoppel are met. The issues of valuation and a "Right of First Refusal" were one and the same as those articulated in the Complaint and were "actually litigated" in connection with the HarbourVest Settlement.

Going through the third prong of collateral estoppel, it is also met. The facts regarding valuation of the HCLOF interests and whether Highland was required to offer the HarbourVest's HCLOF interests to CLO Holdco were very much *necessary* or *essential* to the Bankruptcy Court's ruling approving the HarbourVest Settlement. The Bankruptcy Court was required to consider the value of the HCLOF interests to determine whether the consideration the estate was receiving in the compromise was fair and equitable. Further, the court noted at the settlement hearing that the "Right of First Refusal" was one of the "major arguments" in connection with the HarbourVest Settlement and the court included language in the HarbourVest Settlement Order specifically finding no such right existed. The court would not have approved the HarbourVest Settlement if it thought that it could not be accomplished or would result in Highland later being sued. This would not have been in the best interests of the estate. Thus, the HCLOF interest valuation and the ability or propriety of Highland transferring the HCLOF interest were "a necessary part of the judgment."

Further, the Plaintiffs do not dispute CLO Holdco is in privity with DAF, as DAF is the parent and controlling entity of CLO Holdco. Instead, CLO Holdco argues that it somehow was not a party to the ongoing dispute between Highland and HarbourVest that led to the HarbourVest Settlement (although it was allowed to file objections and take discovery).

Bankruptcy is a collective proceeding that allows creditors to object and raise any argument they think the court should consider that bear on the wisdom of the compromise. Generally, for a party to be bound by orders issued by the bankruptcy court, the party must receive adequate notice of the proceedings for due process reasons. *In re Reagor-Dykes Motors, LP*, 613 B.R. 878, 885

APP_280

(Bankr. N.D. Tex. 2020); *In re Grumman Olson Indus., Inc.,* 467 B.R. 694, 706 (S.D.N.Y. 2012); *see also Richards v. Jefferson Cty., Ala.,* 517 U.S. 793, 799, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) ("Additionally, where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate pre-existing rights if the scheme is otherwise consistent with due process."). The Bankruptcy Rules and bankruptcy jurisprudence provide for due process protection for settlements under Rule 9019(a) by requiring that a debtor in possession give creditors and parties in interest "adequate notice and opportunity to be heard before their interests may be adversely affected." *In re Reagor-Dykes Motors*, 613 B.R. at 885 (citing *W. Auto Supply Co. v. Savage Arms, Inc.* (*In re Savage Indus., Inc.*), 43 F.3d 714, 720 (1st Cir. 1994)). Rule 9019(a) further protects interested parties "[b]y requiring court approval following a hearing before any compromise or settlement may be enforced" to ensure a transparent settlement process and provide "other creditors an opportunity to voice their concerns." *In re Reagor-Dykes Motors*, LP, 613 B.R. at 886 (citing *In re Big Apple Volkswagen*, LLC, 571 B.R. 43, 57 (S.D.N.Y. 2017)). The Plaintiffs were properly noticed, as well as appeared and participated, in the Rule 9019 process.

Thus, the court concludes all three elements of collateral estoppel are met with regard to the fact issues of value of the HCLOF interests and any "Right of First Refusal" (and the ability/propriety of transferring the HCLOF interests). ***All of the causes of action in the Complaint (Counts 1-5) revolve around these two issues that were previously fully litigated****.* Thus, all causes of action asserted in the Complaint are precluded by the doctrine of collateral estoppel.

    E.    <u>Judicial Estoppel</u>

APP_281

The final preclusion doctrine, asserted by Highland, is judicial estoppel. Judicial estoppel is "a common law doctrine by which a party who has assumed one position in [their] pleadings may be estopped from assuming an inconsistent position." *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988). The doctrine is made "to protect the integrity of the judicial process" by "prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self interest." *Id.* "[A] party cannot advance one argument and then, for convenience or gamesmanship after that argument has served its purpose, advance a different and inconsistent argument." *Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 818 (5th Cir. 2002). "Statements made in a previous suit by an attorney before the court can be imputed to a party and subject to judicial estoppel." *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003). In order for a party to be estopped, two elements must be satisfied: (1) it must be shown "the position of the party to be estopped is clearly inconsistent with its previous one; and (2) that party must have convinced the court to accept that previous position. *In re Coastal Plains Inc.*, 179 F.3d 197, 206 (5th Cir. 1999).

The Plaintiffs argue, first, that withdrawing an objection and then raising the same argument later is not taking an "inconsistent position." Second, the Plaintiffs argue that, since the HarbourVest Settlement was approved and the objection was ***unsuccessful***, CLO Holdco could not "have convinced the court to accept that previous position."

Highland argues that CLO Holdco's withdrawal of its objection at the HarbourVest hearing, that was premised on a "Right of First Refusal" under the HCLOF Members Agreement, is, in fact, directly at odds with the Complaint, which asserts claims for violations of the same "Right of First Refusal." Further, Highland argues that the Bankruptcy Court, in ruling on the HarbourVest Settlement, relied on the withdrawal of that objection—noting that the withdrawal "eliminate[d] one of the major arguments" being heard in connection with the HarbourVest

APP_282

Settlement. Highland cites Fifth Circuit authority noting that the "judicial acceptance' requirement does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits." *Hall*, 327 F.3d at 398.

Here, the court believes that the first prong of judicial estoppel is met. At the HarbourVest Settlement hearing, CLO Holdco withdrew its objection, stating that it had determined it had no "Right of First Refusal," based on its "interpretation of the member agreement." Now Plaintiffs claim in their Complaint that CLO Holdco's "Right of First Refusal" was violated by the HarbourVest Settlement. These positions are clearly inconsistent. If that weren't enough, when asked by Debtor's counsel at the HarbourVest Settlement hearing to enter a stipulation reflecting the HarbourVest Settlement was compliant with all applicable agreements between CLO Holdco and the Debtor, counsel for CLO Holdco stated: "I'm not going to enter into a stipulation on behalf of my client, but *the Debtor is compliant with all aspects of the contract*. We withdrew our objection, and we believe that's sufficient."[22] This statement cannot conceivably coexist with the current assertion of a "Right of First Refusal." Moreover, to the extent Plaintiffs argue that CLO Holdco merely withdrew an objection pertaining to an alleged "Right of First Refusal" *in the HCLOF Members Agreement* (and not an objection arguing that Highland had some non-contractual obligation to offer the HarbourVest Interest to CLO Holdco first, based on "fiduciary duty" concepts), this is "no more than ineffectual hair splitting." *See Systems. Ahrens v. Perot Sys. Corp.*, 39 F.Supp.2d 773, 778 (N.D.Tex.1999) (in response to plaintiffs arguing a position taken in one suit could coexist with a position taken in a subsequent suit, despite each position being non-qualified, unconditional statements). It would seem to be the classic example of playing fast and loose with the court.

---

[22] Transcript of Hearing Held 1/14/2021, DE # 1765, at 17:24-18:16 (emphasis added).

The court also believes that the second prong of judicial estoppel is met. The Fifth Circuit has held that judicial estoppel may be applied whenever a party makes an argument "with the explicit intent to induce the district court's reliance." *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1047 (5th Cir. 1998). Further, the success requirement is satisfied when a court "necessarily accepted, and relied on" a party's position in making a determination. *Ahrens v. Perot Systems Corporation*, 205 F.3d 831, 836 (5th Cir. 2000). Here, while the Plaintiffs did not succeed in stopping the approval of the HarbourVest Settlement, that is not the proper inquiry. Instead, what matters is that the Bankruptcy Court carefully considered CLO Holdco's "Right of First Refusal" argument set out in its lengthy, written objection to the HarbourVest Settlement and perceived it as one of the major arguments that was relevant to the HarbourVest Settlement. At the HarbourVest Settlement hearing, the Plaintiffs stated: "CLO Holdco has had an opportunity to review the reply briefing, and after doing so has gone back and scrubbed the HCLOF corporate documents. Based on our analysis of Guernsey law and some of the arguments of counsel in those pleadings and our review of the appropriate documents, I obtained authority from my client, Grant Scott, as Trustee for CLO Holdco, to withdraw the CLO Holdco objection based on the interpretation of the member agreement."[23] The Bankruptcy Court relied upon that withdrawal of CLO Holdco's objection in making the determination to approve of the HarbourVest Settlement and, specifically, that Highland would not be running afoul of any obligation in entering into the HarbourVest Settlement. There is no question that, by withdrawing the objection, CLO Holdco caused the court to rely upon its withdrawal in making such determination. Thus, the Plaintiffs "convinced the court to accept that previous position."

---

[23] *Id*. at 7:24-8:6.

APP_284

The Bankruptcy Court concludes both elements of judicial estoppel are met. Counts 2 and 5 of the Complaint are based solely upon a "Right of First Refusal" under the HCLOF Members Agreement. Thus, judicial estoppel bars Counts 2 and 5 of the Complaint.

### IV. Conclusion

Based upon the facts alleged in the Complaint, the judicially noticed docket entries from the HarbourVest Settlement, and the arguments presented to the court, the court rules that, together, collateral estoppel and judicial estoppel preclude all claims brought in the Complaint. Therefore, the Motion to Dismiss is *granted* and the Complaint is dismissed in its entirety with prejudice.

Because this court believes the doctrines of collateral estoppel and judicial estoppel bar the claims of the Plaintiffs as a matter of law, the court—for the sake of efficiency and judicial economy—will forego addressing the other arguments of Highland. Specifically, Highland has argued that, even if all of the Plaintiffs' claims are not barred as a matter of law by preclusion or estoppel theories, Plaintiffs have failed to state plausible claims upon which relief can be granted with regard to the all of counts in the Complaint based on the RICO statute, Breach of Fiduciary Duty, Breach of Contract, Negligence, and Tortious Interference with Contract. While this court is inclined to agree with these arguments, the court will refrain from addressing them until such time as any higher court may instruct this court to address them.

Accordingly, it is

**ORDERED** that the Motion to Dismiss is **GRANTED** as to all causes of action (Counts 1-5) asserted in the Complaint with prejudice.

### ###END OF MEMORANDUM OPINION AND ORDER###

APP_285

**Exhibit 9**

Memorandum Opinion and Order

Case No. 22−cv−00695 [Dkt. No. 11]

APP_286

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
|    Debtor, | § | |
| ------------------------------------- | § | |
| THE CHARITABLE DAF FUND, L.P. | § | |
| and CLO HOLDCO, LTD., | § | |
| | § | |
|    Plaintiffs/Appellants, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-3129-B |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
|    Defendant/Appellee. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Highland Capital Management, L.P. ("Appellee")'s Motion to Dismiss

(Doc. 7) and The Charitable DAF Fund, L.P.'s and CLO Holdco, Ltd.'s (collectively, the

"Appellants") Motion to Consolidate (Doc. 9). The latter motion requests consolidation of this

action *The Charitable DAF Fund, L.P., et al., v. Highland Capital Management, L.P.*, Case No. 3:21-

CV-3129-B (the "Stay Order Appeal") with *The Charitable DAF Fund, L.P., et al., v. Highland Capital

Management, L.P., et al.*, Case No. 3:22-CV-0695-B (the "Dismissal Order Appeal"). For the reasons

stated below, the Motion to Dismiss is **DENIED** and the Motion to Consolidate is **GRANTED**

pursuant to Federal Rule of Bankruptcy Procedure 8003(b)(2).

1934054220617000000000000004

APP_287

# I.

# BACKGROUND

This is a bankruptcy appeal. The below Adversary Proceeding stems from the complaint filed on April 12, 2021, by Appellants in this Court in *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P., et al.*, Case No. 3:21-CV-0842-B. Doc. 7, Appellee's Mot. Dismiss, 1. On September 20, 2021, this Court referred that case to the bankruptcy court for "docket[ing] as an Adversary Proceeding associated with the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P." Order of Reference, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-CV-0842-B (N.D. Tex. Sept. 20, 2021), Doc. 64.

On November 23, 2021, the bankruptcy court held a hearing on a pending motion to stay by Appellants and a motion to dismiss by the Appellee. Hr'g, *In re Highland Cap. Mgmt., L.P.*, No. 21-3067 (Bankr. N.D. Tex. Nov. 23, 2021), Doc. 75; Hr'g, *In re Highland Cap. Mgmt., L.P.*, No. 21-3067 (Bankr. N.D. Tex. Nov. 23, 2021), Doc. 77. The bankruptcy court denied the motion to stay on December 7, 2021, and Appellants promptly appealed. Order Den. Stay, *In re Highland Cap. Mgmt., L.P.*, No. 21-3067 (Bankr. N.D. Tex. Dec. 7, 2021), Doc. 81; Notice of Appeal, *In re Highland Cap. Mgmt., L.P.*, No. 21-3067 (Bankr. N.D. Tex. Dec. 10, 2021), Doc. 86. Then, on March 11, 2022, the bankruptcy court granted the motion to dismiss and dismissed the complaint with prejudice. Order Granting Mot. Dismiss, *In re Highland Cap. Mgmt., L.P.*, No. 21-3067 (Bankr. N.D. Tex. Mar. 11, 2022), Doc. 100. Once again, Appellants promptly appealed. Notice of Appeal, *In re Highland Cap. Mgmt., L.P.*, No. 21-3067 (Bankr. N.D. Tex. Mar. 21, 2022), Doc. 104.

Appellee moved to dismiss the Stay Order Appeal on March 28, 2022, arguing that the Dismissal Order mooted the Stay Order Appeal. Doc. 7, Appellee's Mot. Dismiss. On April 18, 2022,

APP_288

Appellants moved to consolidate the Stay Order Appeal with the Dismissal Oder Appeal. Doc. 9, Appellants' Mot. Consolidate. These separate appeals were transferred to this Court on June 7, 2022, and June 9, 2022. Doc. 19, Order Reassigning Case; Doc. 10, Order Reassigning Case, (3:22-CV-0695-B). The motions are fully briefed and ripe for review. The Court considers them below.

## II.

## LEGAL STANDARD

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (citations and quotation marks omitted). "[E]ven when the 'primary relief sought is no longer available,' 'being able to imagine an alternative form of relief is all that's required to keep a case alive.'" *Dierlam v. Trump*, 977 F.3d 471, 476–77 (5th Cir. 2020) (quoting *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 553 (7th Cir. 2014), *judgment vacated sub nom. Univ. of Notre Dame v. Burwell*, 575 U.S. 901 (2015)). "This means that a court analyzing mootness in the early stages of litigation need only ask whether the plaintiff's requested relief is 'so implausible that it may be disregarded on the question of jurisdiction.'" *Id.* at 477 (quoting *Chafin v. Chafin*, 568 U.S. 165, 177 (2013)).

## III.

## ANALYSIS

Before deciding whether to consolidate these separate appeals under Federal Rule of Bankruptcy Procedure 8003(b)(2), the Court must address Appellee's mootness argument in case number 3:21-cv-3129-B.

APP_289

A.      *Appellee's Motion to Dismiss the Appeal of the Stay Order as Moot*

"Whether an appeal is moot is a jurisdictional matter, since it implicates the Article III requirement that there be a live case or controversy." *Bailey v. Southerland*, 821 F.2d 277, 278 (5th Cir. 1987). Thus, "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).

Appellee contends that such an event occurred when the bankruptcy court dismissed the Adversary Proceeding with prejudice, thus, the appeal of the order denying a stay of the case is now moot. Doc. 7, Appellee's Mot. Dismiss, 1. Because "there is no longer a case or controversy and there is no relief this Court could grant with respect to the Stay Order," the appeal is moot, according to Appellee. *Id.* at 5. Further, Appellee contends that this case resembles *Benavides v. Housing Authority* because "[t]he Adversary Proceeding has been completely 'demolished' by the Dismissal Order" and "[t]his Court . . . cannot rebuild it." Doc. 12, Appellee's Reply, 4–5 (citing *Benavides v. Housing Auth.*, 238 F.3d 667, 669–70 (5th Cir. 2001)).

Appellants argue that the appeal is not moot because a case or controversy still exists between the parties that the Court can redress. Doc. 10, Appellants' Resp., 4. If this Court reverses the bankruptcy court's dismissal order, then this Court could reverse the bankruptcy court's denial of a stay and redress Appellants' injury, according to Appellants. *Id.* at 5–6 (citing *Benavides*, 238 F.3d at 669–70). Further, Appellants claim that the bankruptcy court lacked subject matter jurisdiction to enter the dismissal order because no case or controversy existed between the parties while the Appellants were enjoined from participating in the Adversary Proceeding. *Id.* at 5. (first citing *United*

- 4 -

APP_290

*States v. Denedo*, 556 U.S. 904, 911 (2009); then citing *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 927 (5th Cir. 2017); and then citing *Hamman v. Sw. Gas Pipeline, Inc.*, 721 F.2d 140, 143–44 (5th Cir. 1983)).

In *Benavides*, former residents of a public housing project sought a temporary restraining order and permanent injunction to stop the demolition of a public housing project. 238 F.3d at 668. The Fifth Circuit dismissed the appeal as moot because "[a] substantial portion of the demolition ha[d] occurred." *Id.* at 669. No "theoretical relief" existed for the plaintiff because the court could not provide any possible relief to affect the substantially demolished public housing project. *Id.* at 670.

Here the Court could reverse the bankruptcy court's Dismissal Order and then the Stay Order, so theoretical relief exists. This is not an instance where a party failed to seek a stay from the bankruptcy court and the sale of the bankruptcy property rendered the district court powerless to grant relief.[1] *Cf. Am. Grain Assoc. v. Lee-Vac, Ltd.*, 630 F.2d 245 (5th Cir. Unit A Nov. 1980). While dismissed with prejudice, Appellants' claims have not been "demolished" so this court could theoretically provide relief to Appellants. *See Benavides*, 238 F.3d at 670. Stated differently, relief is not impossible. *See Knox*, 567 U.S. at 307; *Church of Scientology of Cal.*, 506 U.S. at 12.

The Court finds the following cases persuasive on this issue. In *In re Jiminez*, the Ninth Circuit Bankruptcy Appellate Panel held that an appeal from relief of a Stay Order was not moot despite the subsequent Dismissal Order. 613 B.R. 537, 544 (B.A.P. 9th Cir. 2020). The Deed of Trust

---

[1] This type of mootness—most often arising in the bankruptcy context—is commonly referred to as "equitable mootness" and is distinguishable from constitutional mootness. *See In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009) ("Equitable mootness is a kind of appellate abstention that favors the finality of reorganizations and protects the interrelated multi-party expectations on which they rest. . . . Article III mootness concerns arise when a judicial ruling would have no effect; equitable mootness applies when a judicial ruling might have too much effect on the parties to a confirmed reorganization."); *Abengoa Bioenergy Biomass of Kan., LLC*, 958 F.3d 949, 955 (10th Cir. 2020) ("Equitable mootness is a judicially-created doctrine of abstention that permits the dismissal of bankruptcy appeals where confirmed plans have been substantially completed and reversal would prove inequitable or impracticable.").

- 5 -

beneficiary moved the bankruptcy court for relief from the § 362 automatic stay and the court granted the motion to allow the Deed of Trust beneficiary to foreclose on the debtor's home. *Id.* at 541–42. The bankruptcy court subsequently entered a Dismissal Order to dismiss the bankruptcy case because the debtor failed to remedy several case deficiencies. *Id.* at 542. Because of the timely appeal from *both* orders, "the Stay Relief Order was not moot because the Panel had the power to restore the bankruptcy and reverse the Stay Relief Order." *Id.*

In *In re DSC, Ltd.*, the Sixth Circuit found the bankruptcy court's denial of a petitioner's joinder request was not mooted by the dismissal of the involuntary bankruptcy petition or the post-dismissal settlement. 486 F.3d 940, 945–46 (6th Cir. 2007). If the bankruptcy court had allowed the petitioner to join, the creditors would have satisfied the statutory requirements to defeat dismissal of the petition. *Id.* at 946. Thus, the court found the "subsequent settlement and withdrawal d[id] not affect th[e] court's ability to review the bankruptcy court's [joinder decision]." *Id.*

In another case, *In re Resource Technology Corp.*, lenders argued a case was moot because of settlement after the denial of all requests for a stay. 430 F.3d 884, 886 (7th Cir. 2005). The Seventh Circuit disagreed because the court could order the return of money, reinstate the claims, and order other relief. *Id.* The court distinguished the case as one of "judicial reluctance to upset legitimate reliance interests" and not mootness. *Id.* at 887. Finding the case not moot, the court addressed the merits of the case. *Id.* at 887–88.

In a final case from the Ninth Circuit, *In re Castaic Partners II, LLC*, the court held that it lacked authority to review the appeal of a stay order because the party failed to appeal the dismissal order. 823 F.3d 966, 969 (9th Cir. 2016). The court reasoned that the appeal of the stay order was moot because "[the court] ha[d] no power to restore the bankruptcy proceeding." *Id.* In sum, the

- 6 -

APP_292

failure to appeal *both* orders—the stay order and the dismissal order—deprived the appellate court of jurisdiction to review the stay order. *Id.* Such is not the case here, as Appellants appealed the Dismissal Order along with the Stay Order.

The Court can draw a couple of legal conclusions from these cases. First and most importantly, failure to appeal a dismissal order after a stay order denies a court of jurisdiction to review the stay order. *See id.*; *In re Jiminez*, 613 B.R. at 544. Second, courts otherwise routinely review precedent orders to a final disposition order. *In re DSC, Ltd.*, 486 F.3d at 945–46; *In re Resource Tech. Corp.*, 430 F.3d at 886. Following these circuits' precedent, the Court finds it may review the bankruptcy court's Stay Order because the appeal was not mooted by the bankruptcy court's Dismissal Order that Appellants also appealed.

Having found the appeal from the Stay Order not moot, the Court now turns to address whether it should consolidate these separate appeals.

B.     *Appellants' Motion to Consolidate the Appeals*

Under Federal Rule of Bankruptcy Procedure 8003(b)(2), "the district court . . . may join or consolidate [separate] appeals." Whether to consolidate bankruptcy appeals is left to the district court's discretion. *In re Monge*, 700 F. App'x at 355.

Appellants urge consolidation of "[t]hese interrelated appeals, stemming from the same hearing in the same adversary proceeding involving the same parties." Doc. 4, Appellants' Mot. Consolidate, 4. Appellants contend that Federal Rule of Bankruptcy Procedure 8003(b)(2) and Federal Rule of Civil Procedure 42 allows for the consolidation of these separate bankruptcy appeals. *Id.* at 4–5.

Appellee "does not oppose the consolidation of these two appeals." Doc. 5, Resp. Appellants'

APP_293

Mot. Consolidate.

The Court finds that judicial economy is served by consolidating these two appeals under Federal Rule of Bankruptcy Procedure 8003(b)(2).[2] These appeals involve the same parties in the same adversary proceeding. Thus, the Court consolidates these appeals.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Appellee's Motion to Dismiss and **GRANTS** Appellants' Motion to Consolidate. Accordingly, the Court hereby **ORDERS** that Case No. 3:21-CV-3129-B and Case No. 3:22-CV-0695-B be consolidated. All future pleadings, motions, or other filings shall hereafter be filed under 3:21-CV-3129-B.

**SO ORDERED**.

**SIGNED: June 17, 2022.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

---

[2] Because the Court finds consolidation under Federal Rule of Bankruptcy Procedure 8003(b)(2) warranted, the Court does not address consolidation under Federal Rule of Civil Procedure 42.

APP_294

**Exhibit 10**

Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint and
Memorandum of Law in Support of Defendant Highland Capital Management, L.P.'s Renewed
Motion to Dismiss Complaint

Adv. Proc. No. 21-03067 [Dkt. Nos. 122 and 123]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | ) | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | ) | |
| | ) | |
| Defendants. | ) | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.



1934054221014000000000006    APP_296

## DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## RENEWED MOTION TO DISMISS COMPLAINT

Highland Capital Management, L.P. ("Highland"), a defendant in the above-captioned adversary proceeding, by and through its undersigned counsel, files this renewed motion (the "Motion") seeking entry of an order dismissing the *Original Complaint* [Docket No. 1] (the "Complaint") filed by Plaintiffs Charitable DAF Fund, L.P. (the "DAF") and CLO Holdco, Ltd. ("CLOH") (together, "Plaintiffs").  In support of its Motion, Highland states as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. 157(b).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

### RELIEF REQUESTED

4. Highland requests that this Court issue the proposed form of order attached as **Exhibit A** (the "Proposed Order") pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, made applicable herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5. For the reasons set forth more fully in the *Memorandum of Law in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* (the "Memorandum of Law") filed contemporaneously with this Motion, Highland requests that the Court: (a) dismiss the Complaint in its entirety and (b) grant Highland such other and further relief as the Court deems just and proper under the circumstances.

6. In accordance with Rule 7007-1(g) of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas*, contemporaneously herewith and in support of this Motion, Highland is filing: (a) its Memorandum of Law, and (b) the *Appendix in*

DOCS_NY:46482.2 36027/003

APP_297

*Support of Defendant Highland Capital Management L.P.'s Renewed Motion to Dismiss the Complaint* (the "<u>Appendix</u>") together with the exhibits annexed thereto.

7.      Based on the exhibits annexed to the Appendix, and the arguments contained in the Memorandum of Law, Highland is entitled to the relief requested herein as set forth in the Proposed Order.

8.      Notice of this Motion has been provided to all parties.  Highland submits that no other or further notice need be provided.

WHEREFORE, Highland respectfully requests that the Court (i) enter the Proposed Order substantially in the formed annexed hereto as **Exhibit A** granting the relief requested herein, and (ii) grant Highland such other and further relief as the Court may deem proper.

[*Remainder of Page Intentionally Blank*]

APP_298

Dated:  October 14, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

APP_299

# EXHIBIT A

APP_300

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Reorganized Debtor. | ) |
| | ) |
| In re: CHARITABLE DAF FUND, L.P., AND | ) Adv. Pro. No. 21-03067-sgj |
| CLO HOLDCO LTD., | ) |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |
| HIGHLAND HCF ADVISOR, LTD., AND | ) |
| HIGHLAND CLO FUNDING, LTD. | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**<u>RENEWED MOTION TO DISMISS COMPLAINT</u>**

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1

APP_301

Before the Court is *Defendant Highland Capital Management L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. __] (the "<u>Motion</u>").  Having considered: (a) the Motion; (b) the *Memorandum of Law in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. __] (the "<u>Memorandum of Law</u>");[2] and (c) the *Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* [Docket No. __] (the "<u>Appendix</u>") and the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1409; and this Court having found that (a) Counts 2 and 5 are barred by judicial estoppel, and (b) the Complaint should be dismissed in its entirety because the Complaint fails to allege any Claim for relief that is plausible for relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure; and this Court having found that the Highland's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. The Complaint is dismissed in its entirety.

###End of Order###

---

[2] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Memorandum of Law.

APP_302

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | |
| vs. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S RENEWED MOTION TO DISMISS COMPLAINT

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification
service address for the Reorganized Debtor is 100 Crescent Court, Suite 18



## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................ 3

   A.   Highland Settles with HarbourVest .................................................................. 3

   B.   CLOH, Dondero and Dondero-Controlled Trusts Object to the Settlement Motion ......... 4

   C.   Plaintiffs File this Adversary Case .................................................................. 6

   D.   Highland's Motion to Dismiss and the Decision ............................................ 7

III. ARGUMENT ..................................................................................................... 7

   A.   Legal Standard ................................................................................................. 8

   B.   Counts 2 And 5 are Barred by Judicial Estoppel ............................................ 8

   C.   Plaintiffs Fail to State a Claim under RICO in Count 4 ................................ 12

      1.   Plaintiffs Fail to Allege a Pattern of Racketeering Activity ......................... 13

      2.   Plaintiffs Fails to Allege a RICO Association-in-Fact Enterprise ............... 16

      3.   Plaintiffs Fail to Allege Causation .............................................................. 17

   D.   Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty in Count 1 ........ 18

   E.   Plaintiffs Fail to State a Claim for Breach of Members Agreement in Count 2 ........... 22

   F.   Plaintiffs Fail to State a Claim for Negligence in Count 3 ............................ 23

   G.   Plaintiffs Fail to State a Claim for Tortious Interference with Contract in Count 5 ......... 24

IV.  CONCLUSION ................................................................................................ 25

APP_304

## <u>TABLE OF AUTHORITIES</u>

**Page No.**

## CASES

*Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*,
  625 F.3d 185 (5th Cir. 2010) ...................................................................... 13

*Alabama Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*,
  606 F.2d 602 (5th Cir. 1979) ...................................................................... 18

*Allstate Ins. Co. v. Donovan*,
  2012 WL 2577546 (S.D. Tex. July 3, 2012)................................................ 17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................... 8

*Bordelon v. Wells Fargo Fin. La., LLC*,
  2018 U.S. Dist. LEXIS 124877 (E.D. La. July 25, 2018) .......................... 16

*Brandon v. Interfirst Corp.*,
  858 F.2d 266 (5th Cir.1988) ........................................................................ 9

*C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*,
  61 F.3d 288 (5th Cir. 1995) ......................................................................... 8

*Cade v. Henderson*,
  2001 WL 1012251, 2001 U.S. Dist. LEXIS 13685 (E.D. La. Aug. 31, 2001), *aff'd sub nom*
  *Cade v. USPS*, 45 Fed. App'x 323 (5th Cir. 2002)...................................... 8

*Calcasieu Marine Nat'l Bank v. Grant*,
  943 F.2d 1453 (5th Cir.1991) ............................................................... 15, 16

*D&T Partners v. Baymark Partners LP*,
  2022 U.S. Dist. LEXIS 83140 (N.D. Tex. May 9, 2022) ........................... 13

*Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*,
  2022 U.S. Dist. LEXIS 172351 (N.D. Tex. Sept. 22, 2022)....................... 21

*Gabarick v. Laurin Mar. (Am.) Inc.*,
  753 F.3d 550 (5th Cir. 2014) ....................................................................... 9

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006)..................................................................... 22

*Grigsby v. CMI Corp.*,
  765 F.2d 1369 (9th Cir.1985) ..................................................................... 19

*H. J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989)............................................................................... 15, 16

DOCS_NY:46481.14 36027/003

*Hall v. GE Plastic Pac. PTE Ltd.*,
 327 F.3d 391 (5th Cir. 2003) ........................................................................... 9

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
 258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................... 19

*In re Oil Spill by the Oil Rig "Deepwater Horizon"*
 802 F. Supp. 2d 725 (E.D. La. 2011)........................................................ 17, 18

*In re Soporex, Inc.*,
 463 B.R. 344 (Bankr. N.D. Tex. 2011)........................................................... 20

*Jethroe v. Omnova Sols., Inc.*,
 412 F.3d 598 (5th Cir. 2005) ..................................................................... 9, 10

*Little v. KPMG LLP*,
 2008 WL 576226 (W.D. Tex. Jan. 22, 2008) ................................................ 23

*Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Young*,
 1994 WL 88129 (S.D.N.Y. Mar, 14, 1994) ................................................... 15

*Montesano v. Seafirst Commercial Corp.*,
 818 F.2d 423 (5th Cir.1987) .................................................................... 12, 16

*MWK Recruiting, Inc. v. Jowers*,
 2020 U.S. Dist. LEXIS 229755 (W.D. Tex. Dec. 8, 2020) ..................... 12, 14, 15

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
 No. 21-10449, 2022 U.S. App. LEXIS 25107 (5th Cir. Sept. 7, 2022). .................. 21

*NexPoint Diversified Real Estate Tr. v. Acis Cap. Mgmt., L.P.*,
 2022 U.S. Dist. LEXIS 142029 (S.D.N.Y. Aug. 9, 2022)...................................... 21

*Partain v. City of S. Padre Island*,
 2018 U.S. Dist. LEXIS 220850 (S.D. Tex. Dec. 5, 2018)................................... 16

*Pridgin v. Safety-Kleen Corp.*, Civil Action No. 3:21-CV-00720-K, 2021 U.S. Dist. LEXIS
 240210 (N.D. Tex. Dec. 16, 2021) .............................................................. 19

*Reed v. City of Arlington*,
 650 F.3d 571 (5th Cir. 2011) ......................................................................... 9

*Robinson v. Standard Mortg. Corp.*,
 191 F. Supp. 3d 630 (E.D. La. 2016).............................................. 12, 14, 15, 17

*Rodgers v. City of Lancaster Police*,
 2017 WL 457084 (N.D. Tex. Jan. 6, 2017) ..................................................... 24

*Santa Fe Industries, Inc. v. Green*,
 430 U.S. 462 (1977)....................................................................................... 18

*SEC v. Cap. Gains Research Bureau, Inc.*,
 375 U.S. 180 (1963)....................................................................................... 21

*Sivertsen v. Citibank, N.A. as Tr. for Registered Holders of WAMU Asset-Back Certificates
 WAMU Series No. 2007-HE2 Tr.*,
 390 F. Supp. 3d 769 (E.D. Tex. 2019)........................................................... 24

iii

*Snowden v. Wells Fargo Bank, N.A.*,
   2019 WL 587304 (N.D. Tex. Jan. 18, 2019),
   *adopted by* 2019 WL 586005 (N.D. Tex. Feb. 12, 2019) ...................................................... 23

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) ...................................................................................... 18, 19

*Specialties of Mexico Inc. v. Masterfoods USA*,
   2010 WL 2488031 (S.D. Tex. June 14, 2010) ......................................................................... 24

*St. Germain v. Howard*,
   556 F.3d 261 (5th Cir. 2009) ............................................................................................ 13

*St. Paul Mercury Ins. Co. v. Williamson*,
   224 F.3d 425 (5th Cir. 2000) ............................................................................................ 14

*Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*,
   374 F.3d 330, 335 (5th Cir. 2004) ...................................................................... 9, 10, 11, 12

*T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins.*,
   2008 WL 7627807 2008 U.S. Dist. LEXIS 112613 (S.D. Tex. May 22, 2008) ........................ 8

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*,
   975 F.2d 1134 (5th Cir. 1992) ................................................................................ 12, 14, 15

*Tigue Inv. Co. v. Chase Bank of Texas, N.A.*,
   2004 WL 3170789 (N.D. Tex. Nov. 15, 2004) ....................................................................... 18

*Transamerica Mtg. Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979) .............................................................................................................. 21

*U.S. ex rel. Long v. GSDMIdea City, L.L.C.*,
   798 F.3d 265 (5th Cir. 2015) ............................................................................................ 11

*United States v. Gray*,
   96 F.3d 769 (5th Cir. 1996) ............................................................................................ 14

*United States v. McCaskey*,
   9 F.3d 368 (5th Cir.1993) .................................................................................................. 9

*Woods v. Michael*,
   No. 20-80651-CV, 2021 U.S. Dist. LEXIS 26563 (S.D. Fla. Feb. 9, 2021) ........................... 13

## STATUTES

18 U.S.C. § 1961(4) ............................................................................................................. 18

18 U.S.C. § 1964(c) ..................................................................................................... 14, 19

DOCS_NY:46481.14 36027/003

Highland Capital Management, L.P., a defendant in the above-captioned case (the "<u>Debtor</u>"

or "<u>Highland</u>," as applicable), submits this memorandum of law in support of Highland's *Renewed*

*Motion to Dismiss Complaint* (the "<u>Motion</u>").[2]

## I.    **INTRODUCTION**[3]

1.      This matter comes back to the Court on remand from the United States District

Court for the Northern District of Texas (the "<u>District Court</u>").  On September 2, 2022, the District

Court entered its memorandum opinion and order (the "<u>Decision</u>")[4] on Plaintiffs' appeal of this

Court's order (the "<u>MTD Order</u>")[5] granting Highland's motion to dismiss this action (the "<u>Original</u>

<u>MTD</u>").[6]  In short, the District Court (i) reversed this Court's finding that collateral estoppel barred

Plaintiffs' claims and (ii) remanded the judicial estoppel finding for a determination as to whether

Plaintiffs' withdrawal of its objection to the Settlement on a claimed Right of First Refusal was

"inadvert*ent*."  Decision at 17.

2.      There can be no credible dispute that Plaintiff CLOH's withdrawal of its objection

to the Settlement was "advertent" and, therefore, that judicial estoppel bars Counts 2 and 5 of the

Complaint.  In addition, all Counts of Plaintiffs' Complaint[7] should be dismissed on the substantive

grounds Highland advanced in the Original MTD and renews and restates herein.

3.      In January 2021, the Debtor moved for an order approving its Settlement with

HarbourVest pursuant to which, *inter alia*, HarbourVest settled its claims against the Debtor and

---

[2] Concurrently herewith, Highland is filing the *Appendix in Support of Defendant Highland Capital Management, L.P.'s Renewed Motion to Dismiss Complaint* (the "<u>Appendix</u>"). Citations to the Appendix are notated as follows: Ex. #, Appx. #.

[3] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[4] *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, No. 3:21-cv-03129-B (N.D. Tex. Sept. 2, 2022) (slip op.), District Court Docket No. 28 (also available at 2022 U.S. Dist. LEXIS 159461), **Ex. 12, Appx. 437-458**.

[5] District Court Docket No. 100 (slip op.) (also available at 2022 Bankr. LEXIS 659).

[6] Docket No. 26. Unless otherwise indicated, "Docket No." refers to the docket maintained in this Adversary Proceeding.

[7] Docket No. 1-1.

APP_308

transferred its interest in HCLOF, to a subsidiary of the Debtor (the "Prior Proceeding"). **Ex. 2, Appx. 62-75**. CLOH objected to the Settlement, presumably at the direction of its parent, the "Charitable" DAF Fund, L.P. (the "DAF")[8] (**Ex. 6, Appx. 123-133**) on the grounds that: (i) it had a "Right of First Refusal" to acquire HarbourVest's interest in HCLOF and (ii) HarbourVest could not transfer its interest without complying with that purported right. *Id.* Two other objections were lodged, one by Mr. Dondero and the other by his Trusts.[9] **Exs. 4-5, Appx. 96-122.** Each objecting party had the right to, and took advantage of, discovery, and the Court held an evidentiary hearing on the proposed Settlement and heard argument in support of parties' objections and defenses. During the hearing, CLOH voluntarily withdrew its objection premised on the "Right of First Refusal," after which the Court overruled the remaining objections and approved the Settlement.[10]

4.     Three months later, Plaintiffs—with a new trustee and new counsel—filed their Complaint asserting that the Debtor violated the "Right of First Refusal," breached the Members Agreement, and otherwise violated its alleged duties to Plaintiffs. But, as discussed below, Plaintiffs are judicially estopped from arguing the "Right of First Refusal" was violated. CLOH asserted this very argument during the Prior Proceeding, and knowingly, voluntarily, and advertently withdraw it after due deliberation of the underlying facts, relevant documents, and

---

[8] The Court observed at the time that DAF, the parent of CLOH, "was seeded with contributions from Highland, is managed/advised by Highland, and [its] independent trustee is a long-time friend of Highland's chief executive officer[], Mr. Dondero." *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 292, at *19 (Bankr. N.D. Tex. Jan. 31, 2019) (emphasis in original). Mark Patrick—Mr. Dondero's employee and senior tax counsel of more than a decade— subsequently was appointed trustee of the DAF but this Court has found, and the District Court affirmed, that James Dondero ("Mr. Dondero") exerted significant control over both Mr. Patrick and the DAF. *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 175778, at *17-23 (N.D. Tex. Sept. 28, 2022); *see also Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 2780, at *5 n.5 (Bankr. N.D. Tex. Sept. 30, 2022).

[9] "Trusts" means The Dugaboy Investment Trust and The Get Good Trust, Mr. Dondero's family "trusts:"

[10] The Trusts appealed the Settlement, claiming (ironically and cynically) that the Debtor overpaid. On September 26, 2022, the District Court denied the appeal for lack of standing and affirmed this Court's order approving the Settlement. *See* 3:21-cv-00261-L, Docket No. 38.

APP_309

applicable law. Judicial estoppel thus bars Counts 2 and 5 of the Complaint. Plaintiffs also fail to state any claims on which relief can be granted, and the Complaint must be dismissed under Rule 12(b)(6), applicable here via Bankruptcy Rule 7012.

## II. FACTUAL BACKGROUND

### A. Highland Settles with HarbourVest

5. Highland CLO Funding, Ltd. ("HCLOF") is a Guernsey-based investment vehicle managed by its Guernsey-based board of directors. Highland HCF Advisors, Ltd. ("HCFA"), a wholly-owned subsidiary of Highland, is its portfolio manager.[11] Prior to the commencement of the Bankruptcy Case, HarbourVest[12] invested approximately $80 million in HCLOF. Following its investment, CLO Holdco, Ltd. ("CLOH") held 49.02% of HCLOF's interests, HarbourVest held 49.98%, and the remaining 1% was held by the Debtor and certain Debtor employees. After the Debtor filed bankruptcy, HarbourVest filed claims against the Debtor in excess of $300 million, alleging that it was fraudulently induced into its investment by factual misrepresentations and omissions made by Mr. Dondero and certain of his employees prior to the bankruptcy. (HarbourVest proofs of claim). **Ex. 1, Appx. 1-61**

6. On December 23, 2020, the Debtor filed its motion [Docket No. 1625] (the "Settlement Motion") seeking Bankruptcy Court approval of its settlement with HarbourVest (the "Settlement"). **Ex. 2, Appx. 62-75**. Pursuant to the Settlement, HarbourVest was to transfer its interest in HCLOF to the Debtor's nominee (the "Transfer") in exchange for allowed claims against the estate and certain other consideration. **Ex. 2 ¶ 32, Appx. 71-72; Ex. 3, Appx. 76-95.**

---

[11] HCLOF is past its investment period, and HCFA's role is limited to advising on the liquidation of HCLOF's portfolio and the recovery of cash for distributions to HCLOF's members.

[12] "HarbourVest" means, collectively, HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

APP_310

The Transfer was a necessary component of the Settlement—HarbourVest was essentially seeking rescission of its investment in HCLOF—and the Settlement Motion disclosed all aspects of the Settlement and Transfer, including (i) what HarbourVest was transferring; (ii) the valuation (and method of valuation) of the interests being transferred; (iii) the method of transfer; and (iv) the claims against Highland that HarbourVest would receive.  **Ex. 2 ¶ 32 & n.5, Appx. 71-72; Ex. 3, ¶ 1(b), Appx. 78**.

**B.      CLOH, Dondero and Dondero-Controlled Trusts Object to the Settlement Motion**

7.      On January 6, 2021, Mr. Dondero filed his objection to the Settlement [Docket No. 1697] ("Dondero's Objection").  **Ex. 4, Appx. 96-111**.  On January 8, 2021, the Trusts filed their objection [Docket No. 1706] (the "Trusts' Objection").  **Ex. 5, Appx. 112-122**.

8.      CLOH also objected to the Settlement on January 8, 2021 [Docket No. 1707] ("CLOH's Objection").  **Ex. 6, Appx. 123-133.**   CLOH challenged HarbourVest's right to effectuate the Transfer contending that: (i) CLOH and the other members of HCLOF had a "Right of First Refusal" under the Members Agreement, *id.* **¶ 3, Appx. 125,** and (ii) "HarbourVest has no authority to transfer its interest in HCLOF without first complying with the Right of First Refusal." *Id.* **¶ 6, Appx. 126**.  CLOH offered a lengthy, but faulty, analysis of the Members Agreement, including CLOH's purported "Right of First Refusal" under Article 6 thereof.  *See id.* **¶¶ 9-22, Appx. 127-132**.

9.      After filing their objections, CLOH and Mr. Dondero exercised their right to conduct discovery under Bankruptcy Rule 9014(c) and deposed Michael Pugatch, a representative of HarbourVest [Docket No. 1705]. **Ex. 7, Appx. 134-188**.  CLOH never contended that: (i) the Debtor had a fiduciary duty to offer the HCLOF interests to CLOH (and it did not) or (ii) the Investment Advisers Act of 1940 (the "IAA") was implicated by the Settlement (and it is not).

4

APP_311

10.     On January 13, 2021, the Debtor filed its reply [Docket No. 1731] (the "<u>Omnibus Reply</u>") (**Ex. 8, Appx. 189-211**), in which it established that the Members Agreement did not impede the Settlement and rebutted CLOH's argument that the Transfer could not be completed without complying with the "Right of First Refusal" under Article 6, ***id*. ¶¶ 26-39, Appx. 203-209**.

11.     Subsequently, at the January 14, 2021, hearing, CLOH *voluntarily withdrew* its objection after considering the Debtor's analysis of the Members Agreement and applicable law. CLOH's counsel unequivocally stated on the record:

> CLO Holdco has had an opportunity to review the reply briefing, and after doing so has gone back and scrubbed the HCLOF corporate documents. ***Based on our analysis of Guernsey law and some of the arguments of counsel on those pleadings and our review of the appropriate documents***, I obtained authority from my client, Grant Scott, as trustee for CLO Holdco, ***to withdraw the CLO Holdco objection based on the interpretation of the Members Agreement***.

**Ex. 9 at 7:20-8:6, Appx. 219-220** (emphasis added).

12.     The Debtor called two witnesses in support of the Settlement Motion—its court-appointed Chief Executive Officer, James P. Seery, Jr., and Mr. Pugatch.  Counsel for Mr. Dondero and the Trusts cross-examined the Debtor's witnesses but did not inquire about the value of the HCLOF interests, the Debtor's purported fiduciary obligations, or the Transfer.  **Ex. 9 at 87:18-89:21, Appx. 299-301**.  At the conclusion of the hearing, in reliance on CLOH's withdrawal of its Objection, and the evidence admitted at the hearing, the Court entered an order overruling the remaining objections and approving the Settlement [Docket No. 1788] (the "<u>Settlement Order</u>"). **Ex. 10, Appx. 386-409.**  The Settlement Order ***expressly*** authorized the transfer of HarbourVest's interest in HCLOF to a Debtor subsidiary providing, in relevant part, that "[p]ursuant to the express terms of the [Members Agreement] … HarbourVest is authorized to transfer its interest in HCLOF to a wholly-owned and controlled subsidiary of the Debtor … ***without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF***." ***Id*. ¶ 6,**

APP_312

**Appx. 390** (emphasis added).[13]  This Court included this language because of concerns that Mr. Dondero would "go to a different court somehow to challenge the transfer." **Ex. 9 at 156:17-22, Appx. 368**.[14]

**C.      Plaintiffs File this Adversary Case**

13.      With a new trustee and new counsel, on April 12, 2021, Plaintiffs effectively resurrected the CLOH Objection by filing their Complaint in the District Court, in which they, *inter alia*, challenged the Transfer premised on the "Right of First Refusal." **Ex. 11, Appx. 410-436**. The District Court subsequently referred the case to this Court.  [Docket No. 1-1].  The Complaint raises claims for: (i) breach of fiduciary duty (Count 1); (ii) breach of the Members Agreement (Count 2); (iii) RICO violations (Count 3); (iv) negligence (Count 4); (v) tortious interference (Count 5) (each, a "Count" and collectively, the "Counts").  In Count 1 (breach of fiduciary duty), Plaintiffs allege that the Debtor violated its "broad" duties to Plaintiffs under the IAA and the Debtor's "internal policies and procedures" by: (i) engaging in "insider trading with HarbourVest"; (ii) "concealing" the value of the HarbourVest interest; and (iii) "diverting" the investment opportunity in the HarbourVest entities to the Debtor without offering it to Plaintiffs. *Id.* ¶¶ **67-74**.[15]  In Count 3 (RICO), Plaintiffs allege that the Debtor and two affiliated entities were an "association-in-fact" engaged in a pattern of racketeering activity for this same underlying conduct; namely, failing to disclose the valuation of HCLOF's interest and ultimately effectuating the HarbourVest Settlement.  *Id.* ¶¶ **113-133**.

---

[13] *See also* **Ex. 9 at 156:10-25; 157:5**.

[14] *Id.* **at 156:10-25; 157:1-5, Appx. 368-369** (emphasis added).

[15] Ironically (and cynically), Plaintiffs' baseless insider trading allegations are premised on Mr. Dondero's unsolicited disclosure of alleged material non-public information regarding MGM Holdings.  Mr. Dondero's disclosure to Mr. Seery violated the injunction issued by this Court and presumably violated Mr. Dondero's duties and obligations as a director of MGM Holdings.

14.     Plaintiffs' state-law Counts rest on the same underlying allegations.  In support of Count 2 for breach of the Members Agreement, Plaintiffs again allege that the Debtor breached the "Right of First Refusal."  **Complaint ¶¶ 92-102**.  In Count 4 (negligence), Plaintiffs assert that the Debtor's actions violated the Members Agreement and the Debtor's internal policies by failing to accurately calculate the HCLOF interests and failing to give Plaintiffs the Right of First Refusal to purchase the interests. *Id.* **¶¶ 103-112**.  Count 5 (tortious interference) is again premised on the Debtor's alleged interference with Plaintiffs' "Right of First Refusal" under the Members Agreement. *Id.* **¶¶ 134-141**.

**D.     Highland's Motion to Dismiss and the Decision**

15.     On May 27, 2021, Highland filed the Original MTD, which this Court granted on the grounds of collateral and judicial estoppel.[16]  MTD Order at 22, 26.  Plaintiffs appealed the MTD Order to the District Court and that appeal was consolidated with Plaintiffs' appeal of this Court's order denying their motion for a stay.  *See* 3:21-cv-03129-B, Docket No. 20.[17]  On September 2, 2022, the District Court issued the Decision in which it reversed and remanded the MTD Order.[18]  The District Court reversed this Court's finding that Plaintiffs' claims were barred by collateral estoppel.  On judicial estoppel, the District Court affirmed this Court's findings that the first two elements of judicial estoppel were satisfied (Decision at 14-17) but remanded solely for a determination on whether Plaintiffs' inconsistent position was "inadvertent." *Id.* at 17-18.

**III.     ARGUMENT**

16.     Counts 2 and 5 are barred by judicial estoppel, and Plaintiff fails to state claims for relief under Rule 12(b)(6) as to all Counts of the Complaint.

---

[16] Because this Court granted the Original MTD on these bases, it "refrain[ed] from addressing" Highland's motion to dismiss on Rule 12(b)(6) grounds.  MTD Order at 26.

[17] Defendant HCLOF was voluntarily dismissed from this case on December 7, 2021.  Docket No. 80.

[18] Plaintiffs did not appeal the Decision.

## A.      Legal Standard

17.      To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  "When well-pleaded facts fail to meet th[e] [Twombly] standard, 'the complaint has alleged—but it has not shown—that the pleader is entitled to relief.'" Decision at 5 (quoting *Iqbal*, 556 U.S. at 679).  Dismissal is proper under Rule 12(b)(6) when, taking the facts alleged in the complaint as true, it appears that the plaintiff "cannot prove any set of facts that would entitle it to the relief it seeks." *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*, 61 F.3d 288, 289 (5th Cir. 1995).  The Court may take judicial notice of matters of public record when considering a motion to dismiss for failure to state a claim.[19]

## B.      Counts 2 And 5 are Barred by Judicial Estoppel

18.      Counts 2 and 5, for breach of the Members Agreement and tortious interference with the Members Agreement, are barred by judicial estoppel.  Judicial estoppel is "a common law doctrine by which a party who has assumed one position in [its] pleadings may be estopped from

---

[19] *See T.L. Dallas (Special Risks), Ltd. v. Elton Porter Marine Ins.*, 2008 U.S. Dist. LEXIS 112613, at *5 (S.D. Tex. May 22, 2008); *Cade v. Henderson*, 2001 U.S. Dist. LEXIS 13685, at *6-7 (E.D. La. Aug. 31, 2001), *aff'd sub nom Cade v. USPS*, 45 Fed. App'x 323 (5th Cir. 2002).

DOCS_NY:46481.14 36027/003

APP_315

assuming an inconsistent position." *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988); Decision at 14. The purpose of the doctrine is "to protect the integrity of the judicial process" by "prevent[ing] parties from playing fast and loose with the courts to suit the exigencies of self-interest." *Brandon*, 858 F.2d 266, 268 (internal quotations omitted); *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993); Decision at 14.

19.    As set out in the Decision: "A court examines three criteria when determining the applicability of judicial estoppel: '(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently.'" Decision at 14 (quoting *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (*en banc*)).[20]  As discussed *supra*, the District Court affirmed this Court's determination on the first two criteria but remanded for a determination as to whether Plaintiffs' change of position was "inadvertent." *Id.* at 18. Thus, the only issue before this Court on a judicial estoppel determination is the element of "inadvertence"—an issue not raised by Plaintiffs in their prior briefing to this Court.

20.    A failure to disclose is considered "'inadvertent' only when, in general, the *debtor* either lacks knowledge of the undisclosed claims *or* has no motive for their concealment." *Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330 (5th Cir. 2004); *see also Jethroe v. Omnova Sols., Inc.*, 412 F.3d 598, 600-01 (5th Cir. 2005) ("To establish that [debtor's] failure to disclose was inadvertent, [debtor] may prove either

---

[20] In the Fifth Circuit, the element of "inadvertence" is generally applied in a bankruptcy context where a debtor, post-discharge, seeks to assert a claim that had or could have been addressed within the bankruptcy. Thus, it is unclear whether the element of "inadvertence" applies in this case, which relates to a *non-debtor plaintiff's* change of position in an adversary proceeding. *See Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 n.3 (5th Cir. 2014) (rejecting appellant's argument that the third factor of "inadvertence" applies in a non-bankruptcy case, noting, "we apply [inadvertence] only when the judicial estoppel is based on the non-disclosure of a claim in a prior bankruptcy proceeding."); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (applying two-factor test to judicial estoppel determination in non-bankruptcy case, namely, (a) whether position was inconsistent, and (b) whether court relied on such position). Regardless, there can be no viable dispute that Plaintiffs' conduct was "advertent."

DOCS_NY:46481.14 36027/003

that she did not know of the inconsistent position or that she had no motive to conceal it from the court … at the time she filed her bankruptcy petition.")

21.     Plaintiffs' inconsistent position with regard to their Claims premised on the "Right of First Refusal" was not "inadvertent."  Plaintiffs knew of and analyzed the factual and legal issues concerning Counts 2 and 5 when they unequivocally withdrew their Objection to the Transfer in the Prior Proceeding; indeed, CLOH's thorough, multi-page objection to the Transfer was premised on an alleged violation of the "Right of First Refusal."  ***See* Ex. 6 ¶¶ 3, 6, Appx. 125-126**.

22.     After "review[ing] the reply briefing," "scrubb[ing] the HCLOF corporate documents," analyzing Guernsey law, and reviewing the "appropriate documents," CLOH, on the record, withdrew its Objection to the Transfer premised on the "Right of First Refusal" "based on the interpretation of the Members Agreement." *See* **Ex. 9 at 7:20-8:6, Appx. 219-220.**  Thus, Plaintiffs[21] knew of the underlying facts and legal issues underlying Counts 2 and 5 when CLOH withdrew its Objection in the Prior Proceeding.  Based on the record, CLOH's inconsistent positions regarding the "Right of First Refusal" under the Members Agreement are deliberate, directed, and advertent.  They cannot possibly be deemed "inadvertent." *See Superior Crewboats, Inc.*, 374 F.3d at 335-36 (debtors' non-disclosure of a viable personal injury claim in schedules filed in their no asset bankruptcy case was not "inadvertent" where debtors "were aware of the facts underlying the claim" for months, noting, "[a]lleged confusion as to a limitations period does not evince a lack of knowledge as to the existence of the claim."); *Jethroe*, 412 F.3d at 601 (failure to disclose claim was not "inadvertent" where party was aware of "the facts giving rise to them"

---

[21] It is indisputable that the DAF is in privity with CLOH and therefore cannot be heard to argue that only CLOH should be bound by judicial estoppel for filing and then withdrawing its objection.  *Charitable DAF Fund L.P.*, 2022 U.S. Dist. LEXIS 175778, at *12-13 ("DAF is in privity with CLO Holdco because it controls and owns 100% of CLO Holdco … [DAF] had a fair chance to challenge the gatekeeping orders or [is] in privity with an entity that did.")

at the time she filed her bankruptcy petition); *U.S. ex rel. Long v. GSDMIdea City, L.L.C.*, 798

F.3d 265, 272 (5th Cir. 2015) (failure to disclose claims was not "inadvertent" where party "was

aware of the facts underlying his claims as early as 2010 and [] filed this lawsuit in 2011," noting

that, inadvertence through lack of knowledge cannot be shown "as long as the debtor has enough

information to suggest that he may have a potential claim; the debtor need not know all of the

underlying facts or even the legal basis of the claim.").

23.    Accordingly, Plaintiffs' inconsistent legal positions with regard to the Transfer

violating the "Right of First Refusal" in the Members Agreement were in no way, shape, or form

the result of "inadvertence." [22]

24.    Any claim of inadvertence is also belied by Plaintiffs' self-evident financial interest

in the way that they have chosen to proceed here.  In the (unlikely) event they succeed on their

claims for breach of contract or tortious interference, Plaintiffs would have "reaped a windfall" in

withdrawing their Right of First Refusal objection. *See Superior Crewboats*, 337 F.3d at 336.  Had

Plaintiffs acquired the Interests, they would have had to pay tens of millions of dollars to

HarbourVest.[23]  Those Interests would have been speculative, illiquid, hard to value (by their own

admission), and subject to portfolio performance risk.  By contrast, in the Complaint, Plaintiffs

now seek monetary recovery or specific performance. ***See* Complaint ¶ 143** (ad damnum).  But

---

[22] Plaintiffs' allegation in support of Count 2 that "Plaintiff was not informed of the fact that HarbourVest had offered its shares to Defendant HCM for $22.5 million …" (**Complaint ¶ 98**) is irrelevant, inaccurate, and contradicted by the record.  The allegation is irrelevant because the "Right of First Refusal" is not dependent on the value of the shares. The allegation is inaccurate because HarbourVest did not "offer" its interest in HCLOF to Highland.  Rather, pursuant to the Settlement, HarbourVest *transferred* its interest in HCLOF to Highland's nominee in exchange for allowed claims against the estate and other consideration given to resolve HarbourVest's claim for, among other things, rescission of its investment in HCLOF. **Ex. 2 ¶ 32, Appx. 71-72; Ex. 3, Appx. 76-95.**  Finally, the allegation is contradicted by the record because the Settlement Motion expressly stated that the net asset value of the interest was "estimated to be approximately $22 million as of December 1, 2020."  **Ex. 2 ¶ 32 & n.5, Appx. 71-72; Ex. 3, ¶ 1(b), Appx. 78.**

[23] HarbourVest received a total of $80 million in allowed claims in the Settlement.  Presumably, Plaintiffs would have had to have paid that much for the Interests.

APP_318

HCLOF's investments have been (with limited exception) reduced to cash or equivalents. Accordingly, the only current risk with respect to the Interests is litigation risk—a risk generally created by Plaintiffs.[24]  Their financial interest in bringing the claim in this posture—they allowed the Debtor to assume the speculative risk yet now seek to seize the non-speculative reward—on its own vitiates any claim of inadvertence. *See Superior Crewboats*, 337 F.3d at 336 (debtors "had the requisite motivation to conceal the claim as they would certainly reap a windfall had they been able to recover on the undisclosed claim").  For this additional reason, Counts 2 and 5 are barred by judicial estoppel.

25.     Accordingly, Plaintiffs' inconsistent position is not the result of "inadvertence," and Counts 2 and 5 should, therefore, be dismissed on grounds of judicial estoppel.

## C.     Plaintiffs Fail to State a Claim under RICO in Count 4

26.     To state a RICO claim, a plaintiff must allege: "1) the conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity."  *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 424 (5th Cir.1987).  To defeat a motion to dismiss, "a RICO plaintiff must allege facts sufficient to establish each of the essential elements of his or her RICO claim."  *Robinson v. Standard Mortg. Corp.*, 191 F. Supp. 3d 630, 638 (E.D. La. 2016).  The RICO claim must be plead "with sufficient particularity" under Rule 9(b).  *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992); *see also MWK Recruiting, Inc. v. Jowers*, 2020 U.S. Dist. LEXIS 229755, at *23 (W.D. Tex. Dec. 8, 2020).  "Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [they] obtained thereby."  *Tel-Phonic Servs*, 975 F.2d at 1134 (internal quotations omitted).  "[T]o establish a RICO claim based on a pattern of mail or wire

---

[24] *See, e.g.*, Bankr. Docket Nos. 3507, 3550.

DOCS_NY:46481.14 36027/003

fraud, the plaintiff must plead that the defendant act[ed] knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to [themselves]." *Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 715 (N.D. Tex. 2018) (internal quotations omitted).

### 1.    <u>Plaintiffs Fail to Allege a Pattern of Racketeering Activity</u>

27.    "'A pattern of racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity.'" *D&T Partners v. Baymark Partners LP*, 2022 U.S. Dist. LEXIS 83140, at \*15 (N.D. Tex. May 9, 2022) (quoting *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009)).   Plaintiffs allege three predicate offenses: (i) wire fraud, (ii) mail fraud, and (iii) violation of the IAA's antifraud provisions. ***See*** **Complaint ¶¶ 130-132**.   Plaintiffs fail to sufficiently plead any predicate act.

28.    First, alleged violations of securities laws cannot be predicate acts for a RICO claim. *See* 18 U.S.C. § 1964(c); *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 191 (5th Cir. 2010).   Thus, to the extent that Plaintiffs' RICO claims, however pitched, allege "conduct that would have been actionable as fraud in connection with the purchase or sale of securities" (18 U.S.C. § 1964(c)), the claims are barred by statute.   "Courts have interpreted the scope of § 1964(c)'s so-called 'securities fraud exception' broadly to apply even where a plaintiff does not expressly plead securities fraud as the predicate act, where a plaintiff could not have even brought a securities fraud claim against the particular defendant, and where a plaintiff pleads securities fraud violations but fails to state a claim for relief."  *Woods v. Michael*, No. 20-80651-CV, 2021 U.S. Dist. LEXIS 26563, at \*8 (S.D. Fla. Feb. 9, 2021).   Plaintiffs' RICO claim is wholly predicated on violations of the securities laws: "Defendants' conduct violated the wire fraud and mail fraud laws, and the [IAA's] antifraud provisions."   **Complaint ¶ 132**.   Because the RICO claim is improperly founded on alleged securities fraud, it must be dismissed.

13

APP_320

29.     Second, the Complaint fails to state a claim for mail or wire fraud.  To state a claim for mail fraud, a plaintiff must allege: "(1) a scheme to defraud, (2) which involves the use of the mails, (3) for the purpose of executing the scheme." *United States v. Gray*, 96 F.3d 769, 773 (5th Cir. 1996).  The elements of wire fraud are the same but apply to "wire communications in furtherance of the scheme." *Id.*  "[B]oth RICO mail and wire fraud require evidence of intent to defraud, i.e., evidence of a scheme to defraud by false or fraudulent representations." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 441 (5th Cir. 2000); *Robinson*, 191 F. Supp. 3d at 639–40 ("[A] scheme to defraud must involve fraudulent misrepresentations or omissions").  Accordingly, the specificity requirements and heightened pleading standards of Rule 9(b) apply. *See MWK Recruiting*, 2020 U.S. Dist. LEXIS 229755, at \*23-24 (claim failed to allege time or location of fraudulent occurrences).  The Complaint fails to satisfy Rule 9(b).

30.     The thrust of Plaintiffs' claim is that the Debtor operated in such a way as to "violate insider trading rules and regulations when it traded with HarbourVest" by concealing "non-public information that it had not supplied" to Plaintiffs. **Complaint ¶ 118**.  Plaintiffs' RICO claim is nothing more than a series of conclusory allegations predicated on allegations of mail, wire, and securities fraud. ***See id.* ¶¶ 113-133**.  The Complaint only vaguely alleges, for instance, that Mr. Seery (i) "utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests," *id.* **¶ 120**; (ii) "transmitted or caused to be transmitted through the interstate wires information to HCLOF investors from HCM," *id.* **¶ 121** and (iii) "operated [the Debtor] in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations…" *id.* **¶ 122**.  Plaintiffs do not plead with particularity details about the contents of those alleged communications, when the Debtor had them, to whom, or where such communications were

APP_321

directed. *See Merrill Lynch, Pierce, Fenner & Smith v. Young*, 91 Civ. 2923 (CSH), 1994 U.S.

Dist. LEXIS 2929, at *22-27 (S.D.N.Y. Mar. 15, 1994); *Tel-Phonic Servs.*, 975 F.2d at 1138.

Plaintiffs only generally allege that Mr. Seery testified about the valuation of the HCLOF interests

(**Complaint ¶ 125**) but provide no details about mail or wire fraud.

31.     The Complaint therefore "does not identify specific acts of communication by mail

or by interstate wires" undertaken by the Debtor "in furtherance of a fraudulent scheme" as

required by Rule 9(b).  *See Merrill Lynch*, 1994 U.S. Dist. LEXIS 2929, at *31-32; *Tel-Phonic

Servs*, 975 F.2d at 1134 (Rule 9(b) requires pleading particulars of time, place, content and maker

of the misrepresentation).  Plaintiffs' allegations are insufficient to state a plausible claim for relief

under RICO.  *See Robinson*, 191 F. Supp. 3d at 640 (dismissing RICO claims where plaintiff

provided no factual details); *see also MWK Recruiting,* 2020 U.S. Dist. LEXIS 229755 at *23-24.

32.     Finally, Plaintiffs also fail to plead a "pattern of racketeering activity."  "To prove

a pattern of racketeering activity, a plaintiff must show at least two predicate acts of racketeering

that are related and amount to or pose a threat of continued criminal activity." *MWK Recruiting,*

2020 U.S. Dist. LEXIS 229755, at *25 (quoting *Tel-Phonic Servs.,* 975 F.2d at 1139-40 (W.D.

Tex. Dec. 8, 2020)). To constitute a "pattern," the activities must show "continuity." *Tel-Phonic

Servs.,* 975 F.2d at 1140.  "Continuity" refers "either to a closed period of repeated conduct, or to

past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 1139-40.

"Predicate acts extending over a few weeks or months and threatening no future criminal conduct

do not satisfy this requirement." *Id.* (quoting *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241

(1989)); *see also Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1464 (5th Cir.1991)

("Short-term criminal conduct is not the concern of RICO.")

33.     Here, the Complaint does not allege "continuity."  There is no specific "threat of repetition" or distinct threat of long-term criminal conduct.  Nor do the allegations suggest the Debtor is "operating as part of a long-term association that exists for criminal purposes." *See Partain v. City of S. Padre Island*, 2018 U.S. Dist. LEXIS 220850, at *43 (S.D. Tex. Dec. 5, 2018) (quoting *H. J. Inc.,* 492 U.S. at 242-43).  Plaintiffs' RICO bald allegations concern only non-specific conduct allegedly occurring in a limited period, September 2020 to January 2021, concerning one transaction—the HarbourVest Settlement. ***See, e.g.,* Complaint ¶¶ 119-128**.  Such allegations concern short-term, discrete transactions, and do not show a "pattern of activity," or threat of "continuing racketeering activity."  *See Calcasieu*, 943 F.2d at 1464.

## 2.     Plaintiffs Fails to Allege a RICO Association-in-Fact Enterprise

34.     A RICO "enterprise" can be either a legal entity or an "association in fact" enterprise.  18 U.S.C. 1961(4).  "A RICO association in fact enterprise must be shown to have continuity." *Calcasieu*, 943 F.2d at 1461.  "The linchpin of enterprise status is the continuity or ongoing nature of the association." *Bordelon v. Wells Fargo Fin. La., LLC*, 2018 U.S. Dist. LEXIS 124877, at *8 (E.D. La. July 25, 2018) (internal quotation marks omitted).

> The enterprise must have continuity of its structure and personnel, which links the defendants, and a common or shared purpose. . . An association in fact enterprise (1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure.

*Calcasieu*, 943 F.2d at 1461 (internal quotations omitted).  That is, an "association in fact enterprise must have an existence separate and apart from the pattern of racketeering."  *Id.*

35.     Plaintiffs argue that the Defendants, together, constitute an "association-in fact" enterprise because "the purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the HarbourVest settlement as a vehicle to enrich persons other than the HCLOF investors, including [Plaintiffs]." **Complaint ¶ 115.**  However, these allegations fail to show that

Defendants functioned as a continuing unit, separate and apart from the alleged RICO violation, and fail to allege that Defendants are an "enterprise" within the purview of RICO. *See Montesano*, 818 F.2d at 427 (association-in-fact enterprise not pled under RICO where plaintiffs alleged only that defendants "conspired in this one instance").

36.     Plaintiffs also fail to identify the roles of the two affiliates of the Debtor, HCFA and HCLOF, and how they, with the Debtor, participated in the alleged criminal enterprise.[25]  *See Allstate Ins. Co. v. Donovan*, 2012 U.S. Dist. LEXIS 92401, at *31-32 (S.D. Tex. July 3, 2012) (complaint lacked factual allegations scheme formation, who was in charge, how each defendant participated, and whether there were communications or understanding among the defendants advancing the fraud).

### 3.     <u>Plaintiffs Fail to Allege Causation</u>

37.     Plaintiffs also fail to plausibly allege causation.  RICO provides civil remedies to "[a]ny person injured in [their] business or property *by reason of* a violation of section 1962." 18 U.S.C. § 1964(c) (emphasis added). "An injured party must show that the violation was the but-for and proximate cause of the injury." *Robinson*, 191 F. Supp. 3d at 645 (internal quotations omitted).  Causation requires "[a] direct relationship between the fraud and the injury." *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, 802 F. Supp. 2d 725, 730 (E.D. La. 2011).

38.     Here, Plaintiffs fail to allege that the Debtor's actions induced them to act or that any Debtor's actions were the proximate cause of any cognizable injury.  Plaintiffs generally allege that "had Plaintiff been offered those [HCLOF] interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the HarbourVest Settlement." **Complaint ¶ 50**.   Such conclusory and speculative

---

[25] Highland and Mr. Seery are subject to this Court's oversight.  Mr. Seery was specifically appointed by this Court to oversee the Debtor.  The Debtor and Mr. Seery were thus risibly unlikely participants in a RICO enterprise.

APP_324

"would have" allegations are insufficient to show proximate and but-for causation.[26]   *See*

*Robinson*, 191 F. Supp. 3d at 645 (allegations failed to state causation where plaintiff's "after-the-

fact" and "bare assertion that she would have acted differently" had she known of certain facts

were insufficient "absent additional factual allegations to support or explain this assertion,"); *In re*

*Oil Spill by Oil Rig Deepwater Horizon*, 802 F. Supp. 2d at 729 (no causation where economic

harms suffered by plaintiffs were "too remote" and causation theory "depends on a series of

speculative assumptions to link the alleged fraud" with the harm).

39.     Plaintiffs' RICO claim fails every element and should be dismissed.

**D.     Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty in Count 1**

40.     Plaintiffs fail to state a claim for breach of fiduciary duty.  Plaintiffs' fiduciary duty

claim is premised on the Debtor's alleged: (i) insider trading; (ii) concealment of the value of the

HarbourVest interests; and (iii) diversion of an investment opportunity from Plaintiffs to the

Debtor, in violation of Section 10(b) of the Securities and Exchange Act of 1934 and the IAA. ***See***

***Complaint ¶¶ 67-80***.  Where, as here, a plaintiff's breach of fiduciary duty claim is premised on

theories of securities fraud, Rule 9(b)'s heightened pleadings standards apply.  *See Tigue Inv. Co.*

*v. Chase Bank of Tex., N.A.*, 2004 U.S. Dist. LEXIS 27582, at *4 (N.D. Tex. Nov. 15, 2004).

"Section 10(b) of the Securities and Exchange Act of 1934 makes unlawful the use of 'any

manipulative or deceptive device or contrivance' in contravention of SEC rules."  *Alabama Farm*

*Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 608 (5th Cir. 1979).  "A cause of

action lies under Rule 10b-5 'only if the conduct alleged can be fairly viewed as manipulative or

deceptive' within the meaning of the statute."  *Id.* (quoting *Santa Fe Industries, Inc. v. Green*, 430

U.S. 462, 473 (1977)).  To state a securities-fraud claim under section 10(b) and Rule 10b–5,

---

[26] At no time prior to filing the Complaint did CLOH indicate it wanted to acquire the Interests or state that it was interested in, willing, or able to purchase the HarbourVest interests.

DOCS_NY:46481.14 36027/003

APP_325

plaintiffs must plead: "(1) a misstatement or omission; (2) of a material fact; (3) made with

scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries."

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368 (5th Cir. 2004).  "A fact is

material if there is 'a substantial likelihood that, under all the circumstances, the omitted fact would

have assumed actual significance in the deliberations of the reasonable shareholder.'" *Id.* (quoting

*Grigsby v. CMI Corp.*, 765 F.2d 1369, 1373 (9th Cir.1985)).  "[S]cienter is a crucial element of

the securities fraud claims." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th

Cir. 1994).

     41.    Plaintiffs' allegations underlying their breach of fiduciary duty claim are premised

on largely the same conclusory allegations as those underlying their fraud-based RICO claim. ***See***

**Complaint ¶¶ 67-91**.  Because Plaintiffs fail to properly plead securities fraud, any fiduciary claim

premised on such allegations necessarily fails as well.  *See Town North Bank, N.A. v. Shay Fin.*

*Servs.*, 2014 U.S. Dist. LEXIS 137551, at *74 (N.D. Tex. Sep. 30, 2014).  Plaintiffs fail to plead

with particularity that any alleged omissions by the Debtor assumed any real significance for the

Plaintiffs. ***See, e.g.***, **Complaint ¶¶ 82-89** (speculating about Plaintiffs' "lost opportunity cost,"

and vaguely asserting that "Defendants' malfeasance" has "exposed HCLOF to a massive liability

from HarbourVest").  These allegations also fail to give rise to a "strong interference of scienter"

sufficient to state a claim under Rule 10(b).  *See In re Enron Corp. Sec., Derivative & ERISA*

*Litig.*, 258 F. Supp. 2d 576, 635 (S.D. Tex. 2003); *Southland*, 365 F.3d at 368 (plaintiff must plead

"more than allegations of motive and opportunity to withstand dismissal" for claim of securities

fraud).  Plaintiffs' allegations regarding proximate cause are equally deficient. ***See* Complaint**

**¶¶ 88-89** (vaguely alleging that because of Defendants' actions, "Plaintiffs have lost over $25

million").

APP_326

42.     Plaintiffs also fail to allege any breach of fiduciary claims premised on state law.
Texas law[27] provides "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary
relationship between the plaintiff and defendant; (2) the defendant must have breached his
fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff
or benefit to the defendant."  *Matter of ATP Oil & Gas Corp.*, 711 F. App'x 216, 221 (5th Cir.
2017) (internal quotations omitted).  "The plaintiff must plead some facts as to the nature of the
relationship to state a plausible claim that that a fiduciary duty has been breached."  *Matter of Life
Partners Holdings, Inc.*, 926 F.3d 103, 125 (5th Cir. 2019).

43.     The Complaint fails to sufficiently allege facts regarding the nature of the
relationship between Plaintiffs and the Debtor.  ***See* Complaint ¶¶ 62-63** (generally alleging
simply that (i) the Debtor "owed a fiduciary duty to [Plaintiffs]" pursuant to which the Debtor
"agreed to provide sound investment advice, and (ii) this fiduciary relationship is "broad and
applies to the entire advisors-client relationship").  The Complaint also fails to adequately allege
that any state law or Guernsey fiduciary duty existed, let alone was breached for the same reasons.
*Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 125 (5th Cir. 2019) (no allegation of "the
nature of the fiduciary duty owed" to plaintiff).  The allegations of the Debtor's breach of its
"internal policies and procedures" or the diversion of "corporate opportunities" are vague and
conclusory. **Complaint ¶¶ 72-89**.  *See In re Soporex, Inc.*, 463 B.R. 344, 417 (Bankr. N.D. Tex.
2011).

44.     Plaintiffs allege the Debtor breached its "unwaivable" fiduciary obligation under
the IAA by, among other things, "diverting a corporate opportunity."  **Complaint ¶¶ 82-84**.  This

---

[27] Plaintiffs allege breach of fiduciary duty under state law; however, HCLOF is a Guernsey entity and the Members
Agreement is governed by Guernsey law.  *See* Ex. 13 at 14.  Under the internal affairs doctrine, Guernsey law controls
on issues of fiduciary duties to the members.  *See Pridgin v. Safety-Kleen Corp.*, 2021 U.S. Dist. LEXIS 240210, at
*6 (N.D. Tex. Dec. 16, 2021).

APP_327

Count is purportedly premised on the IAA because (i) the Debtor was the DAF's investment adviser under an advisory agreement and (ii) HCFA is HCLOF's investment adviser under a separate advisory agreement.[28]   However, under clear Supreme Court precedent, the IAA does not provide a private right of action to sue for damages arising from breach of fiduciary duty.[29] *Transamerica Mtg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) (holding there is no private right of action under Section 206 of the IAA); *see also Charitable DAF Fund, L.P.*, 2022 Bankr. LEXIS 2780, at *13, n. 23 ("The court notes that the … Supreme Court has held [in *Transamerica*] that there is not a private right of action for damages under the [IAA]."); *NexPoint Diversified Real Estate Tr.*, 2022 U.S. Dist. LEXIS 142029, at *8 ("Plaintiff has not adequately pleaded a claim … under the IAA … there is no private right of action to bring a claim pursuant to [Section 206 of the IAA].")[30]

45.      Even if there were a right of action under the IAA, Plaintiffs' allegations would still be deficient for failure to plead "duty" or "breach."   The Debtor owed no duty to offer the Interests to Plaintiffs.  The Transfer was effectuated in compliance with the Members Agreement and "Right of First Refusal."  The DAF's advisory agreement included full and clear disclosure that the Debtor could compete with the DAF for investments with no obligation to offer those investments to the DAF.[31]   *SEC v. Cap. Gains Research Bureau, Inc.*, 375 U.S. 180, 181-82 (1963) (finding disclosure of an adviser's "practice of purchasing shares … for his own account" satisfied the

---

[28] Plaintiffs cite to Section 47(b) of the IAA for the proposition that the Transfer is unenforceable.  **Complaint ¶ 89**. There is no Section 47(b) in the IAA.

[29] A party can seek to void an investment management agreement under Section 215 of the IAA if the agreement's formation or performance would violate the IAA.  *NexPoint Diversified Real Estate Tr. v. Acis Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 142029, at *9-10 (S.D.N.Y. Aug. 9, 2022).  Plaintiffs have not pled such claim nor could they.

[30] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 U.S. App. LEXIS 25107, at *26 (5th Cir. Sept. 7, 2022).

[31] *See, e.g.*, **Ex. 14 at Appx. 504** ("The Fund will be subject to a number of actual and potential conflicts of interest … including … that … Highland … may actively engage in transactions in the same securities sought by the Fund and, therefore, may compete with the Fund for investment opportunities…").

APP_328

adviser's fiduciary obligations under the IAA); *Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 172351, at *10-11 (N.D. Tex. Sept. 22, 2022) (addressing argument that fiduciary obligations under the IAA cannot be waived and finding no breach of duty when conflict disclosed). Defendants also owed no duty to CLOH as an investor in HCLOF; there is no fiduciary relationship between an adviser to a fund and the fund's investors. *Goldstein v. SEC*, 451 F.3d 873, 879 (D.C. Cir. 2006).

46.     There was also no corporate opportunity to divert. HarbourVest asserted a claim against the Debtor seeking, among other things, effectively the rescission of its investment in HCLOF, an investment allegedly induced by fraud. The Settlement effectuated that remedy. Because HarbourVest had no claims against Plaintiffs, there was no taking of a corporate opportunity. The Debtor was resolving a claim against the Debtor, not purchasing a security for cash, and could not transfer its liability to HarbourVest to Plaintiffs.

47.     Accordingly, Count 1, for breach of fiduciary duty, should be dismissed.

**E.     Plaintiffs Fail to State a Claim for Breach of Members Agreement in Count 2**

48.     In addition to Count 2 being barred by judicial estoppel, Plaintiffs fail to plead sufficient facts to state a breach of the Members Agreement's Right of First Refusal. **Complaint ¶¶ 92-102**. Further, Plaintiffs' claim of breach is contradicted by the Members Agreement itself. Section 6.1 of the Members Agreement **(Ex. 13, § 6.1, Appx. 468-469)** grants members the unconditional right to transfer its interests to an "Affiliate of an initial Member." Section 6.2 **(*Id.*, § 6.2, Appx. 469)** sets forth the Right of First Refusal and has two exceptions: (i) transfers to "affiliates of an initial Member" from Members *other than* CLOH and the "Highland Principals" and (ii) transfers from CLOH or a Highland Principal to (a) the Debtor, (b) the Debtor's "Affiliates," or (c) another Highland Principal. Under the Members Agreement, "Affiliate" is defined as, "with respect to a person, (i) any other person who, directly or indirectly, is in control

APP_329

of, or controlled by, or is under common control with, such person …" *Id.* § 1.1, Appx. 463. A "Member" is a "holder of shares in the Company." *Id.*, § 1.1, Appx. 464. The "initial Member[s]" are the initial Members of HCLOF listed on the first page of the Members Agreement and include the Debtor, HarbourVest, and CLOH. *Id.*, § 6.2, Appx. 469. Since HarbourVest transferred its interests directly to the Debtor's wholly-owned subsidiary—an Affiliate of an initial Member— the transfer was permitted, without restriction, under section 6.1 and satisfied the exception to the Right of First Refusal in section 6.2. *See* **Ex. 13, Appx. 459-487; Ex. 8 ¶¶ 28-35, Appx. 203-208.**

49. Plaintiffs also fail to plead actual damages resulting from the alleged breach of the Members Agreement, other than contending, that "had plaintiff been allowed to do so, it would have obtained the interests" in HCLOF. *E.g.,* **Complaint ¶ 100.** Such conclusory allegations ignore the fact that CLOH elected not to make an offer to purchase the HCLOF interests[32] and, in any event, are insufficient to state a claim. *See Snowden v. Wells Fargo Bank, N.A.*, 2019 WL 587304, at *6 (N.D. Tex. Jan. 18, 2019), *adopted by* 2019 U.S. Dist. LEXIS 22982 (N.D. Tex. Feb. 12, 2019) (actual damages inadequately pled); Little v. KPMG LLP, 2008 U.S. Dist. LEXIS 26281, at *15 (W.D. Tex. Jan. 22, 2008) (lost profits claim "speculative and conjectural.")

**F.    Plaintiffs Fail to State a Claim for Negligence in Count 3**

50. The Complaint fails to state a claim for negligence. First, this Count is barred by the Plan.[33] Highland has been exculpated from all claims for "conduct occurring on or after [October 16, 2019] in connection with or arising out of (i) the … administration of the Chapter 11 Case … and (v) any negotiations, transactions, and documentation in connection with the foregoing" unless such conduct constituted "bad faith, gross negligence, criminal misconduct, or

---

[32] *See* note 26 *supra*.

[33] "Plan" means the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808].

DOCS_NY:46481.14 36027/003

APP_330

willful misconduct."[34]   The negotiation and consummation of the Settlement were part of the "administration of the Chapter 11 Case," and Highland, therefore, has been exculpated from Plaintiffs' claim for negligence. *NexPoint Advisors, L.P.*, 2022 U.S. App. LEXIS 25107, at *33. Second, even absent exculpation, Plaintiffs fail to state a claim.   "The elements of a negligence claim under Texas law are: '(1) a legal duty on the part of the defendant; (2) breach of that duty; and (3) damages proximately resulting from that breach.'" *Sivertsen v. Citibank, N.A. as Tr. for Registered Holders of WAMU Asset-Back Certificates WAMU Series No. 2007-HE2 Tr.*, 390 F. Supp. 3d 769, 789 (E.D. Tex. 2019).   The negligence allegations (**Complaint ¶¶ 106-107**) are speculative, conclusory, and fail to allege proximate cause; the claim must be dismissed.   *See Rodgers v. City of Lancaster Police*, 2017 U.S. Dist. LEXIS 14588, *37 (N.D. Tex. Jan. 6, 2017). To the extent Plaintiffs' negligence claim is premised on a breach of the Members Agreement, the advisory agreement with DAF, or the IAA, they are duplicative of Plaintiffs' other Counts and fail for the reasons set forth above.

**G.    Plaintiffs Fail to State a Claim for Tortious Interference with Contract in Count 5**

51.    Plaintiffs' tortious interference claim is premised on the Debtor's alleged violation of the Members Agreement and concealment of the value of HCLOF. **Complaint ¶¶ 134-141**. The elements of tortious interference with contract are: "(1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss." *Specialties of Mexico Inc. v. Masterfoods USA*, 2010 U.S. Dist. LEXIS 58782, at *15 (S.D. Tex. June 14, 2010).   Plaintiffs fail to allege how the Debtor intentionally interfered with the Members Agreement, and Plaintiffs have conceded—and are judicially estopped from arguing otherwise—that the transfer of the HCLOF interests did not violate the

---

[34] Plan, Art. I.B.62; Art. IX.C, *aff'd* 2022 U.S. App. LEXIS 25107, at *33.

APP_331

Members Agreement.  Plaintiffs also fail to allege proximate causation or any actual damages sustained as a result of the alleged interference.  This claim should be dismissed.

## IV.    <u>CONCLUSION</u>

WHEREFORE, Highland respectfully requests that the Court grant the Motion, enter an order in the form annexed to the Motion as **<u>Exhibit A</u>**, and grant such further relief as the Court deems just and proper.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

DOCS_NY:46481.14 36027/003

APP_332

Dated:  October 14, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

APP_333

**Exhibit 11**

Renewed Motion to Withdraw the Reference

Adv. Proc. No. 21-03067 [Dkt. No. 128]

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |
| CHARITABLE DAF FUND, L.P. AND CLO | § |
| HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § |
| | § |
| Plaintiffs, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03067-sgj |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| HIGHLAND HCF ADVISOR, LTD., AND | § |
| HIGHLAND CLO FUNDING LTD., NOMINALLY | § |
| | § |
| Defendants. | § |
| | § |

**<u>RENEWED MOTION TO WITHDRAW THE REFERENCE</u>**

The Charitable DAF Fund, L.P. and CLO Holdco, Ltd., Plaintiffs in the above-referenced

adversary proceeding, file this Motion under 28 U.S.C. § 157(d), Rule 5011 of the Federal Rules

of Bankruptcy Procedure, Rule 5011-1 of the Local Bankruptcy Rules, and this Court's standing

order, Order of Reference of Bankruptcy Cases & Proceedings Nunc Pro Tunc, In re Miscellaneous

Order No. 3:04-MI-00033 (N.D. Tex. Oct. 4, 1982), as to the above-referenced adversary

1934054221121000000000001
APP_335

proceeding. Plaintiffs respectfully re-urge withdrawal of the reference in light of Highland Capital

Management, L.P.'s Renewed Motion to Dismiss and arguments advanced therein.

# I.

## **BACKGROUND**

1.      Plaintiffs filed this action in district court. In response to Highland's motion seeking

reference to the bankruptcy court [Doc. 1-1], Plaintiffs filed an opposition and cross-motion

seeking withdrawal of the reference [Doc. 36]. The district court granted Highland's motion and

referred the action to the bankruptcy court without addressing the merits of Plaintiff's cross-motion

or the underlying statutory basis for withdrawal [Doc. 64].

2.      In the bankruptcy court, Plaintiffs filed a proposed motion to withdraw the

reference as an exhibit to their Motion for Stay [Doc. 69-1], explaining in the stay motion that they

understood the Plan Injunction to prohibit them from advocating for withdrawal of the reference

at that time, but that they would do so if allowed.

3.      Highland moved to dismiss the action under Rule 12 of the Federal Rules of Civil

Procedure [Doc. 26]. The bankruptcy court granted that motion [Doc. 80]. The district court

reversed [Doc. 99].

4.      Highland now re-urges dismissal under Rule 12 for the same and other reasons

[Doc. 123], relying on arguments that implicate federal statutes and require, Plaintiffs submit,

withdrawal of the reference now.

# II.

## **WITHDRAWAL OF THE REFERENCE IS MANDATORY**

5.      This adversary proceeding primarily involves fiduciary duties imposed upon

Registered Investment Advisers by the Investment Advisers Act of 1940 ("Advisers Act") and

---

APP_336

corresponding state law claims for breach of those duties. As a result, presiding over this action

will require extensive consideration of federal laws regulating interstate commerce, which renders

withdrawal of the reference to bankruptcy court mandatory under 28 U.S.C. § 157(d).

6.     Under § 157(d), withdrawal of the reference is mandatory when a proceeding

"requires consideration" of non-bankruptcy federal laws regulating interstate commerce:

> The district court may withdraw, in whole or in part, any case or proceeding
> referred under this section, on its own motion or on timely motion of any
> party, for cause shown. The district court shall, on timely motion of a party,
> so withdraw a proceeding if the court determines that resolution of the
> proceeding requires consideration of both title 11 and other laws of the
> United States regulating organizations or activities affecting interstate
> commerce.

28 U.S.C. § 157(d); *cf. TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement*

*Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited

jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *LightSquared Inc. v. Deere*

*& Co.*, 2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014) (quoting *Investor Prot. Corp. v. Bernard*

*L. Madoff Inv. Sec. LLC*, 454 B.R. 307, 312 (S.D.N.Y. Jan. 31, 2011), for the proposition that,

"[i]n determining whether withdrawal is mandatory, the Court 'need not evaluate the merits of the

parties' claims; rather, it is sufficient for the Court to determine that the proceeding will involve

consideration of federal non-bankruptcy law'"); *In re Cont'l Airlines Corp.*, 50 B.R. 342, 360 (S.D.

Tex. 1985), *aff'd*, 790 F.2d 35 (5th Cir. 1986) ("While that second clause [of § 157(d)] might not

apply when some 'other law' only tangentially affects the proceeding, it surely does apply when

federal labor legislation will likely be material to the proceeding's resolution.") (emphasis added).

7.     Plainly here, the claims in the Complaint at least involve federal laws "regulating

organizations or activities affecting interstate commerce." The Advisers Act is such a law, and at

least the first count of the Complaint implicates it. *See, e.g.*, Complaint [Doc. 1-1] ¶¶ 57 & n.5, 66,

APP_337

69, 74 & n.6, 89 (explicitly invoking various provisions of the Advisers Act and accompanying regulations). Defendant's entire argument against withdrawal of the reference thus turns on whether these laws "must be considered."

8.      It is readily apparent that these statutes must be considered in this adversary proceeding. The briefing already puts at issue significant, hotly contested issues regarding the interplay of bankruptcy law and these federal statutes, including

- Whether Defendant owed federal fiduciary duties under the Advisers Act that are unwaivable;

- To whom such duties are owed and whether they were violated;

- Whether they are actionable under federal law;

- Whether such Advisers Act fiduciary duties can be terminated by a blanket injunction in a bankruptcy plan;

- Whether a contractual jury waiver is enforceable as to claims for breach of unwaivable Advisers Act fiduciary duties;

- Whether such waivers can be enforced as to non-parties to the waiver.

Presiding over this action most certainly will require consideration of these issues.

9.      Before joining the Fifth Circuit, Judge Clement addressed a similar matter during her time in the Eastern District of Louisiana. There, in *In re Harrah's Entm't*, 1996 U.S. Dist. LEXIS 18097, at *7-8 (E.D. La. 1996), she denied a motion to refer a federal securities action to bankruptcy court, relying on a rationale fully applicable here. Despite finding that the bankruptcy court had related-to jurisdiction, Judge Clement wrote,

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference.

*Id*. at *11.

10.     Judge Clement rejected the argument that the case would "only involve the simple application of established federal securities laws." *Id.* at \*7. Instead, she relied on alleged "violations of several federal securities laws" and the plaintiff's attempt "to hold defendants directly liable and secondarily liable based on a 'controlling person' theory for certain acts and omissions." *Id.*

11.     Without any need to analyze how "established" the applicable law might be, Judge Clement concluded, "This federal securities litigation involves more than simple application of federal securities laws and will be complicated enough to warrant mandatory withdrawal under § 157(d)." *Id.* (citing *Rannd Res. v. Von Harten (In re Rannd Res.)*, 175 B.R. 393, 396 (D. Nev. 1994), for the proposition that withdrawal of the reference is mandatory where resolution requires more than simple application of federal securities laws, even though that court's determination was based solely on a review of the complaint's alleged violations of § 12(2) of the Securities Act of 1933, § 10 of the Securities Exchange Act of 1934, and Rule 10b-5).

12.     This authority is on all fours here. In the Complaint, Plaintiffs allege violations of federal securities law (the Advisers Act), as well as the RICO statute. Highland has taken the position that the RICO Statute cannot apply because of exclusions under RICO for claims that raise securities laws violations. Deciding the renewed motion to dismiss will require far more than simple application of these laws. Nothing more is necessary to satisfy § 157(d). *Cf. S. Pac. Transp. Co. v. Voluntary Purchasing Grps.*, 252 B.R. 373, 382-84 (E.D. Tex. 2000) (holding that even the court's "limited" role in approving a CERCLA settlement "necessarily involves the substantial and material consideration of CERCLA" and "will require the court to examine the unique facts of the case in light of those CERCLA provisions which create the causes of action at issue"). *Compare id.* at 382 ("It is well settled that CERCLA is a statute "'rooted in the commerce clause'

APP_339

and is precisely 'the type of law . . . Congress had in mind when it enacted the statutory withdrawal provision [in § 157(d)].'") *with* the Advisers Act, 15 U.S.C. § 80b-1 ("Upon the basis of facts disclosed by the record and report of the Securities and Exchange Commission made pursuant to section 30 of the Public Utility Holding Company Act of 1935, and facts otherwise disclosed and ascertained, it is hereby found that investment advisers are of national concern, in that, among other things—(1) their advice, counsel, publications, writings, analyses, and reports are furnished and distributed, and their contracts, subscription agreements, and other arrangements with clients are negotiated and performed, by the use of the mails and means and instrumentalities of interstate commerce; (2) their advice, counsel, publications, writings, analyses, and reports customarily relate to the purchase and sale of securities traded on national securities exchanges and in interstate over-the-counter markets, securities issued by companies engaged in business in interstate commerce, and securities issued by national banks and member banks of the Federal Reserve System; and (3) the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy.").

13.    Although it is unnecessary to demonstrate that Plaintiffs' Advisers Act allegations will require application of underdeveloped law, that certainly is the case. As the Third Circuit pointed out in 2013, there is considerable "confusion" in the case law stemming from the fact that federal law (the Advisers Act) provides "the duty and the standard to which investment advisers are to be held," but "the cause of action is presented as springing from state law." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502 (3d Cir. 2013). The *Belmont* court further suggests the "confusion [that this situation] engenders may explain why there has been little development in either state or federal law on the applicable standards." *Id.* (emphasis added). "Half a century

---

APP_340

later," the *Belmont* court tells us, "courts still look primarily to *Capital Gains Research [, Inc.*, 375 U.S. 180, 192 (1963),] for a description of an investment adviser's fiduciary duties." *Id.* at 503; *see also* Plaintiffs' Response to Renewed Motion to Dismiss (addressing the Debtor's erroneous argument that the Advisers Act creates no private right of action). This observation is bolstered by the necessity of relying extensively on SEC regulations and rulings in the Complaint. *See* Complaint ¶ 57 & n.5 (invoking Investment Advisers Act Release Nos. 3060 (July 28, 2010), and 2106 (Jan. 31, 2003), 66 (17 C.F.R. 275.206(4)-7), 69 (27 C.F.R. part 275 and Rule 10b5-1), 74 & n.6 (Advisers Act Release No. 4197 (Sept. 17, 2015)).

## III.

## <u>THIS ADVERSARY PROCEEDING IS NOT A CORE PROCEEDING</u>

14.     In previous briefing, the Debtor has suggested that this adversary proceeding should remain in bankruptcy court because it is a core proceeding under Title 11. Plaintiffs respectfully submit this is incorrect because the causes of action asserted in the Complaint do not "arise under," or "arise in" Title 11 and therefore cannot be "core" proceedings.

15.     To be clear, Plaintiffs are not seeking and have disclaimed any relief that would literally unwind or reverse any settlement approved by the bankruptcy court. Neither do Plaintiffs attempt an end run around the provisions of any approval. They merely seek vindication of their rights via damages, and they respectfully submit that a proper jurisdictional analysis demonstrates their causes of action are not core proceedings within the bankruptcy court's jurisdiction, for the reasons addressed below.

16.     *<u>First</u>*, "the 'core proceeding' analysis is properly applied not to the case as a whole, but as to each cause of action within a case." *Legal Xtranet, Inc. v. AT&T Mgmt. Servs., L.P. (In re Legal Xtranet, Inc.)*, 453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011); *Davis v. Life Inv'rs Ins.*

---

*Co. of Am.*, 282 B.R. 186, 193 n. 4 (S.D. Miss.2002); *see also In re Exide Techs.*, 544 F.3d 196, 206 (3d Cir. 2008) ("A single cause of action may include both core and non-core claims. The mere fact that a non-core claim is filed with a core claim will not mean the second claim becomes 'core.'").

17.    __*Second*__, the Fifth Circuit has explained that "§ 157 equates core proceedings with the categories of 'arising under' and 'arising in' proceedings; therefore, a proceeding is core under section 157 if it invokes a substantive right provided by title 11[, it 'arises under' the Bankruptcy Code,] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case[, it 'arises in' a bankruptcy case]." *United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 692–93 (Bankr. N.D. Tex. 2020); Stern v. Marshall, 564 U.S. 462, 476 (2011).

18.    __*Third*__, none of the Plaintiffs' five causes of action—breach of fiduciary duty under the Advisers Act, breach of contract related to the HCLOF Company Agreement, negligence, RICO, and tortious interference—arise under title 11. That is, none of the substantive rights of recovery are created by federal bankruptcy law. And plainly so. Because "[a]rising under' jurisdiction [only] involve[s] cause[s] of action created or determined by a statutory provision of title 11," this is indisputably the case. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987) (noting that a proceeding does not "arise under" Title 11 if it does not invoke a substantive right, created by federal bankruptcy law, that could not exist outside of bankruptcy).

19.    __*Fourth*__, for similar reasons, none of Plaintiffs' causes of action "arise in" a bankruptcy case. "Claims that 'arise in' a bankruptcy case are claims that by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case." *Legal*

*Xtranet, Inc.*, 453 B.R. at 708–09 (emphasis added) (citing *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006). The Debtor has previously argued that, because the factual circumstances giving rise to the causes of action included the HarbourVest Settlement, which was approved by the bankruptcy court, this somehow transforms Plaintiffs' causes of action into core claims. But it is the nature of the causes of action that determines whether they are core, not their "particular factual circumstance." *Id*.

20.    To illustrate the point, in *Gupta v. Quincy Med. Ctr.*, 858 F.3d 657, 660 (1st Cir. 2017), the bankruptcy court had issued a sale order which approved an asset purchase agreement whereby the purchaser became obligated to make certain payments to employees. The purchaser failed to make these payments, so the employees sued the purchaser in bankruptcy court, and the bankruptcy court rendered a judgment in favor of the employees. On appeal, the district court concluded that the bankruptcy court lacked subject matter jurisdiction over the claims—claims plainly related to and existing only because of the approved sale order that gave rise to them. The First Circuit affirmed, explaining as follows:

> [T]he fact that a matter would not have arisen had there not been a bankruptcy case does not ipso facto mean that the proceeding qualifies as an 'arising in' proceeding. Instead, the fundamental question is whether the proceeding by its nature, not its particular factual circumstance, could arise only in the context of a bankruptcy case. In other words, it is not enough that Appellants' claims arose in the context of a bankruptcy case or even that those claims exist only because Debtors (Appellants' former employer) declared bankruptcy; rather, "arising in" jurisdiction exists only if Appellants' claims are the type of claims that can only exist in a bankruptcy case.

*Id*. at 664–65 (emphasis added).

21.    Like the claims in *Gupta*, the Plaintiffs' causes of action here arose in the context of a transaction approved in a bankruptcy case. But obviously, the causes of action are not "the type of claims that can only exist in a bankruptcy case." And that ends the analysis. Because

APP_343

Plaintiffs' causes of action do arise under the Bankruptcy Code, and because they are not claims that could only arise in the context of bankruptcy, this action is not a core proceeding.

## IV.

### <u>CONCLUSION</u>

In sum, because 28 U.S.C. § 157(d) mandates withdrawal of the reference here, and because this is not a "core" proceeding, the Court should withdraw the reference as to this adversary proceeding and grant Plaintiffs all additional relief to which they may be entitled.

Dated:  November 18, 2022

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ Jonathan Bridges*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
   jeb@sbaitilaw.com

**Counsel for Plaintiffs**

APP_344

**Exhibit 12**

Highland Capital Management, L.P.'s Response To "Renewed" Motion To Withdraw The

Reference

Adv. Proc. No. 21-03067 [Dkt. No. 138]

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | ) | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | ) | |
| vs. | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | ) | |
| Defendants | ) | |

## HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## <u>RESPONSE TO "RENEWED" MOTION TO WITHDRAW THE REFERENCE</u>

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification service address for the Reorganized Debtor is 100 Crescent Court, Suite 18



1934054221209000000000000005
APP_346

Highland Capital Management, L.P., a defendant in the above-captioned adversary proceeding ("<u>Highland</u>"), hereby submits this response (the "<u>Response</u>") in opposition to the *Renewed Motion to Withdraw the Reference* [D.I. 128] (the "<u>Motion</u>") filed by plaintiffs The Charitable DAF Fund, L.P. ("<u>DAF</u>") and CLO Holdco, Ltd. ("<u>CLOH</u>," and together with DAF, "<u>Plaintiffs</u>").  In support of its Response, Highland states as follows:

## **<u>RELIEF REQUESTED</u>**

1.     Through this Response, Highland respectfully requests that the Court deny the Motion in full, because the Motion is nothing more than another attempt by Plaintiffs to forum shop, delay adjudication, and waste judicial and estate resources.

2.     Pursuant to Rules 7.1(d) and (h) of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "<u>Local Rules</u>"), a separate brief (the "<u>Brief</u>") is being filed contemporaneously with this Response and is incorporated by reference as if fully set forth herein.

## **<u>PRAYER</u>**

WHEREFORE, PREMISES CONSIDERED, Highland respectfully requests that the Court enter an order (i) denying in whole the relief requested in the Motion, and (ii) granting Highland such further and additional relief as the Court deems just and proper.

Dated:  December 9, 2022          **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

2

APP_348

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | |
| vs. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | |
| Defendants | |

## BRIEF IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## RESPONSE TO "RENEWED" MOTION TO WITHDRAW THE REFERENCE

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

APP_349

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 2

ARGUMENT ......................................................................................................... 6

    I.      There is No Basis for Mandatory Withdrawal of the Reference ........................... 6

        a.    The Motion Is Untimely and Should Be Denied .................................... 7

        b.    The Renewed MTD Does Not Require "Substantial and Material
             Consideration" of Significant Federal Laws........................................... 9

        c.    Plaintiffs Cite No Applicable Case Law............................................... 14

        d.    Plaintiffs' Additional Arguments Are Meritless.................................... 15

    II.     The Court Has "Core" Jurisdiction to Adjudicate the Complaint........................ 16

CONCLUSION..................................................................................................... 18

i

## TABLE OF AUTHORITIES

### CASES

*Affco Invs. 2001 LLC v. Proskauer Rose L.L.P.*,
    625 F.3d 185 (5th Cir. 2010) ........................................................................... 13

*Belmont v. MB Inv. Partners, Inc.*,
    708 F.3d 470 (3d Cir. 2012) ............................................................................ 14

*Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*,
    485 B.R. 604 (Bankr. W.D. Wash. 2013) ......................................................... 12

*Carter v. Schott (In re Carter Paper Co.)*,
    220 B.R. 276 (Bankr. M.D. La. 1998) .............................................................. 15

*Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*
*(In re Highland Cap. Mgmt., L.P.)*,
    2022 Bankr. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022) ........................... passim

*City of N.Y. v., Exxon Corp.*,
    932 F.2d 1020 (2d Cir. 1991) ............................................................................ 7

*Connolly v. Bidermann Indust. U.S.A., Inc.*,
    1996 U.S. Dist. LEXIS 8059 (S.D.N.Y. June 13, 1996) ................................... 7

*Corwin v. Marney, Orton Inv.*,
    788 F.2d 1063 (5th Cir. 1986) ......................................................................... 11

*Drew v. WorldCom, Inc.*,
    2006 U.S. Dist. LEXIS 52318 (S.D.N.Y. July 26, 2006) .................................. 8

*Dugaboy Inv. Tr. v. Highland Cap Mgmt., L.P.*,
    2022 U.S. Dist. LEXIS 172351 (N.D. Tex. Sept. 22, 2022) ............................ 10

*Goldstein v. SEC*,
    451 F.3d 873 (D.C. Cir. 2006) ..................................................................... 9, 10

*Gupta v. Quincy Med. Ctr.*,
    585 F.3d 657 (1st Cir. 2017) ........................................................................... 17

*Harpole Constr., Inc. v. Medallion Midstream, LLC (In re Harpole Constr., Inc.)*,
    565 B.R. 193 (Bankr. D. N.M. 2017) .............................................................. 15

*Holzhueter v. Groth (In re Holzhueter)*,
    571 B.R. 812 (Bankr. W.D. Wis. 2017) ........................................................... 12

*Hupp v. Educ. Credit Mgmt. Corp.*,
    2007 U.S. Dist. LEXIS 68199 (S.D. Cal. Sept. 13, 2007) ................................ 8

*In re AI Copeland Enters., Inc.*,
    991 F.2d 233 (5th Cir. 1993) ........................................................................... 16

*In re Colo. Place L.P.*,
    2002 Bankr. LEXIS 2000 (Bankr. N.D. Tex. Feb. 5, 2002) ............................ 17

*In re Fresh Approach, Inc.*,
    51 B.R. 412 (Bankr. N.D. Tex. 1985) ............................................................... 7

APP_351

*In re Harrah's Entertainment*,
  1996 U.S. Dist. LEXIS 18097 (E.D. La. Nov. 26, 1996) ........................................ 13

*In re Highland Cap. Mgmt., L.P.*,
  2021 Bankr. LEXIS 2074 (Bankr. N.D. Tex. Aug. 3, 2021),
  *aff'd* 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022) ............................ 3

*In re Nat'l Gypsum*,
  14 B.R. 188 (N.D. Tex. 1991) ................................................................................ 6

*In re New York Trap Rock Corp.*,
  158 BR 574 (S.D.N.Y. 1993) ................................................................................ 8

*In re Pilgrim's Pride Corp.*,
  453 B.R. 691 (Bankr. N.D. Tex. 2011) .................................................................. 17

*In re Rickel & Assoc., Inc.*,
  2003 U.S. Dist. LEXIS 23136 (S.D.N.Y. Dec. 24, 2003) ...................................... 8

*In re SGS Studio, Inc.*,
  256 B.R. 580 (Bankr. N.D. Tex. 2000) .................................................................. 17

*In re Taco Bueno Rests., Inc.*,
  606 B.R. 289 (Bankr. N.D. Tex. 2019) .................................................................. 17

*In re UAL Corp.*,
  386 B.R. 701 (Bankr. N.D. Ill. 2008) .................................................................... 15

*In re Vicars Ins. Agency, Inc.*,
  96 F.3d 949 (7th Cir. 1996) .................................................................................. 7

*In re Weblink Wireless, Inc.*,
  2003 Bankr. LEXIS 2312 (Bankr. N.D. Tex. Mar. 12, 2003) ................................ 17

*Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.)*,
  2015 U.S. Dist. LEXIS 74006 (D. Me. June 8, 2015) .......................................... 15

*King v. Skolness (In re King)*,
  624 B.R. 259 (Bankr. N.D. Ga. 2020) .................................................................. 12

*Kirschner v. Dondero (In re Highland Cap. Mgmt., L.P.)*,
  2022 Bankr. LEXIS 1028 (Bankr. N.D. Tex. Apr. 6, 2022) .................................. 6

*Laird v. Integrated Res., Inc.*,
  897 F.2d 826 (5th Cir. 1990) ................................................................................ 10

*Langenkamp v. Culp*,
  498 U.S. 42 (1990) ................................................................................................ 15

*Living Benefits Asset Mgmt. v. Kestrel Aircraft Co. (In re Living Benefits Asset Mgmt.)*,
  587 B.R. 311 (N.D. Tex. 2018, *aff'd* 916 F.3d 528 (5th Cir. 2019) ...................... 12

*Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*,
  2009 U.S. Dist. LEXIS 102134 (N.D. Tex. Oct. 1, 2009),
  *aff'd* 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009) ............................ 7

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*,
  651 F.3d 268 (2d Cir. 2011) ................................................................................ 13

*Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.)*,
    931 F.3d 432 (5th Cir. 2019) .................................................................................... 16

*NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.*,
    48 F.4th 419 (5th Cir. 2022) ...................................................................................... 3

*NexPoint Diversified Real Es. Tr. v. Acis Cap. Mgmt., L.P.*,
    2022 U.S. Dist. LEXIS 142029 (S.D.N.Y. Aug. 9, 2022) ........................................ 11

*Omega Overseas, Ltd. v. Griffith*,
    2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014) ........................................ 11

*Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.)*,
    256 B.R. 712 (Bankr. N.D. Tex. 2000) ..................................................................... 17

*Reading Co. v. Brown*,
    391 U.S. 471 (1968) ............................................................................................ 16, 17

*Robare Grp., Ltd. v. SEC*,
    992 F.3d 468, 472 (D.C. Cir. 2019) ......................................................................... 10

*SEC v. Cap. Gains Rsch. Bureau, Inc.*,
    375 U.S. 180 (1963); ............................................................................................... 10

*SEC v. Northshore Asset Mgmt.*,
    2008 U.S. Dist. LEXIS 36160 (S.D.N.Y. May 5, 2008) ........................................... 9

*SEC v. Trabulse*,
    526 F.Supp.2d 1008 (N.D. Cal. 2007) ....................................................................... 9

*Sec. Farms v. Int'l Bhd. of Teamsters*,
    124 F.3d 999, 1007 (9th Cir. 1997) ........................................................................... 7

*Tillman Enters., LLC v. Horlbeck (In re Horlbeck)*,
    589 B.R. 818 (Bankr. N.D. Ill. 2018) ....................................................................... 12

*Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*,
    258 F.3d 385 (5th Cir. 2001) .................................................................................... 16

*Tradex Glob. Master Fund SPC, Ltd. v. Pui-Yun Chui (In re Pui-Yun Chui)*,
    538 B.R. 793 (Bankr. N.D. Cal. 2015) ..................................................................... 12

*Transamerica Mortg. Advisors v. Lewis*,
    444 U.S. 11 (1979) ................................................................................................... 11

**STATUTES**

11 U.S.C. § 503(b)(1)(A) ............................................................................................... 16

11 U.S.C. § 523(a)(19) .................................................................................................... 12

18 U.S.C.A. § 1964(c) .................................................................................................... 13

28 U.S.C § 157(d) ................................................................................................... passim

28 U.S.C. § 1334 ............................................................................................................ 17

28 U.S.C. § 157 ........................................................................................................... 4, 7

28 U.S.C. § 157(b) .......................................................................................................... 17

**OTHER AUTHORITIES**

9 COLLIER ON BANKRUPTCY ¶ 5011.01[2] ......................................................................... 7

*Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No.
   IA-5248; File No. S7-07-18 (July 12, 2019) ........................................................... 10

*Prohibition on Fraud by Advisers to Certain Pooled Investment Vehicles*, Release No. IA-2628;
   File No. S7-25-06 (Aug. 3, 2007) .............................................................................. 9

DOCS_NY:46770.8 36027/003

APP_354

Highland Capital Management, L.P., a defendant in the above-captioned adversary proceeding ("Highland"), hereby submits this brief in support of its response (the "Response") to the *Renewed Motion to Withdraw the Reference* [D.I. 128] (the "Motion") filed by plaintiffs The Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLOH," and together with DAF, "Plaintiffs").[2]  In opposition to the Motion, Highland states as follows:

## PRELIMINARY STATEMENT[3]

1.      This Court should deny Plaintiffs' Motion because it is yet another attempt to forum shop, delay adjudication, and waste judicial and estate resources.

2.      On April 12, 2021, Plaintiffs commenced this action in the District Court by filing its (baseless) Complaint.  After Highland moved to enforce the reference, Plaintiffs cross-moved for a ruling that mandatory withdrawal of the reference was required under 28 U.S.C § 157(d) and that enforcing the reference would therefore be pointless.   On September 29, 2021, notwithstanding Plaintiffs' cross-motion, the District Court enforced the reference and sent this matter to this Court for adjudication.

3.      After referral, Plaintiffs pressed their Stay Motion, and on November 18, 2021, stated that, if their request for a stay were denied, they would file a motion for mandatory withdrawal of the reference.  Plaintiffs' Stay Motion was denied, but Plaintiffs, for unknown reasons, did not move to withdraw the reference at that time.

4.      Now, a year after the hearing on the Original MTD and after resolution of Plaintiffs' appeal of the MTD Order, Plaintiffs filed the Motion to withdraw the reference under 28 U.S.C. § 157(d).  The Motion is untimely.  The Complaint was referred to this Court in September 2021.

---

[2] Concurrently herewith, Highland is filing its *Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference* (the "Appendix").  Citations to the Appendix are as follows:  Ex. #, Appx. #.

[3] All capitalized used but not defined in this Preliminary Statement have the meanings given to them below.

Plaintiffs could have filed a motion to withdraw at that time; they did not and instead adjudicated the Original MTD on the merits in this Court.  The MTD Order was remanded in early September 2022.  Plaintiffs could have filed a motion to withdraw at that time; they did not.  Instead, Plaintiffs waited to file the Motion until a month after Highland filed the Renewed Motion and after all parties had expended significant resources adjudicating the matter in this Court.  The Motion also fails on the merits.

5.      **_First_**, the Complaint does not require substantial and material consideration of non-bankruptcy federal law.  Notwithstanding that, Plaintiffs argue mandatory withdrawal is necessary so that the District Court, not this Court, can resolve four fundamental issues: (a) whether Highland owe Plaintiffs a fiduciary duty under the IAA; (b) the scope of such duty and whether breached; (c) remedies and damages for any breach; and (d) whether a violation of the IAA can be a predicate act under RICO.  But the foregoing allegations only require application of well-settled federal law, including law from the Supreme Court.  None warrant withdrawal.

6.      **_Second_**, the Bankruptcy Court has jurisdiction to adjudicate the Complaint. The facts underlying the Complaint arose **_after_** the Petition Date but **_prior_** to confirmation from Highland's ordinary course operation of its estate.  Assuming a viable claim exists, it would be an "administrative expense claim," and this Court has core jurisdiction to adjudicate administrative expense claims.

7.      Ultimately, the Motion is another waste of judicial and estate resources and should be denied as untimely, prejudicial to Highland, and meritless.

## **BACKGROUND**

8.      On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

APP_356

9.     On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (the "Plan").  The Plan became effective on August 11, 2021 [Bankr. Docket No. 2700] (the "Effective Date").[4]

10.     Pursuant to the Plan, this Court expressly retained jurisdiction to "allow, disallow, determine, liquidate … any Claim … including, without limitation, the resolution of any request for payment of any Administrative Expense Claim …."  Plan, Art. XI.[5]

11.     On April 12, 2021, Plaintiffs filed their *Original Complaint* [D.I. 1] (the "Complaint") in the U.S. District Court for the Northern District of Texas (the "District Court"), in which they alleged that the Bankruptcy Court approved settlement with HarbourVest somehow violated the contractual and extra-contractual duties Highland purportedly owed (i) to CLOH as an investor in Highland CLO Funding, Ltd. ("HCLOF") and (ii) to DAF as an advisee under an investment management agreement.  Complaint ¶¶ 56-112.[6]  Highland's alleged misconduct in settling the HarbourVest claim occurred during the last quarter of 2020 and the first quarter of

---

[4] On September 8, 2022, the U.S. Court of Appeals for the Fifth Circuit affirmed, in material part, the Confirmation Order's factual findings and legal conclusions. *NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022).

[5] The Plan defines "Administrative Expense Claim," in relevant part, as a:

Claim for costs and expenses of administration of the Chapter 11 Case … pursuant to sections 503(b), 507(a)(2), 507(b) … including … (a) the actual and necessary costs and expense incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor ….

Plan, Art I.B.2.

[6] Plaintiffs subsequently sought to add Mr. Seery as a defendant in violation of two orders entered by this Court. Plaintiffs' actions resulted in this Court holding Plaintiffs, among others, in contempt. *In re Highland Cap. Mgmt., L.P.*, 2021 Bankr. LEXIS 2074 (Bankr. N.D. Tex. Aug. 3, 2021), *aff'd* 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022).  The contempt order was affirmed by the District Court, but Plaintiffs have, of course, appealed to the Fifth Circuit.

2021, *i.e.* after the Petition Date but before the Effective Date while Highland was a debtor-in-possession. *Id.* ¶¶ 29-54.

12.     On May 19, 2021, Highland moved for an order to enforce the standing order of reference (Misc. Order No. 33) [D.I. 22] (the "Motion to Enforce") in the District Court arguing that the Complaint asserted claims arising in, arising under, or related to Title 11 and Highland's bankruptcy case.

13.     On May 27, 2021, Highland moved to dismiss the Complaint [D.I. 26] (the "Original MTD").  The Original MTD was fully briefed to the District Court.

14.     On June 29, 2021, Plaintiffs filed their response to the Motion to Enforce [D.I. 36] in which they cross-moved, arguing the Motion to Enforce should be denied because the claims in the Complaint were subject to mandatory withdrawal of the reference, could not be adjudicated in this Court, and that granting the Motion to Enforce would therefore be pointless.  The arguments in Plaintiffs' cross-motion are identical to those in the Motion.

15.     On August 26, 2021, Plaintiffs filed a motion in the District Court to stay all proceedings pending appeal of the Confirmation Order [D.I. 55] (the "Stay Motion"), arguing that the Plan injunction somehow prohibited the prosecution of the Complaint.  The Stay Motion was fully briefed to the District Court.

16.     On September 20, 2021, the District Court—notwithstanding Plaintiffs' cross-motion—granted the Motion to Enforce [D.I. 1] and referred this case to this Court, including the Original MTD, "[p]ursuant to 28 U.S.C. § 157 … to be adjudicated as a matter related to the … Bankruptcy of Highland Capital Management, L.P."  This Court docketed the proceeding and set a hearing for November 23, 2021, on both the Original MTD and Stay Motion.

17.     On November 18, 2021, five days before the scheduled hearing, Plaintiffs filed—without leave of this Court[7]—an amended motion to stay the proceedings [D.I. 69] and attached a draft motion to withdraw the reference [D.I. 69-1] (the "Proposed Motion").  Plaintiffs said they would file the Proposed Motion if this Court denied the Stay Motion.

18.     At the November 23 hearing, this Court denied the Stay Motion from the bench,[8] finding Plaintiffs' arguments "reflect[ed] frankly, a misunderstanding of how the injunction language … applies here"[9] and that the injunction did not prevent litigation of the Complaint in this Court.  Subsequently, Plaintiffs argued the merits of the Original MTD, including their alleged claims under the Investment Advisers Act (the "IAA") and RICO, to this Court.[10]  Plaintiffs, for reasons known only to them, never filed the Proposed Motion.

19.     On March 11, 2022, this Court granted the Original MTD [D.I. 100] (the "MTD Order") and dismissed the Complaint with prejudice.  *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022).  Plaintiffs appealed the MTD Order to the District Court and that appeal was consolidated with Plaintiffs' appeal of this Court's denial of the Stay Motion.  *See* 3:21-cv-03129-B, Docket No. 20 (N.D. Tex. Jun. 17, 2022).  Both appeals were fully briefed to the District Court. Plaintiffs did not raise 28 U.S.C. § 157(d) in the appeals or otherwise argue that this Court lacked jurisdiction to have entered the MTD Order.

---

[7] Ex. 1, Appx. 12 ("I will say that these last-minute amended motions are not going to be tolerated …. Your firm has already been sanctioned once in this adversary proceeding …. So, you know, I'm just kind of baffled why you would take a chance filing an amended motion without leave or somehow getting it to the attention of the Court or running it by the other parties for their consent to you doing it.")

[8] A formal order denying the Stay Motion was entered on December 7, 2021 [D.I. 81].

[9] Ex. 1, Appx. 30.

[10] Ex. 1, Appx. 65-97.

DOCS_NY:46770.8 36027/003

APP_359

20.     On September 2, 2022, the District Court remanded the MTD Order to this Court for further proceedings.  *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162, 166 (N.D. Tex. 2022).  The District Court, in the same opinion, affirmed this Court's denial of the Stay Motion.  *Id.* at 24-28.

21.     On October 14, 2022, Highland filed its renewed motion to dismiss [D.I. 122] (the "Renewed MTD").  Plaintiffs responded to the Renewed MTD on November 18, 2022 (the "Response") but did not include a statement regarding their consent to entry of final orders or judgments as required by Federal Rule of Bankruptcy Procedure 7012(b).

22.     On November 18, 2022, only after the parties expended significant resources adjudicating the Complaint in this Court did Plaintiffs file the Motion seeking mandatory withdrawal of the reference.  Although the Motion is styled as a "renewed" motion, it renews nothing.

## **ARGUMENT**

## I.     **There is No Basis for Mandatory Withdrawal of the Reference**

23.     Under 28 U.S.C. § 157(d), a district court "shall, ***on timely motion*** of a party, so withdraw a proceeding if … resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d) (emphasis added).  Assuming a timely motion, mandatory withdrawal is warranted only if a matter requires "substantial and material consideration" and "significant interpretation of federal laws[,]" rather than a "straightforward application of a federal statute to a particular set of facts."  *In re Nat'l Gypsum*, 14 B.R. 188, 192-93 (N.D. Tex. 1991); *Kirschner v. Dondero (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 1028, at *27-28 (Bankr. N.D. Tex. Apr. 6, 2022) (same).

APP_360

24.    Simply asserting federal law is insufficient and mandatory withdrawal only applies when a matter requires something "more than mere application of existing law to new facts." *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 953-54 (7th Cir. 1996); *City of N.Y. v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) (mandatory withdrawal requires "significant interpretation, as opposed to simple application, of federal laws"). "[M]andatory withdrawal is to be applied narrowly" to "prevent 157(d) from becoming an 'escape hatch.'" *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009), *aff'd* 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009).

### a.    *The Motion Is Untimely and Should Be Denied*

25.    A motion to withdraw the reference may only be granted if it is "timely." 28 U.S.C. § 157(d). Section 157(d) does not define "timely," but it has been interpreted as requiring a motion be made at the first reasonable opportunity. *See In re Fresh Approach, Inc*., 51 B.R. 412, 415-16 (Bankr. N.D. Tex. 1985) (finding a motion to withdraw the reference untimely when filed sixteen days after the court entered its decision on the matter); *see also Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1007, n.3 (9th Cir. 1997). ("A motion to withdraw is timely 'if it was made as promptly as possible in light of the developments in the bankruptcy proceeding.'"); *Connolly v. Bidermann Indust. U.S.A., Inc.,* 1996 U.S. Dist. LEXIS 8059, at *8 (S.D.N.Y. June 13, 1996) ("Plaintiff's delay of over eight months renders her motion untimely, and as such it does not meet the threshold requirement set forth in 28 U.S.C. § 157(d)."); 9 COLLIER ON BANKRUPTCY ¶ 5011.01[2] ("[M]otions for mandatory withdrawal must be made as soon as it is apparent that it is necessary for the district court to hear the proceeding").

26.    Failure to timely move for mandatory withdrawal is dispositive, especially when that delay would prejudice the non-movant or is an attempt to delay or forum shop. *See Fresh Approach,* 51 B.R. at 415 ("[A] motion to withdraw reference should not be used as a vehicle to

APP_361

protract litigation and delay controversies.  'If a motion for withdrawal of reference is not timely

made, it will almost certainly be held that the provisions of the second sentence of section 157(d)

have been waived.'") (citations omitted); *see also Hupp v. Educ. Credit Mgmt. Corp*., 2007 U.S.

Dist. LEXIS 68199, at *8-10 (S.D. Cal. Sept. 13, 2007) ("Courts have found a motion to withdraw

the reference untimely when a significant amount of time has passed since the moving party had

notice of grounds for withdrawing the reference or where the withdrawal would have an adverse

effect on judicial economy"); *Drew v. WorldCom, Inc.*, 2006 U.S. Dist. LEXIS 52318, at *8-9

(S.D.N.Y. July 26, 2006) (denying motion to withdraw reference filed eighteen months after

objection to claim, noting "there is no legitimate justification for the length of the delay in this

case," and "the timing of [movants'] motion gives rise to a strong inference that he is attempting

to forum shop").[11]

27.      Here, the Motion is untimely and can only be interpreted as an attempt to forum

shop, delay adjudication, and waste judicial and estate resources.  The Complaint was referred to

this Court on September 20, 2021.  Plaintiffs did not file a motion to withdraw at that time

(although they threatened to file the Proposed Motion), and consequently the parties spent

considerable time and resources adjudicating the MTD Order in this Court on the merits in

November 2021.  Subsequently, the parties spent more time and resources adjudicating the appeal

of the MTD Order.  The MTD Order was remanded to this Court on September 2, 2021.  But

Plaintiffs did not file the Motion until November 18, 2022, after Highland spent more time and

---

[11] *In re Rickel & Assoc., Inc.*, 2003 U.S. Dist. LEXIS 23136, *6 (S.D.N.Y. Dec. 24, 2003) (finding motion to withdraw reference untimely where "the bankruptcy court had devoted substantial resources to the claim," and "defendants [] seek to retrace in the district court substantially the same journey previously taken in the bankruptcy court," noting "the potential prejudice … of having a case dislodged from its steady progression in the bankruptcy court's calendar to be placed on that of the district court."); *In re New York Trap Rock Corp.*, 158 BR 574, 577 (S.D.N.Y. 1993) (finding untimely a motion to withdraw reference filed after a "short" period of three months where "time span was rich with events," and the circumstances strongly indicated forum shopping—"[f]orum shopping efforts pursued by awaiting a decision relevant to the merits and then bypassing or filing a motion to transfer should not be rewarded with success.").

DOCS_NY:46770.8 36027/003

resources briefing and filing the Renewed MTD.  Instead of timely filing a motion to withdraw the
reference, Plaintiffs allowed Highland (and this Court) to expend substantial time, effort, and
money briefing and arguing this case ***in this Court***.  Plaintiffs' belated attempt to now have the
case adjudicated in the District Court is impermissible.  The Motion is untimely and prejudicial to
Highland.  It should be denied on that basis alone.

> **b.**     ***The Renewed MTD Does Not Require "Substantial and Material Consideration"
> of Significant Federal Laws***

28.     Even if the Motion were timely (it is not), the Complaint does not require
"substantial and material consideration" and "significant interpretation of federal laws."  Plaintiffs
attempt to bootstrap themselves into this stringent standard by exaggerating the complexity of their
baseless claims.  But, their claims are simple:  (a)(i) did Highland owe Plaintiffs a fiduciary duty
under the IAA; (ii) what was the nature of that duty and was it violated; and (iii), if violated, what
are the remedies and potential damages and (b) is the alleged securities fraud a predicate act under
RICO?  These are not difficult questions or outside this Court's expertise.

29.     **Fiduciary Duty under the IAA.**  It is well-settled that Section 206 of the IAA
creates a fiduciary duty to an investment adviser's "client" (*i.e.* the person or entity that is the
counterparty to the investment management agreement) but not to an underlying investor in the
"client." *Goldstein v. SEC*, 451 F.3d 873, 881(D.C. Cir. 2006) ("The adviser owes fiduciary duties
only to the fund [*i.e.*, the client], not to the fund's investors … If the investors are owed a duty and

DOCS_NY:46770.8 36027/003

APP_363

the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.")[12]

30.      HCLOF is a fund managed by Highland HCF Advisors, Ltd. ("HCFA"), a Highland subsidiary.  CLOH is an investor in HCLOF; DAF is not.  Highland's and HCFA's duties do not run to investors in HCLOF, just to HCLOF itself.  Highland has never had a management agreement or client relationship with CLOH and owes it no fiduciary or other duty.  Highland, at all relevant times, was party to a management agreement with DAF and owed DAF certain duties under that agreement.[13]  This analysis is not complicated and only requires a straightforward application of settled law.

31.      **The Scope of the Fiduciary Duty and Breach.**  An adviser's fiduciary duty is satisfied by disclosure.  "To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship."  *See Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18 (July 12, 2019), Ex. 4, Appx. 170-71.  The law is well-established; includes Supreme Court jurisprudence; is not based solely on interpretation of SEC releases; and was recently opined on by the District Court in one of Mr. Dondero's numerous appeals of this Court's orders.  *See, e.g., SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191-92 (1963); *Laird v. Integrated Res., Inc.*, 897 F.2d 826, 831-36 (5th Cir. 1990); *Robare Grp., Ltd. v. SEC*, 992 F.3d 468, 472 (D.C. Cir. 2019); *Goldstein*, 451 F.3d at 881; *Dugaboy Inv. Tr. v. Highland Cap Mgmt., L.P.*, 2022 U.S. Dist.

---

[12] *See also SEC v. Northshore Asset Mgmt.*, 2008 U.S. Dist. LEXIS 36160, at *18-20 (S.D.N.Y. May 5, 2008) (dismissing a claim that an investment adviser owed a duty to a fund's investors rather than just the fund); *SEC v. Trabulse*, 526 F.Supp.2d 1008, 1016 (N.D. Cal. 2007) (same); *Prohibition on Fraud by Advisers to Certain Pooled Investment Vehicles*, Release No. IA-2628; File No. S7-25-06 (Aug. 3, 2007), Ex. 2, Appx. 119 (Rule 206(4)-8 "does not create under the Advisers Act a fiduciary duty to investors or prospective investors in a pooled investment vehicle not otherwise imposed by law").

[13] Highland and DAF entered into that certain *Second Amended and Restated Investment Advisory Agreement*, effective from January 1, 2017 (the "DAF Agreement").  Ex. 3, Appx. 126-48.  The DAF Agreement terminated on February 28, 2021.

DOCS_NY:46770.8 36027/003

APP_364

LEXIS 172351, at *10-11 (N.D. Tex. Sept. 22, 2022).  Adjudicating this issue only requires

determining if appropriate disclosures were made (which they were).[14]

32.  **Remedies for Breach of Duty.**  Assuming, *arguendo*, that Highland breached its

fiduciary duty to DAF under the IAA, under clear Supreme Court precedent, there is no private

right of action for such breach under Rule 206 of the IAA.  *Transamerica Mortg. Advisors v. Lewis*,

444 U.S. 11, 13-14 (1979) ("[W]e hold there exists a limited private remedy under the Investment

Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other

private causes of action, legal or equitable [on a client]").[15]  There is no unsettled federal law.[16]

33.  **Bankruptcy Courts Apply the IAA.**  Finally, bankruptcy courts routinely analyze

federal securities laws.  In fact, this Court reviewed Plaintiffs' claims earlier this year although it

did not rule on them.  *Charitable DAF Fund*, 2022 Bankr. LEXIS 659, at *39-40 ("[This Court]

---

[14] Exhibit A to the DAF Agreement includes pages of disclosures, including the following: (1) "[Highland] … is [not] precluded from engaging in or owning an interest in. . . investment activities of any kind, whether or not such ventures are competitive with [DAF]" and (2) "[Highland] … may actively engage in transactions in the same securities sought by [DAF] and, therefore, may compete with [DAF] for investment opportunities or may hold positions opposite to positions maintained by [DAF]." Ex. 3, Appx. 142-43.

[15] *See also Corwin v. Marney, Orton Inv*., 788 F.2d 1063, 1066 (5th Cir. 1986) (affirming dismissal of claims under the Advisers Act "because the investors had no private causes of action"); *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 2780, at *13 n.23 ("the court notes that the … Supreme Court has held [in *Transamerica*] that there is not a private right of action for damages under the IAA."); *NexPoint Diversified Real Es. Tr. v. Acis Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 142029, at *9-10 (S.D.N.Y. Aug. 9, 2022) ("[U]nder the IAA … there is no private right of action to bring a claim pursuant to [Section 206 of the IAA].").

[16] Plaintiffs alleged, for the first time, in their Response to the Renewed MTD that "Section 215 [of the IAA] recognizes a limited private right of action for equitable relief" (even though Section 215 is not mentioned in the Complaint).  Response at 12.  Plaintiffs do not mention Rule 215 in the Motion but will presumably argue it is a basis for mandatory withdrawal of the reference.  It is not.  First, Rule 215 was not pled in the Complaint and cannot be the basis for withdrawal—there is no claim to withdraw.  Second, Rule 215 imposes no fiduciary duty of any kind but simply provides, under clear Supreme Court precedent, "a limited private remedy … to void an investment advisers contract, but … confers no other private causes of action, legal or equitable." *Transamerica*, 441 U.S. at 24; *see also Corwin*, 788 F.2d at 1066 ("The Investors seek damages, not the voiding of an investment advisers contract, and there is no such private cause of action based on [Section 215]").  That remedy applies only when an advisory agreement was made in violation of any provision of the IAA, not for subsequent breaches.  *NexPoint* , 2022 U.S. Dist. LEXIS 142029, at *10 (Section 215 "'voids a contract only where the contract would be invalid under that principle—that is, where the contract was made illegally or requires illegal performance.'") (quoting *Omega Overseas, Ltd. v. Griffith*, 2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014)).  Here, the contours of Rule 215 (and its lack of applicability to the Complaint) are well-settled and will only require the application of that settled case law to the facts of this case.

DOCS_NY:46770.8 36027/003

APP_365

will forego addressing the other arguments of Highland …. While this court is inclined to agree with those arguments, the court will refrain from addressing them until such time as any higher court may instruct this court to address them.")  Further, Highland was heavily involved in the bitterly contested bankruptcy of Acis Capital Management, L.P. ("Acis").  *In re Acis Cap. Mgmt., L.P.*, *et al*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2019).  In *Acis*, Highland (then controlled by Mr. Dondero) brought claims ***in this Court*** alleging Acis was liable to Highland for breach of fiduciary duties under the IAA—nearly identical claims to those in the Complaint.  Ex. 5, Appx. 205-06.

34.     Moreover, 11 U.S.C. § 523(a)(19) requires bankruptcy courts to determine if there were violations of "federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934) …"[17] in connection with discharge.  As part of this analysis, bankruptcy courts look to, among other things, the applicability of the IAA.  *See, e.g., Tillman Enters., LLC v. Horlbeck (In re Horlbeck)*, 589 B.R. 818, 832 (Bankr. N.D. Ill. 2018) ("bankruptcy courts have jurisdiction to determine liability on an underlying securities claim for purposes of § 523(a)(19)" and "liability under § 523(a)(19) cannot be supported by an alleged violation" of the Advisers Act as there is no private remedy or "actionable claim"); *Tradex Glob. Master Fund SPC, Ltd. v. Pui-Yun Chui (In re Pui-Yun Chui)*, 538 B.R. 793, 806-08 (Bankr. N.D. Cal. 2015) (same).[18] Bankruptcy court analysis of the IAA, however, is not limited to Section 523(a)(19).  *See Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*, 485 B.R. 604 (Bankr. W.D. Wash. 2013)

---

[17] Section 3(a)(47) of the Securities Exchange Act of 1934 (the "Exchange Act") defines "securities laws" as "the Securities Act of 1933 (15 U.S.C. 78a et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), the Sarbanes-Oxley Act of 2002, the Trust Indenture Act of 1939 (15 U.S.C. 77aaa et seq.), the Investment Company Act of 1940 (15 U.S.C. 80a-1 et seq.), ***the Investment Advisers Act of 1940*** (15 U.S.C. 80b et seq.), and the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa, et seq.)" (emphasis added).

[18] *See also King v. Skolness (In re King)*, 624 B.R. 259, 301 (Bankr. N.D. Ga. 2020) (bankruptcy court could determine liability under state and federal securities laws for purposes of § 523(a)(19)); *Holzhueter v. Groth (In re Holzhueter)*, 571 B.R. 812, 822-24 (Bankr. W.D. Wis. 2017) (same).

DOCS_NY:46770.8 36027/003

APP_366

(dismissing complaint alleging that defendant owed a fiduciary duty to an investor under the IAA for failure to state a claim); *Living Benefits Asset Mgmt. v. Kestrel Aircraft Co. (In re Living Benefits Asset Mgmt.),* 587 B.R. 311, 317-20 (N.D. Tex. 2018) (affirming bankruptcy court's rulings under the IAA), *aff'd* 916 F.3d 528 (5th Cir. 2019); *In re Acis Cap. Mgmt. L.P., et al.*, Case No. 18-30264-sgj11, D.I. 549 (Bankr. N.D. Tex. Sept. 4, 2018) (Ex. 6, Appx. 228-30) (finding the IAA did not prohibit assumption of a management agreement under Section 365).

35.    **The IAA Cannot Be a RICO Predicate**:    Plaintiffs allege that determining whether securities fraud can be a predicate act under RICO requires mandatory withdrawal. Motion ¶ 12.   This argument also fails.    ***First***, Plaintiffs concede they have no RICO claim. Response at 23.   Consequently, it should not be a basis for withdrawal of the reference.   ***Second***, RICO, by its terms, expressly excludes securities fraud as a predicate act.   18 U.S.C.A. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO].")[19]   Because Plaintiffs' RICO claim is premised on an alleged securities fraud, it is barred by the express language of the RICO statute. *See, e.g., MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 273-80 (2d Cir. 2011) (barring RICO claims arising out of the operation of a Ponzi scheme because they involved a purchase or sale of a security despite no private right of action existing); *Affco Invs. 2001 LLC v. Proskauer Rose L.L.P.*, 625 F.3d 185, 189-91 (5th Cir. 2010) (same).   There is no unsettled question of federal law warranting mandatory withdrawal.

---

[19] *See also* H.R. Rep. No. 104-369, at 47 (1995) ("The Committee intends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action. In addition, the . . . Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.")

### c. *Plaintiffs Cite No Applicable Case Law.*

36.     Plaintiffs' only citations to support their arguments are to two factually inapposite cases. ***First***, they cite *In re Harrah's Entertainment*, 1996 U.S. Dist. LEXIS 18097 (E.D. La. Nov. 26, 1996), which has nothing to do with the IAA.  *Harrah's* involved a class action arising from the issuance of $435 million in publicly traded debt; claims that the prospectus violated the Exchange Act; and attempts to hold the issuer's partners liable for the issuer's actions under the Exchange Act. The district court ruled that mandatory withdrawal applied because of the foregoing factors, none of which apply here.  There is no public issuance; no retail investors; no class action; no derivative liability; no applicability of the Exchange Act; and no complicated factual analysis. Plaintiffs' IAA claims require only the straightforward application of settled law to the facts in a dispute between two private parties.

37.     ***Second***, Plaintiffs cite *Belmont v. MB Investment Partners, Inc.*, 708 F.3d 470 (3d Cir. 2012), for the proposition that there is "considerable 'confusion'" because "federal law (the IAA) provides, 'the duty and the standard to which investment advisers are to be held,' but 'the cause of action is presented as springing from state law.'"  Motion ¶ 13.  *Belmont* confirms no private right of action exists under the IAA.  *Belmont*, 708 F.3d at 502.  The only "confusion" noted in *Belmont* is if ***state, not federal, law*** creates a private right.  *Id.* (finding the lack of private rights in the IAA "ought to call into serious question whether a limitation in federal law can be circumvented simply by hanging the label 'state law' on an otherwise forbidden federal law claim" but recognizing split on state law claims).  But Plaintiffs have not pled a state law claim, and an unpled claim is irrelevant—there is nothing to withdraw under 28 U.S.C. § 157(d).  Further, section 157(d) requires mandatory withdrawal only ***if material federal law is implicated***; state law claims—even properly pled ones—are not a basis for mandatory withdrawal.

DOCS_NY:46770.8 36027/003

### d.    *Plaintiffs' Additional Arguments Are Meritless.*

38.    Plaintiffs' allege two additional arguments to support mandatory withdrawal.  ***First***,

Plaintiffs argue the District Court needs to assess whether a breach of fiduciary duty claim "can

be terminated by a blanket injunction in a bankruptcy plan."  Motion ¶ 8. But Plaintiffs have been

told **three times** that the Plan's injunction does not prevent Plaintiffs' prosecution of their alleged

IAA claims so long as they are prosecuted in this Court—twice by this Court and once by the

District Court.[20]  ***Second***, Plaintiffs' jury trial waiver argument is premature and irrelevant.  DAF

affirmatively waived its jury trial right in the DAF Agreement (Ex. 3, Appx. 138),[21] but neither

Plaintiff has a jury trial right having availed themselves of the equitable jurisdiction of this Court.[22]

And, importantly for the Motion, Highland has not yet moved to strike Plaintiffs' jury trial

demand.[23]  Accordingly, Plaintiffs' request to withdraw the reference on the jury trial question is

---

[20] Ex. 1, Appx. 30 ("I just don't think that you have shown that … the injunction provisions of the plan somehow tie your hands in arguing the 12(b)(6) motion, defending against the 12(b)(6) motion today or I just think that your arguments reflect, frankly, a misunderstanding of how the injunction language … applies here."); Ex. 7, Appx. 261 (responding to DAF's assertion that it could not prosecute a claim for an IAA breach of fiduciary duty because of the Plan injunction "THE COURT:  Why not?  Why not?  Why not?  There is nothing that would have precluded you from filing a request for allowance of administrative claim."); *Charitable DAF*, 643 B.R. at 176-77 ("The bankruptcy court found the Plan's injunction … did not prevent [DAF] from pursuing its causes of action. … [T]he bankruptcy court held that Charitable DAF could continue to litigate its cause of action and the Court agrees. … Just like the bankruptcy court, this Court does not see how the injunction … prohibit[s] [DAF] from participating [in litigating the Complaint] … [and] [DAF] continued to participate by responding to HCM's motion to dismiss and participating in the hearing regarding the motion to dismiss.")

[21] Plaintiffs argue that the District Court must determine whether DAF's contractual waiver "can be enforced as to non parties [*i.e.*, CLOH] to the waiver" (Motion ¶ 8), but Highland has not argued that CLOH waived its jury trial rights through the DAF Agreement.

[22] The causes of action in the Complaint are administrative expense claims (*see infra* ¶¶ 39-41), and, by pursuing the Complaint, Plaintiffs have triggered the claims allowance process and subjected themselves to this Court's equitable jurisdiction. *See, e.g., In re UAL Corp.*, 386 B.R. 701, 707 (Bankr. N.D. Ill. 2008) ("[B]y filing a claim … the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power … As such, there is no Seventh Amendment right to a jury trial … Claims for payment of an administrative expense are no different from other claims in this regard.") (citing *Langenkamp v. Culp*, 498 U.S. 42 (1990)); *see also Harpole Constr., Inc. v. Medallion Midstream, LLC (In re Harpole Constr., Inc.)*, 565 B.R. 193, 202 (Bankr. D. N.M. 2017) (same); *Carter v. Schott (In re Carter Paper Co.)*, 220 B.R. 276, 290-311 (Bankr. M.D. La. 1998) (finding breach of fiduciary duty claim against bankruptcy trustee originally filed in state court was an administrative expense claim and no jury trial right existed).

[23] Highland will move to strike the jury trial demand if the Renewed MTD is denied, but if the time comes to adjudicate Plaintiffs' jury trial right, it will be decided by this Court as a matter of core bankruptcy law.  Highland reserves all rights.

premature; there is currently nothing to withdraw.  Plaintiffs' thinly veiled attempt to create

controversy and a federal issue where none exists should be rejected.  *See, e.g., Keach v. World*

*Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.)*, 2015 U.S. Dist. LEXIS 74006, at *21-23 (D.

Me. June 8, 2015) (finding no mandatory withdrawal when movant simply "tries to kick up some

dust to make the relevant analysis seem complicated").

## II.    The Court Has "Core" Jurisdiction to Adjudicate the Complaint

39.    The Court has already found that this action "arises in" Highland's bankruptcy case

and is a "core" proceeding.

> [This action] "arises in" a bankruptcy case (making it "core"), in that a claim is
> being asserted against a debtor (which was not yet a "reorganized debtor" …) and
> involves actions of a debtor-in-possession in administering its case.  It involves
> orders of this Bankruptcy Court and activities and litigation over which the
> Bankruptcy Court presided.

*Charitable DAF*, 2022 Bankr. LEXIS 659, at *14-15.  Plaintiffs did not appeal that portion of the

MTD Order, and it is binding.

40.    But even in the absence of a prior ruling, this action involves the adjudication of an

administrative expense claim and is quintessentially "core," having "arisen in" Highland's

bankruptcy.  An administrative expense claim is a priority claim under Section 503(b) for, among

other things, "the actual, necessary costs and expenses of preserving the estate …." 11 U.S.C. §

503(b)(1)(A).  Administrative expense claims include claims arising from a debtor-in-possession's

postpetition negligence, tortfeasance, and malfeasance.  *See Reading Co. v. Brown,* 391 U.S. 471,

478-79 (1968) (holding that if a debtor-in-possession commits a tort or harms a non-debtor

following the petition date, the resulting claim is an administrative expense claim even though

there was no benefit to the debtor's estate); *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt.,*

*L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 2780, at *19-21 (Bankr. N.D. Tex.

APP_370

Sept 30, 2022) (finding Highland's alleged breach of its contractual and extra-contractual duties under the IAA to DAF constituted an administrative expense claim).[24]

41.     Plaintiffs were allegedly harmed by Highland's breach of its duties and obligations (a) *after* the Petition Date, but *before* the Effective Date, *i.e.*, while Highland was a debtor-in-possession, and (b) arising from the ordinary course operation of its estate.  Accordingly, under *Reading* (and this Court's recent precedent), the claims alleged in the Complaint, if valid, would be administrative claims.  This Court retained jurisdiction to adjudicate administrative claims (Plan, Art. XI), and adjudication of an administrative claim is a "core" proceeding.  *See In re Weblink Wireless, Inc*., 2003 Bankr. LEXIS 2312, at *3 (Bankr. N.D. Tex. Mar. 12, 2003) ("The allowance of an administrative expense to be paid pursuant to a confirmed plan of reorganization constitutes a core matter over which the court has jurisdiction to enter a final order."); *see also In re Taco Bueno Rests., Inc.*, 606 B.R. 289, 292 (Bankr. N.D. Tex. 2019) (finding core jurisdiction to adjudicate administrative claim); *In re Pilgrim's Pride Corp*., 453 B.R. 691, 692 (Bankr. N.D. Tex. 2011) ("Objections [to administrative expense claims] are subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B)").[25]  This Court has "core" jurisdiction to adjudicate the Complaint and can enter final orders under 28 U.S.C. §§ 157(b) and 1334(b).[26]

---

[24] *See, e.g., Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 388 (5th Cir. 2001); *In re AI Copeland Enters., Inc.*, 991 F.2d 233, 239 (5th Cir. 1993).

[25] *See also In re Colo. Place L.P.*, 2002 Bankr. LEXIS 2000, at *1 (Bankr. N.D. Tex. Feb. 5, 2002) (same); *In re SGS Studio, Inc*., 256 B.R. 580, 581 (Bankr. N.D. Tex. 2000) (same); *Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.)*, 256 B.R. 712, 714 (Bankr. N.D. Tex. 2000) (same).

[26] Plaintiffs cite *Gupta v. Quincy Medical Center*, 585 F.3d 657 (1st Cir. 2017) to support their argument that this Court lacks jurisdiction over the Complaint. In *Gupta*, the bankruptcy court approved an asset purchase agreement pursuant to 11 U.S.C. § 363, which provided that certain employees would receive severance if terminated.  When they were subsequently terminated, they sought damages for breach of the purchase agreement *in the bankruptcy court*.  The First Circuit held that the severance claims arose "solely" from the alleged breach of the agreement and not from (a) a breach of the order approving the agreement, (b) a question of interpretation of that order, (c) the administration of the bankruptcy estate, or (d) the Bankruptcy Code (*Id.* at 664) and accordingly held there was no bankruptcy jurisdiction. *Gupta* is irrelevant.  The Complaint asserts administrative expense claims against the estate and thus invokes the claims allowance process and this Court's equitable jurisdiction—a quintessentially core action.

## <u>CONCLUSION</u>

42.    Highland respectfully requests that the Court deny the Motion and grant such further relief as the Court deems just and proper.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

18

APP_372

Dated:  December 9, 2022                     **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

19

APP_373

**Exhibit 13**

Report and Recommendation to the District Court on "Renewed Motion to Withdraw the

Reference"  [Bankr. Doc. No. 128]

Adv. Proc. No. 21-03067 [Dkt. No. 158]



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 6, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT L.P., | § | BANKR. CASE NO. 19-34054-SGJ-11 |
| | § | (CHAPTER 11) |
|     REORGANIZED DEBTOR. | § | |
| _____ | § | |
| CHARITABLE DAF FUND, L.P. and | § | |
| CLO HOLDCO, LTD., | § | |
| | § | |
|     PLAINTIFFS, | § | |
| | § | |
| VS. | § | ADV. PRO. NO. 21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | CIV. ACT. NO. 3:22-cv-02802-S |
| | § | CIV. ACT. NO. 3:21-cv-0842-B |
| | § | |
|     DEFENDANT. | § | |

_____

## REPORT AND RECOMMENDATION TO THE DISTRICT COURT
## ON "RENEWED MOTION TO WITHDRAW THE REFERENCE"
## [BANKR. DOC. NO. 128]


1934054230206000000000006
APP_375

## I.    INTRODUCTION

The above-referenced adversary proceeding is related to the now long-running Chapter 11 bankruptcy case of Highland Capital Management, L.P. ("Highland," the "Debtor," or sometimes the "Reorganized Debtor").  Highland is the main Defendant in this action, which was filed by Charitable DAF Fund, L.P. and CLO Holdco, Ltd. ("Plaintiffs") on April 12, 2021, in the District Court (*during* Highland's bankruptcy case and *prior* to the effective date of Highland's Chapter 11 plan) and assigned to Judge Jane Boyle.  For the *second* time since this action was filed, the Plaintiffs are urging the District Court to withdraw the reference from the bankruptcy court.  The *first* time that Plaintiffs urged it (unsuccessfully) was on June 29, 2021, to Judge Boyle, in Civil Action No. 3:21-cv-0842-B, in response to Defendant's motion to *enforce* the reference and in their cross-motion thereto, in which Plaintiffs specifically urged the District Court to find that mandatory withdrawal of the reference under 28 U.S.C. § 157(d) applied to the action and so enforcing the reference (and, thus, sending the action to the bankruptcy court) would be pointless. Judge Boyle entered an order on September 20, 2021, granting Defendant's motion to enforce the reference, referring the action to this bankruptcy court "to be adjudicated as a matter related to the consolidated Chapter 11 Bankruptcy of Highland Capital Management, L.P., Chapter 11 Case No. 19-34054."[1]  Plaintiffs brought their "Renewed Motion to Withdraw the Reference" ("Renewed MTWR") on November 18, 2022,[2] more than a year after Judge Boyle rejected their arguments and referred the action to the bankruptcy court.  The Renewed MTWR was transmitted to the District Court on December 15, 2022 and assigned to a different district judge – Judge Karen Scholer – under the above-referenced civil action number.[3]  Much has happened during this time

---

[1] *See Order of Reference*, Civ. Act. No. 3:21-cv-0842-B, Doc. No. 64.

[2] *See Renewed Motion to Withdraw the Reference*, Adv. Pro. 21-3067-sgj, Bankr. Doc. No. 128.

[3] *See* Civ. Act. No. 3:22-02802-S, Doc. No. 1.

APP_376

span.  This "jurisdictional ping pong" (as it might fairly be described) is best understood with the timeline of relevant events set forth in Part III below. But first, a description of the parties is in order.

## II.    THE PARTIES

Highland is the main Defendant in this action.  There were originally two other Defendants: (a) Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey-based investment vehicle that is now past its investment period, and (b) Highland HCF Advisors, Ltd. ("HCFA"), which has been described as a non-debtor, wholly owned subsidiary of Highland, which served as a portfolio manager for HCLOF.  HCLOF was dismissed with prejudice from this action on December 7, 2021 [Bankr. Doc. No. 80].  The other Defendant, HCFA, has never appeared in this action, and it appears it was never served with the summons and complaint.[4]  The court is unclear why—perhaps it was dissolved as part of the Highland reorganization or has no assets.

The Plaintiffs are CLO Holdco Ltd. ("CLO Holdco") and Charitable DAF Fund, L.P. ("DAF").  DAF is CLO Holdco's parent company.  Both Plaintiffs are Cayman Island entities and are affiliated with Highland's former chief executive officer and founder (James Dondero). Plaintiff CLO Holdco also happens to own a 49.02% equity interest in the dismissed Defendant HCLOF.

For ease of reference—and because there are a very large number of lawsuits pending in the Northern District of Texas involving Highland and its affiliates—this action presently before the

---

[4] Highland noted on page 3 of its *Motion for an Order Extending the Time to File a Responsive Pleading*, filed in the District Court on May 6, 2021, at Doc. No. 9 (and entered on the bankruptcy court docket on September 29, 2021 at Bankr. Doc. No. 9) that "[w]hile Highland agreed to accept service on its own behalf, it could not and did not accept service on behalf of the other defendants, Highland HCF Advisors, Ltd. and Highland CLO Funding, Ltd. (together, the "Other Defendants")" and that "to the best of Highland's knowledge, the Other Defendants have not been served with the Complaint such that the time for each of them to serve a responsive pleading has not begun to run."  A *Waiver of Service of Summons* with respect to HCLOF was filed on June 3, 2021 (at Doc. No. 30 in both the District Court and bankruptcy court), but there does not appear on either docket any proof of service or waiver of service with respect to service of the summons and complaint on HCFA that would indicate that HCFA has been served as of this date.

APP_377

court will be referred to as the "Lawsuit Pertaining to HarbourVest Bankruptcy Settlement." The timeline below fully explains this.

### III.   THE RELEVANT TIMELINE

**October 16, 2019**:  Highland filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date").

**December 23, 2020**:  Highland (during its bankruptcy case—and before getting a Chapter 11 plan approved) moved for approval by the bankruptcy court of a significant settlement it reached with entities collectively known as HarbourVest.  HarbourVest was a disputed creditor—asserting a $300 million proof of claim against Highland—and it also happened to own a 49.98% equity interest in the Defendant HCLOF.  Pursuant to the proposed settlement between Highland and HarbourVest (the "HarbourVest Settlement"), HarbourVest agreed to transfer its 49.98% equity interest in Defendant HCLOF to Highland (or Highland's designee) and agreed to greatly reduce its disputed claim in the bankruptcy case from $300 million to $80 million (which would be given part unsecured creditor status and part subordinated status).

**January 8, 2021**:  Plaintiff CLO Holdco objected to the HarbourVest Settlement, presumably at the direction of its parent, DAF (the other Plaintiff herein).  CLO Holdco argued that: (i) it, as a 49.02% equity member of HCLOF, had a "Right of First Refusal," pursuant to the HCLOF membership agreement, to acquire the 49.98% equity interest that HarbourVest was going to be transferring to Highland under the HarbourVest Settlement; and (ii) HarbourVest could not transfer its 49.98% equity interest to Highland without compliance with this purported right of first refusal.  CLO Holdco did not object on any other basis to the HarbourVest Settlement.

**January 14, 2021:**  The bankruptcy court held an evidentiary hearing on the proposed HarbourVest Settlement, during which CLO Holdco voluntarily withdrew its objection to the

APP_378

HarbourVest Settlement premised on the "Right of First Refusal." After an extensive presentation of evidence, the bankruptcy court overruled certain remaining objections (specifically, those of certain family trusts of James Dondero) and approved the HarbourVest Settlement. Note that the Dondero family trusts appealed to the District Court the approval of the HarbourVest Settlement, and their appeal was dismissed for lack of standing.

**February 22, 2021:** The bankruptcy court entered an order confirming a Chapter 11 plan for Highland [Bankr. Doc. No. 1943] (the "Confirmation Order"), which confirmed Highland's extensively mediated, negotiated, and litigated plan [Bankr. Doc. No. 1808] (the "Plan"). The Plan became effective on August 11, 2021 [Bankr. Doc. No. 2700] (the "Effective Date"). At least the following provisions are germane to this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement. First, pursuant to the Plan, the bankruptcy court expressly retained jurisdiction/authority to "allow, disallow, determine, liquidate … any Claim … including, without limitation, the resolution of any request for payment of any Administrative Expense Claim …." Plan, Art. XI. Second, the Plan defined "Administrative Expense Claim," in relevant part, as a: "Claim for costs and expenses of administration of the Chapter 11 Case . . . pursuant to sections 503(b), 507(a)(2), 507(b) … of the Bankruptcy Code, including … (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor . . . ." Plan, Art. I.B.2.

**April 12, 2021**: Plaintiffs commenced this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement in the District Court—which was assigned Civ. Action No. 21-CV-0842-B (Judge Jane Boyle)—naming Debtor/Highland, HCFA, and HCLOF as Defendants. To be clear, this lawsuit was filed at a time when Highland was still a debtor in possession (its Plan had been recently confirmed, but the plan Effective Date had not yet occurred—it occurred in August 2021). The

underlying Complaint ("Complaint") alleges that conduct of Highland during the bankruptcy case in late 2020 and early 2021 revolving around the HarbourVest Settlement—prior to the Confirmation Order—violated contractual and extra-contractual duties Highland purportedly owed (i) to Plaintiff CLO Holdco as an investor in HCLOF; and (ii) to Plaintiff DAF as an advisee under an investment advisory agreement.   The Complaint raises claims: (i) by Plaintiffs for breaches of fiduciary duty against Highland and HCFA (Count 1); (ii) by CLO Holdco for breach of the HCLOF Members Agreement against all three Defendants (Count 2); (iii) by Plaintiffs for negligence against Highland and HCFA (Count 3); (iv) by Plaintiffs for violations of the Racketeer Influenced and Corrupt Organizations statute (15 U.S.C. § 1961, et seq. ("RICO")) against Highland (Count 4); and (v) by CLO Holdco for tortious interference against Highland (Count 5). In Count 1 (breach of fiduciary duty), Plaintiffs allege that Debtor/Highland violated its "broad" duties to Plaintiffs under the Investment Advisers Act and Highland's "internal policies and procedures" by: (i) engaging in "insider trading with HarbourVest"; (ii) "concealing" the value of HarbourVest's 49.98% equity interest in HCLOF; and (iii) "diverting" the investment opportunity in the HarbourVest entities to the Debtor without first offering it to Plaintiffs.[5] In Count 4 (RICO), Plaintiffs allege that Highland and its co-Defendants were an "association-in-fact" engaged in a pattern of racketeering activity for this same underlying conduct; namely, failing to disclose the valuation of HCLOF's interest and ultimately effectuating the HarbourVest Settlement.   Again,

---

[5] While specific statutory references to the federal Investment Advisers Act are sparse in the Complaint, subsequent pleadings of the Plaintiffs make clear they are referring to at least 15 U.S.C. § 80b-6 and 80b-15(a) (which they cite as imposing both a duty of care and a duty of loyalty, each unwaivable, on investment advisors, in favor of funds and its investors, citing *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008)); 15 U.S.C. § 206(2) (which they cite as requiring investment advisers to seek "best execution" for all their clients' transactions, citing *SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 286, 300 (E.D. Pa. 2021)); and 15 U.S.C. § 215 (which they cite as recognizing "a limited private right of action for equitable relief including disgorgement, wherein one may seek to void the rights of a violator who performs a contract in violation of the Advisers Act").  Response to Renewed Motion to Dismiss, pp. 12-13.  Bankr. Doc. No. 130.

APP_380

Highland's alleged misconduct was the act of settling the $300 million proof of claim filed against Highland by HarbourVest under the terms and conditions of the HarbourVest Settlement.  To be clear, the HarbourVest Settlement was implemented after full notice to creditors in the Highland case, an evidentiary hearing, and approval by the bankruptcy court after fulsome findings of fact and conclusions of law.  And as noted earlier, one of the Plaintiffs, CLO Holdco, even objected to the HarbourVest Settlement and then withdrew its objection the morning of the bankruptcy court's hearing on the HarbourVest Settlement.

**May 19, 2021**: Soon after the commencement of this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement, Highland moved before Judge Boyle for an order to enforce the Northern District of Texas's standing order of reference (Misc. Order No. 33) [Bankr. Doc. No. 22] (the "Motion to Enforce"), arguing that the Lawsuit Pertaining to HarbourVest Bankruptcy Settlement should be referred to the bankruptcy court, since it asserted claims arising in, arising under, or related to Title 11 and Highland's bankruptcy case.

**May 27, 2021**: Highland also swiftly moved to dismiss the Lawsuit Pertaining to HarbourVest Bankruptcy Settlement [Bankr. Doc. No. 26] (the "Original MTD").  The Original MTD was fully briefed to Judge Boyle.[6]

**June 29, 2021:** Plaintiffs reacted by filing their response to the Motion to Enforce [Bankr. Doc. No. 36], arguing the Motion to Enforce should be denied, and ***cross-moving therein that Judge Boyle should keep the Lawsuit Pertaining to HarbourVest Bankruptcy Settlement*** because the claims therein were subject to mandatory withdrawal of the reference, under 28 U.S.C § 157(d)—i.e., they involved "consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce" and could not be adjudicated

---

[6] Defendant HCLOF filed a *Motion to Dismiss and Joinder in Motion to Dismiss of Highland Capital Management, L.P.* in the District Court at Doc. No. 57 (Bankr. Doc. No. 57) on August 30, 2021.

APP_381

in the bankruptcy court.  To be clear, the underlying Complaint (while all about the HarbourVest Settlement) asserts claims of breach of fiduciary duty under the federal Investment Advisers Act ("IAA") and state law; breach of contract; negligence; RICO; and tortious interference with contract.  Notably, the arguments in Plaintiffs' cross-motion on June 29, 2021 appear to be identical to those in Plaintiffs' Renewed MTWR now before the court.

**August 26, 2021:** Plaintiffs filed a motion before Judge Boyle asking her to stay the action before her, pending appeal of the Confirmation Order [Bankr. Doc. No. 55] (the "Stay Motion"), arguing that the Plan injunction somehow prohibited the prosecution of the Lawsuit Pertaining to HarbourVest Bankruptcy Settlement.  The Stay Motion was fully briefed to Judge Boyle.

**September 20, 2021:**  The District Court (Judge Boyle) granted Highland's Motion to Enforce and referred this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement to the bankruptcy court, including the Original MTD, "[p]ursuant to 28 U.S.C. § 157 … to be adjudicated as a matter related to the … Bankruptcy of Highland Capital Management, L.P." [Bankr. Doc. No. 64].

**November 23, 2021:**  Plaintiffs and Defendants argued the Stay Motion and the merits of the Original MTD, including their alleged claims under the IAA and RICO, to the bankruptcy court.  Following the hearing the bankruptcy court denied the Stay Motion.[7]

**March 11, 2022:** The bankruptcy court granted the Original MTD and issued a written ruling on it (the "MTD Order")—never getting to the merits of the claims in the Lawsuit Pertaining to HarbourVest Bankruptcy Settlement. [Bankr. Doc. No. 100]. Rather, the bankruptcy court dismissed the Lawsuit Pertaining to HarbourVest Bankruptcy Settlement with prejudice, on the

---

[7] *See Order Denying Motion to Stay*, Bankr. Doc. No. 81, entered on December 7, 2021.  As noted above,, the bankruptcy court also entered, on December 7, 2021, its *Order Granting Highland CLO Funding, Ltd.'s Motion to Dismiss* [Bankr. Doc. No. 80].

APP_382

basis that the claims were precluded by the doctrines of collateral estoppel and judicial estoppel.
*See Charitable DAF Fund, L.P. and CLO Holco, Ltd. v. Highland Cap. Mgmt., L.P., et al. (In re Highland Cap. Mgmt., L.P.)*, 2022 WL 780991 (Bankr. N.D. Tex., Mar. 11, 2022).  The bankruptcy court concluded that the claims in the Lawsuit Pertaining to HarbourVest Bankruptcy Settlement were barred due to the strategic decisions of Plaintiff CLO Holdco during the bankruptcy case (i.e., choosing to withdraw its objection to the HarbourVest Settlement) and that decision was also binding on its Co-Plaintiff DAF (its parent) since the two were in privity.  On March 25, 2022, the Plaintiffs appealed the MTD Order to the District Court.  *See* 3:21-cv-00695-B, Doc. No. 2.  The Plaintiffs did not raise 28 U.S.C. § 157(d) in the appeal or otherwise argue that the bankruptcy court lacked jurisdiction or authority to have entered the MTD Order.

**June 17, 2022:** Judge Boyle entered an order consolidating the appeal of the MTD Order with Plaintiff's appeal of the bankruptcy court's order denying the Stay Motion, which had been assigned Civ. Act. No. 3:21-cv-03129.  *See* 3:21-cv-03129-B, Doc. No. 20.

**September 2, 2022**: Judge Boyle, sitting this time in an appellate capacity: (i) reversed the bankruptcy court's conclusion that collateral estoppel barred Plaintiffs' claims but (ii) remanded on the judicial estoppel determination.[8]  *See Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162, 166 (N.D. Tex. 2022).  Specifically, Judge Boyle determined that the bankruptcy court had erred in its ruling that collateral estoppel barred entirely the claims in this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement, but Judge Boyle separately, in evaluating the bankruptcy court's determination that judicial estoppel also barred Plaintiff's Lawsuit Pertaining to HarbourVest Bankruptcy Settlement, ruled that the bankruptcy court did not make a certain finding necessary to conclude judicial estoppel applied

---

[8] Judge Boyle also affirmed the bankruptcy court's order denying the Stay Motion.

APP_383

(i.e., a finding of "inadvertence").  Thus, Judge Boyle remanded to the bankruptcy court for possible further findings on the judicial estoppel doctrine and presumably for an adjudication on the merits of the various claims asserted in the Lawsuit Pertaining to HarbourVest Bankruptcy Settlement, if the bankruptcy court concluded judicial estoppel did ***not*** apply (after evaluating the "inadvertence" factor).

**September 8, 2022**: Meanwhile, the U.S. Court of Appeals for the Fifth Circuit affirmed, in material part, the Confirmation Order's factual findings and legal conclusions in support of the Highland Plan.  *NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt.*, L.P., 48 F.4th 419 (5th Cir. 2022).  A petition for writ of certiorari is now pending before the U.S. Supreme Court regarding the Plan Confirmation Order. To be clear, there has never been a stay of the Plan (i.e., the Confirmation Order), and the Highland Plan has been in effect since August 11, 2021.

**October 14, 2022**: In response to Judge Boyle's remand, *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162, 166 (N.D. Tex. 2022), Highland filed a renewed motion to dismiss [Bankr. Doc. No. 122] (the "Renewed MTD"). It addresses the "inadvertence" factor on the judicial estoppel defense (arguing it bars Counts 2 and 5 of the Complaint), and also argues that all claims in this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement—even if not precluded by the doctrine of judicial estoppel—are not plausible on their face, under *Iqbal* and *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**November 18, 2022**:  Plaintiffs responded to the Renewed MTD and also filed their Renewed MTWR, again urging mandatory withdrawal of the reference.  Plaintiffs once again are arguing that this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement "requires consideration" of non-bankruptcy federal laws regulating interstate commerce and, thus,

APP_384

mandatory withdrawal of the reference applies under 28 U.S.C. § 158(d).  ***Interestingly, Plaintiffs have now moved to dismiss their RICO count (without prejudice)***.[9]  Thus, their sole "other federal law" argument boils down to this:

> This adversary proceeding primarily involves fiduciary duties imposed upon Registered Investment Advisers by the Investment Advisers Act of 1940 ("Advisers Act") and corresponding state law claims for breach of those duties. As a result, presiding over this action will require extensive consideration of federal laws regulating interstate commerce, which renders withdrawal of the reference to bankruptcy court mandatory under 28 U.S.C. § 157(d).

Renewed MTWR, at ¶ 5.

## IV.   <u>RECOMMENDATION</u>

The bankruptcy court recommends that Plaintiffs' Renewed MTWR be denied.  The bankruptcy court clearly has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1334(b).  The Renewed MTWR was not timely filed, which is required under the mandatory withdrawal provisions of 28 U.S.C. § 157(d), and it is the quintessential attempt at a second bite at the apple.

### A.   *Jurisdiction and Core Nature of the Action*

First, there is no concern about lack of bankruptcy subject matter jurisdiction here. Bankruptcy subject matter jurisdiction exists over the claims against the Defendant pursuant to 28 U.S.C. §§ 1334(b) and 157.  Under 28 U.S.C. § 1334(b), "district courts shall have original but not exclusive jurisdiction of all civil proceedings ***arising under*** title 11, or ***arising in*** or ***related to***

---

[9] *See* Plaintiff's Response to Renewed MTD at 23 ("Plaintiffs respectfully dismiss the RICO claim under Rule 41(a) to the extent such a claim is revealed to have existed under non-securities bases. Because Highland has conceded that Plaintiffs' claims are actionable under the federal securities laws and the Advisers Act, and has cited same as a basis for dismissing the RICO claim, Highland is precluded and estopped from denying the violations of the Securities Laws and the Advisers Act. As such, to the extent that other, non-securities law violations may give rise to RICO violations, Plaintiffs respectfully reserve the right to bring such a claim but respectfully dismiss their RICO claim at this time.")

APP_385

cases under title 11."[10]  (Emphasis added.)  The bankruptcy courts, in turn, are delegated authority

to exercise that jurisdiction from the district courts, under 28 U.S.C. § 157(a).[11]  There does not

appear to be any dispute that this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement is at

least "related to" the Highland bankruptcy case.  Thus, bankruptcy subject matter jurisdiction

exists.[12]  Moreover, there does not appear to be any dispute that the action involves "core" matters

over which a bankruptcy court may generally enter final judgments.[13]  As noted recently by the

Fifth Circuit:  "[A] proceeding is core under section 157 if it invokes a substantive right provided

by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy

case.  For example, claims concerning the administration of the estate, allowance or disallowance

of claims against the estate, and sale of property of the estate are all core proceedings.[14]  *See*

*generally In re Southmark Corp.*, 163 F.3d 925, 930-31 (5th Cir. 1999) (malpractice suit against

an examiner's accountant was a core proceeding; "The bankruptcy court must be able to assure

itself and the creditors who rely on the process that court-approved managers of the debtor's estate

are performing their work, conscientiously and cost-effectively. . . .  Award of the professionals'

---

[10] 28 U.S.C. § 1334(b); *see also In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999) ("[Section] 1334(b) grants jurisdiction to district courts and adjunct bankruptcy courts to entertain proceedings 'arising under,' 'arising in a case under,' or 'related to' a case under Title 11 of the United States Code, i.e., proceedings 'related to' bankruptcy.").

[11] *In re PFO Glob., Inc.,* 26 F.4th at 252 (citing 28 U.S.C. § 157(a)).

[12] *In re Bass*, 171 F.3d at 1022 ("To determine whether [bankruptcy] jurisdiction exists, 'it is necessary only to determine whether a matter is at least "related to" the bankruptcy.'" (quoting *In re Walker*, 51 F.3d 562, 569 (5th Cir. 1995))).

[13] Plaintiffs' Renewed MTWR seemed to dispute that core matters are involved.  But their position on this at the status conference on this seemed equivocal.  In addition, as noted earlier, there is a non-debtor Defendant named herein, HCFA, that is a subsidiary of Highland.  Likely, claims asserted against it by Plaintiffs (which appear to be asserted at Counts 1-3) would not be core matters.  However, HCFA has not been served and has failed to appear or defend in this matter.  Thus, presumably there will be no adjudication of the claims against it in this action and the claims against it are irrelevant.

[14] *Foster v. Aurzada, et al.* No. 22-10310 and No. 22-10318, slip. Op. at p. 5 (5th Cir. Jan. 3, 2023) (per curium), *citing In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987) and 28 U.S.C. § 157(b)(2)(A), (B), (N), (O)).

APP_386

fees and enforcement of the appropriate standards of conduct are inseparably related functions of bankruptcy courts.").[15]

Again, there appears to be no dispute here regarding the "core/noncore" status of the claims. Plaintiffs' argument is that, even if the claims are core, mandatory withdrawal of the reference is necessitated, pursuant to 28 U.S.C.§ 157(d), because of other federal law, besides bankruptcy law, being significantly implicated.

B. *Untimeliness*.

Plaintiffs' request for mandatory withdrawal of the reference is by any reasonable measure "untimely." Under 28 U.S.C. § 157(d), a district court "shall, on ***timely*** motion of a party, so withdraw a proceeding if … resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d) (emphasis added). Assuming a timely motion, mandatory withdrawal is warranted only if a matter requires "substantial and material consideration" and "significant interpretation of federal laws[,]" rather than a "straightforward application of a federal statute to a particular set of facts." *In re Nat'l Gypsum*, 14 B.R. 188, 192-93 (N.D. Tex. 1991); *Kirschner v. Dondero (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 1028, at *27-28 (Bankr. N.D. Tex. Apr. 6, 2022) (same). The Renewed MTWR was filed ***fourteen months*** after Judge Boyle referred this action to the bankruptcy court. Moreover, it was filed after: (a) the bankruptcy court made a final ruling on a motion to dismiss, (b) Judge Boyle ruled on that final bankruptcy court ruling in an appellate capacity, and (c) remanded back to the bankruptcy court for further proceedings.

---

[15] *See id.* at 930 (citing 28 U.S.C. § 157(b)(3)) (stating that whether claim has a state law origin is not dispositive to whether it is a core bankruptcy matter); *In re Wood*, 825 F.2d at 97 n.34 (stating that whether right is state created is not dispositive to whether proceeding is core under 28 U.S.C. § 157).

APP_387

To be clear, 28 U.S.C. § 157(d) does not define "timely," but it has been interpreted as requiring a motion to be made at the first reasonable opportunity. *See In re Fresh Approach, Inc.,* 51 B.R. 412, 415-16 (Bankr. N.D. Tex. 1985) (finding a motion to withdraw the reference untimely when filed sixteen days after the court entered its decision on the matter); *see also Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1007, n.3 (9th Cir. 1997). ("A motion to withdraw is timely 'if it was made as promptly as possible in light of the developments in the bankruptcy proceeding.'"); *Connolly v. Bidermann Indust. U.S.A., Inc.,* 1996 U.S. Dist. LEXIS 8059, at *8 (S.D.N.Y. June 13, 1996) ("Plaintiff's delay of over eight months renders her motion untimely, and as such it does not meet the threshold requirement set forth in 28 U.S.C. § 157(d)."); 9 COLLIER ON BANKRUPTCY ¶ 5011.01[2] ("[M]otions for mandatory withdrawal must be made as soon as it is apparent that it is necessary for the district court to hear the proceeding").

But this isn't just any untimely motion. This is a ***second*** motion. This appears to be the proverbial second bite at the apple—urged right after Highland, after reviewing Judge Boyle's September 2022 appellate ruling, moved for dismissal of this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement, this time fully arguing the judicial estoppel factors that Judge Boyle determined had not been fully vetted. The Highland Renewed MTD also asks the bankruptcy court to, this time, rule on the merits of the claims (which the bankruptcy court did not do last time), in the event judicial estoppel does not apply. The Renewed MTWR appears to be an attempt by Plaintiffs to avoid the bankruptcy court exercising its duties in response to Judge Boyle's remand. It appears to be forum shopping and an attempt at delaying adjudication. The reality is that, if the bankruptcy court rules on the Renewed MTD in a way Plaintiffs find unsatisfactory, they can appeal again to the District Court. The further reality is that if judicial estoppel prevails, there will never be any "substantial and material consideration" and "significant interpretation of federal

APP_388

laws]" in this Lawsuit Pertaining to HarbourVest Bankruptcy Settlement. *In re Nat'l Gypsum,* 14

B.R. 188, 192-93.

### C. No "Substantial and Material Consideration" and "Significant Interpretation of Federal Laws" are Implicated Here; This is At Bottom a Request for Allowance of an Administrative Expense Claim

To be clear, the causes of action in this Lawsuit Pertaining to HarbourVest Bankruptcy

Settlement are tantamount to the assertion of administrative expense claims against a Chapter 11

Debtor.   As a general matter, the filing of administrative expense claims triggers the claims

allowance process and subjects a claimant to the bankruptcy court's equitable jurisdiction.  *See,*

*e.g., In re UAL Corp.*, 386 B.R. 701, 707 (Bankr. N.D. Ill. 2008) ("[B]y filing a claim … the

creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself

to the bankruptcy court's equitable power … As such, there is no Seventh Amendment right to a

jury trial … Claims for payment of an administrative expense are no different from other claims

in this regard.") (citing *Langenkamp v. Culp*, 498 U.S. 42 (1990)); *see also Harpole Constr., Inc.*

*v. Medallion Midstream, LLC (In re Harpole Constr., Inc.)*, 565 B.R. 193, 202 (Bankr. D. N.M.

2017) (same); *Carter v. Schott (In re Carter Paper Co.)*, 220 B.R. 276, 290-311 (Bankr. M.D. La.

1998) (finding breach of fiduciary duty claim against bankruptcy trustee originally filed in state

court was an administrative expense claim and no jury trial right existed).   It is difficult to see

Plaintiffs' strategy here as anything other than an attempted end-run around the bankruptcy court.

They argue as justification that there is substantial other federal law involved.  But Plaintiffs'

claims do not seem complex.  If Plaintiffs survive the Renewed MTD (based on the judicial

estoppel factors) their federal claims are simply:  (a)(i) did Highland owe both Plaintiffs a fiduciary

duty under the IAA; (ii) if so, what was the nature of that duty and was it violated; and (iii), if

violated, what are the remedies and potential damages?  Fiduciary duties (and interpretation of

APP_389

different sources of fiduciary duties) certainly are not outside a bankruptcy court's expertise. *See In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 953-54 (7th Cir. 1996); *City of N.Y. v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir. 1991) (mandatory withdrawal requires "significant interpretation, as opposed to simple application, of federal laws"). "[M]andatory withdrawal is to be applied narrowly" to "prevent 157(d) from becoming an 'escape hatch.'" *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009), *aff'd* 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009).  Moreover, bankruptcy courts frequently consider other federal law (as well as state law) in adjudicating claims against the estate.

"Claims against the estate" is what's implicated here.  The claims were asserted against the Debtor/Highland before its plan went effective and involve a time period during its case. Administrative expense claims include claims arising from a debtor-in-possession's postpetition negligence, tortfeasance, and malfeasance.  *See Reading Co. v. Brown,* 391 U.S. 471, 478-79 (1968) (holding that if a debtor-in-possession commits a tort or harms a non-debtor following the petition date, the resulting claim is an administrative expense claim even though there was no benefit to the debtor's estate)  Moreover, the Plan made very clear that claims such as this were required to be filed in the bankruptcy court by a date certain.  *See In re Weblink Wireless, Inc.,* 2003 Bankr. LEXIS 2312, at *3 (Bankr. N.D. Tex. Mar. 12, 2003) ("The allowance of an administrative expense to be paid pursuant to a confirmed plan of reorganization constitutes a core matter over which the court has jurisdiction to enter a final order."); *see also In re Taco Bueno Rests., Inc.,* 606 B.R. 289, 292 (Bankr. N.D. Tex. 2019) (finding core jurisdiction to adjudicate administrative claim); *In re Pilgrim's Pride Corp.*, 453 B.R. 691, 692 (Bankr. N.D. Tex. 2011) ("Objections [to administrative expense claims] are subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B)").  The bankruptcy court has "core" jurisdiction to

16

adjudicate the Lawsuit Pertaining to HarbourVest Bankruptcy Settlement and can enter final orders under 28 U.S.C. §§ 157(b) and 1334(b).

For all these reasons, the Renewed MTWR should be denied.

## V.   COMPLAINCE WITH LOCAL BANKRUPTCY RULE 5011-1

Finally, in compliance with Local Bankruptcy Rule 5011-1, the bankruptcy court reports that it held a status conference in this matter on Wednesday January 25, 2023, at 1:30 pm.  All parties appeared through counsel.  As noted above, Highland opposes withdrawal of the reference, and the Plaintiffs continue to urge it.  Both sides presented their arguments orally.  There is no stay of this action in place.  As noted earlier, there is a pending Renewed MTD of Highland, filed after remand to the bankruptcy court by Judge Boyle, that the bankruptcy court has under advisement. There is no scheduling order in place currently.  The parties are not ready for trial (indeed, the Defendant argues no trial is warranted, given its positions urged in the Renewed MTD).  As discussed herein, this action presents core matters.  There are no jury trial rights.

Again, it is the conclusion and recommendation of the bankruptcy court that the Renewed MTWR should be denied in its entirety.

### ###END OF REPORT AND RECOMMENDATION###

APP_391

**Exhibit 14**

Transcript Regarding Hearing Held January 25, 2023 re: Motion Hearing


Adv. Proc. No. 21-03067 [Dkt. No. 155]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. 19-34054-11(SGJ) |
| | . | |
| HIGHLAND CAPITAL | . | Earle Cabell Federal Building |
| MANAGEMENT, L.P., | . | 1100 Commerce Street |
| | . | Dallas, Texas 75242 |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . . . | . | |
| | . | Adv. No. 21-03067-11(SGJ) |
| CHARITABLE DAF FUND, | . | |
| LP, *ET AL.*, | . | |
| | . | |
| Plaintiffs, | . | |
| | . | |
| v. | . | |
| | . | |
| HIGHLAND CAPITAL, | . | |
| MANAGEMENT, L.P., *ET AL.*, | . | |
| | . | |
| Defendants. | . | Wednesday, January 25, 2023 |
| . . . . . . . . . . . . . . | . | 1:38 p.m. |

TRANSCRIPT OF HEARING ON DEFENDANT HIGHLAND CAPITAL MANAGEMENT
L.P.'S RENEWED MOTION TO DISMISS COMPLAINT (122) AND
STATUS CONFERENCE RE: MOTION FOR WITHDRAWAL OF REFERENCE FILED
BY PLAINTIFF CLO HOLDCO, LTD., PLAINTIFF CHARITABLE DAF FUND,
LP (128)

BEFORE THE HONORABLE STACEY G. JERNIGAN
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES ON NEXT PAGE.

Audio Operator:         Michael F. Edmond

Proceedings recorded by electronic sound recording, transcript
produced by a transcript service.

---

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

2

APPEARANCES VIA WEBEX:

For the Plaintiffs:        Sbaiti & Company PLLC
                          BY: MAZIN AHMAD SBAITI, ESQUIRE
                          JP Morgan Chase Tower
                          2200 Ross Avenue, Suite 4900 W
                          Dallas, Texas 75201

                          Kelly Hart & Pitre
                          BY: LOUIS M. PHILLIPS, ESQUIRE
                          301 Main Street, Suite 1600
                          Baton Rouge, Louisiana 70801

For the Defendants:        Pachulski Stang Ziehl & Jones LLP
                          BY:  JOHN A. MORRIS, ESQUIRE
                               GREGORY V. DEMO, ESQUIRE
                          780 3rd Avenue, 34th Floor
                          New York, New York 10017

APP_394

3

INDEX

Page

Matters Heard:

Motion for withdrawal of reference filed by
Plaintiff CLO Holdco, Ltd., Plaintiff Charitable
DAF Fund, LP (128)

Court's Ruling - Recommendation of Denial of Motion          49
   to the District Court

Defendant Highland Capital Management, L.P.'s
Renewed Motion to Dismiss Complaint (122)

Court's Ruling - Taken Under Advisement                    110

**EXHIBITS**                                          ID     EVD

Motion for withdrawal of reference filed by
Plaintiff CLO Holdco, Ltd., Plaintiff Charitable
DAF Fund, LP (128)

FOR THE PLAINTIFFS:
(None)

FOR THE DEFENDANTS:

1 through 6                                           31     31

Defendant Highland Capital Management, L.P.'s
Renewed Motion to Dismiss Complaint (122)
DAF Fund, LP (128)

FOR THE PLAINTIFFS:
(None)

FOR THE DEFENDANTS:

1 through 14                                          58     58

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_395

4

1        (Proceedings commenced at 1:38 p.m.)

2            THE COURT:  All right.  We have settings this

3    afternoon in Highland Adversary 21-3067.  We have a renewed

4    motion to withdraw the reference set for status conference and

5    a renewed Rule 12(b)(6) motion to dismiss.

6            So let's get all of our appearances from the lawyers

7    before we get started.  I'll start with our plaintiffs.  Who do

8    we have appearing for Charitable DAF and CLO Holdco?

9            MR. SBAITI:  Your Honor, this is Mazin Sbaiti on

10    behalf of the two plaintiffs.

11            THE COURT:  Thank you.

12            Any other lawyer appearances for plaintiffs?

13            MR. PHILLIPS:  Your Honor, Louis N. Phillips on -- I

14    have been asked and agreed to argue the motion to withdraw

15    reference.  I did not file a special appearance.  We've talked

16    with opposing counsel, and they were aware that I was involved.

17    I am not counsel of record in the lawsuit, but I've been asked

18    to argue this, the bulk of the motion to withdraw reference.

19            THE COURT:  All right.

20            Appearing for defendants, who will appear today?

21            MR. MORRIS:  Good afternoon, Your Honor.  This is

22    John Morris from Pachulski Stang Ziehl & Jones.  I'll be

23    arguing if Your Honor chooses to hear the renewed motion to

24    dismiss.  I'm joined by my colleague Gregory Demo.  Mr. Demo is

25    going to argue on behalf of defendants and our position the

APP_396

5

1  motion to withdraw the reference.

2          I would note just procedurally while we have

3  absolutely no objection to Mr. Phillips participating today, he

4  really should be making an appearance on behalf of the entity

5  making the motion.  I don't see how he can bind the plaintiffs

6  without serving as their counsel.

7          I've never heard that before.  That wasn't my

8  understanding of what was happening.  But, you know, given some

9  of the things that have happened in this case, I think it would

10 be prudent to make sure that the person who's advocating on

11 behalf of a party actually represents them.

12          THE COURT:  Okay.  We'll circle back to that.  But

13 have I missed any lawyer appearances?

14     (No audible response)

15          THE COURT:  All right.  Others --

16          MR. MORRIS:  Not for the defendants, Your Honor.

17          THE COURT:  Just observers.

18          All right.  Well, Mr. Phillips, let's be crystal

19 clear.  I know that during the underlying bankruptcy case you

20 have, if not this adversary, you have appeared for the

21 Charitable DAF.

22          Exactly let's be clear, you know, you said your role,

23 you've been asked to argue the motion to withdraw th reference.

24 Are you retained by Charitable DAF and CLO Holdco in connection

25 with this adversary?

6

1          MR. PHILLIPS:  Your Honor, I have and I will -- we

2  will file in today a notice of appearance.  And I'm assuming

3  that will be satisfactory, and we will provide any limitations

4  on our representation.  But we are authorized to represent the

5  plaintiff CLO Holdco and the plaintiffs in this matter with

6  respect to the motion to withdraw reference.

7          THE COURT:  All right.

8          MR. PHILLIPS:  And we will file a formal notice of

9  appearance to that effect.

10         THE COURT:  Okay.  So we will look for that to

11 happen.

12         All right.  We're going to take up the motion to

13 withdraw the reference now.  Just as a reminder, my courtroom

14 deputy was in communication with the lawyers and I think the

15 lawyers agreed to 15 minutes each as far as your arguments on

16 the motion to withdraw the reference.

17         Are we all on the same page on that?

18         MR. MORRIS:  It's 25.

19         THE COURT:  Twenty-five.

20         MR. MORRIS:  Correct.

21         THE COURT:  Okay.  That as wishful thinking maybe on

22 my part.

23         Okay, 25 minutes each.  And so I will hear from you,

24 Mr. Phillips.

25         MR. PHILLIPS:  Okay.  Thank you, Your Honor.

APP_398

7

1      As an introductory matter, we discussed with Mr. Demo
2  and Mr. Morris.  We have a peculiar situation here where we
3  have a motion to dismiss that calls into question the claims
4  arising under federal law.  And that argument dovetails almost
5  completely with the argument about the consideration of federal
6  law.

7      And we have agreed that I will defer -- I will grant,
8  carve out some of the 25 minutes so that Mr. Sbaiti who is
9  going to be arguing the motion to dismiss can argue the
10  intricacies of the claim with respect to federal law.

11      THE COURT:  Okay.

12      MR. PHILLIPS:  Thank you, Your Honor.

13      Louis M. Phillips on behalf of the plaintiffs.

14      We're here on what's been deemed a re-urged motion
15  for withdrawal of reference.  We have a response that the
16  withdrawal of reference on multiple grounds, pretty much all
17  the grounds they could oppose.  And we'll start with what I
18  think would be kind of a clearing mechanism.  We have arguments
19  on both sides about various and sundry approaches to whether or
20  not the reference should be withdrawn.  And it seems to me like
21  some of those arguments may not necessarily be relevant.

22      And what I'm talking about is there's an argument,
23  both sides, about the nature of the jurisdiction core versus
24  non-core, whether or not this is an administrative expense
25  claim which is core, whether or not the Court has jurisdiction

APP_399

1  pointing out that courts have jurisdiction to decide securities

2  law matters certainly, including 5.3(a)(19).  We think the

3  following with respect to all of this.

4      Number one, the structure of -- this is a mandatory

5  withdrawal motion.  The structure of 157(d) is that motions

6  that the court shall -- the district court shall withdraw upon

7  a timely motion a proceeding that requires for resolution

8  consideration of both Title 11 and other laws of the United

9  States for regulatory organization of activities affecting

10 interstate commerce.

11      So what we have here is a question of authority.  as

12 I see it, and as we argue, the withdrawal of reference is

13 compelled upon a timely motion, not with respect to -- not

14 considering whether or not the proceeding is core because core

15 proceedings can be withdrawn, not considering whether or not

16 the proceeding is an administrative expense claim or proceeding

17 because administrative expense claim proceedings if they meet

18 the statutory definition of a proceeding subject to mandatory

19 withdrawal can be withdrawn.  In fact, we've got a citation

20 later on in the argument where there's a proof of claim that is

21 subject to mandatory withdrawal.

22      We've seen this -- the point is the question of

23 whether -- there's no question about the Court having

24 jurisdiction.  If this was a matter of subject matter

25 jurisdiction, then you couldn't waive subject matter

**WWW.LIBERTYTRANSCRIPTS.COM**

9

1   jurisdiction by failing to file a timely motion.  And clearly,

2   the jurisdiction of the district court under 1334 is referred

3   to the bankruptcy court in the event there is no motion to

4   withdraw reference.

5          So our position here in argument and before the Court

6   is that the question is not whether the Court has jurisdiction,

7   what the nature of the proceeding is, is it an administrative

8   expense proceeding, is it an adversary proceeding.  It's not

9   whether the Court is capable of deciding this type of issue

10  because clearly the statute provides that, number one, the

11  Court has authority to decide the proceeding if there's no

12  motion to withdraw reference and if it's not related to.  And

13  if it is related to and there's consent, you have authority to

14  decide the proceeding.

15         So the question is whether or not the Court,

16  notwithstanding its authority, notwithstanding the fact that

17  the proceeding might be a core proceeding, has to recommend to

18  the district court or the district court has to withdraw the

19  reference under mandatory withdrawal Section 157(d).  So --

20         THE COURT:  Okay.  Let me --

21         MR. PHILLIPS:  -- I think what we can do --

22         THE COURT:  Let me call time out and my law clerk

23  will stop the timer --

24         MR. PHILLIPS:  Yes, ma'am.

25         THE COURT:  -- when I interrupt with questions.

APP_401

1      So we're on the same page, I think I hear you saying

2   you don't dispute that this is a core in nature proceeding,

3   that it's essentially a request for allowance of an

4   administrative expense claim and even if those involve federal

5   law or non-bankruptcy law, that's core.

6      What you're saying is sometimes even when you have a

7   core matter, whether it's a proof of claim or a request for

8   administrative expense claim, if it involves I guess a

9   significant enough amount of federal law, 157(d) requires it to

10  be yanked from the bankruptcy court?

11     MR. PHILLIPS:  Well, it would be 157(d) would deal

12  with a certain type of federal law, consideration of federal

13  law or an organization and activity involving the regulation of

14  interstate commerce.  So it's not federal law --

15     THE COURT:  Okay.  But I want to make sure I have an

16  answer from you because district courts like you to have

17  certain bells and whistles in your reports and recommendations

18  about is it core or non-core or stern.

19     You acknowledge this is a core matter?

20     MR. PHILLIPS:  Your Honor, what I would rather do if

21  tied to the stake, I might approach this in a different manner.

22  And if you want to tie me to the stake, I might have to.  But

23  what I would rather do is tell the Court that I don't think --

24  I hear the Court with respect to what the district court might

25  want as regards to whether it's core or non-core.

**WWW.LIBERTYTRANSCRIPTS.COM**

1          But what I would rather do at this point, I don't

2   have authority to admit or acknowledge.  What I would rather

3   acknowledge is that I don't think it's relevant to the question

4   of whether a proceeding gets withdrawn under mandatory

5   abstention because --

6          THE COURT:  Okay.

7          MR. PHILLIPS:  -- the proceeding, the definition of a

8   proceeding that's subject to mandatory abstention has no

9   reference to core, non-core, or related to.  It is just a

10  proceeding.  And it clearly is subject to 1334 jurisdiction but

11  this is one provision of Section 157 that does not deal with

12  whether or not a proceeding is core, non-core, arising in,

13  arising under, related to.

14         It's just a proceeding with the assumption that you

15  have jurisdiction under 1334, an assumption that it got

16  referred to the bankruptcy court because of the order of

17  reference and 157 that authorizes reference of matters arising

18  in, arising under, or related to a bankruptcy case to the

19  bankruptcy court.

20         My position is that it's not relevant to whether or

21  not it is core, non-core --

22         THE COURT:  Okay.

23         MR. PHILLIPS:  -- related to because the statute

24  simply refers to the type of proceeding and its involvement

25  with a certain component of federal law.

12

1          THE COURT:  Okay.  We've started the timer again.

2          MR. PHILLIPS:  So -- okay, thank you.

3          I've got my own little timer but, of course, my phone

4  goes off and then I have to find it and if the Court could just

5  tell me when I -- I'd like to reserve five minutes.  If the

6  Court could tell me when I'm at ten minutes, I'd appreciate it.

7          THE COURT:  Okay.

8          MR. PHILLIPS:  So where I think we --

9          THE COURT:  When you are at ten minutes left.  Okay,

10  go ahead.

11          MR. PHILLIPS:  Where I think we were, Your Honor, is

12  that we have a motion to withdraw reference that was originally

13  filed in the district court.  I think there are two questions

14  here.  I think the questions are not -- the questions are

15  whether or not this is a timely motion and, secondly, whether

16  or not the requirements of 157(b) are met with respect to the

17  nature of the proceeding and the involvement of federal law

18  regulating activities or organizations under -- involving

19  interstate commerce.  That's what I think we're here to

20  discuss.

21          And so with respect to timeliness, we have a motion

22  filed in the district court.  We have a motion to enforce the

23  reference under the local order of reference.  And we have a

24  cross-motion that says to the district court don't do that

25  because it's not efficient.  You ought to go ahead and just

1  keep it and, quote, withdraw the reference because this is a

2  157(d) type proceeding.

3        I think what happened and what we have in the

4  district court's order of reference is no resolution of the

5  motion to withdraw reference.  It's simple an order enforcing

6  local order of reference that applies to all proceedings.

7        So I guess the way I look at this, the way I approach

8  -- I'm arguing to the Court that this should be approached is

9  that you can't withdraw reference of a proceeding unless the

10 order of reference is complied with.  And I can see how the

11 district court would say I am not -- we are not going to abide

12 by litigants that file -- we are not going to grant relief

13 because it's efficient in the face of a proceeding

14 automatically referred to the bankruptcy court that should have

15 been filed in the bankruptcy court but was not.

16        And if you look at the order of reference, the order

17 of reference simply says that the matter is referred under the

18 local -- under the order of reference and is to be treated as a

19 proceeding related to the bankruptcy case below and given an

20 adversary proceeding number.  There's no ruling on the question

21 of whether or not mandatory abstention applies because I think

22 what we're dealing with here, in fact, I know what we're

23 dealing with here.

24        We're dealing with a situation where the district

25 court considered any withdrawal of reference to be premature

1  because the order of reference in its mind needed to be

2  enforced so that the proceeding was in the bankruptcy court

3  prior to the ruling on, filing of, or consideration of a motion

4  to withdraw the reference.

5          THE COURT:  Okay.  Let me stop you again there.

6          MR. PHILLIPS:  So our position is --

7          THE COURT:  Let me stop you again there because --

8          MR. PHILLIPS:  Yes, ma'am.

9          THE COURT:  -- before I started preparing for today's

10  argument, I had wrongly had in my head that Judge Boyle, the

11  district judge just sua sponte did a one-paragraph order

12  sending this lawsuit to the bankruptcy court.  But then as I

13  started preparing, I either was reminded --

14          MR. PHILLIPS:  Yes, ma'am.

15          THE COURT:  -- or realized for the first time that

16  the debtor, defendants, filed a motion to enforce the reference

17  arguing, please send this to the bankruptcy court.  And your

18  clients opposed that and essentially made a cross-motion to

19  keep the case.

20          And so the district judge's short little order was

21  actually -- it wasn't sua sponte, it was after presumably

22  reading everybody's pleadings, right?

23          MR. PHILLIPS:  Agreed.  I don't think I argued that

24  it was a sua sponte order.  I did not do that, no.  It was --

25          THE COURT:  Well, no.  I point that out because I

APP_406

1 think the argument was essentially no motion to withdraw the

2 reference even though this is called renewed was really fully

3 made and considered by the district court.  Was that not what

4 you were arguing?

5        MR. PHILLIPS:  I agreed that that's correct.  I

6 agreed that that's my argument.  And the reason that's my

7 argument is you don't have to rule and in fact the district

8 court -- I'm not going to say the district court was wrong

9 because if the district court made a decision that the order of

10 reference, that the plaintiff did not comply with the order of

11 reference, then trying to short-circuit the order of reference

12 by filing in the district court.

13        The court didn't have to, and this is not something

14 that had to be litigated to decide whether or not to refer in

15 accordance with the order of reference because technically I'm

16 not sure that the district court could have concluded that the

17 order of reference could be withdrawn before it was complied

18 with.  So I don't -- I think what we're -- we're not talking

19 about a collateral estoppel or res judicata on the motion to

20 withdraw reference because it was not necessary even to address

21 the motion to withdraw reference before ordering enforcement of

22 the reference.

23        So I'm not saying it was sua sponte.  I'm not saying

24 that the plaintiff who I represent in connection with this

25 argument didn't say keep it, but the plaintiffs' argument about

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_407

16

1  keeping it was you might as well keep it because of efficiency.

2  And the district court in our estimate made the determination

3  that we don't care about efficiency.  We have an order of

4  reference that needs to be complied with as an initial

5  gatekeeper issue.  If you don't comply with the order of

6  reference and file up here, we're going to make sure you start

7  at a right place by ordering the enforcement of the reference.

8          I don't think you have to -- I know you don't.  The

9  district court didn't have to get to the issue of whether or

10 not the reference would be withdrawn on a mandatory withdrawal

11 under 157(d) to order compliance with the reference.  In other

12 words, you can't refer what's not -- you can't withdraw what's

13 not heard.  And I think that's what happened.  We're arguing

14 that that is what the district court did.

15         THE COURT:  Well, let me stop you again.  We're going

16 to be here a long time today, I fear.  Did you argue back at

17 that stage you can't send it to the bankruptcy court, Judge

18 Boyle, this involves material consideration of other federal

19 laws affecting interstate commerce, you can't do it.  And she,

20 nevertheless, did it?

21         MR. PHILLIPS:  No, I think the argument -- I mean I

22 didn't write the brief.  I didn't -- I don't think there was an

23 argument, frankly.  In the brief, as I read it, it was this

24 matter is subject to mandatory withdrawal.  And it makes no

25 sense to order the reference just so we would then bring it and

1  try to bring it back.

2          So I don't think that -- even if -- and I'll tell you

3  that even if the plaintiff argued you can't do it, it's clear

4  to me that the -- it's clear that under the order of reference,

5  that the district court could absolutely have just said I'm not

6  listening to any of this.  I'm ordering the reference and

7  that's what I'm doing.

8          But there was never in the order that was issued by

9  the district court a ruling on mandatory withdrawal.  Why?

10  Because the district court's concern was that the reference had

11  not been complied with.  And so I don't think we're talking

12  about something that had to be actually litigated to get to the

13  district court decision that the order of reference needs to be

14  complied with and this needs to be given an adversary number.

15  Why?  That's what our automatic reference requires.

16          What we don't want at the district court is litigants

17  deciding we don't have to comply with the order of reference

18  because it's going to be withdrawn anyway.  And I think, Judge,

19  if you look at what the district court did, it did not mention

20  any type of withdrawal ruling.  It did not mention any analysis

21  of the nature of the proceeding.  I'm not sure it even knew

22  what the proceeding was.

23          I think what it did was exactly what the defendant

24  asked it to do was enforce the reference, which it could do and

25  did do without consideration of the premature request in its

 1  mind that the reference be withdrawn as a mandatory withdrawal
 2  under 157(d).
 3          THE COURT:  Okay.
 4          MR. PHILLIPS:  That's our position.
 5          THE COURT:  All right.  Does that conclude your
 6  argument?
 7          MR. PHILLIPS:  No, ma'am.  We have to address
 8  timeliness, and we have to address --
 9          THE COURT:  Okay.
10          MR. PHILLIPS:  So the timeliness issue is that this
11  Court, the reference was not enforced.  The proceeding came to
12  this Court, and the defendants raised dismissal and basically
13  raised dismissal on the basis that everything raised in the
14  complaint was actually litigated or determined either through
15  the doctrine of res judicata or collateral estoppel and/or was
16  precluded by judicial estoppel.
17          None of -- those issues were not issues of the type
18  of federal law that is applicable to 157(d).  Those issues are
19  preclusion issues: res judicata, collateral estoppel.  This
20  Court ruled 100 percent on collateral estoppel and res judicata
21  and judicial estoppel and dismissed the complaint with
22  prejudice.
23          In the November hearing, this Court advised the
24  parties that it was in essence sitting as the magistrate and
25  would be writing up a recommendation.

**WWW.LIBERTYTRANSCRIPTS.COM**

 1              "I'm essentially acting as a magistrate for Judge
 2              Boyle in this action and whichever way I go and
 3              whichever theories I think she would expect a
 4              thorough write-up.  It would of course be in the form
 5              of a report and recommendation. for her to either
 6              adopt or, if not" --
 7         THE COURT:  Can I stop you?
 8         MR. PHILLIPS:  Yes.
 9         THE COURT:  Did I later correct myself at some point
10  and go, oh wait, she referred this to me?  I thought at one
11  point I misspoke and then later in open court corrected myself?
12  Did I -- am I wrong?
13         MR. PHILLIPS:  Your Honor, I will look again.
14         THE COURT:  Okay.
15         MR. PHILLIPS:  We'll look again.
16         THE COURT:  Okay.  I --
17         MR. PHILLIPS:  But --
18         THE COURT:  Go ahead.
19         MR. PHILLIPS:  But I will say this.  I will say this,
20  we are faced with and we have to argue about and we're dealing
21  with a final order.  The Court issued a final order, and the
22  plaintiff appealed.
23         So there's no question that the Court, whether or not
24  it advised the parties, it made the decision to issue a final
25  order.  And that order was appealed.  So there's no question,

APP_411

1  we're not challenging the fact that the Court issued a final

2  order.  The Court did.  And the final order went to the Court

3  of Appeals, and it took time at the Court of Appeals to issue a

4  ruling.

5          And the ruling was that collateral estoppel/res

6  judicata did not apply because of the actual litigation

7  requirement given the difference in burdens of proof and

8  standards of proof; and, secondly, that there was one of the

9  components of judicial estoppel that was not resolved by the

10 Court with respect to the request to dismiss Counts 2 and 5

11 through judicial estoppel.

12         So the matter was sent back to Your Honor.  And a

13 motion to dismiss was filed that focuses, re-urges judicial

14 estoppel on Counts 2 and 5 and focuses on the substantive

15 nature of the complaint and kind of a pure failure to state a

16 claim under Rule 12 which involves the substantive nature of

17 the claim.

18         And so what in the answer, in the response to the

19 motion to dismiss, there was a motion to re-urge or renew the

20 motion to withdraw reference.  Now that the substantiative

21 nature of the claim is put at issue by a motion to dismiss,

22 because there's no preclusion -- there is a preclusion argument

23 on Counts 2 and 5, there's no preclusion argument on res

24 judicata or collateral estoppel.

25         The motion to withdraw reference was re-urged, and we

**WWW.LIBERTYTRANSCRIPTS.COM**

1  don't think that was a surprise to anybody.  In fact, in

2  November of '21, counsel for the defendants was suggesting that

3  a motion to withdraw reference was coming and it would be

4  sanctionable, et cetera, et cetera.  We don't think it's

5  sanctionable, clearly, or it wouldn't have been brought.

6          But we now have the substantive issues in the

7  complaint being put to the test by a motion to dismiss.  And at

8  this point, we think it's ripe for motion to withdraw

9  reference.  And we also --

10          THE COURT:  This is your ten-minute warning.

11          MR. PHILLIPS:  -- would point out that --

12          THE COURT:  This is your ten-minute warning --

13          MR. PHILLIPS:  Okay, thank you.

14          THE COURT:  -- you asked for.

15          MR. PHILLIPS:  Yes, thank you very much, Judge.

16          We'd point out that there are -- you know, this court

17  and other courts take the position that -- some courts take the

18  position motions to withdraw reference are premature until and

19  unless there's a jury trial or a trial that the matters are

20  trial-ready.  In fact, I think in the Curson (phonetic)

21  litigation, you have recommended withdrawal of reference but

22  not until it's trial-ready, although those were motions to

23  withdraw reference up at front.

24          But we'd point out In re Reed.  We cited -- we'd

25  point out In re Reed, 2017 WL 1788295, which deals with a

APP_413

1  prematurity finding by the court pending jury trial readiness.

2         And we also look at National Gypsum, 145 B.R.

3  539,542, which is a Judge Fish case.  And in that case, you had

4  an objection to a proof of claim and a subject judgment on the

5  proof of claim.  I don't really understand that, but the

6  respondent to the summary judgment waited until that was filed

7  to bring a motion to withdraw reference because the summary

8  judgment had raised the issue of antitrust law.  And Judge Fish

9  said that this was -- notwithstanding this was late into the

10 case, that the motion to withdraw reference would have been

11 premature prior to that.

12        We understand -- we think this is a very closely

13 analogous case and that the question of the substantive nature

14 of the cause of action and the causes of action are now

15 squarely before the Court which generates a motion to withdraw

16 reference where when we're talking basically about preclusion,

17 that wasn't necessarily -- this is the better time to bring it

18 than that time was.

19        Finally, I would say there's an allegation of

20 prejudice.  Everything's been briefed.  The only question in

21 our mind is whether the Court issues a final order or proposed

22 findings and conclusions so no party is prejudiced.  The Court

23 will either do one or the other based on the briefing that's

24 before the Court.

25        So I'll use the rest of my 20 minutes to defer to Mr.

23

1   Sbaiti about the applicability of federal law and the intricacy

2   of federal law and necessity of dealing with federal law.

3              THE COURT:  Okay.  Mr. Sbaiti?

4              MR. SBAITI:  Good afternoon, Your Honor.

5              I've prepared some remarks for the actual motion to

6   dismiss, and so if it's okay, I'd like to just go through just

7   the legal portions and then I'll save the actual motion to

8   dismiss arguments for my time during the motion to dismiss.  Is

9   that okay?

10             THE COURT:  Okay.

11             MR. SBAITI:  Your Honor, so the main federal statute

12  or the federal statute that we're dealing with here is the

13  Advisers Act, as Your Honor knows.  When we first filed this

14  case, the core allegations or principal allegation was that

15  Highland breached the Advisers Act by -- well, several sections

16  of the Advisers Act by essentially cherry-picking a provision,

17  an opportunity to buy the HarbourVest, the HarbourVest interest

18  in HCLOF.

19             And it does so essentially by making a statement

20  about the value of the HarbourVest, the interest, and then

21  using its position as both a principal and as an adviser in the

22  HarbourVest business in order to accomplish that.  Section 206

23  of the Advisers Act establishes fiduciary duties.  The Supreme

24  Court in Transamerica Mortgage Advisers v. Lewis, 444 U.S.

25  11,17, held that Section 206 imposes federal fiduciary

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_415

24

1  standards to govern the conduct of investment advisers.  And

2  the -- if you actually look at Mr. Seery's appointment hearing

3  in July of 2020, he admitted that the Investment Advisers Act

4  puts a fiduciary duty on Highland Capital to discharge its duty

5  to the investors.

6         And that language that he used I think is going to be

7  important later on when we talk about whether there is a direct

8  fiduciary duty owed by Highland to Holdco, for example, as an

9  investor in HCLOF.

10        I'd like to focus specifically, Your Honor, on

11 Section 206(4) of the Advisers Act which says it's unlawful to

12 directly or indirectly engage in any practice or act in the

13 course of business which is fraudulent, deceptive, or

14 manipulative.  Some of the cases cited by the other side tend

15 to argue that, no, there's only a direct fiduciary duty to a

16 client.  The language that they refer to or the cases they're

17 referring to are usually citing the language in Section 206(1)

18 or Section 206(2), indeed, do discuss the duties directly owed

19 to a client.  Section 206(4) has no such limitation.

20        The next point about that issue, Your Honor, is

21 Section 206(4) also gave the SEC the power to explain the scope

22 of what 206(4) means.  And they cast a rule, 206(4)-8, which

23 Your Honor can find at 17 CFR 275.206(4)-8.  And it

24 specifically says that an investment adviser shall not make any

25 untrue statement of material fact or admit to state a material

APP_416

25

1  fact necessary to make the statements made not misleading to
2  any investor or prospective investor in a pool investment fund,
3  which HCLOF is.

4        And it also prohibits them from otherwise engaging in
5  any act, practice, or course of business that is fraudulent,
6  deceptive, or manipulative with respect to any investor in such
7  a fund.

8        Our argument has been the premise of the complaint --
9  and this rule is cited in the breach of fiduciary duty claim in
10 the complaint.  The premise of the complaint is that these
11 (indiscernible) fiduciary duties that Highland had to abide by,
12 and those fiduciary duties can be broken down into a couple
13 that are relevant for us here.

14        The first one is, is there's a fiduciary duty of care
15 which ports, for example, SEC v. Tambone which we cite in our
16 brief, 550 F.3d 106, says the Advisers Act imposes a fiduciary
17 duty to act at all times in the best interest of the fund and
18 its advisers.  There's also a duty of care which we -- excuse
19 me, a duty of loyalty, and we cite several cases on that.

20        And one example is SEC v. Word Tree Financial, which
21 is a Fifth Circuit case, 43 F. 4th 448,460.  And there, the
22 Fifth Circuit held that because cherry-picking involves
23 allocating more profitable trades to certain accounts, an
24 adviser is stealing from one customer to enrich himself when
25 they engage in cherry-picking.

**WWW.LIBERTYTRANSCRIPTS.COM**

26

1          And in that case, an advisor was cherry-picking

2    between one customer and sending the opportunity to another

3    customer.  Here, it's worse.  Here the --

4          THE COURT:  Okay.  I'm going to --

5          MR. SBAITI:  -- adviser is sending the --

6          THE COURT:  I'm going to interrupt again.  You did --

7          MS. SBAITI:  Yes, Your Honor.

8          THE COURT:  -- foreshadow that your argument might

9    overlap a little with the motion to dismiss argument.

10         MS. SBAITI:  Yes.

11         THE COURT:  I really want to hear why 28 U.S.C.

12   157(d) is triggered here.  And I'm going to give you a "for

13   example."  This court --

14         MS. SBAITI:  Okay.

15         THE COURT:  -- other bankruptcy courts get proofs of

16   claim, claims made against the estate that involve other

17   federal law and certainly state law all the time.

18         The most readily -- the example that most readily

19   comes to mind is employee WARN Act claims, okay.  We see them

20   sometimes in large Chapter 11s where employees were laid off,

21   didn't get the 60 days' notice that the WARN Act contemplated,

22   so under Fair Labor Standards Act, we think we're entitled to X

23   amount of claim.

24         No one ever asks for those to be sent to the district

25   court.  Well, I mean maybe here have been before, but my point

APP_418

27

1  is we try things in this Court involving other federal law

2  fairly often.  What makes your situation different?  What is so

3  hard or beyond what bankruptcy courts should do about your

4  claims if they go forward?

5          MS. SBAITI:  Your Honor --

6          MR. PHILLIPS:  Your Honor, if I --

7          MR. SBAITI:  Yeah, I was going to ask Mr. -- the

8  bankruptcy attorney to --

9          MR. PHILLIPS:  Your Honor, I just want to -- we

10 agreed --

11         THE COURT:  Well, no, no, no.

12         MR. PHILLIPS:  We agreed --

13         THE COURT:  I had understood that Mr. Sbaiti was

14 going to address the federal law --

15         MR. PHILLIPS:  Okay.

16         THE COURT:  -- in more in depth.  And so I'm hearing

17 some explanations of the claims, but I'm not really hearing him

18 zero in on what is significant about these claims or so

19 significant that 157(d) is triggered.  So Mr --

20         MS. SBAITI:  Your Honor, if I may, I would -- sorry,

21 am I on mute?

22         MR. PHILLIPS:  No.  You're -- we can hear you.

23         MR. SBAITI:  Can you hear me?

24         Okay.  Your Honor, I would have two points to make,

25 Your Honor.  Number one, I don't know much about the WARN Act.

1  I do know that the Advisers Act is one of the statutes that is

2  not as highly litigated as an employment statute.  And so while

3  there is case law to support the general proposition --

4       THE COURT:  Well, and the argument is because it

5  doesn't give a private right of action is what I hear the other

6  side saying.

7       MS. SBAITI:  And that was where I was going is they

8  now are citing cases in their reply that says, well, there's no

9  private right of action, at least their reply to the motion to

10 dismiss.  You know, and I'm assuming that's what they've argued

11 in the motion to withdraw reference is that there's not private

12 right of action under Section 215.

13      Well, that kind of -- obviously, we disagree with

14 that because the Supreme Court in <u>Transamerica</u> specifically

15 said there is a private right of action.  It's a private right

16 of action for rescission and there's a private right of action

17 for what the Supreme Court called the incidence of voidness.

18      Section 215 does two things.  It makes void any

19 contract hat requires someone to waive any rights or

20 obligations under the Advisers Act.  And Section 215 also voids

21 the rights of anybody who performed a contract in violation of

22 the Advisers Act.  Now the precise scope of that hasn't been

23 heavily litigated and it's -- you know, these are broad

24 principles.

25      And, in fact, in the reply to the motion to dismiss,

APP_420

1  they bring up a case pending in New York where a court there,

2  although against the overwhelming weight of authority said,

3  well, Section 215 only applies when you have a contract that

4  facially requires someone to violate the Advisers Act or which

5  was made in violation of the Advisers Act.

6         But we argue that the settlement was made in

7  violation of the Advisers Act because it was made as part of a

8  way -- a part of a self-dealing scheme.  But the intricacies of

9  that law and the background and the underlying rules and

10 regulations that go into that that we claim violated I think

11 are not -- I don't know that 157 is a sort of court-competency

12 issue.

13        The way I've always understood it to be is, you know,

14 when there's an Article III court deciding these types of

15 things and there's going to be a jury, that's where this is

16 supposed to go.  I would defer to the bankruptcy experts to

17 correct me on that.  But that is how I've always understood the

18 position that -- on the bankruptcy issue on mandatory

19 withdrawal to be.

20        THE COURT:  All right.  Anything else?

21        MS. SBAITI:  Your Honor, I'll just hit the actual

22 causes of action issue and get them (indiscernible) on the

23 motion to dismiss if that's okay with Your Honor.  I hope we

24 gave Your Honor a flavor of the federal law issues that are

25 very much at play here.

APP_421

1    THE COURT:  Okay.  Yeah, just to be clear, you have

2  one more minute so.

3    MR. SBAITI:  Oh, I'll kick it back to Mr. Phillips.

4    THE COURT:  Okay.

5    MR. PHILLIPS:  We just have one more minute out of

6  the 25?

7    THE CLERK:  Yes, Your Honor.

8    THE COURT:  Yes.

9    MR. PHILLIPS:  Okay.  I'll reserve one minute, Your

10  Honor, for rebuttal.

11    THE COURT:  Okay.

12    Mr. Demo?

13    MR. DEMO:  (Clears throat).  Excuse me.

14    Yes, Your Honor.  Greg Demo for the record, Pachulski

15  Stang Ziehl & Jones, on behalf of Highland Capital Management.

16    That's a lot to unpack, Your Honor, mostly because

17  most of it is factually inaccurate.  And I'll go through why

18  it's factually inaccurate in a minute.  But as we go through

19  this -- oh, I'm sorry, Your Honor.  Before I start, can I do

20  our exhibits?

21    THE COURT:  All right.  So you have exhibits on a

22  motion to withdraw the reference?

23    MR. DEMO:  We do, Your Honor.  And they're at Docket

24  Number 146.  There are six exhibits.  Five of them are just

25  cases that are either on your docket in the Acis bankruptcy or

1   on the docket.  Two of them are SEC guidance.  We think Your

2   Honor can just take judicial notice of those.

3          The last which is Exhibit 3 is the investment

4   management agreement between Highland Capital Management and

5   the DAF.  I did talk to Mr. Phillips before we started, and he

6   said he had no objection to these being entered.

7          THE COURT:  All right.

8          MR. PHILLIPS:  Correct.  Correct.

9          THE COURT:  Then I'll admit them.  I'll admit them.

10     (Defendant's Exhibits 1 through 6 admitted into evidence)

11         MR. DEMO:  Okay.  Thank you, Your Honor.  And

12   apologies for that aside.

13         But going back and, again, I'll unpack these facts,

14   you know, as we go through.  But the one thing that I'd ask

15   Your Honor to keep in mind as we go through this is that Your

16   Honor has actually already adjudicated this issue.  In November

17   of 2023 [sic], Highland filed a substantially similar motion to

18   dismiss.  All parties fully briefed that motion to dismiss.  On

19   November 23, 2021, all parties argued the merits of that motion

20   to dismiss including the Investment Advisers Act in this court.

21         In March of 2022, Your Honor entered a final order on

22   that motion to dismiss which again is substantially the same as

23   what we're here on today.  But we're still here today because

24   plaintiffs are asking you to withdraw the reference on a motion

25   to dismiss that Your Honor has already heard and entered a

APP_423

1  final order on.

2          I would ask Your Honor just keep that in your mind,

3  keep the absurdity of that in your mind as I walk through the

4  rest of this case because I am going to have a timeline as I

5  normally do.  But before we get to that timeline, Your Honor,

6  you've heard plaintiffs' arguments, and their argument boils

7  down to mandatory withdrawal is required because the Investment

8  Advisers Act is somehow implicated.

9          And now plaintiffs also had an argument that

10  mandatory withdrawal is somehow required because this was a

11  non-core proceeding barely even related to this.  Now they've

12  backed off that second argument, Your Honor, and I thin they've

13  done it tactically because they don't want to admit it.  Mr.

14  Phillips said he couldn't admit to Your Honor that this is a

15  core proceeding.

16          And while we agree that in terms of Section or 28

17  U.S.C. 157(d) that that is not entirely relevant.  Your Honor

18  can withdraw or a core proceeding can be referenced and

19  withdrawn in that case.  But because it's a core proceeding,

20  and I'll get to this at the end if Your Honor wants me to go

21  once again in the Supreme Court's Reading (phonetic) case, and

22  this is, claims allowance, equitable jurisdiction of an

23  administrative expense claim, Your Honor can enter final

24  orders, which you just heard Mr. Sbaiti said that, well, maybe

25  you shouldn't do it, and there is no jury trial right.

APP_424

1    And so while again we believe that there's limited

2 relevance to the motion to withdraw the reference, it is an

3 extremely important issue that plaintiffs put into relevance

4 and now are (indiscernible).  And now going -- and Ms. Canti

5 (phonetic), can you please put up Slide 1 -- going to the text

6 of 28 U.S.C. 157(d).  And this is the text that we all know

7 well.  And when it comes up on the screen, you'll see it.  It's

8 really the second section of 157(d) that governs mandatory

9 withdrawal of the reference.

10    And there are two elements to that.  The first

11 element is timeliness, if a movant -- not this court, but if a

12 movant does not file a timely motion, there can be no mandatory

13 withdrawal.  The second element assumes that a timely motion

14 has been filed and requires mandatory withdrawal only if

15 there's substantial consideration, and that's the case law of a

16 non-bankruptcy federal law.

17    Neither of those two elements are met here, Your

18 Honor.  And in terms of timeliness, we take fresh approaches in

19 our case, our papers and we cite other case.  And for the

20 purpose of timeliness, a movant is supposed to file a motion to

21 withdraw a reference as soon as it becomes apparent that there

22 is going to be issues that must be adjudicated by the district

23 court.  Courts look at that dispositively.  If that motion is

24 not timely filed, there is no withdrawal of the reference under

25 157(d).

**WWW.LIBERTYTRANSCRIPTS.COM**

1        But there's more, Your Honor, and again, we cite
2   these cases.  If the motion to withdraw the reference seems to
3   be forum-shopping, that goes into the timeliness requirement.
4   If the motion to withdraw the reference is prejudicial to a
5   non-movant -- in this case, Highland and its creditors -- that
6   goes to timeliness.

7        All of those elements are present here, Your Honor.
8   Not timely, forum shopping, and it's prejudicial.  And this,
9   Your Honor, is where, you know, I want to go through the
10  timeline again because I think the timeline proves our case.
11  And as we go through the timeline, I'll rebut some of the
12  factual misstatements that Mr. Phillips and Mr. Sbaiti made.

13       And, Ms. Canti, if you can go to the next slide,
14  please.

15       As Your Honor knows, this case was started not in
16  this court, notwithstanding the fact that it sought an
17  administrative expense claim, but it was began in district
18  court on April 12th, 2021.

19       And, Ms. Canti, there should be dates up on the top
20  of those slides if you can make sure that those show.

21       The next slide, I'll give you a second to adjust.

22       They're not there, but I can go through the dates,
23  Your Honor.  So this is April 12th, 2021.  In the next slide is
24  May 19th, 2021.  On this date, Highland filed its motion to
25  dismiss their complaint both for failure to state a claim on

APP_426

35

1  the merits and pursuant to res judicata.  And this complaint --

2  I'm sorry, this motion to dismiss that we filed originally I

3  believe is Docket Number 36 on the docket.

4          And if you just go to the table of contents of that

5  pleading, Your Honor, Article 3, subsection (c) is failure to

6  state a claim.  And it's failure to state a claim under RICO.

7  It's failure to state a claim for breach of fiduciary duty.

8  It's failure to state a claim for negligence.  It's failure to

9  state a claim for tortious interference.  And it's failure to

10 state a claim for breach of contract.

11         And if you go to the back end of that motion to

12 dismiss, Your Honor, you'll see that we argue Transamerica, no

13 private right of action under 206.  We argue Goldstein, no

14 fiduciary duty to an investors in a fund.  We argue all of the

15 Investment Advisers Act claims that you are going to hear

16 today.  That was in our motion to dismiss filed in May of 2021.

17         Ms. Canti, next slide, please.

18         And this is May 27th, 2021, and it's plaintiffs file

19 their response to the motion to enforce the reference.  And

20 you've heard a lot of talk about how plaintiffs filed a motion

21 in district court for mandatory withdrawal, and that's the

22 basis for their timeliness argument, Your Honor, is that

23 there's a motion sitting out there somewhere that's never been

24 ruled on.

25         But if you look at this response, and this is the

36

1  only thing they filed in the district court, it's a response to
2  our paper and in the title, it says "Cross motion to withdraw
3  the reference."  There is no stand-alone motion.  It was
4  procedurally improper the way they did it, and basically they
5  only made an argument to the district court that mandatory
6  withdrawal of the reference should apply.  And that argument is
7  verbatim, nearly verbatim the arguments that you're hearing
8  today.  They brought those two in district court.

9       And now you heard Mr. Phillips says things about how,
10 you know, it's just -- there's no thought of judicial economy,
11 right.  It's just you enforce the reference and then Your Honor
12 gets to decide whether it would have to bounce it up to the
13 district court.  That's just not true, Your Honor.

14      In this motion, plaintiffs cited a case, it's called
15 In re Harrah's Entertainment.  They actually cited it in this
16 round of pleadings.  And in that case, which was filed in the
17 Eastern District of Louisiana, there was a case filed in the
18 Eastern District of Louisiana, and the question there was
19 whether or not that case should be referred to the bankruptcy
20 court as a related case.

21      A party filed a motion for mandatory withdrawal of
22 the reference in the district court and also a motion for
23 permissive withdrawal again in the district court.  The
24 district court denied the motion to enforce and decided that it
25 wouldn't make sense because you would end up having to withdraw

APP_428

1    the reference anyway.  Judicial economy, Your Honor.

2              Plaintiffs cited that case.  And they cited that case

3    in this paper that we're talking about now to argue to the

4    district court that it made absolutely no sense to enforce the

5    reference and bring it down here because it would just get

6    roundtrip back and how does that make sense in terms of

7    judicial economy.  The exact opposite of what you heard

8    earlier.

9              And I'll also point you to another case they cite,

10   and this is <u>Continental Airlines</u>, which was affirmed by the

11   Fifth Circuit.  Substantially similar facts, and in that case,

12   the Southern District of Texas, the district court said, "This

13   court strongly suspect that if it does not withdraw the

14   reference, it will only see this exact same lawsuit again in

15   the future on such a de novo review of a report and

16   recommendation.  That duplication of judicial effort would

17   needlessly waste this court's limited resources."

18             The idea -- and again, we'll get to the order that

19   the district court entered, but the ideas that Mr. Phillips put

20   forth in this Court is not borne out by the case law nor are

21   they borne out by what they actually pled.

22             And next slide, please, and I'll move this a little

23   bit faster.

24             June 28th, 2021 -- I'm sorry, we are now in August,

25   Your Honor.  And this is plaintiffs' move to stay the

APP_429

38

1  complaint.  You've hard this one before, arguing they can't be

2  prosecuted because of the plan injunction.

3           Next slide.

4           September 20th, 2021, this is when the district court

5  entered its order referring this case to Your Honor to be

6  adjudicated as -- and there is a typo there -- it just said

7  related to Highland's bankruptcy.  Now you just heard me cite

8  Harrah's, you heard me cite their papers.  Now did the district

9  court say that this cross-motion, this procedurally improper

10 cross-motion was denied?  No, but it enforced the reference

11 notwithstanding plaintiff's arguments that it would aid

12 judicial economy because the reference would have to be

13 withdrawn.  They made the exact same arguments that are being

14 made here today.

15          The inference is not what Mr. Phillips said.  The

16 inference is that the district court read plaintiffs' papers

17 and said, no, there's no basis for mandatory withdrawal, let's

18 send it to the bankruptcy court where it should have been filed

19 in the first instance.

20          Next slide, please.

21          This is November 8th, 2021.  Now this is the first

22 time that plaintiffs indicate in this Court that they think

23 that the reference should be withdrawn, and they did it by

24 attaching a proposed motion to withdraw the reference to a

25 procedurally improper amended motion to stay pending

APP_430

1  adjudication of the confirmation order in the Fifth Circuit.

2  Again, that motion that they attached was verbatim the

3  arguments they made in the district court and verbatim the

4  arguments that they're making here today.

5           Now it begs the question, Your Honor, why they

6  thought they needed to file a motion to withdraw the reference

7  in this Court in November of 2021 if they already had a motion

8  to withdraw the reference pending when it was referred down to

9  this Court.  It makes not sense, Your Honor.

10          Now they've threatened to file that motion if you

11  were to deny the stay.  And now -- can we go to the next slide,

12  please?

13          November 23, 2021, Your Honor denied the stay.  What

14  did plaintiffs do?  I can tell you what they didn't do.  They

15  didn't file their motion to withdraw the reference.  Again,

16  they argued in the Court the merits of the motion to dismiss

17  including that the Investment Advisers Act claims should be

18  dismissed.

19          Now fast track because there's a fairly large gap

20  between September '21 and November of '21.  What happened in

21  that gap?  The answer to that, Your Honor, is not that a motion

22  to withdraw the reference was filed.  What happened in that gap

23  is that the parties agreed on the November 23rd date to hear

24  both the motion to dismiss and the motion to stay.

25          Next slide, please, Ms. Canti.

1    And this is March 11th, 2022.  This is the date that

2 Your Honor entered a final order.  All the equivocation about

3 whether you're acting as a magistrate, all of that stuff goes

4 out the window.  Your Honor did not enter a report and

5 recommendation to the district court.  Your Honor entered a

6 final order, as Your Honor could do because this is a core

7 proceeding.

8    Important to Mr. Phillips' argument is what did this

9 order say.  Primarily it dismissed on collateral and res --

10 and, sorry, and judicial estoppel grounds.  That's correct.

11 But if you look at the last paragraph of Your Honor's March

12 2022 order, it said that it reviewed all of Highland's other

13 arguments which are the arguments as to why the Investment

14 Advisers Act claims should be dismissed.

15    And Your Honor in March of 2022 in the last paragraph

16 of that order said she was inclined to agree with our arguments

17 on the Investment Advisers Act claims.  Your Honor has done

18 this before, yet we're here again today.

19    Next slide, please.

20    Now this is fast forwarding a year.  Now we are in

21 September, specifically September 2nd, 2022.  This was when the

22 district court remands this back to Your Honor for one finding.

23 But, again, there's a fairly large gap between March of 2022

24 and September of 2022.  And so what was happening during that

25 time period?  Again, no motion to withdraw the reference was

41

1 filed.

2          But what was happening is that the parties were fully

3 briefing the merits of your final order on the motion to

4 dismiss to the district court.  Plaintiffs at no point during

5 that briefing made reference to a need to withdraw the

6 reference or made reference to the Court's, your inability to

7 enter a final order.  September 2nd, 2022.

8          Next slide, please.

9          This is October 14th, 2022.  Now this is when

10 Highland filed its renewed motion to dismiss in this Court.

11 Again, there's a month.  September, October, no motion to

12 withdraw the reference filed.  The motion to dismiss that

13 you'll hear today from Mr. Morris, again, substantially similar

14 to the motion to dismiss that you heard in November of 2021, a

15 year ago.

16          Next slide, please, Ms. Canti.

17          All right.  Now we are at finally, finally November

18 18th, 2022.  Plaintiffs respond to the renewed motion to

19 dismiss and file what they call a renewed motion to withdraw

20 the reference pursuant to 28 U.S.C. 157(d).  That renewed

21 motion, again, is the exact same as their supposedly cross-

22 motion that was filed in the district court.  It's the exact

23 same as the motion they threatened to file a year ago in

24 November of '21.  And it's now being asked to be heard today

25 when Your Honor has already adjudicated these exact same facts.

APP_433

42

 1         And, again, look at that gap, Your Honor.  November

 2  -- I'm sorry, September to November, Highland takes the time

 3  and effort to file a renewed motion to dismiss.  At no point in

 4  that three-month gap until November of 2022, a year after Your

 5  Honor already heard this issue, did they file their first

 6  motion to withdraw the reference.  And, again, if they already

 7  had one on file, why did they file one again?  It doesn't make

 8  sense, Your Honor.

 9         And that's timeliness.  And, Ms. Canti, if you can go

10  to the next slide, please.

11         And all this is, Your Honor, is a summary of what I

12  just went through, right.  Like look at this, April 2021,

13  November 2022.  November 2022 after we've done all of this is

14  the first time they asked this Court to withdraw the reference.

15  Where is the timeliness?  This is per-se untimely.

16         They could have filed a motion to withdraw the

17  reference in September of 2021.  They didn't.  They could have

18  filed their threatened motion to withdraw the reference in

19  November of 2021.  They didn't.  They could have at any time

20  between November '21 and March '22 before Your Honor entered

21  her final order filed a motion to withdraw the reference.  They

22  didn't.  Instead, they briefed their appeal, made no mention of

23  it.

24         September 2nd, 2022 it's remanded back here for an

25  adjudication on the merits of the motion to dismiss.  They

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_434

43

1 could have filed a motion to withdraw the reference.  Didn't.

2 Highland filed this motion to dismiss, no motion to withdraw

3 the reference.  Only a year after Your Honor has heard the

4 merits of his exact motion to dismiss did they ask Your Honor

5 to withdraw the reference.

6          That's untimely, Your Honor.  That is absolutely at

7 least in my estimation untimely, and I don't know how you get

8 around it.  But it's worse than that, Your Honor.  It's forum

9 shopping.  Again, April 2021, they start this thing in the

10 district court an administrative expense claim.  They seek to

11 prosecute outside of Your Honor.  That's the first indication.

12          But going back to March of 2022 when Your Honor

13 reviewed the argument that Mr. Morris is about to make and said

14 that it was inclined to agree with Mr. Morris -- I'm sorry,

15 inclined to agree with Highland.  Only after Your Honor gave

16 plaintiffs a preview of how you would rule on the motion to

17 dismiss that you're to hear today did Highland -- I'm sorry,

18 did plaintiffs file their motion to withdraw the reference.

19 That's forum shopping.

20          And the prejudice to Highland should also be apparent

21 from the timeline.  Each of these little bullet represents a

22 significant cost to the estate.  And what do plaintiffs want?

23 They want to go from November 2022 back to April of 2021.  They

24 don't want any of this, Your Honor.  They want to restart the

25 clock with significant cost to Highland and it creditors.

**WWW.LIBERTYTRANSCRIPTS.COM**

44

1    Impermissible.

2         28 U.S.C. 157(d) requires timeliness.  If timeliness

3    is not met, the motion must be denied.  There is no timeliness,

4    there is forum shopping, and there is prejudice.  If that

5    weren't enough, Your Honor, they still lose on the merits on

6    the question of the (indiscernible) consideration of federal

7    non-bankruptcy law.  And I think the clearest indication of

8    that is Mr. Sbaiti's argument.  Supreme Court case, Supreme

9    Court case, Supreme Court case.  Here are the SEC guidance.

10         Where did he say that there's a circuit split?  Where

11   did he say that there's any unsettled law?  Nowhere, Your

12   Honor, and he did that because there is no unsettled law.

13   These are very simple questions.  Was there a fiduciary duty?

14   Was there a breach of that duty?  And what is the remedy?

15   That's the exact same question that Your Honor and bankruptcy

16   courts all over this country answer and adjudicate every day.

17         There is nothing complicated about this case,

18   notwithstanding what plaintiffs want you to believe because

19   let's look at the issues, right.  Let's drill them down.  The

20   first issue is, is there a fiduciary duty under the Investment

21   Advisers Act.  Yes.  How do we know that?  The Supreme Court

22   told us so.  Non-issue.

23         The second issue is who does that fiduciary duty run

24   to?  Under Goldstein, which we cited in our papers, under the

25   SEC guidance which we cited in our papers, it's very clear that

APP_436

45

1  that fiduciary duty which is separate and apart from Rule

2  206(4) that Mr. Sbaiti cited, that fiduciary duty runs only to

3  the fund, not to the investors in that fund.  And that makes

4  perfect sense, Your Honor.  If an investment manager has a

5  fiduciary duty to the hundreds of -- potentially hundreds of

6  people who are invested in a fund individually, that's chaos.

7  And the investment manager will be sued every day.  Settled

8  law, Your Honor.

9          And so what do you have to do?  You have to look at

10 two agreements, the HCLOF investment management agreement,

11 Highland is indirectly the investment manager to HCLOF,

12 fiduciary duty.  CLO Holdco is an investor in HCLOF.  No

13 fiduciary duty between Highland to CLO Holdco because of HCLOF.

14 Again, Goldstein clear precedent.

15         Highland had an investment management agreement with

16 the DAF.  Is there a fiduciary obligation to the DAF under that

17 agreement?  Yeah.  That's it, Your Honor.  Okay, question one's

18 done.

19         Question two, assuming there's a fiduciary

20 obligation, what's the scope of that obligation and what's the

21 remedy for breach?  Going to breach first, again, you heard Mr.

22 Sbaiti argue 206, 206, 206.  Supreme Court precedent is

23 absolutely clear that 206 provides no private right of action.

24 Cases have been dismissed because they've been brought by a

25 private investor under Rule 206.  That's the Corman case.

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_437

46

1  That's the Fifth Circuit we cite in our papers.

2          The Fifth Circuit doesn't stand alone on this, Your

3  Honor.  Supreme Court precedent.  206 which again is the only

4  actual rule that they pled in their complaint does not provide

5  a private right of action.  That's it, Your Honor.  That's all

6  you have to do.  Not complicated.

7          And I'll get to 215 in a second because even though

8  it wasn't pled in the complaint, I still want to talk about it.

9  Okay.  So what is the scope of that allegation?  Mr. Sbaiti

10 talked about a duty of care.  Okay, that's fine.  That's

11 clearly set out in the guidance, and a duty of loyalty.  The

12 duty of loyalty under clear, again, Supreme Court precedent,

13 SEC guidance and, as Mr. Morris will talk about, a Northern

14 District of Texas case entered in an appeal from Mr. Dondero,

15 one of this Court's orders said the same thing.  That duty of

16 loyalty is satisfied by disclosure.

17         So all Your Honor has to do is look at the

18 disclosures made to the DAF and say are those sufficient to

19 satisfy a reasonable investor about the conflict of interest or

20 the potential conflict of interest.  That's it.  Easy-peasy.

21         And so where do we go next?  And, you know, I'm

22 actually going to leave out 215.  It wasn't pled.  It can't be

23 a motion.

24         THE COURT:  This is your two-minute warning.

25         MR. DEMO:  The case law is clear.

**WWW.LIBERTYTRANSCRIPTS.COM**

1          THE COURT:  You have two more minutes.

2          MR. DEMO:  Okay.  Thank you.

3          Thank you, Your Honor.  And I guess the last point,

4  and it bears repeating, is that Your Honor has already

5  adjudicated this in this Court and Your Honor actually

6  adjudicated it in the Acis bankruptcy.  And this is on our

7  witness and exhibit list.

8          In the Acis bankruptcy, Highland then under the

9  control of Jim Dondero filed an objection to the plan saying

10  that it could not be confirmed because it violated applicable

11  law.  What was that applicable law?  The Investment Advisers

12  Act of 1940 for the exact same things that they're doing here.

13          (Indiscernible) examples of significant federal law,

14  plan injunction prohibits it.  That's already been addressed

15  three times.  Jury trial right, it's not up, but they don't

16  have a jury trial right because this is an administrative

17  expense claim, Your Honor.

18          The motion is untimely, it's prejudicial, it's forum

19  shopping, and there is nothing that's not -- nothing that rises

20  to the level of a material consideration of unsettled federal

21  law.  All you have to do is look at the federal law and apply

22  it to a set of facts, the same thing you do every day in this

23  courtroom.  For that reason, Your Honor, we'd ask the motion to

24  be denied and I can answer any questions.

25          THE COURT:  All right.  Mr. Phillips, you get one

**WWW.LIBERTYTRANSCRIPTS.COM**

APP_439

48

1    minute in rebuttal.

2         MR. PHILLIPS:  Your Honor, a couple of thing very

3    quickly.

4         Number one, whether or not what the district court

5    did, we asked and frankly maybe don't know the answer to

6    whether or not this Court can decide what the district court

7    did in its order of reference.  But I guess, number one, I

8    guess we'll find out what the district court did.

9         We understand the case law, but we also understand

10   there's another version of the approach to matters filed in the

11   district court and that is we want the reference withdrawal

12   order to be complied with before we deal with anything.

13        That is a long-term judicial economy because if you

14   have people filing in the district court making their own

15   determinations, what's the best way to stop that from

16   happening?  The order of reference will be enforced and if you

17   have a motion to withdraw reference, file it then.

18        Secondly, one of the things about the scope of

19   fiduciary duty that's before the Court in the lawsuit is that

20   they say there's an investment adviser agreement with DAF Fund,

21   the DAF Fund but not CLO Holdco.

22        But the investment advisory services subject to --

23   (indiscernible) the investment adviser shall act as an

24   investment advisor to the fund -- that's the DAF -- the general

25   partner with respect to the fund and its subsidiaries and shall

APP_440

1  provide investment advice with respect to the investment and

2  reinvestment of the cash, financial instruments, and other

3  properties comprising the assets and liabilities of the fund

4  and the subsidiaries.

5         The subsidiary CLO Holdco is the one where the

6  investments are.  That's where the investment advice actually

7  bore fruit.  So the question -- there is a question about scope

8  of fiduciary duty and you couldn't have the investment adviser

9  agreement without the investment adviser being subject to the

10 Investment Advisers Act.

11        THE COURT:  Okay.

12        MR. PHILLIPS:  My point is from my standpoint --

13        THE COURT:  Time's up.

14        MR. PHILLIPS:  -- is that there was a question about

15 the scope of the duty.  Thank you, Your Honor.

16        THE COURT:  Thank you.

17        All right.  Here's what I am going to do.

18        I am going to recommend that the district court deny

19 this renewed motion to withdraw the reference.  First, I had

20 put together my own timeline before I saw Mr. Demo's and I

21 think I have to find that this is not a timely motion to

22 withdraw the reference.

23        The action as we all know was filed April 12th, 2021.

24 We are now January 25th, 2023.  So I don't think the timeliness

25 requirement has been met here.

1          Second, this does feel like a second bite at the

2   apple, to use that worn-out metaphor.  I think substantially

3   the same arguments were made, albeit in a differently-worded

4   pleading maybe to Judge Boyle, again, back in 2021.  I guess it

5   was June 29th, 2021 when the plaintiffs first argued that the

6   district court should keep this matter and, among other things,

7   argued 28 U.S.C. 157(d).  This involved consideration of both

8   Title 11 and other laws of the United States.

9          So it's sort of a second reason on top of

10  untimeliness that I think this has already been asked for once

11  and denied.

12         But yet another reason I will recommend denial of

13  this motion is I don't think this action ultimately involves

14  material consideration or significant consideration of other

15  laws of the U.S. regulating organizations or activities

16  affecting interstate commerce.

17         Again, the Investment Advisers Act is implicated.

18  RICO is implicated.  But I don't think it's terribly

19  complicated.  As I alluded to, bankruptcy courts consider

20  proofs of claim as well as requests for administrative expense

21  claims all the time that involve significant other law

22  including federal law, and I just don't think this triggers

23  mandatory withdrawal under 28 U.S.C. 157(d).

24         So I am going to go ahead and do that written report

25  and recommendation to the district court.  Now normally, I

APP_442

51

1  guess my most often followed practice is I don't rule on

2  motions to dismiss or any kind of dispositive motions while I'm

3  waiting on the district court to either adopt or reject a

4  report and recommendation.

5        But I'm going to go ahead and hear the arguments on

6  the motion to dismiss today even with that risk that the

7  district court may say, no, you're wrong, I'm yanking the case.

8  I'm going to go ahead and hear the arguments because my best

9  guess is the district court is going to adopt my report, okay.

10        My best guess is the district court is going to say

11  untimely, is going to say second bite at the apple, and I think

12  this is not materially enough other federal law to yank it from

13  the bankruptcy court.  I may be wrong, and this may all be a

14  waste of time today.  But I'm going to go ahead and hear the

15  hearing, the arguments on the motion to dismiss.

16        I'll say a couple of additional things.  It's still

17  nagging at me the transcript that Mr. Phillips read from where

18  I said in this adversary I'm going to do a report and

19  recommendation to the district court on the previously-argued

20  motion to dismiss.  I'm not questioning that because I have

21  this memory of me later going why did I say that.

22        This was referred to me.  I had in my mind core

23  matter because it was a request for an allowance of

24  administrative expense claim against a debtor for conduct while

25  it was still a debtor in possession.  So I thought at some

APP_443

52

1  point I had come out and announced maybe in a different

2  Highland hearing and maybe others, not everyone was on the

3  call.

4      I thought I remembered correcting myself out loud to

5  the parties.  Maybe I didn't.  Maybe that was just back in

6  chambers to my law clerk, and I had every intention of coming

7  out and telling y'all and I didn't.  So that's just an

8  explanation of that.  I misspoke when I did that.

9      And then what was the other thing I wanted to say.

10 Well, gosh, I've lost my train of thought on that.  Oh, I know

11 what it was.  My law clerk noticed this week that when the

12 renewed motion to withdraw the reference was transmitted to the

13 district clerk's office from the bankruptcy clerk's office,

14 guess what?  A new district court civil action number was

15 created, and it was assigned to a different district judge,

16 Judge Karen Scholer.

17     I don't think anyone would think that is the most

18 efficient thing to happen here, so we'll do our part on our end

19 to get personnel talking to personnel and hopefully get that

20 fixed to where it goes back to Judge Boyle.  But no promises

21 there.  We will just point it out and point out that we think

22 that was inefficient and a mistake and they'll do whatever

23 they're going to do.

24     All right.  So with that, do you all need a five-

25 minute break before we launch into the motion to dismiss

53

1  arguments?

2          MR. MORRIS:  I would --

3          MR. PHILLIPS:  Your Honor, this is Louis Phillips.  I

4  just wanted to tell Your Honor that we wanted to make sure that

5  we hadn't overlooked anything in the transcript that we cited.

6  And we read it again.  I didn't.  Ms. Heard read it again while

7  we were arguing.  And we did not find anything else.

8          I have to -- I will tell the Court on the record that

9  we read a lot of pleadings, but we did not -- we did not come

10 across anything that we left out that would contradict that.

11 And we made sure again today there's nothing else in that

12 transcript that would contravene what I read to Your Honor.  So

13 --

14         THE COURT:  Okay.

15         MR. PHILLIPS:  -- look, we understand that what

16 happened after was -- there was a final order.  And so we

17 understand there was an appeal of the final order.  And we have

18 to admit that we didn't read the entire record, and we have not

19 come across and ignored and not brought before Your Honor

20 something that would contravene what we've mentioned today in

21 argument.

22         THE COURT:  Okay.  Thank you for that.  And, again,

23 it may have been back in chambers that I said what did I say

24 that for.  I have the authority to issue a final order, and

25 certainly someone could have raised that on appeal if they

**WWW.LIBERTYTRANSCRIPTS.COM**

54

1  thought she made a mistake.

2          All right.  So --

3          MR. PHILLIPS:  Understood.  Understood.

4          THE COURT:  -- why don't we take a five-minute --

5  please, five minutes, not six -- five-minute break, and we'll

6  hear the oral arguments on motion to dismiss.

7          THE CLERK:  All rise.

8          MR. PHILLIPS:  Thank you, Your Honor.

9      (Recess at 2:58 p.m./Reconvened at 3:05 p.m.)

10         THE CLERK:  All rise.

11         THE COURT:  Please be seated.

12         All right.  We are going back on the record in the

13 Adversary, CLO Holdco DAF versus Highland, the renewed motion

14 to dismiss.

15         Mr. Morris, I think we agreed 45 minutes and 45

16 minutes, right?

17         MR. MORRIS:  That's correct.

18         THE COURT:  Okay.  You may proceed.

19         MR. MORRIS:  Okay.  Before I begin, Your Honor, may I

20 please just move for the admission into evidence of the

21 Defendant's Exhibits that are lodged at Docket 145?  It's

22 Exhibits 1 through 14, and I understand there's no objection.

23         THE COURT:  Confirm there's no objection.

24         MR. SBAITI:  Your Honor, we agreed that we would

25 reserve our rights to object to the relevance of those to

55

1   certain arguments, but overall, we have no objection.  And I

2   guess while we're on it, we also were asking to admit our

3   exhibits, which are on Docket 150.

4         THE COURT:  Okay.  And there's no objection to those,

5   Mr. Morris?

6         MR. MORRIS:  Yeah.  It's a little vague to say that I

7   have no objection to the exhibits, except potentially as to

8   relevance.  I didn't quite understand that part.

9         THE COURT:  Well --

10         MR. MORRIS:  Is there objection or isn't there?

11         MR. SBAITI:  Well, I just, they might not be relevant

12   to some arguments, is all I'm saying, but they can still be --

13         THE COURT:  Well --

14         MR. MORRIS:  So --

15         THE COURT:  I'm going to say something.  I've been

16   saying this a lot lately.  You probably haven't heard it.  But

17   I'm old enough to remember when a 12(b)(6) motion was, I look

18   at the motion response reply and look at the four corners of

19   the complaint, and there's either a plausible claim articulated

20   or not.

21         And what I have been seeing is these motions to

22   dismiss with appendices that are hundreds of pages long and

23   then responses with appendices that are hundreds of pages long.

24   So much so that one day, different case, I had a law clerk go

25   do research for me.  Am I an old fogey who has it wrong, who

56

1  thinks I'm only supposed to look at the four corners of the
2  complaint?

3        And to my surprise, there is a Fifth Circuit case,
4  maybe everyone knew about it but me, that says if it's either
5  something attached to the complaint or something that goes at
6  the heart of the claims in the complaint, or words to that
7  effect, yeah, you can go beyond the four corners of the
8  complaint and have some evidence.

9        But I will tell you, I and every judge I know just we
10  keep getting these longer and longer and longer appendices and
11  then people just agree, as opposed to saying no, it doesn't go
12  to something at the heart of the complaint.  And then, we find
13  ourselves with 4,000 pages of stuff to read before we can even
14  rule on a 12(b)(6) motion.

15        So that was my rant.  If each side thinks the
16  appendices are within the spirit of that Fifth Circuit case
17  that says these items go to the heart of the complaint, the
18  claims articulated in the complaint, then I'll consider it all.
19  So are you both --

20        MR. SBAITI:  Your Honor, if I may --

21        THE COURT:  -- conceding to that?

22        MR. SBAITI:  If I may, Your Honor --

23        MR. MORRIS:  No, Your Honor.  The point I was
24  making --

25        THE COURT:  Okay.  One at a time.  One at a time.  So

APP_448

1  I'll let Mr. Sbaiti --

2          MR. MORRIS:  -- with respect to the defendants'

3  exhibits --

4          THE COURT:  -- since he --

5          MR. MORRIS:  -- Your Honor --

6          THE COURT:  Okay.  Mr. Sbaiti, do you agree or not

7  agree that the Court can consider these exhibits of defendant?

8          MR. SBAITI:  Yeah, Your Honor.  Your point went to

9  the heart of my reservation of rights to argue relevance.  I

10 think a lot of the exhibits they've attached and what we've

11 attached are relevant to the judicial estoppel argument because

12 I think that's something we do have to look outside the

13 complaint to look to whether judicial estoppel was there.

14          I don't think those exhibits are relevant to the

15 other issues.  That's the heart of my reservation.

16          MR. MORRIS:  And I would agree with that, Your Honor.

17 I was going to actually make the exact same point.  So --

18          THE COURT:  Okay.

19          MR. MORRIS:  -- there you've got (indiscernible)

20 agreement on the admission of the exhibits, but on the scope.

21          MR. SBAITI:  Yeah.

22          THE COURT:  Okay.  Got it.  So you both agree to all

23 of your exhibits with the understanding that these go to the

24 judicial estoppel arguments.  Yes?

25          MR. SBAITI:  Not all of them.  Exhibits 13 and 14 are

58

1  two agreements that are at the heart of the case that --

2            MR. MORRIS:  I agree with that.

3            MR. SBAITI:  -- at the heart of the matter.

4            THE COURT:  All right.  So with that out of the way,

5  we'll start the timer.  I've admitted these exhibits.

6            You may proceed.

7       (Defendants' Exhibits 1 to 14 admitted into evidence)

8            MR. MORRIS:  Okay.  Thank you, Your Honor.

9            John Morris, Pachulski Stang Ziehl and Jones, for the

10 defendants.

11           Your Honor, I want to begin with just a brief

12 background.  Although I know how familiar the Court is with

13 these facts, this entire adversary proceeding arises from the

14 debtor's settlement with HarbourVest.  HarbourVest had a $300

15 million claim based, unfortunately, on misrepresentations and

16 other causes of action.

17           And as the Court is aware, a settlement was a reach

18 that was effectively a rescission of HarbourVest's investment

19 whereby the debtor divided HarbourVest with allowed claims of

20 $80 million, which was their investment amount, a portion of

21 which was in Class 8 and a portion of which was a subordinated,

22 unsecured claim in Class 9.  And HarbourVest surrendered their

23 interest in HCLOF to a wholly owned affiliate of Highland.

24           There's no dispute that CLO Holdco objected,

25 contending that the transfer of HarbourVest's interest was not

APP_450

1 permitted under the members agreement because it violated

2 supposedly its right of first refusal and there's no dispute

3 that after the issue of the ROFR was fully briefed that CLO

4 Holdco did further diligence and thereafter acknowledged that

5 the ROFR did not apply to the circumstances at issue, and they

6 withdrew their objection.

7           Following the withdrawal of CLO Holdco's objection,

8 the Court heard argument, overruled the remaining objections,

9 and approved the 9019 settlement and the settlement was

10 effectuated.  The settlement order expressly provided that the

11 transfer of the HarbourVest interest to the debtor's affiliate

12 could be effectuated "without the need to obtain the consent of

13 any party or to offer such interest first to any other investor

14 in HCLOF."  And while that order is the subject of an appeal

15 pending in the Fifth Circuit right now, it wasn't appealed for

16 purposes of challenging that provision.

17           A couple of months later, the plaintiffs brought this

18 action with new counsel and a new trustee.  Your Honor may

19 recall that shortly after the HarbourVest settlement, Grant

20 Scott left the trustee, and John Kane, his lawyer, was

21 terminated as well to be replaced by Mr. Patrick and

22 Mr. Sbaiti.

23           And they commenced this action originally in the

24 district court.  And in substance, there's really two issues

25 that underlie the entirety of the complaint.  Number one, the

APP_451

60

1  plaintiffs allege that the debtor had a legal obligation to

2  offer the HarbourVest interest to the plaintiffs before

3  effectuating the transfer.  We'll show in a few minutes that

4  the plain and unambiguous terms of the two agreements I just

5  pointed out, Exhibits 13 and 14, the very agreements that

6  plaintiffs rely upon, prove that no such duty existed and no

7  such duty exists under federal law or fiduciary duty for this

8  particular transaction because of the nature of the parties'

9  agreements.

10       The second issue that underlies the complaint is the

11  allegation that Mr. Seery received inside information in

12  December, 2020, and therefore, knew or should have known, the

13  $22.5 million value be placed on HarbourVest's interest was, I

14  think the words used in the complaint are, "off the mark."

15       Rest assured, Your Honor, if Highland is ever

16  required to do so, Highland will prove that these insider

17  trading allegations are absurd.  But we understand the law.  We

18  understand that for purpose of a motion to dismiss, the Court

19  must accept the allegations as true.

20       But at the end of the day, Your Honor, since Highland

21  had no legal or contractual obligation to make this transaction

22  available to the plaintiffs, the valuation is completely

23  irrelevant.  It really doesn't matter because there's nothing

24  for the plaintiffs to rely upon at the end of the day if they

25  had no ability to participate in the transaction.

APP_452

1          Based on these two issues, Your Honor, plaintiffs

2    have conjured up five separate causes of action, breach of

3    fiduciary duty, breach of the members agreement for the ROFR,

4    negligence in regards to Mr. Seery's testimony about the sales

5    price, and the failure to give plaintiffs the opportunity to

6    buy the asset.  There is a RICO claim, of course, and there's

7    tortious interfere.

8          Procedural history, very briefly, Your Honor.

9    Highland, as Mr. Demo described, moved to dismiss on

10   substantive grounds, as well as on grounds of collateral and

11   judicial estoppel.  Ultimately, this Court granted the motion

12   on collateral and judicial estoppel and stated that while it

13   was inclined to agree with the defendants on the substantive

14   points, it simply refrained from addressing the motion to

15   dismiss on 12(b)(6) grounds really for purposes of judicial

16   economy.

17         The plaintiffs appealed that final order.  After

18   determining that collateral estoppel did not apply, the

19   district court affirmed this Court's findings on the first two

20   elements of judicial estoppel, but remanded on the sole issue

21   of whether the plaintiffs' inconsistent positions was

22   "inadvertent" and really the only issue that the Court sent

23   down here, and here we are.

24         Let me begin with Counts 2 and 5 and the matter that

25   the district court referred back to the bankruptcy court,

APP_453

62

1  judicial estoppel.  The only issue is whether the inconsistent

2  positions are inadvertent.  CLO Holdco, as I mentioned and as

3  the Court knows, withdrew its objection to the 9019 motion

4  based on the ROFR with the advice of very sophisticated

5  counsel, John Kane.

6          Mr. Kane's statements to the Court provide all the

7  evidence that's needed to show that CLO Holdco's decision to

8  withdraw the objection based on the ROFR was deliberate,

9  intentional, and made on a fully informed basis.

10         Ms. Canty, if you can put up Slide 1.

11         I'm putting up on the screen, Your Honor, just an

12 excerpt of Mr. Kane's presentation to the Court where he said,

13 among other things, that CLO Holdco has had the opportunity to

14 review the reply briefing.  After doing so, has gone back and

15 scrubbed the HCLOF corporate documents.  They analyzed

16 Guerensey law and some of the arguments of counsel in those

17 pleadings and they reviewed appropriate documents.

18         And after doing all of that work, Mr. Kane informed

19 the Court that he had obtained the authority from his client,

20 Grant Scott as the trustee for CLO HoldCo, to withdraw the CLO

21 Holdco objection based on "the interpretation of the member

22 agreement."

23         You can take that down now.

24         Plaintiffs can't refute this, right?  There's nothing

25 to refute.  Those words are clear as day.  The decision to

63

1   withdraw was informed.  It was deliberate.  It was purposeful.

2   And it was consequential.

3        Instead, new counsel makes arguments concerning

4   basically the state of mind of Mr. Scott and Mr. Kane that not

5   only have no factual basis but really are not plausible at all,

6   right?  If they wanted this Court to know what Mr. Scott or

7   Mr. Kane thought, perhaps they should have had them submit some

8   evidence into this.  They didn't do that.  They didn't do that,

9   and instead, they speculate as to what they would have done if

10  they were in their shoes.  That's not proper here.

11       They argue first that the claim now is that Highland

12  breached the members agreement, a claim that Mr. Kane and

13  Mr. Scott were apparently unaware of since they only waived the

14  objection with respect to HarbourVest's obligations under the

15  agreement.  So this is their first argument that it was

16  inadvertent because they didn't know.

17       There's no evidence that they didn't know, but that's

18  their argument.  Simply an argument that they made by new

19  counsel on behalf of a new trustee with citation to nothing.

20  More importantly, Your Honor, the district court has already

21  held that CLO Holdco "made clear in the withdrawal of its

22  objection that it no longer disputes the other party's

23  interpretation of the right of first refusal, which now forms

24  the basis of Charitable DAF's second and fifth causes of

25  action.  That's at Page 16 of the Court's order.

1    The district court's holding that CLO Holdco's

2  position applied to all parties was correct.  It's the law of

3  the case and cannot be overcome by new counsel's speculative

4  musings.

5    Second, plaintiffs speculate that quote, and this is

6  I think on Page 9 of their opposition, "But for the

7  misrepresentation, Holdco would not have withdrawn its

8  objection.  It would've made a more robust objection to the

9  settlement or sought a different path."  This argument fails

10  for at least the following reasons.

11    Again, there's absolutely no evidence to support it.

12  It's simply an argument made by new counsel on behalf of a new

13  trustee with citation to nothing.  But more troubling to me,

14  Your Honor, is it suggests that Mr. Kane would have engaged in

15  unethical conduct.  We know what he told the Court.  We know

16  that he concluded that his clients couldn't rely on the ROFR to

17  prevent the transfer.  That's what he told you.

18    Even the plaintiffs don't contend that valuation is

19  relevant to determining whether ROFR applies.  It doesn't.  The

20  ROFR applies or it doesn't, and it has nothing to do with

21  value.  And yet, we're told today that counsel wants this Court

22  to find that even though the legal analysis would not change at

23  all, Mr. Kane would have pressed the objection or done

24  something different, even though he concluded it was without

25  merit based on a representation that has absolutely nothing to

APP_456

1   do with the ROFR.  I don't think that's proper.

2        I don't think the Court should find that Mr. Kane,
3   having concluded that the ROFR applied, would have told the
4   Court that it did simply because you have to accept the
5   misrepresentation claim as true.  It's not a particularly
6   credible argument.  (Indiscernible), Your Honor, that the
7   purpose of judicial estoppel is to protect the integrity of the
8   judicial process by "preventing parties from playing fast and
9   loose with the courts to suit the exigencies of self-interest."

10       The evidence conclusively establishes that based on
11  Mr. Kane's thoughtful advice and analysis, after due
12  deliberation, that CLO Holdco knowingly and intentionally
13  acknowledge that the ROFR and the members agreement did not
14  preclude the HarbourVest transaction to an affiliate of the
15  debtor.

16       The Court should protect the integrity of the
17  judicial process, reject plaintiffs' attempts to play fast and
18  loose, and dismiss Counts 2 and 5 on the ground of judicial
19  estoppel.

20       Having said all that, it's kind of easier on a
21  certain level, although I think that's pretty black and white.
22  If you just look at Mr. Kane's own words, it's really easy to
23  dismiss both counts on the merits.  Even if Count 2 wasn't
24  barred by judicial estoppel, it must be dismissed for failure
25  to state a claim upon which relief can be granted.

APP_457

66

1              And if we can put up Slide 2, please.

2              Let's take a look at the members agreement, Your

3   Honor.  This is the members agreement.  It's Defendant's

4   Exhibit 13.  We're looking at Sections 6.1, 6.2.

5              Section 6.1 of the members agreement expressly

6   provides that members shall not transfer their shares other

7   than to an affiliate of an initial member party hereto without

8   getting consent.

9              So if a member wants to transfer their shares to an

10  affiliate of an initial member to this agreement, they don't

11  have to get consent.  They can do it whenever they want.  And

12  there is no dispute that HarbourVest was a member.  And there's

13  no dispute that the transfer was to an affiliate of Highland

14  who was an initial member and party to this agreement.  So I

15  don't think there's any argument at all that HarbourVest had

16  the ability to transfer its interest in HCLOF to an affiliate

17  of Highland.

18             6.2 is the ROFR, okay.  So what we've done is we've

19  highlighted the portion that I think applies here.  Prior to

20  the transfer, prior to making any transfer, and that's where

21  the parenthetical really ends the whole discussion.  Other than

22  transfers to affiliates of an initial member, a member must

23  first offer to the other members the right to purchase the

24  shares.

25             So the obligation, the ROFR, by the plain unambiguous

APP_458

67

1  terms of the agreement simply does not apply to transfers to

2  affiliates of an initial member.  Again, this was a transfer in

3  the settlement to an affiliate of an initial member.  In this

4  instance, Highland.  This is the parties' agreement.

5         Highland and HarbourVest had every right under this

6  agreement to do this transaction.  They had no obligation to

7  offer it to the plaintiffs or to anybody else.  That's what the

8  plain terms say.  So while we think they should be estopped,

9  judicially estopped, from making the arguments and pursuing

10 these claims, they fail on the merits anyway.  And these

11 Counts 2 and 5 should be dismissed with prejudice because

12 there's nothing they can do to rewrite this agreement.  There's

13 no way around it.  The agreement says what it says.  The

14 parties are bound by it.

15        Let's turn to Count 5.  We can take that down.

16        Count 5 fails to allege a plausible plan for tortious

17 interference, and that's kind of simple because the tortious

18 interference here is that Highland allegedly interfered with

19 CLO Holdco's rights under Section 6.2 of the management

20 agreement.  As we just saw, it did not.  It could not.  It had

21 no obligation.  It simply had no obligation.

22        Let me state it differently.  CLO Holdco had no right

23 to participate in this transaction.  They had no right of first

24 refusal and there was no right in the contract otherwise

25 because they cite exclusively to 6.2.  There's no right

1  otherwise that the plaintiffs rely upon as a right that

2  Highland tortiously interfered with.

3       So since 6.2 did not provide CLO Holdco with a ROFR

4  under these particular circumstances, Highland could not have

5  tortiously interfered with it.  Stated differently.  There

6  can't be a cause of action for tortious interference with a

7  contractual right that never existed.  No amendment changed

8  that.  Count 5 should be dismissed with prejudice.

9       Count 4 fails to state a cause of action for RICO.

10 Plaintiffs allege that defendants are liable under RICO.  The

11 defendants move to dismiss this count because there is no

12 plausible cause of action for at least the following reasons.

13      RICO claims can't be predicated on Securities Law

14 violations.  Allegations concerning mail and wire fraud were

15 not stated with particularity and otherwise fail to meet the

16 heightened pleading requirements under Rule 9(b).

17      Plaintiffs fail to plead a pattern of racketeering

18 activity, nor could they since, based on the pleading, the

19 entire complaint is based on a singular statement during the

20 9019 hearing concerning a singular transaction with no

21 suggestion that there would or could be a continuing or future

22 threat.  So you don't have a pattern of racketeering activity.

23      They fail to state a cause of action because they

24 fail to plead that the RICO association in fact enterprise.

25 They fail to plead causation.  And here's the thing, Your

69

Honor, this is really simple, they didn't contest any of this.
Plaintiffs did not file a substantive response to the motion to
dismiss on RICO.

Instead, at the end of their pleading, at Page 23,
they purport to move to dismiss the RICO claim "at this time,
pursuant to Rule 41, while purportedly reserving the right to
bring the claim at some future time."  Your Honor has heard
this playbook before.  We heard it in HCRE.  We heard it with
claims that have been withdrawn.  You know, don't rule on this
because we want to save it for another day.  They can't do
that.  The Fifth Circuit has said you can't do that.  That's
not what Rule 41 is about.

Their so-called motion on Page 23 is improper for at
least the following reasons.

It doesn't comply with Bankruptcy Rule 8013(a)(2)(A)
because it fails to state with particularity the grounds for
the motion and the legal argument necessary to support it.

Rule 41(a) is made applicable to this adversary
pursuant to Bankruptcy Rule 7041.  The title of that rule, Your
Honor, is "Dismissal of Adversary Proceedings."  Neither the
title of the Rule nor the substance of the Rule concerns,
addresses, or permits the dismissal of individual claims.

The same is true for Rule 41 itself.  It is titled,
"Dismissal of Actions."  Section (a), which the plaintiffs rely
upon, states "Plaintiff may dismiss an action without a court

1  order under certain circumstances."  That's not what they're

2  trying to do here.  They're trying to dismiss a singular claim.

3         Even if they had complied with 8013, and they didn't,

4  they have no right to do that under Rule 41.  You don't have to

5  take my word for it, Your Honor, we cite it in our brief.  The

6  Fifth Circuit's decision in National Horsemen's.  It's in

7  Paragraph 1 of our reply.

8         The Fifth Circuit said very clearly that Rule 41(a)

9  does not allow for the dismissal of individual claims, right.

10  If they wanted to dismiss an individual claim, they had to

11  amend their pleading and proceeded under Rule 15, and we would

12  have had the opportunity to say they can't do this unless it's

13  without prejudice -- you know, unless it's with prejudice,

14  right.

15         We would have argued hard that all of these issues

16  should be pled together, that there is no basis to with

17  withdraw it to save it for another day.  It would be, you know,

18  it would wreck havoc on the judiciary.  You'd be trying the

19  same case in multiple forums at multiple times.  They didn't do

20  that.  They went under Rule 41(a).  The Fifth Circuit has said

21  you can't do that.

22         So the dismissal of this claim, the RICO claim,

23  should be with prejudice.  There is no plausible claim that can

24  be alleged under the circumstances.  There is no defense to the

25  motion to dismiss.  There is no substantive defense.  They'll

71

1  never be able to plead a pattern of racketeering.  We know what

2  the factual predicates are here.

3        It's the HarbourVest settlement, a singular

4  transaction that occurred over a matter of weeks with no

5  continuing or future, you know, harm that could ever be done.

6  That's the claim that they have.  So this cause of action, too,

7  should be dismissed with prejudice.

8        Negligence, Count 3, should also be dismissed with

9  prejudice.  Count 3 alleges that Mr. Seery negligently valued

10  HarbourVest's interest in HCLOF.  They fail to give plaintiff

11  the opportunity to purchase the interest.  This count should be

12  dismissed with prejudice for the following reasons.

13        Number one, of course, Highland's plan of

14  reorganization exculpates the debtor for claims of negligence

15  arising from the administration of the estate.  That part of

16  the confirmation order has been specifically affirmed by the

17  Fifth Circuit Court of Appeals.  I can't think of a better

18  example of a debtor administrating the estate and resolving

19  claims.

20        If there's one thing that I know a debtor does, and I

21  know a debtor does many things, but there's no dispute that one

22  of the -- there's one thing debtors must do to administer the

23  estate is to resolve claims.  So the exculpation provision bars

24  Count 3.

25        They suggest somehow that the defense should be

72

1  stricken because it was raised previously and therefore waived.

2  I'm not sure what that means, but there's no evidence.  There

3  will never be any evidence that Highland ever knowingly,

4  intentionally, you know, relinquished their protection from

5  negligence claims arising from the administration of the

6  estate.  The plan's exculpation clause really should end this

7  inquiry.

8          But there is more if Your Honor needs it.

9          The plaintiffs also refer to the Advisers Act to

10 contend that it imposes a duty of care and loyalty.  You heard

11 Mr. Sbaiti say that earlier under Section 206.  This is their

12 argument.

13         You know, he did refer to some case out there that

14 said otherwise.  And he's right and he should know that because

15 it's his case.  He brought the case on behalf of NexPoint from

16 Mr. Dondero, the Southern District of New York, against Josh

17 Terry and Acis.  It's the case that we've cited in our brief.

18         And last summer, the Southern District of New York,

19 who probably does have a lot of experience with Investment

20 Adviser Act claims, said "No private right of action under

21 206."  Plain and simple.  They cited to Transamerica.  They

22 quoted Transamerica.  They said the Supreme Court held there

23 that there is no private right of action under Section 206.

24 Transamerica made no distinction between investors or the fund.

25 It unequivocally held that there is no private right of action

APP_464

73

1    under Rule 206.

2           But there's more because there's always more.  In the

3    advisory agreement, there's a very explicit separate

4    exculpation clause that the DAF agreed to.  And if we can put

5    up to the screen Slide 3.  And I will admit, Your Honor, this

6    is not in our brief.  But this is the document that the

7    Plaintiffs are relying upon.  This is the advisory agreement

8    that they contend, you know, imposes duties on Highland.

9           I'll wait for Mr. Sbaiti to explain his views as to

10   this agreement, but the Court has to consider the four corners

11   of the agreement.  It is the principal -- one of the principal

12   basis for the whole lawsuit.  And in Section 11, the DAF agreed

13   that to the fullest extent permitted by law, no covered person

14   shall be liable, general partner, or the Fund, or any of its

15   subsidiaries including CLO Holdco.

16          I heard Mr. Phillips say that somehow CLO Holdco is a

17   beneficiary under this agreement.  Well, if they are, they've

18   also exculpated Highland for any reason whatsoever, less the

19   act or omission constituted willful misconduct or gross

20   negligence.  They can't bring their own agreement.  And it's

21   funny, Your Honor, because think about the context in which

22   this agreement is drafted.

23          This agreement is drafted by Mr. Dondero's company,

24   Highland, who's going to provide advisory services to his own

25   Donor Adviser Fund, the DAF.  This is his agreement.  I want to

APP_465

74

1  hear why it doesn't apply.  I want to hear why this exculpation

2  provision doesn't preclude a negligence claim.  It absolutely

3  does.

4          Finally, the negligence claim could never be

5  plausible in any event, because the Plaintiffs didn't have a

6  right of first refusal.  We saw that they reached an agreement

7  with Highland that said they were not going to get a right of

8  first refusal if there's a transaction between affiliates of

9  initial members.

10         And so if you have agreed that that conduct is

11  permitted, you cannot plausibly assert a cause of action that

12  says you were negligent in executing that same contract.  And

13  by the same token, the whole concept of oh, they misstated the

14  value.  Also irrelevant, because the valuation has nothing to

15  do with any rights that the Plaintiff has.  There's nothing for

16  them to rely on.

17         HarbourVest maybe.  You know, HarbourVest would have

18  a complaint.  I haven't heard from them on that point, although

19  I speak to from time to time.  But Plaintiffs have no standing

20  here.  They have no interest.  There's no reliance.  Whatever

21  Mr. Seery said about value, the Court can accept as true.  All

22  the allegations in the complaint, it is a big so what.

23         Finally, the fiduciary duty issue.  That also must be

24  dismissed.  Count 1 is for breach of fiduciary duties.  It's

25  premise are the exact same facts; insider trading,

APP_466

75

1 misrepresentation, or the concealment of the true value of

2 HarbourVest's interests and the diversion of the investment

3 opportunity.  This count must also be dismissed with prejudice.

4 To be clear, as a matter of law, the Defendants never owed a

5 fiduciary duty to CLOF -- CLO Holdco.

6        HCF as the adviser, is a wholly-owned affiliate of

7 the debtor and it serves as the portfolio manager of HCLOF, but

8 it is black-letter law -- and this is gold standard, you heard

9 Mr. Demo refer to it earlier -- that there is no fiduciary

10 relationship between a Fund adviser and the funds investors.

11        The relationship is between the Fund adviser and the

12 Fund.  That's who the agreement is with.  That's who they

13 serve.  They all take direction from Fund investors.  They have

14 no obligation to listen to Fund investors.  And as Mr. Demo

15 cogently pointed out, think about the chaos that would result

16 if Fund advisers owed fiduciary duties to each of the Fund's

17 investors.

18        To the extent that the Plaintiffs allege that the

19 fiduciary duties are owed by Highland to the DAF under the

20 Investment Advisers Act, I'd again point out, Your Honor, there

21 is no private right of action under the Investment Advisers Act

22 to enforce violations of Rule 206, which is the only thing that

23 the Plaintiffs have pled.  There is no viable remedy.  You

24 can't bring a claim for damages as they're trying to do here.

25 That's the holding of the Supreme Court in TransAmerica.  And

76

1  that's the holding in Mr. Sbaiti's <u>NexPoint</u> case from the

2  Southern District of New York.

3          But here's the thing.  Even if a fiduciary duty

4  existed, they still can't plead a plausible cause of action.

5  Why?  Because Highland owes no duty to CLO Holdco as an

6  investor in HCLOF.  None.  Even if it did, Highland complied

7  with the members agreement governing HCLOF.  They were

8  permitted to do this transaction.  How can you breach your

9  fiduciary duty by complying with the very agreement that the

10 Plaintiff is a party to?  They can't.

11         Second, Highland had an investment advisory agreement

12 with the DAF as Mr. Demo conceded.  It does give rise to

13 fiduciary duties.  But what are the obligations?  To make a

14 full and fair disclosure of potential conflicts of interest.

15 And what did Highland do under the direction of Mr. Dondero?

16 He did exactly that.  Right?  Mr. Dondero is always looking out

17 for Mr. Dondero.  And he's got to live with the consequences of

18 that now, even though he's not in control of Highland.

19         And here's the thing.  Mr. Dondero knows that because

20 Dugaboy made the exact same argument that Mr. Sbaiti is making

21 here.  He did it in connection with the UBS settlement.  Your

22 Honor, will recall that Dugaboy objected to that settlement.

23 They appealed that settlement to Judge Starr.  It wound up in

24 front of Judge Starr in the District Court.  And he heard the

25 exact same argument that these folks are making here.

1           Dugaboy argued that Highland, that's Multi Strat's

2    investment manager, had fiduciary duties that could not be

3    waived, right?  We hear Mr. Sbaiti say that.  Unwaivable

4    fiduciary duties could not be waived.  But Judge Starr found

5    that the applicable provision, and I'm going to quote from it

6    here, this is the Dugaboy decision that we've cited in our

7    brief.

8           He said, "It's true that the Act prohibits any

9    provision binding any person to waive compliance with any

10   provision of the Act, but that provision stands for the

11   proposition that general waivers of the Investment Advisers Act

12   protections will not be enforceable."  It says nothing about

13   whether a fiduciary duty beneficiary, such as the Plaintiffs

14   here, gave informed consent to a specific scheme.

15          So the notion that the fiduciary duties somehow can

16   never be waived, it's not true, right?  Take Judge Starr's word

17   for it.  He's in the District Court, right.  The same court

18   that these guys think would be a more appropriate forum to hear

19   these very sophisticated issues.  Judge Starr said no.

20   Dugaboy, you're absolutely wrong.

21          Judge Starr found specifically in the conflict of

22   interest section in the Multi Strat private placement memo,

23   evinced informed consent that Highland might resolve issues in

24   a manner inconsistent with the interests of Multi Strat's

25   investors.  Highland was allowed -- Highland had complete

78

1   authority to settle or compromise suits on behalf of Multi

2   Strat without notice, without seeking anybody's prior approval.

3          He went through in detail and quoted some of the

4   conflict of interest language.  The same result hold here.

5   Let's take a look at the advisory agreement and see the

6   conflict of issues that were disclosed to the Plaintiffs here.

7   If we can put Slide 4 on the screen.

8          So Slide 4, this is Exhibit A, again to the advisory

9   agreement.  It's Exhibit 14, and they've got a whole section.

10  It goes on for a couple of pages, Your Honor, called potential

11  conflicts of interests.  And it says that the Highland Group

12  can age in transactions whether or not such vendors are

13  competitive with the Fund.  The Fund here is the DAF.

14         "The Fund will be subject to a number of actual and

15  potential conflicts of interest involving Highland, including

16  among other things, that Highland may actively engage in

17  transactions for the same securities saw by the Fund and may

18  compete with the Fund for investment opportunities, or may hold

19  positions opposite to positions maintained by the Fund."  If we

20  can go to the next slide, because it continues.

21         "Highland Group Trading as part of its regular

22  business, the members of the Highland Group may hold, purchase,

23  sell, trade, or take other related actions for their own

24  account.  The members of the Highland Group will not be

25  restricted in their performance of any services or in the types

79

1 of debt or equity investments, which they may make."

2        And this is the most important part here.  In

3 connection with those activities, "The members of the Highland

4 Group may hold, purchase, sell, trade, or take related actions

5 in securities or investments of a type that may be suitable to

6 investments for the Fund.

7        "Members of the Highland Group will not be required

8 to offer such securities or investments to the Fund or provide

9 notice of such activities to the Fund."  In other words,

10 Highland could enter into this -- this is the party's

11 agreement.  This is exactly what Judge Starr said was

12 permitted.  Informed consent.

13        This is Mr. Dondero talking to Mr. Dondero.  It's his

14 company talking to his Donor Adviser Fund, and he's talking to

15 himself, and he's saying, okay, look, I may -- I'm going to be

16 able to do whatever I want.  And don't worry.  You know, it may

17 conflict with you.  But if I want to look out for this guy,

18 I'll look out for this guy.  I want to look out for that guy,

19 I'll look out for that guy.  I'm not going to tell you.  I'm

20 not going to give you the opportunity.  This is the agreement

21 that he struck with himself.  He may not like it today.  But

22 that's the agreement that he struck with himself.

23        Through these provisions, Highland has made full

24 disclosure about potential conflicts of interest.  DAF, a

25 fiduciary duty beneficiary, to use Judge Starr's term, gave its

1  informed consent to a specific scheme.  It was not a general

2  waiver of the IAA's protections.  That would be wrong.  No

3  general waiver.  That's what Judge Starr said he couldn't do.

4  And that's not what's happening here.  Rather, a specific

5  scheme was agreed upon between Mr. Dondero's company and his

6  donor advised Fund.

7        Finally, let's just look at reality.  There was no

8  corporate opportunity to divest.  Highland didn't buy anything.

9  They settled a $300 million claim.  They structured it at the

10 request of HarbourVest in a manner of rescission.  So they took

11 the investment back, gave the $80 million back in the form of

12 claims.  And that's it.  That's not an opportunity that ever

13 existed for the Plaintiffs or for anybody else.

14        In short, no fiduciary duty to CLO Holdco.  Highland

15 made full and complete disclosure of its conflicts of interest,

16 including expressly stating that Highland could acquire

17 securities without offering them to the DAF or even giving the

18 DAF notice.  At the end of the day, Highland didn't take an

19 opportunity that was ever available to the DAF that they had no

20 right to.  Rather it settled a $300 million claim and

21 transferred its interest as part of the settlement.

22        No amendment can change these facts, Your Honor.

23 There was no private cause of action under the Investment

24 Advisers Act.  Highland owed no duty to CLO Holdco.  Highland

25 fully disclosed the very scheme that purported to settle the

1  HarbourVest claim as it did.  And there was no opportunity that
2  the Plaintiffs could have taken advantage of.  By my count,
3  Your Honor, I'm at 38 minutes, so I'd like to reserve seven for
4  rebuttal.
5          THE COURT:  Okay.  My law clerk confirms 38 minutes.
6          All right.  Mr. Sbaiti?
7          MR. SBAITI:  Thank you, Your Honor.  Your Honor, the
8  -- I'm going for the most part rest on our briefs because I
9  think they deal with a lot of the issues that were discussed.
10 And I'd like to focus on the Advisers Act and the fiduciary
11 duty argument and I'll address Mr. Morris' arguments there.
12         The case does begin though with Mr. Seery's testimony
13 at the settlement appeal hearing on January 14th, 2021.  Mr.
14 Morris has that correct.  He testified specifically that the
15 HarbourVest interest in HCLOF was worth 22 and a half million.
16 He also testified that that was the value at the end of
17 November of 2020.  He also testified that that was a fair value
18 for the HarbourVest interest that Highland actually had, and he
19 testified that the value hasn't gone up explosively.  And he
20 said that we think that's good real value.
21         After Your Honor approved the settlement, the DAF
22 discovered two months later that in January 2021, Highland's
23 internal metrics did or should have valued HCLOF under an NAV,
24 a net asset value basis, because these are not totally liquid
25 securities.  And when they went back and did the math

82

1  internally, the net asset value as we pled of those securities

2  at the end of November, would have been about 34 and a half

3  million, not 22 and a half million.  And it would have been

4  closer to $42 million by the time that he was testifying in

5  Your Honor's court.  So we start with that misrepresentation

6  and the case it arises from the outcroppings of the

7  implications of that misrepresentation.

8        One of the things that we looked at is under the

9  Advisers Act is that under Transamerica Mortgage, as I said

10  earlier, it says that violations of Section 206 are actionable

11  under Section 215.  You've heard Mr. Demo and now Mr. Morris

12  say that the Supreme Court has held that Section 206 does not

13  have a private right of action for damages.  And he's

14  absolutely correct.  But that doesn't mean that if there's a

15  violation of Section 206, that you have nothing.

16        What Transamerica Mortgage held, was that there was a

17  private right of action under Section 215 of the Advisers Act

18  for breaches of Section 206.  You do have a private right of

19  action.  And that's one of the ways we believe violations of

20  Section 206 are actionable.

21        The other way we argued that violations of Section

22  206, which does impose fiduciary duties on an investment

23  adviser, purely by virtue of its activities as an investment

24  adviser is that Judge Boyle and other courts, as we cite in our

25  brief, Judge Boyle had a case called Douglas v. Beekley

1  (phonetic).  Held that state fiduciary duty actions can be

2  predicated upon breaches of the fiduciary duties owed under the

3  Investment Advisers Act.

4         Judge Boyle found that, and then we've also cited

5  cases in other jurisdictions that have similarly found.  And I

6  would note that although in the reply, Mr. Morris, or excuse

7  me, Highland takes the position that, you know, we haven't pled

8  a state cause of action.  We actually pled a breach of

9  fiduciary duty and then pled both damages, and

10  discouragement/rescission, the full panoply which are available

11  under both state and federal.

12         And in fact, as you've heard Highland's lawyers say

13  multiple times today that they originally filed their motion to

14  dismiss, and that this new motion to dismiss is substantially

15  similar.  In our response to their original motion to dismiss,

16  we also cited the case law that says that violations of Section

17  206 of the Advisers Act are actionable through state law,

18  fiduciary duty actions, and that's what we've pled.  We didn't

19  limit ourselves to only state or federally available remedies.

20  So I'll concede --

21         THE COURT:  Can I stop you?  Because I'm really hung

22  up on this issue.  If it's actionable, what is the remedy?  If

23  it's not damages, what is the remedy you think is available?

24         MR. SBAITI:  So I do believe damages are available

25  under a fiduciary duty claim under Section -- under the Section

215.  And this is where I was going earlier on.  Section 215
essentially voids either a contract that waives or waives
compliance with the Advisers Act or voids the provisions, but
it also voids the rights of someone who performs a contract in
violation or makes a contract in violation of one of the duties
under the Advisers Act.

And what the Supreme Court said in Transamerica is,
once you have a void right or a void provision, then the
incidences of voidness, which they included to be restitution
or disgorgement, and other courts have construed to mean other
equitable remedies that would happen once you have voided a
right, it could include things like disgorgement, of course,
then you actually have those rights.

And in fact, Judge Boyle's case, Douglas v. Beekley
also addresses the fact that those can be the remedies once the
rights of a violator have been voided under Section 215 of the
Advisers Act.

THE COURT:  So let's take that from conceptual to
these facts.  How would that play out?

MR. SBAITI:  Sure.  So Your Honor, we would argue,
because we're seeking damages for the lost opportunity, or
disgorgement of the asset, and so one of two options could
happen.  Either Highland could transfer the interest in
exchange for, you know, would have an offset, would have an
unjust enrichment right.  DAF I think would owe $22 and a half

APP_476

85

1  million to Highland to compensate for what it paid.  Or we

2  could just get damages under a state cause of action for

3  whatever the potential value is.  I'm not sure what the value

4  of it is stands today.  But that would be the idea.

5          THE COURT:  Okay.  Well, I have to say, and you can

6  either move on or not, I'm very confused.  Because --

7          MR. SBAITI:  Okay.

8          THE COURT:  -- no private right of action -- and you

9  say that just applies to damages -- you know, no private right

10 to damages.  But you can get the remedy of voiding a contract

11 or voiding provisions of the contract.  But somehow at the end

12 of it, you're saying damages or disgorgement?  You want to --

13         MR. SBAITI:  Sure.  Let me be a little bit more

14 specific, Your Honor.

15         If there's a violation of Section 206, the Supreme

16 Court in Transamerica has held that you can seek to avoid the

17 rights of the other party violating Section 206.  And then you

18 can seek the equitable remedies surrounding the voiding of

19 those rights.  That's what Transamerica held.  It held that you

20 can simply walk in and say you violated Section 206.  We want

21 damages.  But you can seek to (indiscernible) the rights of the

22 violator and then seek whatever equitable remedies arise out of

23 that, whatever those may be.

24         The flip side of that, Your Honor, is that as Judge

25 Boyle has held and as other courts have held, is that because

APP_477

86

1  the Advisers Act imposes fiduciary duties, those are formal

2  fiduciary duties recognizable under Texas fiduciary duty law.

3  So I can have a Texas fiduciary duty claim for breach.  And

4  then I get the full panoply of remedies, including damages that

5  are available under Texas law for a breach of fiduciary duty.

6         So in other words, Section 206, and both of these

7  regimes simply provides the duty, the basis of the duty.  It's

8  a federal law imposition of a fiduciary duty.  The violation of

9  that then is actionable through either Section 215, or it's

10  bore by the state or adopted by the state fiduciary duty cause

11  of action.  That's what the case law says that we cite.

12         THE COURT:  Okay.  And again --

13         MR. SBAITI:  I'm hoping I'm answering your question.

14         THE COURT:  Sorry to interrupt.  Maybe you're going

15  to get to this, but --

16         MR. SBAITI:  It's okay.

17         THE COURT:  But the argument very strongly made --

18  vehemently made by Highland is there's no fiduciary

19  relationship to investors, i.e. the DAF.  If you're right, this

20  could only be a tool of CLO Holdco.  You disagree with that?

21         MR. SBAITI:  I do, for a couple of reasons, Your

22  Honor.

23         THE COURT:  Okay.

24         MR. SBAITI:  I can address that.

25         THE COURT:  Okay, go ahead.

APP_478

1         MR. SBAITI:  And if Mr. Morris is correct, they

2    didn't argue the implications of the contract as it would apply

3    to the fiduciary duty.  So I'll address that at the end of

4    these comments, Your Honor.

5         THE COURT:  Okay.

6         MR. SBAITI:  Because I think they're obviously

7    relevant and they've been brought up.  But in terms of simply a

8    matter of federal law, there is a fiduciary duty by Highland to

9    the DAF and its subsidiaries and that's in the agreement that

10   Mr. Morris was going through.  So they can't escape the idea

11   that there's not a fiduciary duty.  Those fiduciary duties

12   arise as a result of Highland performing services as an

13   investment adviser to the DAF.

14        I think what Mr. Morris was arguing is that because

15   that contract waives anything, what anything -- any liability

16   for anything that was less than gross negligence or intentional

17   misconduct.  I think he was arguing that therefore that

18   contract takes away the idea that the fiduciary duties imposed

19   under the Advisers Act, to the extent that they're actionable

20   is negligence.  I think he was arguing that goes away, because

21   that's where I understood his argument to come from.

22        I didn't understand his argument to say there is no

23   fiduciary duty from Highland directly to the DAF.  In fact, I

24   believe Mr. Demo conceded that that fiduciary duty existed

25   because he was trying to show Your Honor how simple of an issue

1  it is and how not complicated it is in terms of for the

2  purposes of the question of withdrawing reference.

3          So you have a direct fiduciary duty from Highland as

4  the DAF's adviser.  You also have a direct fiduciary duty by

5  Highland to Holdco.  Now you've heard them cite a case.  They

6  call it Goldstein.  It's a DC Circuit case.  And what Goldstein

7  held is that you own -- is that an investment adviser only has

8  a fiduciary duty to its client.  And the client is the Fund.

9  It's not the investors in the Fund.

10          And I mentioned this without mentioning the name of

11  the case.  But I mentioned that they had cited cases that deal

12  with Section 206(1) or (2) of the Advisers Act, which Goldstein

13  is a Section 206 -- I believe (2) case.  And indeed, it

14  specifically says Section 206(2) specifically only applies to

15  the clients or the advisers due to its client.

16          So under 206(2), indeed, you have a fiduciary duty

17  only for the Fund.  The part that they miss is that Rule

18  206(4)-8, which I brought up earlier in regards to when I was

19  going through the mechanisms.  That rule was actually passed in

20  response to Goldstein to actually clarify that, no, under

21  206(4), those same duties are going to exist directly to the

22  Fund and its (indiscernible).

23          And that's what I read, Your Honor, the rule and it's

24  -- I believe I read you the statutory -- the actual cite, which

25  is -- get to it again, for Your Honor's record.  And it's in

APP_480

89

1  the CFR.  I believe it's 17 CFR 275.206(4)-8.  And it is very
2  clear.  And if you look at the SEC -- and the SEC passed it, if
3  you look at when they passed it.  They passed it the year after
4  Goldstein.  So Goldstein isn't good law for the provision that
5  there's no fiduciary duty to the investor in a Fund.  It's just
6  not good law at this point.  Nor in any of the other cases that
7  they cite, or that Goldstein backs with the same proposition,
8  because it relies on the wrong part of the statute.  The
9  statute, I should say.

10       So now that we have an agreement that Highland and
11  its subsidiary are the investment advisers to HCLOF, and this
12  provision, this regulation passed by the SEC says there -- the
13  duties under 206(4) actually do apply to the investors in the
14  Fund, and not just Fund itself.  That's the direct investment
15  advisory relationship to Holdco.  So you can get at it either
16  way, Your Honor, under the statute.  And that's kind of the
17  point that we make.

18       And then you look at the other cases that we've
19  cited, and the statutes that we've cited, and they're all
20  basically get to the same provision.  So the math is pretty
21  simple for us on this.  Section 206 of the Advisers Act says,
22  those fiduciary duties, that's what Transamerica and its
23  progeny held.  And Rule 206 defines the scope of Section 206,
24  which includes investors in the managed Funds, which means
25  there's a direct fiduciary duty.

APP_481

1          They hang their hat a lot on the lack of a direct

2   fiduciary duty or the lack of a cause of action for actuating

3   these duties when they've been breached, but they're just

4   simply wrong as a matter of law.  In their reply, Your Honor,

5   they also bring up the argument which we talked about a little

6   earlier, that there is -- they cite the Acis -- NexPoint v.

7   Acis decision for a premise that, you know, therefore, there's

8   no private right of action.  That's actually not what that case

9   held.

10          What that case held is that under Section 215, you

11  could only void -- you can't void someone's performance of an

12  otherwise lawful agreement.  Which is not the issue here.

13  Here, we're saying that an agreement was made in violation of

14  the Advisers Act, because the settlement agreement was

15  predicated on a misrepresentation of fact to the advisers and

16  breached the adviser's duty to cherry-pick for itself the best

17  investments.

18          And if you look at the contract that Mr. -- and which

19  I'll get to now -- look at the contract that Mr. Morris was

20  talking about, right after the provisions he read under the

21  Attachment A specifically says, "It is the policy of the

22  investment adviser to allocate investment opportunities fairly

23  and equitably over time."  And it goes on to say that the

24  considerations -- that's its fiduciary duties -- owed to the

25  accounts, the primary mandate of the accounts.

APP_482

1          In other words, if there are some accounts that are

2    specifically there for certain types of investments, those

3    investments are going to be allocated there.  The capital

4    available to the accounts, restrictions on the accounts and the

5    investment opportunity, the sourcing of the investment, the

6    size, and so on.  It goes through about 11 different

7    considerations.

8          So as a matter of fact, we can argue later whether or

9    not Highland went through those provisions when it decided to

10   take it for itself.  But the most important thing about

11   everything that Mr. Morris read to you about Highland's ability

12   to trade and to do these things, is that the allocation of the

13   investments is amongst its other accounts.  It doesn't get to

14   (indiscernible) it somewhere for itself at the expense of its

15   advisees, number one.

16         And number two, if it does, we would argue that

17   that's void under Section 215(a) and (b), that the Advisers Act

18   doesn't let it -- the Advisers Act imposes duties where it's

19   not allowed to do that.

20         Now he cited anew Judge Starr's decision, which I

21   actually haven't had a chance to read.  I tried to pull it up

22   while he was reading from it, but it just didn't come up and so

23   I don't know what to say about that specifically, what he found

24   or how he relates in any way.

25         I don't have the underlying documents to see whether

92

1  or not it's the exact same language or different.  But the

2  upshot, I believe, of what he said was that by disclosing all

3  of these things that Highland, the person who signed it

4  basically made an agreement that they were going to let

5  Highland do whatever it did.

6         And that was an informed -- that amounted to informed

7  consent except for one thing, that the Advisers Act doesn't let

8  you do it ahead of time.  You have to go through specifically

9  with the actual investment, talk about it just like the

10 provisions in the agreement I was reading from which comes

11 right after Mr. Morris's quotation.

12        And those provisions don't talk about it being ahead

13 of time.  Those considerations have to be done on an

14 investment-by-investment basis.  So it is a general waiver

15 otherwise, if you're not talking about a particular investment

16 and that's all I can really comment on that, Your Honor,

17 because I don't have Judge Starr's opinion or the underlying

18 facts in front of me, unfortunately.

19        Turning back to sort of the core argument, Your

20 Honor, so the alleged breach we have is that Highland as an

21 adviser is liable for cherry-picking and making it, bringing it

22 over to itself.

23        In our brief, we actually cited a Fifth Circuit case

24 that said that's a violation of the Advisers Act and it's not

25 -- again, it's not a waiveable -- it's simply not waivable in

93

1 the way that they've cited.  And the second alleged breach that

2 we have is that Highland failed to disclose the true violation

3 of it, excuse me, the true valuation of the HarbourVest

4 interest.

5       And so the fact that they didn't do those two things

6 and keep the DAF apprised or keep Holdco apprised as the case

7 may be, are two independent and actionable violations -- and

8 I'm making these points in summary -- and that's really what it

9 boils down to is it was an act of self-dealing.

10       The remedy for breach of fiduciary duty is, Your

11 Honor, as is for any loss suffered by the plaintiff.  And I

12 would cite, I would refer Your Honor, for example, to the cases

13 we cited, but also to Hsin-chi-Su v. Vantage Drilling, for

14 example, 474 S.W.3d 284, which also says, under state law

15 disgorgement of profits is an equitable remedy appropriate when

16 a party has breached his fiduciary duty; its purpose is to

17 protect relationships of trust by discouraging disloyalty.

18 We've got both state and now federal remedies, including a

19 panoply of possibilities for violations of breaches of

20 fiduciary duty.

21       Turning to, Your Honor, to some of the arguments that

22 were made by Mr. Morris regarding these, the argument that they

23 make about, excuse me, about Section 215 not having a, having a

24 viable cause of action -- and like I said, the argument's

25 incorrect.  It is a viable cause of action -- I admit it is a

1  limited cause of action.

2          It's limited to declaring a provision or a right void

3  and then, you know, crafting an appropriate remedy that arises

4  out of that.  But it doesn't mean that there's no cause of

5  action.

6          And I've seen no case cited by them, and I've looked,

7  and I haven't seen a case saying that a Texas or a state

8  fiduciary duty action cannot be predicated on the breach of a

9  federally imposed fiduciary duty, which is what (indiscernible)

10 actually held.

11         Interestingly, Your Honor, twice, at the beginning

12 and at the end of his colloquy, Mr. Morris said that the

13 settlement was essentially a rescission of the HarbourVest

14 investment in HCLOF, a rescission to Highland.  The problem

15 with that language and maybe it is a rescission, but I don't

16 see how it could possibly be because we actually pled the

17 background of that transaction.

18         And the background of that transaction is that HCLOF

19 was a hundred percent owned by Holdco, by the DAF, not by

20 Highland.  So if it was a rescission then the shares should

21 have gone back to the DAF or Holdco.  They shouldn't have gone

22 to Highland if that's how they were going to treat it.

23         And I believe he makes that argument because he

24 wanted to show that it's just not a big deal that this is

25 simply a way to settle the case, and I can see that.  This

1  lawsuit is not about unwinding the HarbourVest settlement to

2  drag them back in here and undo and unscramble the egg.

3       But that doesn't mean that there aren't specific

4  equitable remedies that Highland had, excuse me, that the DAF

5  or Holdco had vis-a-vis Highland because of the breaches of

6  fiduciary duty.  The fact that he admits that it's a rescission

7  action but it was rescinded to the wrong party, I think, is

8  very telling.

9       I'll briefly touch upon the other arguments, Your

10  Honor.  I think, I don't think I need to use all 45 minutes.  I

11  think these arguments are pretty well laid out in our brief.  I

12  think the law is pretty well laid out in our brief as much as

13  they want to argue that, you know, that we're just misstating

14  it.

15       When he says Highland owes no duty to Holdco, I think

16  I've addressed that.  But he also says, well, how could there

17  be a breach of fiduciary duty when Highland was complying with

18  the agreement that Holdco agreed to, and I believe he's talking

19  about the membership agreement.  But we have two different

20  readings of the membership agreement, which is why I don't

21  think it's appropriate to dismiss at this stage.

22       The reading that Highland wants you to adopt is that

23  when it says in 6.1, no member shall sell its shares other than

24  to an affiliate of an initial member, thereto, without the

25  prior written consent of the portfolio manager, and then it

APP_487

goes on in 6.2 to say you have to offer it to another member,
highland wants you to read that as saying that well, then you
can only sell, as long as you don't sell to your own affiliate,
which is how we read it, then you're in the clear.

But if you actually look at the way it's constructed,
it's the member selling to its own affiliate that was supposed
to be carved out.  So Holdco might be able to sell to its own
affiliate.  That was the purpose and intent, otherwise it
really doesn't make any sense that a member has to offer it to
another member unless it sells to another member's affiliate.

It's actually kind of an absurd reading that Highland
wants you to adopt.

THE COURT:  You're going to have to repeat that.  I
got very lost during that.

MR. SBAITI:  Oh, sure.  Would it help if I bring it
up, Your Honor?

THE COURT:  It would be helpful if it was on the
screen again, but if you could --

MR. SBAITI:  May I share my screen, Your Honor?

THE COURT:  Absolutely.

MR. SBAITI:  Do you see the contract, Your Honor?

THE COURT:  I do.

MR. SBAITI:  I just want to make sure I -- where it
says "no member," so it's this language, Your Honor, that we're
looking at, 6.1 and then down here, 6.2.  And I'll just -- so

97

1  6.1 first says, "no member shall sell, pledge, charge,

2  mortgage, assign, assign by way of security transfer."  And it

3  goes on "other than to an affiliate of an initial member party

4  thereto without the prior written consent of the portfolio

5  manager."

6         That exclusion which also exists in 6.2, prior to

7  making any transfers of shares other than transfers to

8  affiliates of an initial member, or in the case of CLO Holdco

9  or Highland, to Highland, its affiliates or another Highland

10 principal, "a member must first offer to the other members a

11 right to purchase the shares."

12        Your Honor, setting aside the judicial estoppel

13 argument, I'm simply talking about the read of this.  What

14 Highland wants you to adopt here is the idea that where it

15 says, "other than transfers to affiliates of an initial

16 member," it's talking about an affiliate of a member other than

17 the one doing the transferring, and that's an absurd read.

18        What it means, they way they read it, it means that

19 if I'm CLO Holdco, I can't transfer it to HarbourVest but I can

20 transfer it to a HarbourVest affiliate.  But if I transfer it

21 to HarbourVest, then I have to offer it to the other members.

22 That makes no sense.  There's no reason for that.

23        The better reading, we believe, is that the exclusion

24 is that if I'm Holdco, I could transfer it to my own affiliate

25 without offering it to anybody else because it's basically the

APP_489

98

1  same person sitting in that membership seat.  The same would go

2  for HarbourVest.  HarbourVest can offer it to its own

3  affiliate, but shouldn't be able to offer it to somebody else

4  or their affiliate without first offering it to the other

5  membership pro rata.

6           So that's --

7           THE COURT:  What about that word --

8           MR. SBAITI:  -- the reading in the --

9           THE COURT:  -- "initial member?"  In your example,

10  you said HarbourVest could only transfer it to an affiliate of

11  HarbourVest, but HarbourVest wasn't an initial member.

12           MR. SBAITI:  I actually believe HarbourVest is an

13  initial member to this agreement, Your Honor, because they're

14  actually named up here.  Sorry to scroll.  See, those are

15  there.  I believe all the signatories of this are initial

16  members and I believe that definition is down here.  Sorry to

17  scroll fast.  I'm just trying to find it.  It may not be a

18  defined term here, Your Honor.

19           THE COURT:  Well, I saw HarbourVest.  It's just what

20  you would expect, all the HarbourVest entities, but it wasn't

21  an initial member.  It was not an initial member of HLO or

22  whatever the --

23           MR. SBAITI:  It's an initial member of this --

24           MR. MORRIS:  Your Honor, I believe it is.  I think if

25  you just scroll to the top you'll see they are.  This is the

APP_490

99

1  original document.

2          THE COURT:  They were an initial member?

3          MR. MORRIS:  Yes, they were.

4          MR. SBAITI:  Yes.

5          THE COURT:  Oh.

6          MR. MORRIS:  They are right there.  This is the

7  original agreement.

8          MR. SBAITI:  And they're an original member.

9          MR. MORRIS:  I would agree with that.  So.

10         THE COURT:  Okay.

11         MR. SBAITI:  So anyway, Your Honor, our position is

12 it's -- this is at best an ambiguous contract that would

13 require discovery to go into what that was really supposed to

14 mean.  I know there is a judicial estoppel.  I think that

15 argument's been beaten to death by both sides in the briefing

16 so, you know, we'll rest on our briefing in that issue and, you

17 know, I guess to the extent they are relevant in the exhibits.

18         But, Your Honor, the point of the matter is the

19 agreement, you know, read the way Highland is suggesting just

20 really doesn't make a whole heck of a lot of sense from a

21 practical and common sense standpoint.  I think it's ambiguous

22 as to what that meant, "an affiliate of the initial member."

23         I think it was intend -- we believe it was intended

24 to mean the member doing the transferring can transfer to its

25 own subsidiary, its own affiliate without anybody objecting,

APP_491

1  which makes perfect sense because all of these investment

2  company are, you know, they sometimes need to move investments

3  around.

4          HarbourVest did it.  That's why there's ten, you

5  know, the half dozen of their affiliates that are there, Your

6  Honor.  So, you know, when it comes down to that, I don't

7  really don't have an argument other than that because I think

8  that's the only argument Mr. Morris made on the membership

9  agreement.

10         And I believe the tortious interference argument,

11 specifically, has, you know, has a little bit heightened

12 relevance because of the testimony and because nobody knew what

13 the actual value was until one of Highland's people left and

14 there was a discussion which you have heard about.

15         I believe at one of the hearings there was a

16 discussion where he actually told some of the advisers to the

17 DAF that those values were actually much higher at the

18 (indiscernible).  I think discovery if bears true then there's

19 been a misrepresentation and there should be consequences for

20 those misrepresentations.

21         And nothing in Highland's agreement with the DAF or

22 with HCLOF says that misrepresentations are somehow excused or

23 that those misrepresentations don't rise above the negligence

24 level, you know, to the extent where those are actionable.

25         I don't know if you have any more questions, Your

1  Honor, but that really is the argument, I think.  We rest on

2  our briefs and ultimately we have fulsome argument on a lot of

3  these issues the last time.  So unless Your Honor has

4  additional questions, I'll rest.

5          THE COURT:  I guess a couple of follow-up questions.

6          Okay, I'm zeroing in on the -- what exhibit is this?

7  I think it's Exhibit 6 in your notebook, the amended and

8  restated investment advisory agreement.

9          MR. SBAITI:  Okay.

10         THE COURT:  Paragraph 11, the exculpation, the

11 indemnification, 11B.  I think every single adviser agreement

12 I've seen in my history of dealing with Acis and Highland has

13 had a provision like this, substantially similar if not exactly

14 like this.

15         Is your position that basically even though these

16 provisions are always in investment advisory agreements, this

17 is a meaningless provision?  That you cannot contract around

18 some federal fiduciary duty in the IAA, so any, you know,

19 agreement between sophisticated people that says, you know,

20 we're not going to hold you liable for negligence or any other

21 misconduct, it's just wasted ink on paper.

22         It's not -- it's overridden by the IAA.

23         MR. SBAITI:  Your Honor, I've seen this.  Yes.  I

24 mean in a word, yes.  I think a lot of times these are in

25 boilerplate -- this is boilerplate -- not only in Highland's

1  but in a lot of investment adviser agreements.

2          And one thing you're allowed to do under the IAA is

3  define the scope of your services, what you're going to do and

4  what you're not going to do in terms of the types of

5  investments you're going to advise; whether you're going to be

6  the one to buy them or make the investor go buy them

7  (indiscernible).  There's a whole way to discuss the scope.

8          But within that scope, the Advisers Act is fairly

9  crystal clear in Section 215(a) and (b) that when there is a

10  duty imposed -- and the duties are under Section 206 and

11  elsewhere, by the way.  Section 208(d) says you can't do

12  indirectly what you can't do directly, you know, you can't

13  waive those.

14          It specifically says anything that allows someone to

15  not comply with the Advisers Act is void.

16          THE COURT:  Okay.

17          MR. SBAITI:  And I don't blame investment advisers

18  for putting things, I mean they're not the only ones who put

19  things like this in their contracts to give themselves a

20  fighting chance, I suppose, or to make the arguments that Mr.

21  Morris has made and maybe sometimes they're even successful.

22          But I think the statute is so plain and clear that I

23  don't know how this --

24          THE COURT:  Okay.  My last question was the motion to

25  dismiss the RICO claim that is --

103

1          MR. SBAITI:  Yes.

2          THE COURT:  -- on Page 23 of your response to the

3    motion to dismiss.  What about the argument that you dismiss

4    actions not claims pursuant to Rule 41, this is not a proper

5    procedural mechanism for what you're trying to do here.

6          MR. SBAITI:  Here's how I was thinking about it, Your

7    Honor, when we put that in.  If Your Honor doesn't dismiss the

8    Securities Act claim, essentially the Advisers Act claim, then

9    I think the lead argument that they made because we've pled

10   RICO in the alternative, the lead argument that they made is

11   that if we have an Advisers Act claim we don't have a RICO

12   claim, I think, is correct.

13         So in a world where you uphold the Advisers Act

14   claim, then I think the RICO claim is dismissed with prejudice,

15   without prejudice because we have an actionable Securities Act

16   claim, so I think their lead argument on that was correct.

17         In a world where you dismiss based upon everything

18   because you don't think we have a Securities Act claim, we are

19   asking Your Honor to dismiss that claim without prejudice

20   because we believe there would be other reasons to plead

21   because we do think we can show a, you know, as we argued in

22   response to the first motion to dismiss, there are other things

23   that we think this adviser has done in similar fashion that

24   show a pattern of activity of misleading the activity or

25   violating their duties under state law, for example, but using

APP_495

1 the interstate wires to accomplish that.

2          We do believe we can plead that, but we agreed with

3 their lead argument that if we succeed on Count 1 then we don't

4 have a RICO.

5          THE COURT:  Okay.  But what is the efficiency in

6 taking it out now without prejudice to reasserting it?  Where's

7 the judicial economy and efficiency there?

8          MR. SBAITI:  I guess what we're asking for, Your

9 Honor, is either a dismissal for, well, allowing us to re-plead

10 to meet the other issues that they talked about, which is the

11 further, you know, is there an actual (indiscernible).

12    Rather than brief that all the way, we saw the argument

13 that they've cited which they didn't bring in their first

14 motion, but we saw the argument that they were making, "Well,

15 these two can't co-exist.  You can't have a Securities Act

16 claim and a RICO claim."  We agree.  So if we win our Advisers

17 Act claim, RICO claim goes away.  We agree with that.

18    If we don't though, we should be allowed to re-plead

19 because we disagreed with everything else he said.  I think we

20 do have, we do meet 9(b), but we should have an opportunity to

21 plead the other acts that we believe make this part of a

22 (indiscernible).

23          THE COURT:  Okay, thank you.

24          All right, Mr. Morris, you have seven minutes.

25          MR. MORRIS:  Okay.  To try to get to this as quickly

105

1  as I can, first of all, Your Honor, to the extent that Mr.

2  Sbaiti is suggesting that there is more claims to come, I'll

3  just remind him in court that the administrative bar date

4  passed a year and a half ago.

5          Going to Section 6.1, there is not two readings of

6  this.  There's nothing irrational about the plain words that

7  are on this page.  It says other than to an affiliate of an

8  initial member.  It doesn't say other than to an affiliate.  It

9  says other than to an affiliate of an initial member.

10         And it makes absolute perfect sense.  Just look at

11 the percentages of the interests that were held at the time

12 this agreement was entered into.  HarbourVest had almost but

13 not quite 50 percent and every entity and person controlled by

14 Mr. Dondero, the majority.

15         Mr. Dondero was in control.  He didn't care if, you

16 know, it was never going to happen under his watch that somehow

17 somebody was going to transfer something to HarbourVest.  He

18 was always going to be in control, so it didn't matter to him.

19         It didn't matter to him how among the members it was

20 transferred because the one thing he knew was not going to

21 happen was that he was not going to lose control.  I guess he

22 just didn't foresee the bankruptcy two years later.  But that's

23 perfectly consistent with this.

24         What this provision does say is that we're keeping

25 this in the family.  We're keeping this among ourselves and

APP_497

1   we're not letting anybody in who's not already here.  Because

2   dealing with the people who are already here, he knew he would

3   always be in control and that's perfectly consistent with the

4   way this is drafted.

5        The language is unambiguous, "other than to an

6   affiliate of an initial member."  That is exactly what this

7   transaction did.  It transferred HarbourVest's interests.

8   HarbourVest was a member.  It transferred HarbourVest interest.

9   They sold, they assigned, they transferred, actually, the word

10  is "transfer."

11       HarbourVest is the member who transferred its

12  interest to an affiliate of an initial member.  Highland is the

13  initial member.  Actually, Your Honor had it right before

14  because HarbourVest actually acquired its interest from CLO

15  Holdco, so you were right.  I don't know that HarbourVest was

16  an initial member, but I know Highland was.  I know HarbourVest

17  was a member.  But these provisions say --

18       THE COURT:  Yeah.  And again, I'm not counting -- I

19  had thought it came along, you know, a couple years down the

20  road but, you know, shortly --

21       MR. MORRIS:  You may be right.

22       THE COURT:  -- shortly before the whole Acis.  But

23  anyway, but I guess Mr. Sbaiti's wanting me to read this

24  parenthetical in 6.2 as other than transfers from --

25       MR. MORRIS:  To an affiliate.

1          THE COURT:  -- an initial member to its own

2    affiliate.  And that's, it's not worded that way.

3          MR. MORRIS:  It's not what it says.

4          THE COURT:  Yeah.

5          MR. MORRIS:  It's just not what it says.  It may be

6    what they wish it said today, but that doesn't -- you can't

7    just change a contract to make it say what you wished it did.

8    This is the contract that they drafted.  This is Dondero's

9    contract.

10          It says other than to an affiliate of an initial

11   member.  And it's kind of irrelevant as to whether HarbourVest

12   was an initial member.  The important point is that Highland

13   was an initial member and HarbourVest was a member.  So the

14   member HarbourVest transferred its interest to an affiliate of

15   an initial member.  Period, full stop.  It was permitted under

16   6.1 and the ROFR doesn't apply under 6.2.

17          Number two, next, the concept of rescission is a

18   euphemistic term, okay.  It's not like what Mr. -- because, you

19   know, if Mr. Sbaiti was right and we were trying to undo it and

20   put everybody back to where they were, his clients would have

21   to take on $300 million of liability.

22          You don't just get to take the interest.  The whole

23   thing was part of a transaction.  He forgot the 300 million

24   dollar debt.  Let's go to Section 215.  215 is not anywhere in

25   the complaint, okay, but the important point here is what does

APP_499

1   215 say?

2            If you go back to the Nexpoint case from the Southern

3   District of New York, it says that every contract made in

4   violation of a provision of the Investment Advisers Act shall

5   be void.  Period. Full stop.  It doesn't have other remedies.

6   It doesn't mean that the plaintiffs here get money.

7            In fact, I would argue that they don't even have

8   standing to pursue this under 215.  They are not party to the

9   agreement.  How do they even have the ability to come in?

10  There's no case that Mr. Sbaiti can cite to.  No court has ever

11  said a nonparty to the agreement can come in and somehow try to

12  void it.

13           No case in the history of the world has ever said

14  that a third party who's not party to the agreement cannot only

15  come in and void the agreement but somehow benefit from it.

16  They're nobody.  Like the plaintiffs are nobody here.  The

17  agreement that they signed said that Highland that they didn't

18  have a right of first refusal.

19           The agreement that the court approved was an

20  agreement between Highland and HarbourVest.  If there's a

21  misrepresentation as to the price, maybe HarbourVest has a

22  complaint.  I don't know what their remedies would be.  I'm not

23  saying they do, but they're not here.

24           Who are the plaintiffs?  What on earth gives them the

25  right to come in here and say they should have that contract,

1  they should have that benefit without, of course, the

2  liability?  There's nothing.  It's prohibited under the

3  members' agreement.

4          It's permitted under the advisory agreement.  No

5  fiduciary duty at all.  How can you breach a fiduciary duty

6  when all you're doing is complying with the terms of the

7  parties' agreement?  There's no connection between 215 and 206,

8  like he said.

9          There's no case that's ever said that.  Just take a

10 look at the Nexpoint case from the Seventh District of New

11 York.  It says a plaintiff may only pursue a remedy, may only

12 pursue a claim to avoid the contract, right.  That's all there

13 is to it.

14         And so again, you can't just unwind the portion of

15 the contract that they're really interested in.  You can't just

16 say Highland has to give back its interest.  That means that

17 Highland also has to pay back the 300 million-dollar liability.

18 Where is HarbourVest here?  How come HarbourVest doesn't have

19 notice?  How come -- think about how HarbourVest's rights would

20 be impacted from what the plaintiffs are saying here.

21         They need to be at the table.  They're the biggest

22 party of interest of all.  They thought this was in their

23 rearview mirror.  They wanted to get out of here.  And now

24 we're going to -- you can't just unwind part of a contract.

25 You have to unwind the whole contract.

APP_501

1          This is so much, this is so untenable, Your Honor,

2    that it really needs to be dismissed with prejudice.  I think

3    that's all I have.  I mean there's no -- you know, the remedies

4    that are being suggested now, they're not in the pleading.  But

5    how, I just ask the Court to consider where's HarbourVest?

6          How do you unwind the piece of the transaction and

7    not the only full transaction?  Where does the plaintiff who

8    agreed that it wouldn't have a right of first refusal, who

9    agreed that Highland could pursue transactions on its own

10   without notice of the other side, how do they come in here and

11   try to undo a piece that they want?  They can't.

12         Complaint should be dismissed with prejudice, Your

13   Honor.  Thank you very much.

14         THE COURT:  All right.  Thank you all.

15         Well, I'm obviously going to take this one under

16   advisement and read all of your cases and pleadings.  And I

17   feel like I'm becoming a broken record on that sentence.  Right

18   now let's see where we are under Highland advisements.

19         We have the written ruling I need to do on the motion

20   to conform plan to be consistent with the Fifth Circuit.  We

21   have the HCRE proof of claim trial.  And then we have the

22   motion, the renewed motion to recuse me, and then now we're

23   going to have this, okay?

24         So that's going to be four Highland matters under

25   advisement.  All I can tell you is we've had a brutal December

1  and January with things under advisements, trials, and

2  different court commitments of all different kinds.  So I hope

3  we can have a very productive rest of January and February and

4  March.

5          Inside baseball, judges, they tend to look at March

6  31st and September 30th as important catch-up days because we

7  do these reports of how many things you have under advisement

8  to our circuit courts.  And I'm just giving you that inside

9  baseball to let you know I really anticipate catching up on

10  some of these things before that looming deadline.  But

11  hopefully, hopefully sooner.

12          And, of course, the report and recommendation I

13  should have that out in a few days because I need to get that

14  squared away, I feel like with the district court, especially

15  since a different district judge is now in that loop because of

16  what I think was a mess up between the clerk's offices.

17          So anyway --

18          MR. MORRIS:  They've been pretty good about moving

19  them when we've asked, Your Honor, as well.  So maybe we can

20  file something.

21          THE COURT:  Okay.  All right.  But just circling

22  back, the report and recommendation I should have out in a few

23  days.  But there may be a little bit of waiting on the ruling

24  on the motion to dismiss.

25          All right.  Is there anything else as far as

APP_503

112

1  housekeeping?

2        MR. MORRIS:  Just thank you very much, Your Honor.  I

3  know this was a long day.  We appreciate your diligence, as

4  always, and for your time.

5        THE COURT:  Okay.  All right.

6        MR. SBAITI:  Thank you for your time, Your Honor.

7        THE COURT:  Okay.  Thank you.  We're adjourned.

8        THE CLERK:  All rise.

9     (Proceedings concluded at 4:35 p.m.)

10                    * * * * *

11

12

13              **C E R T I F I C A T I O N**

14        I, DIPTI PATEL, court approved transcriber, certify

15  that the foregoing is a correct transcript from the official

16  electronic sound recording of the proceedings in the above-

17  entitled matter, and to the best of my ability.

18

19  /s/ Dipti Patel

20  DIPTI PATEL, CET-997

21

22  LIBERTY TRANSCRIPTS              DATE: January 26, 2023

23

24

APP_504